UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CLARENCE MACK, | ) | Case No.: 1:04 CV 829 |
| | ) | |
| Petitioner | ) | JUDGE SOLOMON OLIVER, JR |
| | ) | |
| -vs- | ) | |
| | ) | MEMORANDUM OF OPINION |
| MARGARET BRADSHAW, WARDEN | ) | AND ORDER |
| | ) | |
| Respondent | ) | |

**Introduction**

This matter is before the Court upon Respondent Margaret Bradshaw's ("Respondent") Motion to Dismiss for Lack of Exhaustion (ECF No. 76).  For the following reasons, Respondent's Motion is denied.  Rather, the Court will stay this matter and hold it in abeyance to allow Petitioner to return to state court to pursue his unexhausted claims.

**I.      Factual History**

On February 5, 1991, a Cuyahoga County Grand Jury issued a three-count indictment against Mack.  The indictment charged Mack with two counts of aggravated murder, in violation of Ohio Revised Code § 2903.01, and one count of aggravated robbery, in violation of Ohio Revised Code § 2911.01, relating to the murder of Peter Sanelli.  The aggravated murder charges contained the following three specifications: (1) Mack committed the aggravated murder while committing, or attempting to commit, aggravated robbery and either was the principal offender or committed the aggravated murder with prior calculation and design; (2) Mack had previously been convicted of or

1

pleaded guilty to an aggravated felony and was convicted of aggravated burglary and felonious assault; and (3) Mack had a firearm on or about his person or under his control while committing the offense charged.  Mack entered a plea of not guilty on February 7, 1991.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence presented at trial, upon considering Mack's direct appeal of his convictions and sentences:

Peter Sanelli, along with his son Anthony, owned and operated Sandglo Glass and Mirror Company on Prospect Avenue in the city of Cleveland. On January 21, 1991, Thomas Sowell, Reginald Germany, and the defendant-appellant, Clarence Mack, carjacked Mr. Sanelli as he was leaving his business, fatally shooting him and stealing his car.

Mr. Sanelli was last seen around 5:45 p.m. by his son Anthony. At that time, Anthony went home for the day, leaving Mr. Sanelli at Sandglo. Before he left, Anthony gave his father a package of nails that he would need for a job. Mr. Sanelli's body was found around 6:10 p.m. lying in the middle of the parking lot next to Sandglo. Dr. Robert Challener of the Cuyahoga County Coroner's Office later testified that the autopsy performed by Dr. Kalil Jiraki showed that Mr. Sanelli had been shot three times, and died from these wounds. One bullet entered the left side of the victim's face, somewhat below the ear. The irregular entrance wound indicated that the bullet had come in contact with an intermediate object such as glass before striking the victim. The other two bullets were fired into Mr. Sanelli's left shoulder from close range. One of these bullets struck Mr. Sanelli's left lung and tore the sac which surrounds the heart. A pellet with its copper jacket was retrieved from the right sleeve of Mr. Sanelli's undershirt.

Detective Leo Allen investigated Mr. Sanelli's murder. At the scene where the body was found, Detective Allen discovered three nine-millimeter shell casings on the street three to five feet from the curb. A fourth shell casing was discovered on the sidewalk behind the Dome Grille, a neighboring business.

Mr. Sanelli's car, a 1987 light blue or silver Plymouth Horizon with red and white truck license plates, was found around 7:15 p.m. It had been crashed into a utility pole at East 90th and Holton Avenue. The front driver's side window and rear passenger side window were broken out. Anthony Sanelli testified that the car's windows were all intact when he last saw his father before the murder. An apparent bullet indentation was discovered on the rear passenger door, and a bullet hole was found in the back side of the passenger front seat. Part of a copper jacket to a nine-millimeter bullet was found in the car. No fingerprints were found.

2

On January 23, 1991, two days after the murder of Peter Sanelli, Timothy Willis approached the Sanelli family with information regarding the murder. The Sanelli family sent Willis to the police. At approximately 2:30 p.m. on January 23, Mr. Willis called Lt. John James, and told him the following story.

Willis stated that on January 21, 1991, he was approached around 5:30 p.m. by the appellant, Thomas Sowell and Reginald Germany, who were looking to buy a gun to aid them in stealing a car. When Willis refused, Germany told Sowell that he had a nine-millimeter gun which Sowell could borrow. The three then drove away. Later around 6:45 p.m. the appellant and Sowell drove up to Willis in a silver Plymouth Horizon. Willis especially noticed that the automobile had red and white license plates and that the back passenger and front driver side windows were broken out. Sowell told Willis that they had obtained the car on Prospect Avenue. The appellant and Sowell then discussed in front of Willis their reasons for shooting "the man." Sowell said that he had fired at the car window because the man disobeyed his instructions by attempting to lock his door. The appellant claimed that he had started shooting because Sowell had fired. During this discussion, Willis noticed a pair of binoculars. Anthony Sanelli testified that his father kept a pair of binoculars in the car. Later that evening, Willis recognized the car driven by the appellant and Sowell on the evening news story about the murder of Peter Sanelli.

On January 22, 1991, Willis met the appellant and Germany at approximately 9:00 p.m. and drove around with them in a red van. Willis specifically asked the appellant and Germany where they got the silver Plymouth Horizon. The appellant again told Willis that they got it from the downtown area. The appellant and Germany laughed as they related how Sowell had injured his nose when he crashed the stolen car into a pole.

After Willis told the police this story, he informed them where and when they might locate the appellant, Germany and Sowell. Based on the information given by Willis, the police dispatched officers to arrest these men. Willis had told the police that the appellant and Germany were on their way to his address. The police saw a red van matching the description given by Willis park in front of Willis's house at around 4:30 p.m. Reginald Germany, the appellant, and Maurice Washington exited. A fourth man, Brian McKinney, remained in the van. Reginald Germany exited the driver's side of the van holding a nine-millimeter gun in one hand, which he immediately dropped to the ground as the police approached. The officers stopped and frisked each of the men, and searched the van. The officers felt and uncovered a nine-millimeter gun in a holster under the appellant's coat. The police also found a third gun on the floor of the van at the feet of Brian McKinney. Appellant's and Germany's guns were loaded, and two additional clips were recovered from the appellant's pockets as well. The men were taken into custody by the police.

Willis told police that Thomas Sowell could be located at Cleveland Industrial Drum.

3

Police arrested Sowell there, and discovered a nail in his pocket that matched the type of nails Anthony Sanelli had given his father shortly before Peter Sanelli was murdered.

Detective Qualey, along with Lt. John James, questioned the appellant on January 23, 1991, at approximately 4:30 p.m. after the appellant's arrest. After advising the appellant of his Miranda rights, as printed on a standard police card, Det. Qualey questioned the appellant about the nine-millimeter gun that had been found on the appellant's person at the time of the arrest. Appellant stated that he had bought the gun on January 22, 1991, from an individual who was unknown to him. Further, the appellant denied any knowledge of, or involvement in, the murder of Peter Sanelli. After about an hour of interrogation, appellant was returned to his cell.

About half an hour later Detective Qualey became aware of the results of ballistics tests. The tests revealed that the three spent shell casings found on the street at the murder scene and the bullet found on Peter Sanelli at the morgue had come from appellant's nine-millimeter gun. The ballistics tests also revealed that the gun confiscated from Reginald Germany at the time of his arrest had fired the spent shell casing found on the sidewalk outside the Dome Grille and the copper bullet jacket found in the stolen car.

Detective Qualey reapproached appellant and asked if he knew his rights, to which appellant responded "yeah." After being informed of the ballistics tests, appellant changed his story. He stated that he had loaned the nine-millimeter handgun to a stranger known to him only as "Dee" the day before the murder of Peter Sanelli. Appellant claimed that Dee had needed protection because he was going to a party. The gun had been returned to the appellant the day after Sanelli's murder. The appellant noticed that the gun had been fired but did not ask why.

*State v. Mack*, 73 Ohio St.3d 502 (1995).

## II.      Procedural History

### A.      Pre-Trial, Trial and Sentencing

Mack filed a number of pre-trial motions, including a Motion for Discovery of Statements of Potential Witnesses under Ohio Revised Code § 149.43 (Apx. Vol. 1 at 31) and a Motion for Discovery and to Examine Exculpatory and Mitigatory Material (Apx. Vol. 1 at 38).  Both of these Motions were denied.  In addition, in February 1991, Mack served a request on the State for discovery of, among other things, "all evidence known or which may become known to the

4

prosecuting attorney favorable to the defendant and material to guilt or punishment." (Evid. Hrg. Exh. 44). The State responded in writing to Mack's request, indicating that "no exculpatory material is available to or in the possession of the prosecuting attorney." (Evid. Hrg. Exh. 45).

Mack's trial commenced on July 2, 1991.  That same day, the jury returned a verdict of guilty as to one count of aggravated murder with the specifications that he was the principal offender and that he had a firearm on or about his person or under his control while committing the offense. (Apx. Vol. 1 at 108). The jury also found Mack guilty of aggravated robbery. (Apx. Vol. 1 at 108).

The mitigation phase of the trial began on July 17, 1991. (Apx. Vol. 1 at 109).  Mack presented the testimony of his uncle John Mack, his mother Bernice Mack, and his grandmother Rosey Mack.  He also made an unsworn statement, in which he denied any involvement in the Sanelli murder.

The next day, the jury found that the State had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors, and recommended imposition of the death penalty. (Apx. Vol. 1 at 110).  Mack thereafter filed a Motion for New Trial on the grounds that the State had withheld exculpatory evidence, which was overruled. (Apx. Vol. 1 at 113-120). On August 1, 1991, the trial court issued an Opinion, accepting the jury's recommendation and sentencing Mack to death. (Apx. Vol. 1 at 122).

**B.**     **Direct Appeal, Post-Conviction Proceedings, and Rule 26(B) Application**

Mack filed a timely appeal of the trial court's decision to the Eighth District Court of Appeals of Ohio, setting forth twenty-seven assignments of error.  The Ohio Court of Appeals affirmed Mack's conviction and sentence on December 2, 1993.  *State v. Mack*, 1993 WL 497052 (Ohio App. 8th Dist. Dec. 2, 1993).  Mack filed an Application for Reconsideration on December

5

13, 1993, which was denied.  (Apx. Vol. 3 at 419, 425).

Mack then appealed to the Ohio Supreme Court, raising twenty-eight propositions of law. The Ohio Supreme Court affirmed the decision of the Eighth District Court of Appeals on August 30, 1995.  *State v. Mack*, 73 Ohio St.3d 502 (1995).  Concluding his direct appeals, Mack filed a Petition for Writ of Certiorari in the United States Supreme Court on November 30, 1995. (Apx. Vol. 4 at 440).  That Court denied the Petition on January 22, 1996. (Apx. Vol. 4 at 445).

Mack then filed a petition for post-conviction relief in the trial court.  Therein, he raised four grounds for relief based on ineffective assistance of trial counsel, and requested an evidentiary hearing. (Apx. Vol. 5 at 23-4).  The Cuyahoga County Court of Common Pleas denied the petition without a hearing on September 10, 1996.  (Apx. Vol. 5 at 172).  Due to a clerical error, the court's Findings of Fact and Conclusions of Law were not issued until January 25, 1999. (Apx. Vol. 5 at 174-178, 195).

Mack appealed the denial of his Petition for Post-Conviction relief to the Eighth District Court of Appeals, raising two assignments of error. (Apx. Vol.6 at 41). The Eighth District Court of Appeals affirmed the decision of the trial court on October 26, 2000.  *State v. Mack*, 2000 WL 1594117 (Ohio App. Oct. 26, 2000). Thereafter, Mack appealed to the Ohio Supreme Court, again raising two propositions of law. (Apx. Vol. 7 at 10). The Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question.  *State v. Mack*, 91 Ohio St.3d 1459 (2001). The United States Supreme Court denied certiorari on October 1, 2001.  *Mack v. Ohio*, 534 U.S. 863 (2001).

Mack then filed an Application for Reopening his direct appeal in the Eighth District Court of Appeals pursuant to Ohio Rule of Appellate Procedure 26(B).  The Application alleged

6

ineffective assistance of appellate counsel on the basis of six assignments of error. (Apx. Vol. 8 at 41-50). The Eighth District Court of Appeals denied Mack's Application on May 19, 2003. *State v. Mack*, 2003 WL 21185786 (Ohio App. May 19, 2003).

Mack appealed to the Ohio Supreme Court, raising ten propositions of law. (Apx. Vol. 9 at 48). On April 14, 2004, the Ohio Supreme Court affirmed the Eighth District Court of Appeals' decision. *State v. Mack*, 101 Ohio St.3d 397 (2004).

**III.     Habeas Proceeding**

On May 4, 2004, Mack filed a Notice of Intention to file a Petition for Writ of Habeas Corpus. (ECF No. 1).  Several months later, on December 15, 2004, Mack filed his Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, asserting twenty-nine grounds for relief. (ECF No. 24). The following three of these grounds for relief are relevant to Respondent's Motion to Dismiss:

> * * *
>
> 5.     The State improperly, illegally and unconstitutionally withheld exculpatory, mitigation and/or impeachment evidence from the defense in violation of *Brady v. Maryland.*
>
> * * *
>
> 17.     The ineffective assistance of trial counsel during the guilt/innocence phase of the case denied Mr. Mack his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.
>
> 18.     The ineffective assistance of trial counsel during the sentencing phase of the case denied Mr. Mack his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

(ECF No. 24).  Respondent filed a Return of Writ on February 14, 2005. (ECF No. 26).  Mack filed his Traverse on May 16, 2005 (ECF No. 35) and Respondent thereafter filed a Reply on May 31, 2005. (ECF No. 44).

7

Subsequent to the filing of his Petition, Mack filed a number of discovery motions. On May 15, 2005, Mack filed a Motion for Leave to Conduct Discovery and for Appointment of Experts, which Respondent opposed. (ECF Nos. 36, 42). The Court granted Mack's motion in part, and required Respondent to provide certain discovery to Mack regarding his ineffective assistance of trial counsel and *Brady* claims. (ECF No. 52).

In June 2009, Mack filed a Motion for an Evidentiary Hearing, which Respondent opposed. (ECF Nos. 65, 69). On May 31, 2010, the Court granted Mack's motion in part and directed that an evidentiary hearing be held on Mack's claims of (1) ineffective assistance of trial counsel for failure to conduct a reasonable investigation into the credibility of Timothy Willis; (2) ineffective assistance of trial counsel for failure to conduct a proper mitigation investigation; and (3) certain of Mack's *Brady* claims. (ECF No. 74 at 16).

The Court conducted an evidentiary hearing on these claims on June 28 through June 30, 2010 and July 9, 2010. Mack and Respondent filed Post-Hearing Briefs on September 13, 2010 and November 12, 2010, respectively. (ECF No. 107, 110).

## IV.    AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter, the "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996. In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date. *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) ("It is now well-settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date."). Because Mack's petition was filed on December 15, 2004, well after the AEDPA's effective date, the

8

AEDPA governs this Court's consideration of his petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford,* 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of the AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 127 S.Ct. 2218, 2224 (2007) (citations omitted). As the Supreme Court recently explained, the AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S.Ct. 770, 786 (Jan. 19, 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This is "a 'difficult to meet' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (April 4, 2011) (quoting *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner

carries the burden of proof.  *Pinholster*, 131 S.Ct. at 1398.

The Supreme Court recently emphasized the limited nature of review under Section 2254(d)(1) in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011) and *Harrington v. Richter,* 131 S.Ct. 770 (2011).  In *Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and that "evidence introduced in federal court has no bearing on § 2254(d)(1) review."  *Pinholster*, 131 S.Ct. at 1398, 1400.  The Court further cautioned in *Harrington* that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and that "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id*. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were "adjudicated on the merits" in the state court proceeding.  *Harrington*, 131 S.Ct. at 784.  *See also Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, but rather conducts a *de novo* review of the claim.  *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).

## V.     Express Waiver of Exhaustion

The process of presenting a constitutional claim to the state's highest court is called

exhaustion. Under Section 2254 of the AEDPA, a federal court cannot grant a writ of habeas corpus to a prisoner held in state custody unless the applicant has exhausted all available remedies in state court. *See* 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). To be properly exhausted, each claim must have been "fairly presented" to the state courts. *See e.g. Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Frazier v. Huffman*, 343 F.3d 780, 797 (6th Cir. 2003). Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim. *Wagner*, 581 F.3d at 414. Specifically, in determining whether a petitioner "fairly presented" a federal constitutional claim to the state courts, courts should consider whether the petitioner: (1) phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) relied upon federal cases employing the constitutional analysis in question; (3) relied upon state cases employing the federal constitutional analysis in question; or (4) alleged "facts well within the mainstream of [the pertinent] constitutional law." *See Hicks v. Straub,* 377 F.3d 538, 553 (6th Cir. 2004) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). This does not mean that the applicant must recite "chapter and verse" of constitutional law, but the applicant is required to make a specific showing of the alleged claim. *Wagner,* 581 F.3d at 414.

If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion

11

has not occurred and the federal habeas court cannot entertain the merits of the claim. 28 U.S.C. § 2254(c) (stating that "an applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . .if he has the right under the law of the State to raise, by any available procedure, the question presented"). *See also Rust*, 17 F.3d at 160. Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001). In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001). Under the AEDPA, the State may waive the exhaustion requirement through an express statement by counsel. Specifically, § 2254(b)(3) provides that "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." Although the AEDPA requires an express waiver, it "does not require 'magic words' in order for a state to expressly waive exhaustion." *D'Ambrosio v. Bagley*, 527 F.3d 489, 497 (6th Cir. 2009). "The touchstone for determining whether a waiver is express is the clarity of the intent to waive." *Id*. at 496-97 (finding the State had expressly waived the exhaustion requirement because "counsel's conduct during the district court proceedings manifested a clear and unambiguous intent to waive the requirement").

In the instant case, Respondent states the following in her Return, filed February 14, 2005:

Respondent observes that all of Mack's claims are exhausted. The claims are exhausted because they were either raised properly on direct appeal to the Ohio Supreme Court, raised in post-conviction and barred from review on the basis of res judicata, raised and considered or barred in an application for reopening, or there is no remaining avenue by which Mack can now fairly present these claims to the state courts.

12

By pointing out that Mack's claims have been exhausted because there are no remaining state court remedies, Respondent expressly **does not** waive the exhaustion requirement. 28 U.S.C. § 2254(b)(3); *see Dennis v. Mitchell*, 68 F.Supp.2d 863, 879 (N.D. Ohio 1999)(finding Respondent waived exhaustion requirement by stating that claims in petition were exhausted) with Habeas Rule 5 (Respondent's answer shall state whether petitioner has exhausted state remedies). Respondent wishes it to be clear that by stating her view that Mack has exhausted all claims, she **does not** intend to waive the exhaustion requirement.

(ECF No. 26 at 42) (emphasis in original).

Over five years later, on April 23, 2010, Respondent filed her Motion to Dismiss for Lack of Exhaustion, in which she claims that Mack failed to fairly present three claims (i.e. two of his *Brady* sub-claims and one ineffective assistance of trial counsel claim) to the state courts and that these claims are, therefore, unexhausted. After the Evidentiary Hearing conducted in this Court in June -July 2010, Mack filed a Post-Evidentiary Hearing Brief in which he raised additional *Brady* sub-claims that were not included in his Petition or Traverse. In her own Post-Evidentiary Hearing Brief, Respondent argued that all but one of this expanded group of *Brady* sub-claims were unexhausted, raising the total to ten allegedly unexhausted *Brady* sub-claims. In addition, she added another ineffective assistance of trial counsel claim to her list of unexhausted claims; i.e. ineffective assistance of trial counsel based on counsel's failure to argue that Mack was not the "principal offender." (ECF No. 110 at 6-7).

Based on the above, Respondent argues that Mack's entire Petition should be dismissed since "available and adequate state remedies exist for Mack to bring these claims in state court," including a Motion for New Trial under Ohio Crim. R. 33 or a Successive Motion for Post-Conviction Relief pursuant to Ohio Revised Code § 2953.23.[1]

---

[1]     In the alternative, Respondent suggests that this Court could dismiss Mack's unexhausted claims or "simply deny the writ." (ECF No. 78 at 7).

13

In response, Mack emphasizes Respondent's five-year delay in raising her exhaustion argument, and argues strenuously that Respondent has clearly and unambiguously waived exhaustion with her statement in the Return that "all of Mack's claims are exhausted." He further maintains that Respondent's Motion is "way too late and should be denied on that basis alone." Finally, Mack argues that he did, in fact, exhaust the claims at issue. (ECF No. 77 at 1-3).

Respondent insists that she did not waive the exhaustion requirement, highlighting her disclaimer in the Return that "Respondent expressly does not waive" exhaustion. She explains that, "[w]hen stating that 'all of Mack's claims are exhausted,' the Warden was merely 'stating her view' that the claims were exhausted," not waiving the requirement itself. She further states that "the Warden's concededly flawed legal conclusion that the statutory requirement has been met represents an acknowledgment that the statutory requirements should be evaluated by the Court, not that the statutory requirements of exhaustion are waived." (ECF No. 78 at 2). Thus, Respondent argues that she did not waive exhaustion and is not estopped from seeking dismissal on that basis.

As stated above, the AEDPA provides that the State may waive exhaustion only through an express statement, through counsel, to that effect. *See* § 2254(b)(3). To be express, a waiver must be clear, explicit and unambiguous. *D'Ambrosio*, 527 F.3d at 495. The simple failure to raise the exhaustion requirement does not, by itself, expressly waive the issue, nor does the fact that the State participated in federal habeas discovery proceedings. *Id.* at 497. Rather, "it is the statements made and actions taken by the warden, in addition to these facts, that constitute an express waiver." *Id.*

In the instant case, the Court is faced with conflicting statements and actions from the Respondent regarding her position as to exhaustion. On the one hand, the Respondent expressly states, in her Return, that "all of Mack's claims are exhausted" and that Mack has properly raised

14

all his claims in the appropriate state courts. Indeed, for five years, Respondent failed to give any indication whatsoever that she intended to argue that any of Mack's claims are unexhausted.

It was not until Respondent filed her Motion to Dismiss in April 2010 that she indicated that Mack had, in fact, failed to fairly present two *Brady* sub-claims and one ineffective assistance of trial counsel claim to the state courts, despite the fact that these three claims had been explicitly raised in Mack's Traverse.  Several months later, and after this Court's Evidentiary Hearing, Respondent claimed that additional *Brady* sub-claims newly argued by Mack in his Post-Evidentiary Hearing Brief are also unexhausted. With regard to the allegedly unexhausted *Brady* sub-claims raised in Mack's Traverse, the only basis on which Respondent can rely to support her argument that she has not expressly waived the exhaustion requirement as to these sub-claims is the disclaimer in her Return, in which she states that "[b]y pointing out that Mack's claims have been exhausted because there are no remaining state court remedies, Respondent expressly **does not** waive the exhaustion requirement."  (ECF No. 26 at 42).

It is troubling that Respondent relies on this contradictory language in her Return to justify her failure to raise lack of exhaustion until over five years after the filing of the Petition. Respondent does not offer any justification for failing to raise this issue earlier in these proceedings with regard to the allegedly unexhausted *Brady* sub-claims raised in Mack's Traverse and, indeed, the Court does not discern any reason why she could not have done so. Respondent's failure to raise this issue promptly as to these claims frustrates the AEDPA's goal of reducing delays and impedes this Court's ability to efficiently and effectively manage this case.

That being said, the Court also recognizes the importance of the exhaustion requirement in the AEDPA's overall statutory scheme, and the fact that "the interests of comity and federalism

15

dictate that state courts must have the first opportunity to decide a petitioner's claims." *Rhines v. Weber*, 544 U.S. 269, 274 (2005).  Moreover, the Court recognizes that Mack raised additional *Brady* sub-claims in his Post-Evidentiary Hearing Brief (on the basis of the discovery he obtained in this federal habeas proceeding) and that Respondent clearly could not have raised exhaustion as to these sub-claims until Mack had himself identified them.  The fact that Mack raised new *Brady* sub-claims after the Evidentiary Hearing, to a certain extent therefore, explains Respondent's failure to raise exhaustion at an earlier point in the litigation.

Given this unusual circumstance, as well as the fact that Respondent did include express language in her Return stating that she did not intend to waive the exhaustion requirement, this Court will not deem the Respondent estopped from raising exhaustion at this stage in the proceedings and will consider the merits of Respondent's Motion to Dismiss for Lack of Exhaustion.

**VI**.      **General Arguments against applicability of Exhaustion Requirement**

In his Opposition to Respondent's Motion to Dismiss, Mack incorporates a number of general procedural arguments raised in his Traverse, Motion for Discovery, and Motion for Evidentiary Hearing. (ECF No. 77 at 4).  The Court will address herein only those arguments that are clearly relevant to the issues raised in Respondent's Motion to Dismiss.

**A.      Existence of Adequate Corrective Procedure for Redressing Constitutional Violations**

Mack first argues that he was not required to exhaust either the ineffective assistance of trial counsel or *Brady* claims at issue under § 2254(b)(1) because the State has failed to provide an adequate corrective procedure for redressing constitutional violations.  Section 2254(b)(1) provides:

(1) An application for a writ of habeas corpus on behalf of a person in

16

custody pursuant to the judgment of a State court shall not be granted unless it appears that –

(A) the applicant has exhausted the remedies available in the courts of the State; **or**

**(B)(i) there is an absence of available State corrective process; or**

**(ii) circumstances exist that render such process ineffective to protect the rights of the applicant**.

28 U.S.C. § 2254(b)(1) (emphasis added).

Mack maintains that Ohio's Rule 26(B) Application procedure does not constitute an adequate State corrective process under § 2254(b)(1) because it fails to meet constitutional requirements in three respects.  First, he argues that Ohio's Rule 26(B) process is deficient because it only provides for appointed counsel if the indigent applicant can first present a genuine issue that his appellate counsel has indeed been ineffective.  Second, he maintains that Rule 26(B) contains procedural limitations that severely restrict the ability of an applicant to present the merits of his or her claims to the court, including the requirement that  "an application for reopening and an opposing memorandum shall not exceed ten pages." Rule 26(B)(4).

Third, and finally, Mack argues that the Ohio courts routinely ignore the Rule's requirement that, in order for the Application to be granted and the appeal reopened with full briefing, the applicant need only demonstrate a "genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal." Rule  26(B)(5).  Rather than using this "genuine issue" standard, Mack contends that the Ohio courts routinely require applicants to demonstrate ultimate success on the merits under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1986), which Mack argues is an "elevated burden."  For these reasons, Mack maintains that Ohio's procedure for reopening a direct appeal under Rule 26(B) does not meet constitutional standards.

17

Therefore, he concludes, Ohio does not provide an adequate corrective process for redressing such claims and "there is no requirement that such claims first be presented to the Ohio state courts in order to be reviewed in federal habeas." (ECF No. 35 at 12).

Ohio's Rule 26(B) Application process is a two-step procedure for raising claims of ineffective assistance of appellate counsel. At the first stage, the appellate court considers whether to grant the application to reopen proceedings. Rule 26(B) requires that an application contain "[a] showing of good cause for untimely filing if the application is filed more than ninety days after journalization of the appellate judgment," and "one or more assignments of error or arguments in support of assignments of error that previously were not considered on the merits in the case by any appellate court or that were considered on an incomplete record because of appellate counsel's deficient representation." Rule 26(B)(2)(b) and (c). "If there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal," then "[a]n application for reopening shall be granted." Rule 26(B)(5). The Rule 26(B) application is a streamlined procedure, in which applications are strictly limited in length to under ten pages, and oral argument is not granted except at the request of the court. *See* Rule 26(B)(4). An indigent applicant is not appointed counsel during the first stage of this proceeding.

In the event that an application to reopen is granted, however, the applicant is afforded the opportunity to fully develop his claim of ineffective assistance of appellate counsel. An application that is granted proceeds as an initial appeal, and the defendant is permitted to submit briefing and present oral argument. *See* Rule 26(B)(7). A defendant who is indigent and unrepresented is entitled to have counsel appointed on his behalf. *See* Rule 26(B)(6)(a).

Both the Ohio Supreme Court and the Sixth Circuit have expressly held that an application

18

to reopen a direct appeal under Rule 26(B) is part of the collateral, post-conviction process and is not part of the direct appeal. *See Morgan v. Eads*, 104 Ohio St.3d 142 (2004) (finding that "the App. R. 26(B) process represents a collateral post-conviction remedy and is not part of the original appeal"); *Lopez v. Wilson*, 426 F.3d 339, 352 (6th Cir. 2005) (concluding that "a Rule 26(B) application to reopen is a collateral matter rather than part of direct review").  Because the application to reopen is a collateral review, Ohio courts have wide latitude in determining how to review their own cases.  *Sneed v. Johnson*, 2007 WL 709778 at * 24 (N.D. Ohio March 2, 2007).

The Court finds that Mack's arguments that the Rule 26(B) procedure fails to meet constitutional standards are without merit. The Sixth Circuit has repeatedly held that, because Rule 26(B) proceedings are collateral, an applicant does not have a constitutional right to appointed counsel.  *See Lopez*, 426 F.3d at 352; *Scuba v. Brigano*, 527 F.3d 479, 488 (6th Cir. 2007); *Haliym v. Mitchell*, 492 F.3d 680, 692 (6th Cir. 2007). Moreover, although a Rule 26(B) application is limited to ten pages, an applicant need only present the issues in a manner sufficient to result in reopening of his case.  If reopening is granted, the applicant has an opportunity to fully develop his claim through briefing and oral argument and indigent applicants are provided with appointed counsel. *See Haliym*, 492 F.3d at 692.

The Court also rejects Mack's argument that Ohio courts do not apply Rule 26(B)'s "genuine issue" standard and instead improperly evaluate the ultimate merits of claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  The Sixth Circuit has held that a state court's reference to *Strickland* to determine whether a "genuine issue" has been raised under Rule 26(B) is appropriate. *See Haliym*, 492 F.3d at 693.

In light of the above, the Court rejects Mack's arguments that Ohio's Rule 26(B) does not

provide an adequate corrective process and that there is, therefore, no requirement that his claims first be presented to the Ohio state courts. Given that Ohio courts are not constitutionally bound to provide post-conviction, collateral review in the first instance, courts have declined to find that the Rule 26(B) process is unconstitutional. *See e.g. Sneed*, 2007 WL 709778 at * 24 (rejecting habeas petitioner's assertion that his constitutional rights were denied because he was not afforded counsel in preparing his Rule 26(B) application to reopen). For the reasons set forth above, this Court declines to do so as well.

### B.     Sufficiency of Ineffective Assistance of Appellate Counsel Claims Raised in Rule 26(B) Application to Preserve Predicate Claims for Review in Habeas

Mack next argues that, even if this Court considers the Rule 26(B) Application process to be constitutional and finds that he was required to exhaust his claims in the state courts, his Rule 26(B) Application was sufficient to fairly present both his principal claims for ineffective assistance of appellate counsel, as well as the predicate claims upon which that alleged ineffectiveness was based.  He insists that his Rule 26(B) assigned errors predicated on ineffective assistance of trial counsel and *Brady* violations were fully argued as both ineffective assistance of counsel claims and on the substantive merits of the underlying predicate claims. Moreover, Mack maintains that these particular predicate claims were, in fact, presented to the state court in earlier proceedings and were raised in his Rule 26(B) Application for a second time.

Respondent maintains that the ineffective assistance of trial counsel and *Brady* claims at issue were not raised by Mack as independent claims during direct review or his post-conviction proceedings on the same theory as they are now being raised here. Rather, they were presented to the Ohio courts only as predicate claims and presented in the context of the ineffective assistance of appellate counsel, rather than in the context of the legal standards applicable to the alleged denial

of the specific constitutional rights at issue. Thus, Respondent argues that the claims at issue are unexhausted.

As noted above, Rule 26(B) is a collateral proceeding that allows for the reopening of a direct appeal based on a claim of ineffective assistance of appellate counsel. In some instances, a State court may address the substance of a petitioner's predicate claims in order to determine whether defense counsel's failure to raise them constituted ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). However, the fact that a State court engages in this analysis does not require a conclusion that the underlying predicate claim has been "fairly presented" for exhaustion purposes.

As the Sixth Circuit explained in *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999):

> Since the central issue before us is whether, as the federal district court found, Mapes' appellate counsel was constitutionally ineffective for failing to raise several alleged trial errors, we must first determine whether the trial court in fact erred. If it did not, there can be no constitutional deficiency in appellate counsel's failure to raise meritless issues. If the trial court did err, the question then becomes whether appellate counsel was constitutionally ineffective for failing to raise those errors on appeal and, if so, whether the petitioner was prejudiced by counsel's unsatisfactory representation. We shall address those questions in due course, but we must, of course, first examine Mapes' allegations of error, even though, on their merits, they may be defaulted.

*Id*. at 413-14. As *Mapes* suggests, an analysis of a particular claim for purposes of determining whether counsel's failure to assert that claim at trial or on appeal was ineffective is independent of whether the underlying claim would itself be deemed unexhausted or procedurally defaulted if asserted as a discrete claim. Indeed, the Sixth Circuit has since reiterated that, in order to avoid procedural default, a petitioner must present "the same claim under the same theory" to the state courts before raising it on federal habeas review. *See Hicks*, 377 F.3d at 552-53; *Lott*, 261 F.3d at

21

612.

In its discussion of each of the individual claims at issue herein, the Court will determine whether Mack's claims are exhausted with the general principles set forth above in mind.

**VII.    Merits of Respondent's Motion to Dismiss**

In her Motion to Dismiss, Respondent argues that Mack failed to exhaust the following three claims in the state courts: (1) ineffective assistance of counsel for failure to conduct a reasonable mitigation investigation; (2) the failure of the State to disclose prior inconsistent statements made by Timothy Willis in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) the failure of the State to disclose evidence of a deal given by the State to Mr. Willis in exchange for his testimony against Mack in violation of *Brady, supra*.

As noted *supra*, after the Evidentiary Hearing conducted in this Court in June-July 2010, Mack filed a Post-Evidentiary Hearing Brief in which he raised additional *Brady* sub-claims that were not included in his Petition or Traverse. In her own Post-Evidentiary Hearing Brief, Respondent then argued that all but one of this expanded group of *Brady* sub-claims was unexhausted, raising the total to ten allegedly unexhausted *Brady* sub-claims. In addition, she added another ineffective assistance of trial counsel claim to her list of unexhausted claims; i.e. ineffective assistance of trial counsel based on counsel's failure to argue that Mack was not the "principal offender." (ECF No. 110 at 6-7).

Given the fact that at least some of Mack's additional *Brady* and ineffective assistance of trial counsel sub-claims arose after the filing of Respondent's Motion to Dismiss and the completion of the Evidentiary Hearing, the Court will consider Respondent's arguments that these claims are unexhausted despite the fact that many of them were not argued expressly in her Motion to Dismiss.

The Court will address the *Brady* and ineffective assistance of trial counsel claims separately, below.

      **A.**    ***Brady* Claims (Fifth Ground for Relief)**

In his Fifth Ground for Relief, Mack alleges that the State improperly failed to disclose exculpatory and impeachment information in its possession and control in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Mack raises this argument with respect to eleven distinct categories of information and/or documents, which will be referred to as Mack's *Brady* sub-claims.  As set forth *supra*,  Respondent now argues that ten of these *Brady* sub-claims are unexhausted.  These allegedly unexhausted *Brady* sub-claims are based upon the allegation that the State improperly failed to provide the following categories of information and/or documents:

    1.    Handwritten notes authored by the victim's son-in-law Mike Barone of the family's first meeting with Timothy Willis on January 23, 1991. ("Sanelli Family Notes")

    2.    Cleveland Police Department reports regarding Willis' communications with police regarding the Sanelli murder, and Willis' written statement to the police dated January 23, 1991. ("Willis Police Reports" and "Willis Statement")

    3.    Cleveland Police Department reports regarding Sanelli's stolen vehicle as or after it crashed on Holton Avenue and the name of witness to that crash, Jerry Kirkland. ("Holton Crash Reports")

    4.    Evidence of an agreement by the prosecutor to provide favorable consideration to Willis in an unrelated pending felony case in exchange for his testimony regarding Mack ("Willis Deal Evidence")

    5.    Statement by Mr. Lekas to the Cleveland Police Department ("Lekas Statement")

    6.    Cleveland Police Detective Norman Sherwood's report pertaining to his January 25, 1991 interview of Demill Blue ("Sherwood Report")

    7.    Cleveland Police Department reports regarding searches of Willis' house (Willis Search Reports")

8.      Cleveland Police Department reports regarding Ski Mask Task Force ("Ski Mask Task Force Reports")

9.      Willis' oral statement to prosecutors that Mack admitted to shooting his gun after Sowell had fired first shots. ("Willis' Oral Statement")

In addition, in what this Court will call *Brady* sub-claim 10, Mack argues that the State improperly and knowingly allowed Timothy Willis to give perjured testimony at trial.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Subsequently, the Court eliminated the requirement for a defendant to request favorable information and stated that the constitutional duty to disclose is "triggered by the potential impact of favorable but undisclosed evidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The State's duty to disclose favorable evidence includes all such evidence known to those acting on the government's behalf in the case, including the police.  *Id.* at 437.

To establish a claim under *Brady*,  the petitioner has the burden of establishing that (1) the prosecutor suppressed evidence; (2) such evidence was favorable to the defense; and (3) the suppressed evidence was material. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).  *See also Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).  The inquiry is objective, independent of the intent of the prosecutors. *Brady,* 373 U.S. at 87.

Evidence is "material" for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *Kyles*, 514 U.S. at 433.  In *Kyles*, the Supreme Court emphasized four aspects of materiality.  First, the Court explained that:

24

> a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . .. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.   A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' *Bagley*, 473 U.S. at 678.

*Id*. at 434.   Second, materiality is not a sufficiency of the evidence test.   Even if the evidence, including the suppressed exculpatory evidence, is sufficient to support a conviction, a *Brady* claim may still be successful.   *Id*. at 435.   A *Brady* violation is proven by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."   *Id*.   Third, once a *Brady* violation is found, there is no need for further harmless-error review, as a *Brady* violation is never harmless. *Id.*   Fourth, when materiality is assessed, the suppressed evidence must be considered collectively, not item by item. *Kyles,* 514 U.S. at 436.

As long as the evidence was disclosed during trial, *Brady* is not violated unless the defendant is prejudiced by late disclosure.   Thus, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.   *United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006). Moreover, there is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."   *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

"Favorable" evidence under *Brady* is exculpatory evidence, including impeachment material. *United States v. Bagley*, 473 U.S. 667, 676 (1985). In fact, inculpatory evidence may be considered *Brady* material if it may be used to impeach a witness.   *Strickler v. Greene*, 527 U.S. 263 (1999).

*See also Giglio v. United States*, 405 U.S. 150, 154 (1972) (stating that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' non-disclosure of evidence affecting credibility falls within the general rule [of *Brady*])."

### 1. Procedural Posture of *Brady* sub-claims at issue

Respondent argues that Mack failed to raise any of the ten *Brady* sub-claims at issue as independent claims during direct appeal or post-conviction proceedings and that they are, therefore, unexhausted. Respondent further maintains that, even if any of these sub-claims were raised generally in the context of Mack's Rule 26(B) Application, they were not raised by Mack as independent claims on the same theory as they are now being raised here. Rather, if mentioned at all, they were presented to the Ohio courts only as predicate claims and presented in the context of the *Strickland* ineffective assistance of counsel standard, rather than in the context of the legal standards applicable to the alleged denial of the specific constitutional rights at issue.

Mack advances a number of arguments, common to each of the *Brady* sub-claims at issue, in support of his position that these sub-claims have been fully exhausted in the state courts. First, he argues that he raised the sub-claims at issue on direct appeal to the Ohio Court of Appeals in his first Assignment of Error, which states "Clarence Mack was denied due process of law when the court denied his Motion for Discovery and Inspection." (Apx. Vol. 3 at 3). In this Assignment of Error, Mack argues that the trial court erred when it denied Mack's February 1991 Motion for Discovery and Inspection of various witnesses' statements in police reports. (Apx. Vol. 3 at 39-40). There is no mention of *Brady* in Mack's state appellate brief.

The Court finds Mack did not raise the instant *Brady* sub-claims in his direct appeal to the Ohio Court of Appeals. It is well-established in the Sixth Circuit that "the exhaustion doctrine

26

requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). Mack did not raise any of the specific *Brady* sub-claims at issue in the Ohio Court of Appeals; rather, he raised the issue of the trial court's alleged error in denying his motion for discovery. This issue is distinct from a *Brady* claim and does not constitute the "same claim under the same theory" under *Hicks, supra*.

Next, Mack argues he raised the *Brady* sub-claims at issue in his direct appeal to the Ohio Supreme Court.  In his brief to that court, Mack did raise a *Brady* claim as part of his twenty-fifth Proposition of Law, which stated that "[f]ailure of the prosecutor to comply with pre-trial discovery is grounds for a new trial if the thing discovered during trial prejudiced the rights of the defendant." (Apx. Vol. 4 at 41). However, the *Brady* claim raised by Mack in the Ohio Supreme Court related only to the State's failure to disclose evidence of a $10,000 reward offered by the Sanelli family for information that led to the conviction of the person responsible for Mr. Sanelli's murder. (Apx. Vol. 4 at 127-29).  It did not mention the factual bases of any of the *Brady* sub-claims at issue here or make any argument that the State's failure to disclose the information and/or documents relevant to each sub-claim constituted a *Brady* violation.  Accordingly, the Court finds Mack failed to fairly present the specific *Brady* sub-claims at issue on direct appeal to the Ohio Supreme Court under "the same claim under the same theory," as required by *Hicks, supra*.[2]  *See also Lott*, 261 F.3d at 619

---

[2]     For the same reason, the Court rejects Mack's suggestion that he properly raised this sub-claim on direct appeal to the Ohio Court of Appeals via his twenty-fourth Assignment of Error, which states that "[t]he trial court erred and denied Clarence Mack his constitutional right to a fair trial by denying his motion for new trial." (Apx. Vol. 3 at 7).  This state appellate claim was based on the trial court's failure to grant a new trial on the theory that the State had failed to disclose the Sanelli family reward.  While it mentions *Brady*, it does not raise the factual bases of any

27

(finding that petitioner's presentation to the state court of *Brady* claim on one issue does not permit him to put forward other supposed *Brady* claims predicated on factually dissimilar premises).

Finally, Mack argues that he raised some of the *Brady* sub-claims at issue in his Rule 26(B) Application, thus satisfying the exhaustion requirement. While Mack did argue in his Rule 26(B) Application that the State had failed to disclose material that is relevant to some of the *Brady* sub-claims at issue, he did so in the context of his claims of ineffective assistance of appellate counsel. As this Court previously explained, an analysis of a particular claim for purposes of determining whether counsel's failure to assert that claim on appeal was ineffective is independent of whether the underlying claim would be procedurally defaulted if asserted as a discrete claim. *See Mapes*, 171 F.3d at 413-14; *Lott*, 261 F.3d at 612; *Davie v. Mitchell*, 547 F.3d 297, 312-13 (6th Cir. 2008). Accordingly, since Mack only raised certain of these *Brady* sub-claims in his Rule 26(B) Application in the context of his appellate ineffective assistance of counsel claim, the Court finds they were not fairly presented to the state courts under the same theory as they are now being presented for federal review. Thus, Mack's Rule 26(B) Application cannot be used to demonstrate that these sub-claims have been exhausted.

In light of the above, and based on the Court's own independent review of the state court record, the Court finds that the ten *Brady* sub-claims at issue have not been fairly presented to the state courts and are, therefore, unexhausted.

As set forth above, a federal court may not grant a writ of habeas corpus unless the applicant has exhausted all available remedies in state court. § 2254(b)(1)(A). As a general matter, a federal

---

of the specific *Brady* sub-claims at issue here.

court may not grant a writ on a "mixed" petition, i.e. one that contains both exhausted and unexhausted claims. *See Rhines*, 544 U.S. at 273-74; *Wagner v. Smith*, 581 F.3d 410, 415 (6th Cir. 2009); *Harris v. Lafler*, 553 F.3d 1028, 1031 (6th Cir. 2009). This is because "the interests of comity and federalism dictate that state courts must have the first opportunity to decide a petitioner's claim," since "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." *Rhines*, 544 U.S. at 273-74 (citations omitted). Accordingly, where a habeas writ contains unexhausted claims, there is a "strong presumption" in favor of requiring a petitioner to pursue his available state remedies. *Granberry v. Greer*, 481 U.S. 129, 131 (1987). *See also O'Guinn v. Dutton*, 88 F.3d 1409, 1412 (6th Cir. 1996) (stating that "the Supreme Court has been quite clear that exhaustion is the preferred avenue and that exceptions are to be for narrow purposes only").

Rather than dismiss certain claims that the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Lott*, 261 F.3d at 608. In circumstances where the petitioner has failed to present a claim in state court, a habeas court may dismiss a mixed petition with prejudice where the unexhausted claims on their face lack merit. *Id.* (finding that because petitioner's unexhausted claim lacked merit, "any resort to the state courts would amount to a mere futility" and "we need not await a state court's determination of what we have already concluded"). Moreover, a federal habeas court may deny a mixed petition "upon a finding that the petitioner has no available remedy in state court and to dismiss the petition would amount to nothing more than a futility." *Id*. at 620. *See also Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

29

In the instant case, having determined that the ten *Brady* sub-claims at issue herein are indeed unexhausted, the Court must determine whether Mack's "mixed petition" should be dismissed or stayed to afford Mack the opportunity to exhaust this sub-claim in state court. Prior to reaching this issue, however, the Court must consider whether a return to state court would be futile. This requires a determination of (1) whether any of these unexhausted *Brady* sub-claims have potential merit; and (2) whether Mack has an available remedy in state court to pursue his unexhausted claims. *See Lott*, 261 F.3d at 608.

2.      **Futility Analysis: Whether Unexhausted Claims Have Potential Merit**

The Court has thoroughly reviewed the arguments and evidence[3] relating to the ten unexhausted *Brady* sub-claims at issue to determine whether they have potential merit. For the reasons set forth below, the Court finds that, at a minimum, the following four *Brady* sub-claims have potential merit.  In so finding, the Court is not suggesting the state courts would, upon review, ultimately find the following sub-claims to be meritorious. Rather, this Court determines only that several of Mack's *Brady* sub-claims have sufficient merit to warrant requiring Mack to return to state court to pursue exhaustion.[4]

---

[3]      Because the state courts did not adjudicate the *Brady* sub-claims at issue on the merits, this Court need not limit its consideration of these sub-claims to the evidentiary record that was before the state court at the time of its decision, pursuant to *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Accordingly, this Court will consider not only the trial transcript and exhibits, but also the transcript of the evidentiary hearing conducted in this Court, as well as any relevant discovery obtained in this habeas proceeding.

[4]      For purposes of ruling on the instant Motion to Dismiss, the Court will conduct only a limited inquiry to determine whether Mack's unexhausted claims have potential merit, as it would not be appropriate for the Court to conduct "a

30

### a. *Brady* sub-claim 1: Sanelli Family Notes

Mack argues that the State failed to provide the defense with notes made by the Sanelli family (hereinafter "Notes") during a January 23, 1991 meeting they had with Willis. Mack claims that these Notes constitute valuable impeachment evidence, as they allegedly contain several inconsistencies between Willis' statements to the Sanelli family on January 23, 1991 and his subsequent testimony at trial.

During trial, Timothy Willis testified that he went to the Sanelli's glass store at about noon on January 23, 1991, two days after Peter Sanelli's murder. (Tr. at 687). He spoke with Anthony Sanelli, Sanelli's sister Denise, and Denise's fiancee (now husband) Mike Barone and told them that he had information regarding their father's murder. (Tr. at 474-75). Anthony Sanelli testified that the family took notes during this meeting, but that as far as he knew, the notes had been kept within the family and not given to the police. (Tr. at 479). He further testified that he encouraged Willis to call the police. (Tr. at 477).  Several hours later, Willis did call the police and provided them with information implicating Mack in Sanelli's murder.

Respondent does not contest the fact that the Sanelli Family Notes were not provided to Mack at any time prior to or during trial.  Mack did not obtain these Notes until they were produced in habeas discovery as part of the prosecutor's file.  During the Evidentiary Hearing conducted in this Court in June - July 2010, Mr. Barone (the victim's son-in-law) identified Evidentiary Hearing Exhibit (hereinafter "EH Exh.") 8 as the notes that were taken during the January 23rd meeting with Willis. (EH Tr. at 680). He testified that he took the Notes himself, and that he turned them over to

---

searching inquiry into the merits of an unexhausted claim at this stage." *Bailey v. Lafler*, 2010 WL 4286352 at * 5 (W.D. Mich. Sept. 29, 2010).

the police "within a day" of the meeting. (EH Tr. at 683-64). [5]

The State's duty to disclose favorable evidence extends to all such evidence known to those acting on the government's behalf in the case, including the police.  *See Kyles*, 514 U.S. at 437.  In light of this undisputed evidence that the Notes were given to the police, the Court finds there is potential merit in Mack's claim that the State suppressed the Notes under first prong of *Brady*.

Mack argues that the Notes are favorable under the second prong of *Brady* because the information contained therein conflicts with Willis' trial testimony in several respects and would have provided the defense with valuable impeachment material against him. For example, he argues that the Notes are significant because they only identify Sowell as a suspect and make no mention of Mack having any involvement in the murder. (EH Exh. 8). This is particularly important, Mack argues, because Willis had known Mack for many years and could have easily been able to identify him by name. (Tr. at 666). In addition, Mack argues the Notes are significant because they state that Willis only saw "a man" (singular) outside the Fairfax Recreation Center, rather than two men as he testified at trial. (Tr. at 673-75).  Mack maintains that, taken in connection with the Notes' failure to mention Mack, this reference to a single man could be used to support the theory that only Sowell was involved, and not Mack.  Mack also argues the Notes are significant because they make no reference at all to the story told by Willis at trial that Mack, Sowell and Germany came to Willis' house before the murder, asked for a gun, and said they were going to steal a car.

The Court finds potential merit in Mack's argument that the Notes contain valuable impeachment evidence. As *Brady* material must be considered collectively to determine whether its

---

[5]        Mr. Barone was not called as a witness during Mack's trial.

suppression was material,[6] the Court will consider this issue with regard to the Notes in the context of its materiality review, *infra*.

### b.    *Brady* sub-claim 2: Willis Police Report

Mack next argues the State improperly failed to disclose an undated police report which summarizes (1) Willis' telephone call to the police on January 23, 1991; (2) the arrest of Mack, Sowell, and Germany; and (3) Willis' visit to a police impound lot to view Mr. Sanelli's vehicle (EH. Exh. 9).[7]  Mack claims this document contains valuable impeachment evidence and that its suppression by the State was prejudicial. Respondent maintains this undated police report was, in fact, disclosed to the defense prior to trial.

It is unclear whether this Report was read or otherwise disclosed to Mack prior to trial.  Mr. Bombik and his second-chair prosecutor John Ghazoul identified this Report during the Evidentiary Hearing in this Court and testified that it was the type of report that would have been read aloud to defense counsel during a pre-trial conference.  (EH Tr. at 147-153, 617).  However, defense counsel Paul Mancino was not certain that he had been apprised of the content of this Report, and his handwritten notes from a pre-trial in the case do not clearly establish that this particular Report was, in fact, reviewed with him prior to trial.  (EH Tr. at 576; EH Exh. 38).

The Court finds potential merit in Mack's claim that the State suppressed Willis' undated

---

[6]     The Court addresses the materiality requirement of *Brady* cumulatively, below. *See Kyles*, 514 U.S. at 436 fn. 10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality separately. . .. ")

[7]     In his Traverse, Mack argues that the State failed to disclose three reports generated by the police as a result of their contact with Willis regarding the Sanelli murder.  For purposes of ruling on the instant Motion, the Court finds that it need only address the undated police report (EH Exh. 9) discussed above.

Police Report.  The record reflects that Mack diligently attempted to obtain discovery of all exculpatory material, including police reports, prior to trial.  In February 1991, he filed both a (1) Motion for Discovery and to Examine Exculpatory and Mitigatory Material; and (2) Motion for Discovery of Statements of Potential Witnesses. (Apx. Vol 1 at 31, 38).  In addition, in February 1991, Mack served a discovery request on the State for "all evidence known or which may become known to the prosecuting attorney favorable to the defendant and material to guilt or punishment." (EH Exh. 44).  The State responded in writing to this requests, indicating that "no exculpatory material is available to or in the possession of the prosecuting attorney." (EH Exh. 45).

Mr. Mancino testified that he did not receive copies of any police reports generated by the Cleveland Police Department in the course of its investigation of the Sanelli murder, including the undated Willis Police Report at issue herein.  (EH Tr. at 398-99, 426).  While he could not specifically remember whether the particular police report at issue was read to him during a pre-trial conference, he explained that it is difficult to determine whether any particular police report was read to him because he wasn't allowed to look at any of the police reports and "you don't know what they [the prosecutors] are reading when they are reading it to you."  (EH Tr. at 576).  Even when the prosecutors did read police reports or statements aloud, Mancino stated he could not be certain whether the prosecutors were reading word for word, or merely summarizing.  (EH Tr. at 571).

The Supreme Court has held that defendants are not required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  In the instant case, Mack's defense counsel attempted to gain access to exculpatory material prior to trial through their discovery motion, motion for exculpatory evidence, and specific discovery request for material favorable to the defense. The

34

prosecution explicitly represented to the defense that it had no exculpatory information in its possession, and it did not update or correct this assertion at any time prior to trial (EH Tr. at 400-01). Moreover, to the best of his recollection, Mancino did not recall ever being apprised of the undated Willis Police Report at issue. Accordingly, the Court finds potential merit in Mack's claim that the State suppressed the undated Willis Police Report.

The Court must next determine, under the second prong of *Brady*, whether Mack's claim that this Report has exculpatory or impeachment value has potential merit. Mack argues that this Report is exculpatory because it asserts that Willis "stated that the person who shot THE GUY WITH THE GLASS STORE, was TOM SOWELL." (EH Exh. 9 ) (caps in original). In addition, it states that Willis was conveyed to an impound lot to view Mr. Sanelli's vehicle prior to giving his written statement. (*Id.*). Mack claims that this information constitutes valuable impeachment evidence that would have helped to discredit Willis' trial testimony identifying Mack as the killer.

The Court finds potential merit in Mack's claim that the undated Willis Police Report (EH Exh. 9) has exculpatory value. The issue, then, is whether the suppression of this Report was material. Although standing alone this Report might not be sufficient to demonstrate prejudice, this Court must view all suppressed evidence collectively in order to determine materiality. *Kyles*, 514 U.S. at 436. The Court will consider whether the suppression of the undated Willis Police Report was material in connection with its materiality review, *infra*.

### c.    *Brady* sub-claim 3: Holton Crash Reports

Mack next argues that the State suppressed police reports relating to the recovery of Mr. Sanelli's stolen vehicle on Holton Avenue in Cleveland (hereinafter referred to as the "Holton Crash

Reports"), as well as the name of a witness to the crash of that vehicle, Jerry Kirkland.[8]  Mack

claims that the Reports (along with the identity of Kirkland as a witness) constitute material,

exculpatory information and that their suppression prejudiced him. Respondent does not specifically

address Mack's substantive arguments regarding this sub-claim.

At trial, the State offered testimony and evidence that Peter Sanelli's vehicle was recovered

within an hour of his murder, having crashed into a utility pole at East 90th Street and Holton Avenue

in Cleveland. (Tr. at 505-06). Mack obtained in habeas discovery a copy of a police report dated

January 22, 1991 (EH Exh. 6) that relates to the recovery of the Sanelli vehicle.  This Report states

that the police learned a man named Jerry Kirkland and his two teenage daughters witnessed the

Sanelli vehicle crash into the utility pole.  Mr. Kirkland was interviewed on January 22, 1991.  He

told police that he saw the stolen vehicle crash into the utility pole and that there was only one

person in the car at that time.  That person, a black male in his 20's, exited the damaged car cursing

and rubbing his injured nose.  Kirkland further indicated this male was wearing a Chicago Bulls

jacket at the time. (EH Exh. 6).

Mack argues that the report at issue was suppressed and that it contains material, exculpatory

information. Specifically, he asserts the January 22, 1991 Report (EH Exh. 6) is important because

it identifies Mr. Kirkland and his daughters as witnesses to the crash, and states that both Mr.

Kirkland and his daughters saw only one man in the Sanelli vehicle.  Mack also claims Mr.

Kirkland's description of this unidentified man matches Sowell's physical description, and it is

---

[8]    Mack argues that the State failed to disclose two police reports relating to the recovery of the stolen Sanelli vehicle.  For purposes of ruling on the instant Motion, the Court finds that it need only address the January 22, 1991 police report (EH Exh. 6), discussed above.

significant that the unidentified man wore a Chicago Bulls coat since Sowell had such a coat in his possession when he was arrested on January 23, 1991.  Because there is no mention of another man in the vehicle, Mack claims this Report impeaches Willis' claim that he saw both Mack and Sowell in the Sanelli vehicle and, further, that it suggests that Sowell was the shooter.

The Court finds potential merit to Mack's argument that the State suppressed the January 22,1991 Holton Crash Report (EH Exh. 6) and identity of Jerry Kirkland, and that this information has exculpatory value.  The Court will consider whether the suppression of this information is material in connection with its materiality review, *infra*.

### d. *Brady* sub-claim 9: Willis' Oral Statement to prosecutors

Mack argues the State improperly failed to disclose an oral statement by Willis to prosecutor Bombik, in which he asserted for the first time that Mack admitted to shooting his gun during Mr. Sanelli's carjacking.  He maintains that, while not exculpatory, this statement could have been used to impeach Willis as to the changing nature of his story regarding Mack's involvement in the murder.

Prosecutor Bombik testified during the Evidentiary Hearing that he met with Willis at least once prior to trial to discuss his trial testimony. (EH Tr. at 509-11). The notes of Bombik's June 1991 meeting with Willis were produced in habeas discovery as EH Exh. 35. (EH Tr. at 656-59). Bombik testified that, during the course of this meeting, he likely became aware of Willis' allegation that Mack made the statement "I shot because you [Sowell] shot." (EH Tr. at 510-11). Willis' allegation that Mack made this statement does not appear in Willis' written statement or in any other documents recording Willis' allegations regarding the Sanelli homicide.  Defense counsel Paul Mancino testified he was not made aware prior to trial of Willis' allegation that Mack made this

37

statement.  (EH Tr. at 405-08).

Assuming the State indeed failed to disclose Willis' oral statement to the prosecution, the Court finds potential merit in Mack's argument that this statement has impeachment value.  While the content of Willis' statement is clearly not exculpatory, the Court agrees that Mack could have used Willis' June 1991 oral statement to demonstrate that Willis had changed his story since giving his written statement to the police in January 1991.

The issue, then, is whether the suppression of Willis' oral statement was material.  The Court will consider whether the suppression of Willis' oral statement to prosecutors was material in connection with its materiality review, *infra*.

### e.    *Brady* **Materiality Review**

When analyzing the materiality of *Brady* evidence, the Supreme Court has held that a reviewing court must examine its cumulative effect.  *Kyles*, 514 U.S. at 436.  As set forth *supra*, evidence is "material" for *Brady* purposes if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."  *Id*. at 433. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Wilson v. Parker*, 515 F.3d 682, 701-2 (6th Cir. 2008). *See also Montgomery v. Bobby*, 2011 WL 3654383 at * 9 (6th Cir. Aug. 22, 2011).  The Supreme Court also explained that materiality is not a sufficiency of the evidence test. *Kyles*, 514 U.S. at 435.  Indeed, the question is not whether the defendant would have more likely than not received a different verdict with the evidence, but "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*.  at 434.

As detailed *supra*, the Court has found that, at a minimum, four of Mack's *Brady* sub-claims

38

have potential merit under the first and second prongs of *Brady*; i.e. the suppression of (1) the Sanelli Family Notes (EH Exh. 8); (2) the undated Willis Police Report (EH Exh. 9); (3) the January 22, 1991 Holton Crash Report (EH Exh. 6) and the identity of witness Jerry Kirkland; and (4) Willis' oral statement to prosecutors that Mack admitted to shooting his gun during the Sanelli carjacking. Because these sub-claims are unexhausted and Respondent has moved to dismiss the Petition on that basis, the Court considers the cumulative materiality of these sub-claims in the context of the determination of futility; i.e. whether it would be futile to require Mack to exhaust these sub-claims in state court because, on their face, they lack potential merit.

Mack argues that he "easily satisfies" the materiality requirement because the above suppressed evidence would have allowed Mack's counsel to much more effectively challenge the testimony, bias and credibility of Willis and of the entire investigation. Moreover, it would have given rise to a much more credible argument that Willis was involved in the Sanelli homicide and "was testifying to save his own skin." (ECF No. 107 at 61). Mack further argues that, if the suppressed evidence had been disclosed, he could have requested an "accomplice" jury instruction as to any testimony from Willis. Further, he maintains that the suppressed evidence would have cast grave doubt on whether Mack was the "principal offender," resulting in a reasonable probability that Mack would not have been sentenced to death.

Respondent argues summarily that Mack has not demonstrated how the suppressed evidence would have changed the outcome of the trial or undermined confidence in the verdict, particularly when viewed in the context of the entire record.

The Court cannot say that, on its face, there is no potential merit to Mack's argument that the suppressed evidence, viewed cumulatively, was material. Willis was undoubtedly a key witness

for the State. As Justice Wright noted in his dissent in Mack's direct appeal:

> . . . Willis' testimony was critical to the state's case.  Willis is the only witness who places [Mack] at the scene of the crime.  Willis is the only witness who testified that [Mack] was in a position to fire a shot at Sanelli. Willis is the only witness who in any way related that [Mack] had a motive to commit the crime. Willis is the only witness who described in any sort of detail the automobile that [Mack] and co-defendant Sowell were allegedly driving on the day of the crime. In a word, Willis was a key witness for the state whose testimony was critical to the conviction of [Mack].  If his credibility would have been impugned, the issue of [Mack's] guilt would have been a close call at best.

*State v. Mack*, 73 Ohio St.3d 502, 517 (Ohio 1995). Taken as a whole, it is not plainly meritless to suggest that there is "reasonable probability" the suppressed evidence could have caused the jury to question the credibility of Willis' testimony.  In the Sanelli Family Notes, Willis identifies Sowell as the shooter and does not mention Mack, despite the fact that Willis had personally known Mack for many years. Similarly, the Holton Crash Report's summary of the police interview with Mr. Kirkland indicates that Mr. Kirkland saw only one man in Sanelli's vehicle shortly after the homicide occurred and this man was wearing a Chicago Bulls jacket, like the one found in Sowell's possession when he was arrested.  In addition, Willis' undated police report states that Sowell was the shooter, and makes no mention of Mack allegedly firing a gun.

While there was certainly other evidence linking Mack to the crime (e.g., the fact that the gun used to kill Sanelli was found in Mack's possession), the Court is not to engage in a sufficiency of the evidence test but, rather, to ask whether in the absence of the suppressed evidence at issue Mack received a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.  The Court is not suggesting that a state court would necessarily find that the suppressed evidence at issue herein meets this test, but it cannot state either that Mack's argument that this evidence is material is plainly meritless, particularly in light of the importance of Willis'

testimony in convicting Mack.

Accordingly, the Court finds that, because a number of Mack's unexhausted *Brady* sub-claims have potential merit, it would not be futile to require Mack to return to state court.

### 3.    Futility: Availability of State Remedy

As stated *supra*, a federal habeas court may also deny a mixed petition "upon a finding that the petitioner has no available remedy in state court and to dismiss the petition would amount to nothing more than a futility." *Lott*, 261 F.3d at 620. *See also Buell*, 274 F.3d at 349.

In the instant case, Respondent argues that available and adequate state remedies exist for Mack to bring his unexhausted *Brady* claims in state court. Specifically, Respondent maintains that Mack could file either a Successive Motion for Post-Conviction Relief under Ohio Rev. Code § 2953.23, or a Motion for New Trial under Ohio Crim. R. 33. (ECF No. 76 at 3).

Mack does not argue that either of these state remedies would be unavailable to him. Rather, he states only that "the Ohio courts made it clear they were unwilling to give these claims meaningful consideration, and they refused to let him develop them in state court." (Memorandum in Opp. to Mtn. To Dismiss at 4).

Although this Court is in no position either to command the state courts to make a remedy available or to direct Mack to pursue a certain remedy, it appears that at least two potential remedies may be available to Mack to present his unexhausted *Brady* sub-claims in state court. First, given the fact that the *Brady* evidence at issue was unavailable to Mack on direct appeal and is *dehors* the record, it appears that Mack could file a successive petition for post-conviction relief. Pursuant to Ohio Rev. Code § 2953.21(A)(2), a petition for post-conviction relief must be filed no later than 180 days after the date on which the trial transcript is filed in direct appeal proceedings. However, the

41

court is permitted to consider a petition filed after this deadline has expired if (1) the petitioner shows that he "was unavoidably prevented from discovery of the facts upon which he must rely to present the claim for relief" or "the United States Supreme Court recognized a new federal or state right that applies proactively to persons in the petitioner's situation, and the petition asserts a claim based on that right;" and (2) the "petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found [him] guilty of the offense of which [he] was convicted." Ohio Rev. Code § 2953.23.

Mack has not argued that he would be unable to meet this test. While he might not ultimately prevail, the Sixth Circuit has held that "where the state's remedial process is open to interpretation with respect to the availability of relief via that process, the state should be given an opportunity to adopt the interpretation." *Sampson v. Love*, 782 F.2d 53, 58 (6th Cir. 1986). *See also Godbolt v. Russell*, 2003 WL 22734743 at **2 (6th Cir. Nov. 18, 2003) (stating that "[n]o matter how unlikely it seems that Godbolt's petition will fall within the narrow exception contained in [Ohio's post-conviction relief] statute, it is for the state courts to interpret and enforce their laws on such issues").

It also appears that Mack could file a Motion for New Trial pursuant to Ohio Crim. R. 33, based on prosecutorial misconduct and/or newly discovered *Brady* evidence. That Rule provides, in pertinent part, that "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: . . . (2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state; . . . (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." Ohio Crim. R. 33(A)(2) and (6). Once again, Mack has not argued that he would be unable to meet this test.

Ultimately, it is not the place of this Court either to command the state courts to make a remedy available or to direct Mack to pursue a certain remedy. Because there is ambiguity about their availability, however, the Court is compelled to require Mack to attempt them. *See Sampson*, 782 F.2d at 58. *See also Steffen v. Tate*, 2006 WL 1339381 at * 6 (S.D. Ohio May 16, 2006) (finding that habeas petitioner must return to state court to attempt to exhaust claims because potential state court remedies were available to him in the form of successive petition for post-conviction relief and/or motion for new trial).

**4.  "Supplementation or Clarification" of Existing Claim under *Vasquez v. Hillery*, 474 U.S. 254 (1986)**

In a final attempt to persuade this Court that he has fully exhausted the *Brady* sub-claims at issue, Mack argues that these claims are not substantially different from the *Brady* claims that he raised in state court. Citing *Vasquez v. Hillery*, 474 U.S. 254 (1986), Mack maintains that the new evidence supporting these sub-claims is merely "supplementation and clarification" of the state factual record and does not dramatically change the underlying claim so as to require exhaustion in state court.

In *Vasquez*, the petitioner brought an equal protection claim in federal habeas proceedings, arguing that blacks had been systematically excluded from the grand jury that had indicted him. In the district court, petitioner submitted several "new" affidavits supporting his claim that no black individual had ever served on a grand jury in the county in question. *Vasquez*, 474 U.S. at 257.  The petitioner also submitted (at the district court's request) a computer analysis that showed the probability that chance could have accounted for the exclusion of blacks on grand juries in the county.  *Id*.  This "new" evidence was included in the habeas record pursuant to Rule 7 and had not been presented to the state courts.  The district court concluded that petitioner had established

43

discrimination in the grand jury, and granted the writ. The Court of Appeals affirmed.

On appeal to the Supreme Court, the State argued that this new evidence "drastically altered" petitioner's claim and, thus, he should have been required to exhaust it in state court. *Id*. at 257. The Court disagreed. First, the Court noted that the "new" affidavits did not introduce a new claim upon which the state courts had not passed, because the facts established by the affidavits had been considered undisputed by the state courts. *Id*. at 258. Second, the Court found that the computer analysis did not render petitioner's claim "a wholly different animal" because it added nothing to the case that "this Court has not considered intrinsic to the consideration of any grand jury claim." *Id*. at 259. Thus, the Court held that "the supplemental evidence presented by [petitioner] did not fundamentally alter the legal claim already considered by the state courts, and, therefore, did not require that [petitioner] be remitted to state court for consideration of that evidence." *Id*. at 260.

The Court finds that *Vasquez* is distinguishable from the instant case. In *Vasquez*, the petitioner repeatedly raised his grand jury discrimination claim in the state courts under the same factual and legal theory as presented on federal habeas review. While additional factual evidence was developed regarding this claim in federal habeas proceedings, the nature of the claim itself did not change, either in terms of its legal or factual basis. The crux of petitioner's claim was unchanging; i.e. that he had been discriminated against in violation of the equal protection clause because blacks had been systematically excluded from the grand jury that indicted him.

In the instant case, Mack did raise a *Brady* claim during his direct appeal to the Ohio Supreme Court, but this claim related only to the State's alleged failure to disclose evidence of a $10,000 reward offered by the Sanelli family. In his brief to that court, Mack did not raise, discuss, or refer to any of the sub-claims at issue herein in the context of an alleged *Brady* violation.

44

The *Brady* sub-claims which this Court have found to be unexhausted are factually distinct from the alleged suppression of the Sanelli family reward.  In state court, Mack's argument centered on establishing that the State had suppressed evidence of the Sanelli family reward, and this evidence was material because it could have been used to establish that Willis' testimony was motivated by greed.  The factual allegations contained in the unexhausted *Brady* sub-claims herein are wholly different than what was presented below and, thus, "fundamentally alter" the claim already considered by the state courts.  Accordingly, the Court finds that Mack's reliance on *Vasquez* and its allied cases is misplaced.  *See, e.g. Lott*, 261 F.3d at 619 (finding that petitioner's presentation to the state court of *Brady* claim on one issue does not permit him to put forward other supposed *Brady* claims predicated on factually dissimilar premises).  **5**  .

### Conclusion

For all the foregoing reasons, the Court finds that the ten *Brady* sub-claims at issue are unexhausted.  In addition, the Court finds that it would not be futile to require Mack to return to state court to exhaust his claims because, at a minimum, the following four *Brady* sub-claims have potential merit: (1) sub-claim 1 (the Sanelli Family Notes); (2) sub-claim 2 (as to Willis' undated Police Report); (3) sub-claim 3 (as to the January 22,1991 Holton Crash Report and identity of Jerry Kirkland); (4) and sub-claim 9 (Willis' oral statement to prosecutors).  The Court further finds that it would not be futile to require Mack to return to state court to exhaust his *Brady* sub-claims because there are potential state remedies available to him.

### B.  Ineffective Assistance of Counsel Claims

In her Motion to Dismiss and Post-Evidentiary Hearing Brief, Respondent argues that the following two of Mack's ineffective assistance of trial counsel claims are unexhausted: (1) counsel's

failure to argue during the guilt phase of trial that Mack was not the "principal offender," and (2) counsel's failure during the mitigation phase to conduct a sufficient mitigation investigation into Mack's social, educational, and psychological background, or to develop a coherent mitigation strategy.  Mack maintains that each of these claims were fairly presented to the state courts during either direct appeal, post-conviction, or his Rule 26(B) Application.[9]

The Court will first set out the legal standards for analyzing ineffective assistance of counsel claims, and will then address the procedural posture of the two claims at issue.

To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id* at 687. To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation falls "below an objective standard of reasonableness."  *Id.* at 688.  A court considering an ineffective-assistance claim "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, – U.S. –, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689).

The petitioner also must demonstrate that he or she was prejudiced by counsel's errors.  To do this, a petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable

---

[9]     Mack raises a number of additional ineffective assistance of counsel sub-claims in his Seventeenth and Eighteenth Grounds for Relief.  Respondent argues, however, that only the two particular sub-claims identified above are unexhausted.

probability is a probability sufficient to undermine confidence in the outcome.'" *Harrington,* 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. *Strickland*, 466 U.S. at 689. "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689). If a petitioner fails to prove either deficiency or prejudice, then the ineffective assistance of counsel claims must fail. *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).

> ### 1. Procedural Posture of Ineffective Assistance of Counsel claims
>
> #### a. Failure to Argue that Mack was not the "Principal Offender"

Respondent argues Mack's claim that counsel was ineffective for failing to argue that Mack was not the "principal offender" is unexhausted because Mack failed to raise it at any time during any of the state court proceedings in this case. Mack does not address this procedural argument.[10]

The Court has thoroughly reviewed the state court record and finds that Mack did not raise

---

[10] The Court notes that Mack failed to raise this particular ineffective assistance of counsel sub-claim in either his Petition or Traverse. Rather, he raises it for the first time in these habeas proceedings in his Post-Evidentiary Hearing Brief, filed on September 13, 2010.

this particular ineffective assistance of counsel sub-claim at any time prior to these federal habeas proceedings.  On direct appeal, Mack did argue ineffective assistance of counsel during the guilt phase, but only in the context of defense counsel's failure to object to the court's reasonable doubt jury instruction, and failure to move for a mistrial after the trial court's refused to allow two witnesses (Carole Mancino and Curtis Mack) to testify.  During post-conviction proceedings, Mack raised four ineffective assistance of counsel during the guilt phase claims, arguing that defense counsel was ineffective for (1) failing to conduct an independent ballistics test; (2) failing to lay a proper foundation so that Willis could be impeached through testimony from Carole Mancino and Curtis Mack; (3) failing to investigate other evidence that would have impugned Willis' credibility; and (4) failing to investigate other alibi evidence.[11]  However, none of these claims bear any relation to the particular sub-claim at issue herein; i.e. the claim that defense counsel was ineffective for failing to argue that Mack was not the "principal offender."

Based on the above, the Court finds that Mack has failed to fairly present to the state courts his claim of  ineffective assistance of counsel during the guilt phase based on counsel's failure to argue that Mack was not the "principal offender."  Accordingly, the Court finds that this sub-claim is unexhausted.

### b. Failure to Conduct a Sufficient Mitigation Investigation

Respondent next argues that Mack's claim that counsel was ineffective for failing to conduct a sufficient mitigation investigation is unexhausted because Mack failed to raise it during direct appeal or post-conviction proceedings. Respondent further maintains that, although this sub-claim

---

[11]     Mack also failed to raise his "principal offender" ineffective assistance claim in the context of his Rule 26(B) Application.

was raised in the context of Mack's Rule 26(B) Application, it was not raised by Mack as an independent claim on the same theory as it is now being raised here.  Rather, it was presented to the Ohio courts only as a predicate claim and presented in the context of a ineffective assistance of *appellate* counsel claim, rather than as an independent ineffective assistance of trial counsel claim. Thus, Respondent argues that Mack failed to raise "the same claim under the same theory" to the state courts before raising it on federal habeas review, rendering the instant sub-claim unexhausted. *See Hicks*, 377 F.3d at 552-53.

Mack argues that his Rule 26(B) Application was sufficient to raise both his ineffective assistance of appellate counsel claims, as well as his underlying predicate claim of ineffective assistance of trial counsel for failure to conduct a sufficient mitigation investigation.

As set forth previously, an analysis of a particular claim for purposes of determining whether appellate counsel's failure to assert that claim on appeal, is independent of whether the underlying claim would itself be deemed unexhausted if asserted as a discrete claim.  *See Mapes*, 171 F.3d at 413-14; *Lott*, 261 F.3d at 612.  As the Sixth Circuit has made clear, "[a]lthough the determination of whether appellate counsel was ineffective for failing to raise a substantive claim may, in some cases, involve an inquiry into the merits of the underlying substantive claim, the fact remains that the two claims are analytically distinct for purposes of the exhaustion and procedural default analysis in habeas review." *Davie v. Mitchell*, 547 F.3d 297, 312-13 (6th Cir. 2008).  This principle applies where a habeas petitioner fails to raise an ineffective assistance of trial counsel claim in state court and attempts to preserve the issue by arguing (in a Rule 26(B) Application) that appellate counsel was ineffective for failing to argue ineffective assistance of trial counsel on direct appeal. *Muntaser v. Bradshaw*, 2011 WL 2646551 at *6 (6th Cir. July 6, 2011) (finding that petitioner's Rule

49

26(B) application claim of ineffective assistance of appellate counsel "cannot function to preserve the underlying [ineffective assistance of trial counsel] claim for federal habeas review").

In light of the above, the Court finds that, by failing to raise his claim of ineffective assistance of trial counsel for failing to conduct a sufficient mitigation investigation on either direct appeal or post-conviction, Mack has failed to fairly present this issue to the state courts for review. Therefore, the Court finds that this sub-claim is unexhausted.[12]

### 2.      Futility

Having found that the two ineffective assistance claims at issue are unexhausted, the Court would ordinarily next determine whether it would be futile to require Mack to return to state court to exhaust these claims. However, as the Court has already determined that Mack must return to state court to exhaust his *Brady* sub-claims, it is unnecessary for the Court to engage in a futility analysis as to Mack's unexhausted ineffective assistance claims. When Mack returns to state court to exhaust his *Brady* claims, there is nothing to prevent him from seeking state court review of his unexhausted ineffective assistance of trial counsel claims as well.[13]

### VII.    Stay and Abeyance

---

[12]    Whether Mack's claim of ineffective assistance of appellate counsel for failing to raise this claim might excuse a procedural default of that claim is a separate and distinct issue that is not addressed by the Court in this Opinion.

[13]    These sub-claims cannot be considered "supplementation or clarification" of an existing ineffective assistance of counsel claim under *Vasquez, supra*, as they are premised on entirely different factual and legal arguments than the ineffective assistance claims that Mack did raise on direct appeal and post-conviction review in state court. *See Caver v. Straub*, 349 F.3d 340, 346-7 (6th Cir. 2003) (finding that "to the extent that [an ineffective assistance] claim is based upon a different allegedly ineffective action than the claim presented to the state courts, the claim has not been fairly presented").

Having concluded that Mack's Petition and Post-Evidentiary Hearing Brief assert a number of unexhausted claims and that to require Mack to return to state court would not be futile, the Court must next determine how to proceed. Respondent argues the Court should either (1) dismiss Mack's Petition in its entirety; (2) dismiss Mack's unexhausted claims; or (3) "simply deny the writ."

In the past, a federal court presented with a "mixed petition" was required to dismiss that petition in its entirety, without prejudice, to permit the petitioner to exhaust his claims. *Rose v. Lundy*, 455 U.S. 509, 510 (1982). When *Rose* imposed this "total exhaustion" requirement, however, "there was no statute of limitations on the filing of habeas corpus petitions." *Rhines v. Weber*, 544 U.S. 269, 274 (2005). Now, in order to ensure that a petitioner who otherwise files a timely habeas petition is not precluded by the statute of limitations set forth in § 2244(d)(1) from re-filing his petition following the exhaustion of his state remedies, a federal court is permitted to stay and abey the habeas proceedings to permit exhaustion, rather than dismissing the petition. *Id*. at 277.

However, in *Rhines*, the Supreme Court cautioned that stay and abeyance is only appropriate when the district court determines that (1) there was good cause for the petitioner's failure to exhaust his claims first in state court; (2) the petitioner's unexhausted claims are not plainly meritless; and (3) petitioner has not engaged in abusive litigation tactics or intentional delay. *Id*. at 277-78. Where a stay and abeyance is appropriate, the Supreme Court suggested that "district courts should place reasonable time limits on a petitioner's trip to state court and back." *Id*. at 278.

The Court finds that it would not be appropriate to dismiss Mack's Petition, as suggested by Respondent, as a dismissal raises the possibility that Mack might be prevented under the one year statute of limitations set forth in § 2244(d)(1) from refiling his Petition. Moreover, since at least several of Mack's unexhausted claims have potential merit, the Court is disinclined to dismiss them

51

outright. For similar reasons, the Court rejects Respondent's suggestion that the Court "simply deny the writ" due the presence of unexhausted claims.

Rather, the Court determines that the better course would be to stay the instant case and hold it in abeyance to permit Mack the opportunity to exhaust his unexhausted claims. With respect to his unexhausted *Brady* sub-claims, Mack has shown good cause for failing to exhaust since they are predicated on suppressed evidence and information that was not provided to Mack until habeas discovery. Moreover, the Court has already determined that, at a minimum, the four *Brady* sub-claims discussed *supra* are not "plainly meritless." Finally, there is no indication that Mack engaged in abusive litigation tactics or intentional delay.[14]

Accordingly, the Court will stay the instant case and hold it in abeyance pending exhaustion.[15] The stay is granted, however, on the condition that (1) Mack initiate proceedings in state court within thirty (30) days of the entry of this Opinion & Order; (2) the parties submit status reports every ninety (90) days regarding the status of Mack's efforts to exhaust his unexhausted claims; and (3) Mack seek reinstatement on this Court's active docket within thirty (30) days of fully exhausting his state court remedies.

IT IS SO ORDERED.

---

[14] Since the Court has found that stay and abeyance is warranted because at least four of Mack's unexhausted claims meet both the first and second prongs of the *Rhines* test, it need not determine whether each individual unexhausted sub-claim also meets this test. Once the Court determines that a stay is warranted under *Rhines*, it is unnecessary to make this determination for each and every individual unexhausted claim.

[15] This Court has the discretion to stay the Petition and hold it in abeyance even though Respondent did not specifically request that the Court do so. *See Banks v. Jackson*, 2005 WL 2108358 at * * 5, n. 7 (6th Cir. Aug. 31, 2005); *Buchanan v. Bell*, 2010 WL 2560434 at *3 (E.D. Mich. June 16, 2010).

/s/ *SOLOMON  OLIVER,  JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT

November 23, 2011