UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Clarence Mack, | ) | Case No. 1:04 CV 829 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| -vs- | ) | |
| | ) | |
| Margaret Bradshaw, Warden, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |

### INTRODUCTION

Petitioner Clarence Mack was convicted and sentenced to death in an Ohio state court for the aggravated murder of Peter Sanelli.  Mack has filed a petition and amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentence.  (Docs. 24, 155.)  Respondent Warden Margaret Bradshaw has filed a return of writ to the amended petition.  (Doc. 158.)[1]  Mack has filed a traverse.  (Doc. 162.)  For the reasons stated below, the court denies Mack's amended petition.

---

[1] According to the parties' filings, Mack is currently incarcerated at the Chillicothe Correctional Institution, where Timothy Shoop, not Margaret Bradshaw, is the warden.  For consistency with the docket, however, the court continues to list Margaret Bradshaw as the respondent.

## FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying Mack's

convictions:

Peter Sanelli, along with his son Anthony, owned and operated Sandglo Glass
and Mirror Company on Prospect Avenue in the city of Cleveland. On January
21, 1991, Thomas Sowell, Reginald Germany, and the defendant-appellant,
Clarence Mack, carjacked Mr. Sanelli as he was leaving his business, fatally
shooting him and stealing his car.

Mr. Sanelli was last seen around 5:45 p.m. by his son Anthony. At that time,
Anthony went home for the day, leaving Mr. Sanelli at Sandglo. Before he left,
Anthony gave his father a package of nails that he would need for a job. Mr.
Sanelli's body was found around 6:10 p.m. lying in the middle of the parking
lot next to Sandglo. Dr. Robert Challener of the Cuyahoga County Coroner's
Office later testified that the autopsy performed by Dr. Kalil Jiraki showed that
Mr. Sanelli had been shot three times, and died from these wounds. One bullet
entered the left side of the victim's face, somewhat below the ear. The irregular
entrance wound indicated that the bullet had come in contact with an
intermediate object such as glass before striking the victim. The other two
bullets were fired into Mr. Sanelli's left shoulder from close range. One of these
bullets struck Mr. Sanelli's left lung and tore the sac which surrounds the heart.
A pellet with its copper jacket was retrieved from the right sleeve of Mr.
Sanelli's undershirt.

Detective Leo Allen investigated Mr. Sanelli's murder. At the scene where the
body was found, Detective Allen discovered three nine-millimeter shell casings
on the street three to five feet from the curb. A fourth shell casing was
discovered on the sidewalk behind the Dome Grille, a neighboring business.

Mr. Sanelli's car, a 1987 light blue or silver Plymouth Horizon with red and
white truck license plates, was found around 7:15 p.m. It had been crashed into
a utility pole at East 90th and Holton Avenue. The front driver's side window
and rear passenger side window were broken out. Anthony Sanelli testified that
the car's windows were all intact when he last saw his father before the murder.
An apparent bullet indentation was discovered on the rear passenger door, and
a bullet hole was found in the back side of the passenger front seat. Part of a
copper jacket to a nine-millimeter bullet was found in the car. No fingerprints
were found.

On January 23, 1991, two days after the murder of Peter Sanelli, Timothy

2

Willis approached the Sanelli family with information regarding the murder. The Sanelli family sent Willis to the police. At approximately 2:30 p.m. on January 23, Mr. Willis called Lt. John James, and told him the following story.

Willis stated that on January 21, 1991, he was approached around 5:30 p.m. by the appellant, Thomas Sowell and Reginald Germany, who were looking to buy a gun to aid them in stealing a car. When Willis refused, Germany told Sowell that he had a nine-millimeter gun which Sowell could borrow. The three then drove away. Later around 6:45 p.m. the appellant and Sowell drove up to Willis in a silver Plymouth Horizon. Willis especially noticed that the automobile had red and white license plates and that the back passenger and front driver side windows were broken out. Sowell told Willis that they had obtained the car on Prospect Avenue. The appellant and Sowell then discussed in front of Willis their reasons for shooting "the man." Sowell said that he had fired at the car window because the man disobeyed his instructions by attempting to lock his door. The appellant claimed that he had started shooting because Sowell had fired. During this discussion, Willis noticed a pair of binoculars. Anthony Sanelli testified that his father kept a pair of binoculars in the car. Later that evening, Willis recognized the car driven by the appellant and Sowell on the evening news story about the murder of Peter Sanelli.

On January 22, 1991, Willis met the appellant and Germany at approximately 9:00 p.m. and drove around with them in a red van. Willis specifically asked the appellant and Germany where they got the silver Plymouth Horizon. The appellant again told Willis that they got it from the downtown area. The appellant and Germany laughed as they related how Sowell had injured his nose when he crashed the stolen car into a pole.

After Willis told the police this story, he informed them where and when they might locate the appellant, Germany and Sowell. Based on the information given by Willis, the police dispatched officers to arrest these men. Willis had told the police that the appellant and Germany were on their way to his address. The police saw a red van matching the description given by Willis park in front of Willis's house at around 4:30 p.m. Reginald Germany, the appellant, and Maurice Washington exited. A fourth man, Brian McKinney, remained in the van. Reginald Germany exited the driver's side of the van holding a nine-millimeter gun in one hand, which he immediately dropped to the ground as the police approached. The officers stopped and frisked each of the men, and searched the van. The officers felt and uncovered a nine-millimeter gun in a holster under the appellant's coat. The police also found a third gun on the floor of the van at the feet of Brian McKinney. Appellant's and Germany's guns were loaded, and two additional clips were recovered from the appellant's pockets as well. The men were taken into custody by the police.

3

Willis told police that Thomas Sowell could be located at Cleveland Industrial Drum. Police arrested Sowell there, and discovered a nail in his pocket that matched the type of nails Anthony Sanelli had given his father shortly before Peter Sanelli was murdered.

Detective Qualey, along with Lt. John James, questioned the appellant on January 23, 1991, at approximately 4:30 p.m. after the appellant's arrest. After advising the appellant of his Miranda rights, as printed on a standard police card, Det. Qualey questioned the appellant about the nine-millimeter gun that had been found on the appellant's person at the time of the arrest. Appellant stated that he had bought the gun on January 22, 1991, from an individual who was unknown to him. Further, the appellant denied any knowledge of, or involvement in, the murder of Peter Sanelli. After about an hour of interrogation, appellant was returned to his cell.

About half an hour later Detective Qualey became aware of the results of ballistics tests. The tests revealed that the three spent shell casings found on the street at the murder scene and the bullet found on Peter Sanelli at the morgue had come from appellant's nine-millimeter gun. The ballistics tests also revealed that the gun confiscated from Reginald Germany at the time of his arrest had fired the spent shell casing found on the sidewalk outside the Dome Grille and the copper bullet jacket found in the stolen car.

Detective Qualey reapproached appellant and asked if he knew his rights, to which appellant responded "yeah." After being informed of the ballistics tests, appellant changed his story. He stated that he had loaned the nine-millimeter handgun to a stranger known to him only as "Dee" the day before the murder of Peter Sanelli. Appellant claimed that Dee had needed protection because he was going to a party. The gun had been returned to the appellant the day after Sanelli's murder. The appellant noticed that the gun had been fired but did not ask why.

* * *

### Guilt Phase

The prosecution called several witnesses in its case against the appellant. Dr. Robert Challener of the Cuyahoga County Coroner's Office testified regarding the results of Dr. Kalil Jiraki's autopsy on Peter Sanelli. The state also called Detective Edward Lucey to testify regarding the results of the examination which he and other police experts had conducted on the bullet and shell casings. The prosecution's key witness was Willis, who testified as to the story he told the police.

The defense attempted to call Carole Mancino, one of the appellant's attorneys,

4

to provide testimony to impeach Mr. Willis. The trial court refused to allow her to testify. Ms. Mancino proffered that she would have testified about an interview she had with Timothy Willis on May 2, 1991. At that time, Willis was in jail along with the appellant, Germany, and Sowell, who were awaiting trial for the murder of Peter Sanelli. Ms. Mancino claims that Willis told her the following story. Willis never saw any of the defendants on January 21, 1991. Willis did see the appellant and Germany on January 22, 1991 when they came to his house to get a car part, and on January 23, 1991, the appellant and Germany drove to the front of his house to pick Willis up. Willis stated that the appellant and Germany were "good guys" and he could not believe they were involved in something like this. When asked how the police knew that the appellant and Germany would be at Willis's house at 4:30 p.m. on January 23, 1991, Willis responded that he suspected his phone was bugged due to his suspected implication in another crime.

On the witness stand, Willis had testified that he told Ms. Mancino that he did not know anything about the murder of Peter Sanelli. The prosecution pointed out that Willis was in the same jail as the men he had fingered. The trial judge ruled to suppress Ms. Mancino's testimony.

The appellant's cousin, Curtis Mack, testified that he saw numerous firearms and handmade weapons at Willis's house, and that he knew that Willis carried and sold firearms. The appellant's cousin was not allowed by the court to testify regarding a conversation he had with Willis on the night the appellant was arrested. The defense proffered into the record that Curtis Mack would have testified that Willis said he knew the appellant had nothing to do with Sanelli's murder and that Willis admitted that he, in fact, killed Sanelli.

The defense called DeMille Blue, Thomas Sowell's girlfriend, who testified that on the day of the murder, January 21, 1991, she cooked dinner for Sowell, Mack, Germany and others. Ms. Blue claimed that she was cooking when Clarence Mack arrived at 5:00 p.m. and that he did not leave until about 8:00 p.m. On cross-examination Ms. Blue asserted that Thomas Sowell did not own any firearms and that Clarence Mack did not have a firearm while he was at her house. The prosecution called Detective Norman Sherwood in rebuttal. Detective Sherwood testified that when he spoke with Ms. Blue on January 25, 1991, she told him that she had not begun cooking her Martin Luther King Day dinner until 6:00 p.m.

John Scott, the boyfriend of Clarence Mack's sister, testified for the defense that Timothy Willis owned several firearms and weapons, including nine-millimeters. He identified the gun found on the person of the appellant as one of the firearms owned by Willis in December 1990, testifying that he himself had wished to purchase it, but did not have the cash. Scott asserted that

5

he and the appellant had gone to Willis's house sometime between 1:00 p.m. and 5:00 p.m. the day after the murder, at which time Clarence Mack purchased the handgun.

Barbara Lackey, Clarence Mack's girlfriend, testified that the first time she ever saw Clarence Mack with the weapon was the day after the murder.

*State v. Mack*, 73 Ohio St. 3d 502, 502-07 (Ohio 1995).

## PROCEDURAL BACKGROUND

### A.    State-Court Proceedings

#### 1.    Trial Court

On February 5, 1991, the Cuyahoga County, Ohio, Grand Jury indicted Mack for two counts of aggravated murder in violation of Ohio Rev. Code § 2903.01(B) and one count of aggravated robbery in violation of Ohio Rev. Code § 2911.01. (Doc. 149-1 at 23-25.)[2] The first count of aggravated murder charged Mack with purposely causing the death of Peter Sanelli with prior calculation and design; the second, causing death while committing, or attempting to commit or fleeing immediately after committing or attempting to commit aggravated robbery. (*Id*. at 23-24.) Each aggravated-murder count carried a death penalty specification under Ohio Rev. Code § 2929.04(A)(7), charging that Mack committed the aggravated murder during an aggravated robbery, and either was the principal offender of the murder or committed the aggravated robbery with prior calculation and design. (*Id*.) They also had attached prior-offender and firearm specifications. (*Id*.)

Mack entered pleas of not guilty to all charges. (*Id*. at 30.) The State dismissed the

_____

[2] For ease of reference, all citations to page numbers of documents filed in the court's electronic court filing system ("ECF") are to the ECF-assigned page numbers of the individual document, not to the original document's page numbers or the ECF "PageID" numbers.

first aggravated-murder count before trial.  (Doc. 150-2 (Trial Tr.) at 39-40.)

Mack's trial began on July 1, 1991.  (*See* Doc. 150-1 (Trial Tr.) at 3.)  He was represented by Attorneys Paul Mancino and Carole Mancino.  (*See id*. at 2.)

The jury convicted Mack on all charges and specifications on July 11, 1991.  (Doc. 149-1 at 108.)  The penalty phase of the trial began on July 17, 1991, and the next day, the jury recommended that Mack be sentenced to death.  (*Id*. at 109-10.)  On August 1, 1991, the trial court accepted the jury's recommendation and imposed a death sentence.  (*See id*. at 125-27.)  The court also imposed consecutive sentences of three years' imprisonment for the firearms-specification conviction and fifteen to twenty-five years' imprisonment for the aggravated-robbery conviction.  (*Id*. at 128.)

Meanwhile, on July 24, 1991, Mack filed a motion to merge for the purpose of sentencing his convictions for aggravated robbery and aggravated murder.  (*Id*. at 111-12.)  In addition, the next day, he filed a motion for a new trial on the ground that the State had suppressed exculpatory evidence.  (*Id*. at 113-19.)  The trial court denied both motions on August 2, 1991.  (*Id*. at 120.)

## 2.    Direct Appeal

On August 30, 1991, Mack filed a timely appeal of his convictions and sentences to the Eighth Judicial District Court of Appeals.  (*Id*. at 147-48.)  He was represented by former trial counsel Paul Mancino and new counsel, Hyman Friedman, Cuyahoga County Public Defender, and Robert Ingersoll, Assistant Public Defender.  (*Id*. at 159.)  In his appellate brief, Mack raised twenty-seven assignments of error, stated as follows:

1.    Clarence Mack was denied due process of law when the court denied his motion for discovery and inspection.

7

2.     The trial court denied Clarence Mack due process, when it overruled his motion for grand jury testimony.

3.     The court denied Clarence Mack's right to be free from unreasonable search and seizure by overruling a motion to suppress evidence seized during a warrantless arrest of Clarence Mack.

4.     The trial court denied Clarence Mack his right to a jury from a fair, impartial cross-section of the community, when it dismissed for cause jurors who expressed concern about the death penalty but stated they could follow the law.

5.     The trial court denied Clarence Mack's right to a jury from a fair, impartial cross[-]section of the community, when it did not dismiss for cause jurors who believed death was the only proper sentence for someone convicted of felony murder.

6.     Clarence Mack was denied his right of confrontation when a non-examining coroner, Dr. Robert Challener, to testify [*sic*] concerning an autopsy made by a non-testifying coroner.

7.     Clarence Mack was denied the right to confrontation when State witness Anthony Sanelli testified about out-of-court conversations he had with Timothy Willis.

8.     Clarence Mack was denied due process of law when the court permitted Detective Edward Lucey to testify as an expert.

9.     Clarence Mack was denied his right against self-incrimination by the introduction of a statement made by Clarence Mack when he had not been advised of his constitutional rights.

10.    Clarence Mack was denied his right [to] defend himself by the exclusion of impeachment testimony against Timothy Willis.

11.    Clarence Mack's convictions are against the manifest weight of the evidence.

12.    Clarence Mack's constitutional right to life is violated by his conviction for a felony murder specification that was not supported by sufficient evidence to prove his guilt beyond a reasonable doubt.

13.    Clarence Mack was denied his constitutional right to a fair and impartial jury at his trial by the introduction of gruesome and

inflammatory photographs.

14. Clarence Mack was denied his right to a trial by a jury by the improper jury instructions given during his trial.

15. Clarence Mack was denied due process of law by the refusal to instruct on the lesser included offenses of murder and involuntary manslaughter.

16. Clarence Mack was denied his right to effective assistance of counsel by counsel's failure to preserve the record.

17. Clarence Mack was denied his constitutional right to a fair trial by the cumulative effect of all the errors that occurred during his trial.

18. Repeated prosecutorial misconduct denied Clarence Mack a fair trial.

19. The court denied Clarence Mack his right to a fair, impartial jury when it allowed gruesome and inflammatory photographs during the penalty phase of his trial.

20. Clarence Mack was denied due process of law when the court improperly instructed the jury during the penalty phase.

21. Clarence Mack was denied his right to effective assistance of counsel during the penalty phase of his trial.

22. Clarence Mack was denied his right to a fair tribunal as the court had prepared its sentencing memorandum prior to the sentencing hearing of the trial.

23. Clarence Mack was deprived of his constitutional right to a fair trial by the cumulative effect of all the errors that occurred during his penalty phase.

24. The trial court erred and denied Clarence Mack his constitutional right to a fair trial by denying his motion for a new trial.

25. Clarence Mack was denied due process and equal protection of the law [by] his conviction of a death penalty specification that does not require proof of prior calculation and design for principal offenders but does require proof of prior calculation and design for an aider and abettor.

26. Clarence Mack's death sentence has denied him due process under the

law as the trial court erred in adopting the recommendation of the jury and in finding that the aggravating circumstances outweighed the mitigating factors.

27.     Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I, of the Ohio Constitution.

(Doc. 149-2 at 2-5.)  The State filed a responsive brief.  (*Id*. at 213-313.)

The appellate court affirmed Mack's convictions and sentences on December 2, 1993.  *State v. Mack*, No. 62366, 1993 WL 497052 (Ohio Ct. App. Dec. 2, 1993).  Mack filed an application for reconsideration on December 13, 1993.  (Doc. 149-3 at 314-16.) The court denied the application on January 4, 1994.  (*Id*. at 320.)

Mack, now represented by Attorneys Thomas Gill and Kevin Spellacy, filed a timely notice of appeal to the Ohio Supreme Court.  (*Id*. at 329-31.)  In his appellate brief, he presented the following twenty-eight propositions of law, stated as:

1.     Ohio public records statute, R.C. 149.43 enables discovery of statements made by potential witnesses at a trial, and denial of this discovery by a court denies a defendant of due process.

2.     Where a particularized need is demonstrated by the defense for the examination of grand jury testimony the failure of the trial court to provide defense counsel with said grand jury testimony deprives a defendant of a fair trial.

3.     Absent an arrest or search warrant independent probable cause to search passengers of a vehicle is necessary even if there exists probable cause to search the driver.

4.     A trial court's dismissal for cause of jurors who express concern over recommending the death penalty but otherwise stated that they could follow the instruction of law provided by the trial court violates a defendants [*sic*] right to a fair and impartial jury.

5.     A trial court's failure to remove for cause jurors with a predisposition for recommending the death penalty in applicable cases violates a

10

defendants [*sic*] right to a fair and impartial jury.

6.  Allowing coroner's testimony by way of someone other than the coroner who performed the autopsy denies a defendant his constitutional right to confront witnesses against him.

7.  By allowing a witness to testify as to the out of court statements of another a trial court commits prejudicial error and violates a defendants [*sic*] right [to] confront witnesses against him.

8.  The admission of expert testimony by one who is not properly qualified as an expert pursuant to Evid. R. 702 violates a defendant's due process.

9.  The introduction of a statement of a defendant prior to his being advised of his constitutional rights to remain silent violates a defendant's right against self[-]incrimination.

10. A defendant is denied his right to a fair trial when a trial court improperly denies him the right to call witnesses for impeachment purposes.

11. A conviction which is against the manifest weight of the evidence must be overturned on appeal.

12. A defendant is denied due process of law when his conviction for a felony-murder is not supported by sufficient evidence to prove the corresponding felony offenses.

13. The introduction of gruesome photographs at trial denies a defendant the right to a fair and impartial jury.

14. The trial court must properly charge of [*sic*] jury on the law and failure to do so denies a defendant the right to a fair and impartial jury.

15. At a trial for aggravated murder with specifications, a trial court's refusal to instruct on the lesser included offenses of murder and voluntary manslaughter amount to reversible error.

16. Failure of trial counsel to preserve the record for appealable issues necessitate [*sic*] reversal if a substantial right of the defendant has been violated.

17. The right to effective assistance applies to an appeal as of right and the

11

failure of appellate counsel to raise reversible assignments of error on appeal constitutes ineffective assistance of appellate counsel.

18.     Although no one error in and of itself supplies grounds for reversal, the cumulative effect of several errors can be grounds for reversing a criminal conviction.

19.     Repeated prosecutorial misconduct denies a defendant the right to a fair trial and is grounds for reversing a conviction.

20.     The introduction of gruesome photographs during the penalty phase of trial denies a defendant the right to a fair and impartial jury.

21.     Due process requires the proper instructions be given to the jury during the penalty phase of a capital case.

22.     The right to effective assistance of counsel extends to the penalty phase of a capital trial.

23.     A trial court's preparation of its sentencing memorandum prior to the sentencing hearing denies a defendant his right to a fair trial.

24.     The cumulative effect of errors that occur during the penalty phase of a trial may deprive a defendant his right to a fair trial.

25.     Failure of the prosecutor to comply with pre-trial discovery is grounds for a new trial if the thing discovered during trial prejudiced the rights of the defendant.

26.     Required proof of prior calculation and design necessary to convict aiders and abettors of a capital offense, and a lower standard for the mental state of principal offenders, denies a defendant due process and equal protection under the law.

27.     A trial court's improper weighing of aggravating circumstances with mitigating factors requires a reversal of the death penalty imposed thereunder.

28.     Imposition of the death sentence violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I, of the Ohio Constitution.

(Doc. 149-3 at 361-78.)  The Stated filed a responsive brief.  (*Id*. at 615-730.)  The court

12

affirmed the judgment of the appellate court on August 30, 1995.  *Mack*, 73 Ohio St. 3d at 516.

Mack filed a petition for writ of *certiorari* in the United States Supreme Court. (Doc. 149-3 at 771.)  The Court denied the petition on January 22, 1996.  (*Id*. at 776.)

### 3.    First Post-Conviction Proceedings

On August 2, 1996, Mack, now represented by J. Dean Carro, filed a petition for post-conviction relief with the trial court.  (Doc. 149-4 at 23-45.)  He asserted that his trial counsel were ineffective by failing to:

1.    Hire an independent ballistics examiner of the gun and bullets to kill the decedent when the State's evidence was inconsistent on whether the decedent died by a hollow-point, or regular, bullet.

2.    Properly introduce into evidence the inconsistent statements of Tim Willis.

3.    Investigate other evidence that would have impeached the credibility of Tim Willis.

4.    Investigate a phone call Mr. Mack received from William Payne at a home several blocks from the place where the victim was shot and other alibi evidence.

(*Id*. at 24.)  The State moved to dismiss the petition.  (Doc. 149-5 at 28-34.)

The trial court denied the petition on September 13, 1996.  (*Id*. at 43.)  The court issued its findings of fact and conclusions of law on January 25, 1999.  (*Id*. at 45-48.)

Mack filed a timely appeal of that judgment in the Eighth District Court of Appeals. (*Id*. at 69-70.)  In his appellate brief, he raised two assignments of error, stated as:

1.    The trial court abused its discretion and violated Mr Mack's Sixth Amendment right to effective assistance of trial counsel; Section 10, Article I, Ohio Constitution; and R.C. 2953.21 by denying post-conviction relief to Mr. Mack because the petition contained sufficient

13

operative facts and was not barred by res judicata.

> 2. The trial court abused its discretion and violated R.C. 2953.21(E) by denying post-conviction relief to Mr. Mack without an evidentiary hearing.

(*Id*. at 107 (capitalization altered and citations omitted).) The State also filed a brief. (*Id*. at 193-249 .)

On October 26, 2000, the appellate court affirmed the trial court's judgment dismissing Mack's post-conviction petition. *State v. Mack*, No. 77459, 2000 WL 1594117 (Ohio Ct. App. Oct. 26, 2000).

Mack filed a timely appeal of the appellate court's judgment in the Ohio Supreme Court. (Doc. 149-5 at 332-33.) In his memorandum in support of jurisdiction, he presented the following propositions of law, stated as:

> 1. Where a criminal defendant is represented by trial counsel on direct appeal, along with co-counsel who is new to the case, *res judicata* does not bar consideration of ineffective assistance of counsel claims on post-conviction relief.

> 2. A trial court should hold a hearing on a post-conviction relief petition in a capital case when the affidavits and other evidence filed with the Petition contain facts that demonstrate that trial counsel provided ineffective assistance of counsel.

(*Id*. at 340.) The State filed a memorandum in opposition. (*Id.* at 377-87.)

The Ohio Supreme Court declined jurisdiction over the appeal on March 7, 2001. (*Id*. at 388.)

### 4.    Application to Reopen Direct Appeal

On June 15, 2001, Mack, represented by Jeffry Kelleher and Michael Benza, filed an application for reopening pursuant to Ohio Appellate Rule 26(B). (Doc. 149-6 at 41-50.)

14

Rule 26(B) permits defendants to request to reopen the direct appeal from a judgment to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause." Ohio R. App. P. 26(B); *see also State v. Murnahan,* 63 Ohio St. 3d 60 (Ohio 1992). In Mack's application, he asserted that he was denied the effective assistance of appellate counsel for failing to raise on direct appeal the following assignments of error:

1.    The prosecutors' misconduct tainted the entire proceeding and deprived Mr. Mack of a fair and impartial trial.

2.    Improper and misleading jury instructions deprived Mr. Mack of a fair trial and a fair and reliable sentencing proceeding.

3.    Mr. Mack was denied the effective assistance of counsel at trial.

4.    The trial court committed numerous errors of fact and law depriving Mr. Mack of his due process and equal protection rights.

5.    Ohio's death penalty scheme is unconstitutional.

(Doc. 149-6 at 42, 43, 44, 46, 47 (capitalization altered).) The State filed a brief in opposition. (*Id*. at 327-37.) The appellate court denied the application on May 19, 2003. *State v. Mack*, No. 62366, 2003 WL 21185786 (Ohio Ct. App. May 19, 2003).

Mack filed a timely appeal of the appellate court's judgment in the Ohio Supreme Court. (Doc. 149-6 at 439-40.) He presented the following propositions of law, stated as:

1.    The prosecutors' misconduct tainted the entire proceeding and deprived Mr. Mack of a fair and impartial trial.

2.    Improper and misleading jury instructions deprived Mr. Mack of a fair trial and a fair and reliable sentencing proceeding.

3.    Counsel for a capitally charged client are ineffective under the Sixth Amendment when they fail to conduct a full investigation into their client's character, history and background in anticipation of a capital

15

sentencing proceeding.

4.  Objective standards for the performance of counsel defending capitally charged clients in the courts of Ohio, required under the Sixth Amendment, are codified in the ABA Guidelines for the appointment and performance of counsel in death penalty cases.

5.  Absent a full investigation into their client's character, history, and background in anticipation of a capital sentencing proceeding, a decision by counsel not to present such evidence in mitigation of sentence cannot be deemed a reasonable strategic decision precluding a finding their client was denied the effective assistance of counsel under the Sixth Amendment.

6.  The performance of Mack's lawyers during and in preparation for the trial phase of his case deprived him of the effective assistance of counsel.

7.  The numerous errors of fact and law committed by the trial court deprived Mack of his due process and equal protection rights.

8.  Mr. Mack was denied the effective assistance of counsel on appeal.

9.  Ohio's death penalty scheme is unconstitutional.

10.  Ohio's *Murnahan* process is not an adequate and independent process to protect defendants' constitutional rights.

(*Id*. at 485-86 (capitalization altered).)  The State filed a brief in response.  (*Id*. at 669-719.)

The Ohio Supreme Court affirmed the appellate court's judgment on April 14,

2004.  *State v. Mack*, 101 Ohio St. 3d 397 (Ohio 2004) (per curiam).

**B.  Initial Federal Habeas Corpus Proceedings**

Mack filed a notice of intent to initiate this habeas action on May 4, 2004.  (Doc. 1.)

He requested appointment of counsel and permission to proceed *in forma pauperis*.  (Docs.

3, 4.)  After several substitutions of counsel, he was represented by appointed counsel John

Gibbons and Timothy Sweeney.  (*See, e.g.*, Docs. 12, 15, 32.)

16

Mack filed his original petition for a writ of habeas corpus on December 15, 2004. (Doc. 24.)  He asserted twenty-nine grounds for relief, including a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), alleging that the State had improperly withheld exculpatory, mitigation and/or impeachment evidence from the defense, and numerous claims of ineffective assistance of trial counsel.  (*See* Doc. 24-1 at 28-32, 80-89.)

Respondent filed a return of writ on February 14, 2005.  (Doc. 26.)  Mack filed his traverse on May 16, 2005 (Doc. 35), to which Respondent replied (Doc. 44).

Also on May 16, 2005, Mack filed a motion for leave to conduct discovery and for the appointment of experts, which Respondent opposed.  (Docs. 36, 42.)  The court granted Mack's motion in part on March 31, 2008, permitting certain discovery relating to his ineffective-assistance and *Brady* claims, including depositions, document production, and funds to retain a mitigation expert and criminal investigator.  (Doc. 52.)

On June 17, 2009, Mack filed a motion for an evidentiary hearing, which Respondent opposed.  (Docs. 65, 69.)  The court granted Mack's motion in part on May 31, 2010, directing that an evidentiary hearing be held on Mack's claims of ineffective assistance of trial counsel for failure to conduct a reasonable investigation into the credibility of Timothy Willis and to conduct a proper mitigation investigation, and certain of Mack's *Brady* claims.  (Doc. 74 at 16.)

On April 23, 2010, Respondent moved to dismiss three claims on exhaustion grounds:  (1) ineffective assistance of trial counsel for failure to conduct a reasonable mitigation investigation; (2) the failure of the State to disclose prior inconsistent statements of Timothy Willis; and (3) the failure of the State to disclose evidence of a deal given by

17

the State to Willis in exchange for his testimony against Mack and Sowell.  (Doc. 76.)

Mack opposed the motion.  (Doc. 77.)

The court conducted an evidentiary hearing on Mack's ineffective-assistance and

*Brady* claims on June 28 through June 30, 2010, and July 9, 2010.  (*See* Docs. 99-102 (Hrg.

Trs.).)  The court also permitted Mack to supplement the record of the hearing with the

deposition testimony of Cleveland Police Detective Earl Brown and former Cuyahoga

County Prosecutor Anthony Manning.  (Docs. 105 (Manning Dep.), 106 (Brown Dep.).)

Mack and Respondent filed post-hearing briefs on September 13, 2010, and November 12,

2010, respectively.  (Docs. 107, 110.)

On November 23, 2011, the court denied Respondent's motion to dismiss.  (Doc.

115.)  It agreed with Respondent that certain of Mack's ineffective-assistance and *Brady*

claims were unexhausted, but found that state-court remedies existed for Mack to exhaust

the claims in state courts.  (*See, e.g., id*. at 41-43, 45, 47-50.)  It therefore stayed Mack's

federal habeas case and held it in abeyance pending Mack's exhaustion of the claims in

state court.  (*Id*. at 52.)

### C.    Second State Post-Conviction Petition and Motion for New Trial

On December 21, 2011, Mack filed a successor post-conviction petition and motion for

leave to file a motion for new trial in the state trial court.  (Doc. 151-1 at 37-65 (Mot. for New

Trial), 66-123 (Post-Conviction Pet.).)  He continued to be represented by attorneys Gibbons

and Sweeney.  (*See id*. at 38, 122-23.)

In his post-conviction petition, Mack asserted the following grounds for relief, stated

as:

18

1. Mack was denied due process of law and a fair trial as the result of the State's suppression of evidence and materials discoverable under *Brady v. Maryland*.

   a. The State suppressed the handwritten notes authored by the victim's son-in-law Mike Barone of the Sanelli family's first meeting with Timothy Willis on January 23, 1991.

   b. The State suppressed CPD's reports from Tim Willis' first communications with police regarding the Sanelli murder and Willis' written statement to the police dated January 23, 1991.

   c. The State suppressed the CPD's reports regarding Sanelli's stolen vehicle as or after it crashed on Holton Avenue and the names of witnesses to that crash and its aftermath.

   d. The State suppressed evidence of an agreement by the prosecutor to provide favorable consideration to Timothy Willis in his pending felony case involving Robert Burgess in exchange for Willis' testimony and cooperation in the prosecutions of Mack and Willis' testimony and cooperation in the prosecutions of Mack and Sowell.

   e. The State suppressed CPD reports and other evidence that indicates Timothy Willis' house was searched at least four (4) times by police during the relevant time and Willis was considered a suspect in the Sanelli murder.

   f. The State suppressed CPD reports indicating that Timothy Willis was, during the relevant time, believed by police to himself be a suspect in other ski-mask robberies and murders that were believed to be related to the Sanelli murder.

   g. The State suppressed Willis' oral statement to prosecutors in or about June 1991 alleging that Mack admitted to shooting his gun after Sowell had fired the first shots.

   h. The State allowed Timothy Willis to present perjured testimony and suppressed information that would have enabled Mack to challenge Willis' false testimony.

   i. The State suppressed other police reports and statements.

2. Mack's trial counsel rendered ineffective assistance of counsel during

both the guilt/innocence and sentencing phases of the trial and in the preparation therefor.

    a.    Mack's trial counsel failed to investigate and pursue arguments and evidence that, even under the State's theory of the case, Mack was not the principal offender and thus not eligible for the death penalty.

    b.    Mack's trial counsel failed during the mitigation phase to conduct a sufficient mitigation investigation into Mack's social, educational, and psychological background, or to develop a coherent mitigation strategy.

(*See id.* at 79, 82, 85, 88, 90, 96, 98, 100, 102, 105, 109, 116 (capitalization altered and citations omitted).)  Mack's motion for new trial asserted *Brady* claims also presented in his post-convictions petition.  (*See id.* at 49 n.1, 51-53.)

On April 20, 2012, the State moved to dismiss the post-conviction petition and motion for new trial.  (*Id*. at 138-69.)  Mack opposed the motion.  (*Id*. at 181-212.)

The court conducted an evidentiary hearing on August 27, 2013, and September 10, 2013.  (*See* Doc. 151-9 (Hrg. Tr.).)  It denied the petition and motion on March 20, 2014. (Doc. 151-2 at 260-69.)

Mack filed a timely appeal of the trial court's judgment to the Eighth District Court of Appeals.  (Doc. 151-4 at 4-5.)  In his appellate brief, he raised the following assignments of error:

    1.    The trial court erred when it denied Mack's second-in-time petition for post-conviction relief for not meeting the jurisdictional requirements of R.C. § 2953.23, or for any other reason.  All requirements for the court's jurisdiction under R.C. § 2953.53 were met, and Mack's claims are meritorious, thereby entitling Mack to relief from his unconstitutional convictions and/or sentence of death.

    2.    Mack's convictions and death sentence are void and voidable because Ohio's post-conviction procedures do not provide an adequate

corrective process and violates the [C]onstitution.

3.  Mack's convictions and/or sentence of death are void and/or voidable because Mack's trial counsel rendered ineffective assistance in the guilt/innocence phase of Mack's trial by unreasonably failing to investigate and pursue arguments and evidence that, even under the State's theory, Mack was not the principal offender and thus not eligible for death, in violation of Mack's constitutional rights.

4.  Mack's convictions and/or sentence of death are void and/or voidable because Mack's trial counsel rendered ineffective assistance in the sentencing phase of Mack's trial, in violation of Mack's constitutional rights.

5.  Mack's convictions and/or sentence of death are void and/or voidable because the State of Ohio suppressed material exculpatory and/or impeachment information from Mack during and after his trial, in violation of *Brady v. Maryland* and its progeny and Mack's constitutional rights.

6.  The trial court erred in denying Mack's motion for leave to file a motion for new trial and in failing to grant a new trial.

(*Id*. at 40-42.)  The State filed a brief in response.  (*Id*. at 126-67.)

The court of appeals affirmed the judgment of the trial court.  *State v. Mack*, No.

101261, 2015 WL 3540451 (Ohio Ct. App. June 4, 2015).  Mack moved for

reconsideration, arguing that the appellate court erred in failing to consider the transcripts

of the trial and successor post-conviction evidentiary hearings.  (Doc. 151-4 at 222-77;

Doc. 151-5 at 1-307.)  The State did not oppose the application.  (*See* Doc. 151-5 at 308-

10.)  The court denied Mack's application on September 16, 2015.  (*Id*. at 311.)

Mack filed a timely appeal of the appellate court's judgment with the Ohio Supreme

Court.  (*Id*. at 312-14.)  In his memorandum in support of jurisdiction, he asserted as his

first of six propositions of law:

An Ohio appellate court must review and consider in adjudicating a capital

21

post-conviction petitioner's appeal the transcripts of the underlying capital trial and of those other proceedings that are already on file with the court, were cited and relied upon by both parties to the appeal, and were reviewed and considered by the trial court in its opinion under review, and may not disregard those transcripts because of perceived clerical and/or procedural mistakes by the clerk or others, and the appellate court's failure to review and consider the transcripts on file in Appellant's case denied Appellant his right to an appeal and violated his rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution, Article I, Sections 1, 2, 9, 10, and 16, and Article IV, Sections 1, 2, 3, and 5, of the Ohio Constitution and Ohio Rev. Code § 2953.21 et. seq.

(Doc. 151-6 at 82.)

On February 22, 2017, the Ohio Supreme Court accepted the appeal on Mack's first proposition of law, vacated the appellate court's decision, and remanded the cause to the court of appeals to reconsider the merits of Mack's appeal. *State v. Mack*, 148 Ohio St. 3d 1409 (Ohio 2017) (Table).

On November 2, 2017, the court of appeals affirmed the trial court's judgment. *State v. Mack*, No. 101261, 2017 WL 5036648 (Ohio Ct. App. Nov. 2, 2017). Mack again moved for reconsideration. (Doc. 151-5 at 353-400.) On January 25, 2018, the appellate court granted Mack's application for reconsideration and ordered *sua sponte* that the court's November 2, 2017, decision was vacated and substituted with the judgment issued on that same date. (*Id*. at 409.) In that decision, it again affirmed the trial court's judgment. *State v. Mack*, No. 101261, 2018 WL 565704 (Ohio Ct. App. Jan. 25, 2018).

Mack filed a timely appeal of the appellate court's judgment with the Ohio Supreme Court. (Doc. 151-7 at 2-4.) In his memorandum in support of jurisdiction, he asserted the following five propositions of law:

1. Ohio's post-conviction procedures do not provide an adequate corrective process and violate the Constitution. Ohio Const. Art. I, §§

22

2, 5, 9, 10 and 16; U.S. Const. Amends. V, VI, VIII and XIV; *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016).

2.    An Appellant's right to due process is violated when the lower courts find that the trial court lacked jurisdiction to consider claims in Appellant's postconviction petition pursuant to R.C. § 2953.21 and R.C. § 2953.23(A), when he satisfied all statutory requirements. Art. I, §§ 2, 5, 9, 10 and 16 of the Ohio Constitution; U.S. Const. Fifth, Sixth, Eighth and Fourteenth Amendments.

3.    The lower courts unreasonably determined the facts and misapplied the law when they failed to grant relief on Appellant's claims of ineffective assistance of trial counsel.  The right to effective assistance of trial counsel is violated when counsel's deficient performance results in prejudice to the defendant.  *Strickland v. Washington*, 466 U.S. 688 (1984).  Ohio Const. Art. I, §§ 2, 5, 9, 10 and 16; U.S. Const. Amends. V, VI, VIII and XIV.

4.    The lower courts unreasonably determined the facts and misapplied the law when they failed to grant relief on Mack's claims that the State of Ohio suppressed material exculpatory and/or impeachment information from Mack during and after his trial, which denied Mack a fair trial and reliable sentencing proceeding. *Brady v. Maryland*, 373 U.S. 83 (1963). Ohio Const. Art. I, §§ 10 and 16; U.S. Const. Amends. V, VI, VIII and XIV.

5.    An Appellant's right to due process is violated when his motion for leave to file a motion for new trial is denied, and upheld on appeal, even though Appellant met all applicable requirements for being granted a new trial.  Art. I, §§ 2, 5, 9, 10 and 16 of the Ohio Constitution; U.S. Const. Fifth, Sixth, Eighth, and Fourteenth Amendments.

(Doc. 151-7 at 57-58.)

The Ohio Supreme Court declined to accept the appeal on June 6, 2018.  *State v. Mack*, 152 Ohio St. 3d 1489 (Ohio 2018) (Table).

**D.    Reinstated Federal Habeas Proceedings**

Having exhausted his remedies in state court, Mack moved to reinstate his case on this court's docket on July 5, 2018.  (Doc. 143.)  Mack filed an amended habeas petition on

23

April 19, 2019.  (Doc. 155.)  Respondent filed a return of writ on August 5, 2019.  (Doc. 158.)  Mack filed a traverse on January 2, 2020.  (Doc. 162.)

In addition, Mack filed a second motion for evidentiary hearing (Doc. 163) on January 30, 2020, which Respondent opposed (Doc. 164).  The court denied the motion on September 22, 2020, as the motion merely "renew[ed] and/or submit[ted]" the motion for an evidentiary hearing that Mack filed in 2005 (Doc. 36) as to those claims the court had previously denied a hearing (*see* Doc. 52).  (Doc. 165.)

### PETITIONER'S GROUNDS FOR RELIEF

Mack asserts twenty-nine grounds for relief in his amended petition, stated as:

1.  The State's improper, discriminatory and unconstitutional use of peremptory challenges to remove African-Americans and women from the jury denied Mr. Mack his constitutional rights.

2.  The trial court applied the wrong standard in reviewing Mr. Mack's challenges to the State's improper, discriminatory and unconstitutional exercise of peremptory challenges, thereby obliterating his rights under *Batson v. Kentucky* and its progeny.

3.  Mr. Mack was denied his right to a fair trial with an impartial jury that was representative of the community because prospective jurors who expressed reservations about the death penalty were excused while jurors who expressed a predisposition for the death penalty in cases of felony murder were retained.

4.  Mr. Mack was denied the effective assistance of counsel during the voir dire stage of his trial.

5.  The State improperly, illegally and unconstitutionally withheld exculpatory, mitigation and/or impeachment evidence from the defense in violation of its obligations under *Brady v. Maryland*.

6.  Mr. Mack was subjected to an unreasonable search and seizure in violation of his rights under the Fourth and Fourteenth Amendments.

7.  Mr. Mack's custodial statements were obtained in violation of his

constitutional rights.  All statements obtained in violation of *Miranda* and its progeny violate the protections under the Fifth, Sixth, Eighth and Fourteenth Amendments.

8.   The refusal to allow Mr. Mack access to the grand jury proceedings, and in particular the testimony of the lying informant Timothy Willis, denied his rights to due process and a fair trial.

9.   The trial court's refusal to allow the defense to present the testimony of witnesses who were prepared to testify about the bias of Timothy Willis and about his prior statements, including Willis' confession that Willis himself committed the subject murder, deprived Mr. Mack of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

10.   The trial court's failure to allow the defense to confront lying informant Timothy Willis with his lies, and its refusal to permit a meaningful cross[-]examination of Willis that would challenge his veracity and expose his bias, deprived Mr. Mack of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

11.   The trial court made a number of other significant errors in its evidentiary rulings during the trial phase of the case, thereby denying Mr. Mack his rights to due process and to a fair trial.

12.   The admission of gruesome and inflammatory photos was prejudicial and denied Mr. Mack due process and a fair trial.

13.   Mr. Mack was denied his right to a fair trial because the trial judge provided the jury with a number of erroneous jury instructions in both the guilt/innocence and penalty phases of the trial.

14.   Mr. Mack was denied due process and a fair trial because the trial judge refused to instruct on the lesser included offenses of murder and involuntary manslaughter and improperly instructed on purpose to kill.

15.   The trial court committed numerous other errors of fact and law thereby depriving Mr. Mack of his rights to a fair trial, due process of law and equal protection under the law.

16.   Mr. Mack was denied his right to a fair trial because of repeated instances of prosecutorial misconduct throughout both phases of his trial.

17.   The ineffective assistance of trial counsel during the guilt/innocence

25

phase of the case denied Mr. Mack his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

18.     The ineffective assistance of trial counsel during the sentencing phase of the case denied Mr. Mack his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

19.     The ineffective assistance of appellate counsel denied Mr. Mack his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

20.     Mr. Mack's conviction for felony murder is unconstitutional because it was obtained with insufficient evidence that he was the principal offender.

21.     Mr. Mack was denied due process and equal protection of the law as a result of his conviction of a death penalty specification that does not require proof of prior calculation and design for principal offenders but does require proof of prior calculation and design for an aider and abettor.

22.     Mr. Mack was denied due process because both the trial court and the appellate courts failed to fulfill their statutory duties in imposing and reviewing his sentence of death, and the appellate counts failed to fulfill their obligation to meaningfully review the proportionality of Mr. Mack's death sentence.

23.     Ohio's post-conviction procedures, and its *Murnahan* procedures for re-opening a direct appeal, neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

24.     Mr. Mack's death sentence is unconstitutional because it is not reliable and because the mitigating factors outweigh the sole aggravating circumstance.

25.     Mr. Mack's death sentence is unfairly disproportionate to similar cases, including that of his co-defendants.  The Ohio courts denied him due process by failing to properly consider the proportionality of his death sentence.

26.     Ohio's death penalty statute is unconstitutional in numerous respects.

27.     Mr. Mack's conviction and sentence are unconstitutional because of the cumulative effect of the many errors that occurred during his trial and

26

in all subsequent proceedings.

28.    Mack's conviction and death sentence violate due process because they
       are based almost exclusively, if not exclusively, on the uncorroborated
       testimony of Timothy Willis.

29.    Mack is innocent of the crimes for which he was convicted, is innocent
       of the death penalty, and it would be a miscarriage of justice to allow
       his conviction and sentence to remain in effect.

(Doc. 155 at 3-9 (capitalization altered).)

## STANDARD OF REVIEW

**A.    AEDPA Review**

In essence, habeas corpus is "an attack by a person in custody upon the legality of

that custody, and . . . the traditional function of the writ is to secure release from illegal

custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Mack's petition for a writ of

habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (AEDPA governs federal

habeas petitions filed after Act's effective date). The Act, which amended 28 U.S.C. §

2254, authorizes federal courts to issue writs of habeas corpus to state prisoners who are "in

custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a).

At the same time, however, AEDPA was intended "to reduce delays in the

execution of state and federal criminal sentences, particularly in capital cases, and 'to

further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S.

202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)). The

Act "recognizes a foundational principle of our federal system: State courts are adequate

27

forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  It

therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims

have been adjudicated in state court." *Id*. at 19.

Most significantly, § 2254(d) forbids a federal court from granting habeas relief

with respect to a "claim that was adjudicated on the merits in State court proceedings"

unless the state-court decision either:

> (1)     resulted in a decision that was contrary to, or involved an unreasonable
>         application of, clearly established Federal law, as determined by the
>         Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination
>         of the facts in light of the evidence presented in the State court
>         proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim

at issue.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original).  A state

court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of

whether the state court provided little or no reasoning at all for its decision.  "When a

federal claim has been presented to a state court and the state court has denied relief, it may

be presumed that the state court adjudicated the claim on the merits in the absence of any

indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562

U.S. 86, 99 (2011).

 "[C]learly established Federal law" for purposes of  § 2254(d)(1) "is the governing

legal principle or principles set forth by the Supreme Court at the time the state court

renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  It includes "only the

28

holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). When identifying what a Supreme Court decision actually holds, courts should not frame the decision "at too high a level of generality." *Woods v. Donald*, 575 U.S. 312, 318 (2015). Clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case. *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas court may not grant relief because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Further, the state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*

*v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[3] The Supreme Court has cautioned, however, that "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether

---

[3] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

that determination was unreasonable – a substantially higher threshold.").  Rather, §

2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the

state criminal justice systems" and does not function as a "substitute for ordinary error

correction through appeal."  *Harrington,* 562 U.S. at 102-03 (internal quotation marks

omitted).  A petitioner, therefore, "must show that the state court's ruling . . . was so

lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.  This is a

very high standard, which the Court readily acknowledges:  "If this standard is difficult to

meet, that is because it is meant to be."  *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of

claims already rejected in state proceedings."  *Id*.  "[E]ven in the context of federal habeas,

deference does not imply abandonment or abdication of judicial review.  Deference does

not by definition preclude relief."  *Miller-El*, 537 U.S. at 340.  Federal habeas courts may,

for example, review *de novo* an exhausted federal claim where a state court misapplied a

procedural bar and did not review the claim on the merits.  *See, e.g., Hill v. Mitchell*, 400

F.3d 308, 313 (6th Cir. 2005).  They likewise may review *de novo* claims adjudicated on

the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions.

*See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second

prong because the state court unreasonably applied the law in resolving *Strickland*'s first

prong).

**B.**      **Exhaustion and Procedural Default**

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no

31

remaining state remedies, before a federal court will review a petition for a writ of habeas corpus.  28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to either:  (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available.  *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.

Where a state court declines to address a prisoner's federal claim because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state

procedural rule and the state courts' application of it must not rely in any part on federal law.  *Id.* at 732-33.  To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[4]

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim.  *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition.").  Under these circumstances, while the exhaustion requirement is technically satisfied

---

[4] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now-familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule.  It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

33

because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, the federal court again looks to the last state court rendering a reasoned opinion on that claim. *Ylst,* 501 U.S. at 805. If the state court "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted.[5] *Harris v. Reed*, 489 U.S. 255, 263 (1989). Conversely, if the last

---

[5] Where a later state-court decision rests upon a prohibition against *further* state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3. In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id*. at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing

state court presented with the claim reaches its merits, then the procedural bar is removed

and the federal habeas court may consider the merits of the claim in its review.  *Ylst*, 501

U.S. at 801.

A petitioner may overcome procedural default by demonstrating cause for the

default and actual prejudice that resulted from the alleged violation of federal law, or that

there will be a "fundamental miscarriage of justice" if the claim is not considered.

*Coleman*, 501 U.S. at 750.  "'[C]ause' under the cause and prejudice test must be

something external to the petitioner, something that cannot be fairly attributed to him."  *Id*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked

to his actual and substantial disadvantage."  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th

Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "A fundamental

miscarriage of justice results from the conviction of one who is 'actually innocent.'"

*Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477

U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent

of the death penalty.  *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992).  In this sense, "[t]o

show 'actual innocence' one must show by clear and convincing evidence that, but for a

constitutional error, no reasonable jury would have found the petitioner eligible for the

death penalty under the applicable state law."  *Id*. at 336.  This "actual innocence" standard

"must focus on the elements that render a defendant eligible for the death penalty."  *Hutton*

*v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

---

upon [a petitioner's] ability to raise the [federal] claim in federal court").

**C.      Cognizability**

Federal habeas courts also must consider whether the petitioner's claims are cognizable.  To the extent a claim alleges state-law violations, it is not reviewable by a federal habeas court and must be dismissed on that basis.  "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68).  A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Courts, therefore, "'have defined the category

36

of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## DISCUSSION

### I.     First and Second Grounds for Relief:  *Juror Selection*

For his first and second grounds for relief, Mack contends that the prosecution's discriminatory use of peremptory challenges to exclude African-American and female members of the jury pool from serving on the jury violated his constitutional rights.  (Doc. 155 at 49-56.)  Respondent argues that these claims are procedurally defaulted and meritless.  (*See* Doc. 158 at 48-51.)

### A.     Procedural Posture

As Respondent asserts, these claims are procedurally defaulted.  They arise out of the record of proceedings in the trial court, and therefore could have been raised on direct appeal.  But Mack failed to do so, and under Ohio law, *res judicata* now prohibits him from raising the issues in any post-conviction proceeding.  *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata.");  *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967) (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised at trial or on direct appeal).  With no state-court remedies still available to him, Mack has defaulted the claims.  *See Gray v. Netherland*, 518 U.S. 152, 161–62 (1996) ("Because the exhaustion requirement refers only to remedies still available at the time of the federal petition . . ., it is satisfied if it is clear that [the petitioner's] claims are now

37

procedurally barred under [state] law.") (internal quotation marks and citations omitted);
*Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be
procedurally barred under state law, that claim is procedurally defaulted for purposes of
federal habeas review.").

Mack strenuously contests the procedural default.  He notes that he presented the
claims to Ohio courts in an application to reopen his direct appeal pursuant to Ohio
Appellate Rule 26(B) as the underlying grounds of claims of ineffective assistance of
appellate counsel.  *See Mack*, 2003 WL 21185786, at *3-4.  And he argues that the claims
are not defaulted because either:  (1) the claims are exempt from AEDPA's exhaustion
requirement under § 2254(b)(1)(B) since Rule 26(B) does not provide an adequate
corrective process for redressing constitutional violations; or (2) he fairly presented the
claims to state courts in the Rule 26(B) reopening application.  (Doc. 162 at 34-67, 104-07.)

As Mack concedes, however, this court already has carefully considered these
arguments and rejected them.  (*See* Doc. 115 at 16-22.)  In short, as to Mack's first
argument, Rule 26(B) proceedings are a "separate collateral opportunity" to raise appellate-
counsel ineffective-assistance claims, and not part of the original appeal.  *E.g., Goldberg v.
Maloney*, 692 F.3d 534, 537 (6th Cir. 2012).  As such, Ohio courts have wide latitude in
governing the process, which courts have declined to find unconstitutional.  *See, e.g., Sneed
v. Johnson*, No. 1:04 CV 588, 2007 WL 709778, at *24 (N.D. Ohio March 2, 2007).
Second, the Sixth Circuit repeatedly has held that a state application to reopen the direct
appeal does not preserve the underlying substantive arguments of appellate-counsel
ineffective-assistance claims for habeas review.  *See, e.g., Wogenstahl v. Mitchell*, 668 F.3d

38

307, 338 (6th Cir. 2012) ("[P]ermitting an Ohio prisoner to revive procedurally defaulted

claims by raising them in a Rule 26(B) application 'would eviscerate the continued vitality

of the procedural default rule; every procedural default could be avoided, and federal court

merits review guaranteed, by claims that every act giving rise to every procedural default

was the result of constitutionally ineffective counsel.'") (quoting *Lott v. Coyle*, 261 F.3d

594, 612 (6th Cir. 2001)); *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) ("[B]ringing

an ineffective assistance claim in state court based on counsel's failure to raise an

underlying claim does not preserve the underlying claim for federal habeas review because

the two claims are analytically distinct.") (internal quotation marks and citation omitted);

*White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005) (same).  This court is bound by that

precedent.

Mack argues that even if these claims are procedurally defaulted, he can establish

cause and prejudice or his actual innocence to excuse the defaults.  (Doc. 162 at 68-76;

106-07.)  He points to the ineffective assistance of trial counsel in failing to preserve the

claims, and of appellate counsel in failing to raise these claims on direct appeal.  (*Id*.)

Attorney error that constitutes ineffective assistance, including that of appellate counsel, is

cause.  *Coleman v. Thompson*, 501 U.S. 722, 754 (1991); *Murray v. Carrier*, 477 U.S. 478,

492 (1986).  But claims of ineffective assistance of counsel cannot provide cause for the

procedural default of another claim if the ineffective-assistance claim itself is procedurally

defaulted.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  For the reasons discussed

below with regard to Mack's independent ineffective-assistance claims, the ineffective-

assistance claims Mack cites here as cause either lack merit or are themselves procedurally

defaulted and do not establish cause for the default of Mack's jury-selection claims.
Similarly, as the court explains with regard to Mack's independent claim of actual
innocence, that claim, too, lacks merit and cannot excuse the default of Mack's jury-
selection claims.  Mack's first and second grounds for relief, therefore, are procedurally
defaulted.

### B.      Merits Analysis

Although Mack's jury-selection claims are procedurally defaulted, they also lack
merit.  Because no state court has addressed these claims, AEDPA deference does not apply
and the court reviews them *de novo*.  *Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011) ("It
is well settled that we may review *de novo* an exhausted federal claim that was not
adjudicated on the merits in state court.").

#### 1.      Factual basis

Mack's claim of purposeful discrimination to exclude African-American members
of the venire focuses on prospective jurors Theodore Griggs, Christal Martin, and Maralyn
Wiley.  His claim of purposeful discrimination to exclude women focuses again on
potential jurors Martin and Wiley, and also Eleanor George.  (*See* Doc. 155 at 49-50.)

*Prospective Juror Griggs*.  After three black jurors were seated on the jury without
challenge from the prosecution, the prosecutor used his first peremptory challenge to
exclude Mr. Griggs, a black man, after brief questioning by the prosecutor and defense
attorney.  (Doc. 150-1 (Trial Tr.) at 129-31, 167-68.)  Defense counsel objected:

> I would object to [the] excus[al] of Mr. Griggs on peremptory challenge.
> Clarence Mack is a black individual, only two of the first 12, there are two
> black individuals on this jury and Mr. Griggs is a black prospective juror and
> I would object to him being excused.

40

(*Id*. at 173.)  The trial court then responded:

> The Court at this point would note that the juror who will take his place is also black and that there are numerous black prospective jurors in the pool yet to be questioned.  And it would appear to the Court that the jury that will ultimately be selected will be representative of the community.  And at this point I don't see any basis to refuse the peremptory challenge.  Obviously the make-up of the jury after all 12 are selected would be the determining factor.
>
> You may re-raise your objection at that time if it appears the jury is not representative.

(*Id*.)  Defense counsel did not raise this objection again.

*Prospective Juror Martin.*  During *voir dire*, Ms. Martin stated that she had a second cousin she did not see frequently who worked for the Cleveland Police Department. (*Id*. at 175-76.)  She also said she was employed by a group of physicians and had been for six years.  (*Id*. at 176-77.)  And she admitted that eight or nine years earlier she had plead guilty to a misdemeanor welfare crime arising from being employed and receiving benefits at the same time, for which she had made restitution and was placed on probation.  (*Id*. at 177-81.)  Ms. Martin further stated that she would not believe that a person was guilty just because they were charged, or that the testimony of persons in positions of authority should be given more weight; and the fact that the defendant was black and the victim was white would not prevent her from rendering a just verdict.  (*Id*. at 190-92.)

The prosecutor exercised his second peremptory strike to remove Ms. Martin.  (*Id*. at 202.)  The defense objected:  "[T]he prosecutor excused juror Christal Martin, that was after they had come to the bench and tried to get her excused for cause.  And she's a black juror and we would object to her being excused on a peremptory."  (*Id*. at 226-27.)  The trial court overruled the objection, finding a "reasonable basis for the peremptory challenge

41

not for challenge for cause." (*Id*. at 227.)

*Prospective Juror Wiley*. The prosecution's questioning of Ms. Wiley focused on whether she would be able to sentence the defendant to death; she agreed that she could follow the law.  (*Id*. at 227-52.)  The State used a peremptory challenge to excuse her.  (*Id*. at 252.)

After the jury was seated, defense counsel raised an objection to Ms. Wiley's excusal:

> Yes, Judge, for the record we want to enter an objection to the excusal of Maralyn Wiley by the prosecutor.
>
> The record should indicate she was a black individual. In addition to that, she had been previously passed over for cause and accepted as a juror when that panel was, and then she was excused by the prosecutor.

(*Id*. at 301.)

The court stated, "I assume at this time the State would like to present their reasons for the excusal on the record."  (*Id*.)  The prosecutor replied:

> Yes, your Honor. First of all, I won't give you my reason[.] There hasn't been systematic excusal of blacks pursuant to Griffith versus Kentucky. There are three blacks presently seated on this jury, I didn't challenge any of those. The reason I kicked off Miss Wiley, upon further reflection I find that it has nothing to do with race, she has circumstances in her life that I got from this questionnaire; she's 35 years old, she has three children, presently unemployed, and in the last 18 years has worked a total of five years. That combination, based upon my past experience, and plus her facial mannerisms that I saw looking at her, in my past experience, your Honor, I just felt uncomfortable about it.

(*Id*. at 301-02.)

The court then overruled the defense's objection, stating:

> I have been observing the peremptory challenges to make sure there have been no violations of existing Court rules or constitutional precedents and it's my

42

belief that there have been legitimate reasons for all of the excuses in this case, and therefore, I have not intervened.

(*Id*. at 302.)

*Prospective Juror George.* After Ms. Wiley was excused from the jury but before the defense objected to her removal, the prosecutor used his third peremptory challenge to excuse Ms. George, a white woman.   (*Id*. at 282-83.)  Defense counsel did not object.

When the jury was seated, of fourteen jurors, three were black and five were women.  (*See* Doc. 149-1 at 84-85.)

## 2.    Legal standards

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), *modified on other grounds by Powers v. Ohio*, 499 U.S. 400 (1991).  The Supreme Court extended this protection to the area of gender discrimination in *J.E.B. v. Alabama*, 511 U.S. 127 (1994).

The trial court's determination of whether the prosecutor is using peremptory challenges for an improper purpose involves three steps.  First, the court must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on a discriminatory basis.  *Batson,* 476 U.S. at 96-97.  Once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a *prima facie* case was established becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

Second, if the showing is made, the burden shifts to the prosecutor to present a

43

race-neutral explanation for striking the juror in question.  *Batson,* 476 U.S. at 97-98.

"Although the prosecutor must present a comprehensible reason, '[t]he second step of this

process does not demand an explanation that is persuasive, or even plausible'; so long as

the reason is not inherently discriminatory, it suffices."  *Rice v. Collins*, 546 U.S. 333, 338

(2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)).

Third, the court must then determine whether the defendant has carried his burden

of proving purposeful discrimination.  *Batson*, 476 U.S. at 98.  "This final step involves

evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the

ultimate burden of persuasion regarding racial motivation rests with, and never shifts from,

the opponent of the strike.'"  *Rice*, 546 U.S. at 338 (quoting *Purkett*, 514 U.S. at 768).  In

making this determination, "'the court presumes that the facially valid reasons proffered by

the [party exercising the peremptory challenge] are true.'"  *Braxton v. Gansheimer*, 561

F.3d 453, 459 (6th Cir. 2009) (quoting *Lancaster v. Adams*, 324 F.3d 423, 433 (6th Cir.

2003)).  The issue, therefore, "comes down to whether the trial court finds the prosecutor's

race-neutral explanations to be credible."  *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

"Credibility can be measured by, among other factors, the prosecutor's demeanor; by how

reasonable, or how improbable, the explanations are; and by whether the proffered rationale

has some basis in accepted trial strategy."  *Id*.

The Supreme Court has emphasized that trial-court findings on the issue of

discriminatory intent must be afforded "great deference."  *See Hernandez*, 500 U.S. at 364-

66.  This makes "particular" sense, it has explained, because

> [t]here will seldom be much evidence bearing on that issue, and the best
> evidence often will be the demeanor of the attorney who exercises the

> challenge.  As with the state of mind of a juror, evaluation of the prosecutor's
> state of mind based on demeanor and credibility lies "peculiarly within a trial
> judge's province."

*Id*. at 365 (quoting *Wainwright v. Witt,* 469 U.S. 412, 428 (1985)).  Indeed, "[t]he

credibility of the prosecutor's explanation goes to the heart of the equal protection analysis,

and once that has been settled, there seems nothing left to review."  *Id*. at 367.  "[I]n the

absence of exceptional circumstances," therefore, habeas courts must "defer to state-court

factual findings, even when those findings relate to a constitutional issue."  *Id*. at 366.

### 3.    Analysis

Mack's trial counsel did not make a *prima facie* case of discrimination against

prospective jurors Martin, Wiley, and George on the basis of gender.  In fact, defense

counsel never objected to the State's use of peremptory challenges to these prospective

jurors on that ground at all.  This aspect of Mack's *Batson* claim, therefore, lacks merit.

Furthermore, after reviewing the *voir dire*, the court defers to the trial court's

rulings on defense counsel's objections.  As to Mr. Griggs, the court did not overrule

defense counsel's objection.  It stated the defense could raise the objection again once the

jury was set and the court could evaluate its composition as a whole.  (*Id*. at 173.)  The

defense did not raise its objection to Mr. Griggs' excusal again.  There is no basis,

therefore, for a constitutional violation in Mr. Griggs' removal from the jury.

Mack asserts that under *Batson*, the prosecution was required to provide an

explanation for its challenged strike of Mr. Griggs.  (Doc. 162 at 91.)  But because the trial

court noted the objection and reserved ruling on it until the defense raised it again at a later

stage in the jury-selection process, which it did not, there was no need at that point for the

45

prosecution to explain the strike.  Mack also argues that the trial court's reference to the jury's final composition in his remarks on the objection was inappropriate under *Batson* because it stressed the jury's representation of the community rather than racial discrimination.  (*Id*. at 98-99.)  The trial court's remarks with regard to Mr. Griggs are not relevant to its final determination on the *Batson* issue, however, which it made later in the proceedings regarding the State's peremptory challenge of Ms. Wiley.

The court did overrule defense counsel's objection to the prosecutor's peremptory challenge of Ms. Martin.  Defense counsel objected on the basis of her race and the timing of the State's challenge – the prosecutor initially attempted to excuse her for cause but was unsuccessful and used a peremptory challenge instead.  (Doc. 150-1 (Trial Tr.) at 226-27.)  The court found the peremptory challenge had a "reasonable basis."  (*Id*. at 227.)  And this court agrees.  Mack did not make a *prima facie* case of racial discrimination given that Ms. Martin admitted to having a criminal history.

The defense also objected to the prosecution's peremptory challenge of Ms. Wiley based on her race and the fact that the prosecutor had changed his mind after initially accepting her on the jury.  This time the trial court asked the prosecutor to respond.  The prosecutor stated the challenge "had nothing to do with race."  (*Id*. at 301-02.)  He cited Ms. Wiley's family responsibilities as a mother of three children, lack of work history, and "facial mannerisms," that, based on his "past experience," made him "uncomfortable" about her service as a juror.  (*Id*.)  The court found that in context of the entire process, he did not find any constitutional violations and there were "legitimate reasons for all of the excuses in this case . . . ."  (*Id*. at 302.)

46

Mack argues that the prosecutor's explanation was "not facially valid [or] neutral, and is discriminatory on its face," or, at most, "amounted to little more than vague and general claims . . . that he was acting in good faith and not on the basis of discriminatory intent."  (Doc. 162 at 93-94.)  The court disagrees.  The prosecutor made specific, particularized observations about Ms. Wiley's personal circumstances and demeanor that, based on his trial experience, were concerning.  The trial court found this explanation credible, and nothing leads this court to question that.  "The fact that a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror . . . does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions."  *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (internal quotation marks and citations omitted).  As the prosecutor's reasons were "not inherently discriminatory," the trial court properly found "[they] suffice[d]."  *Collins*, 546 U.S. at 338.

Accordingly, this case does not present any "exceptional circumstances" to overcome the great deference owed to the trial court's factual findings.  *Hernandez*, 500 U.S. at 366.  Mack's first and second grounds for relief, therefore, are denied.

## II.     Third Ground for Relief:  *Juror Bias*

For his third ground for relief, Mack claims the trial court erred in dismissing for cause potential jurors who articulated misgivings about the death penalty and in denying his motions to remove prospective jurors who favored the death penalty.  (Doc. 155 at 56-60.)  Respondent argues that this claim is partially procedurally defaulted and meritless.  (Doc. 158 at 51-54.)

47

### A.     Procedural Posture

As the Ohio Supreme Court explained on direct review of Mack's case, during the jury selection process, a "key question" arose concerning the potential jurors' "views on the death penalty and their ability to apply the law as given to them by the judge." *Mack*, 73 Ohio St. 3d at 505.  It recounted:

> Two potential jurors, Mr. Spelic and Ms. Davis, were dismissed at the prosecution's request because they stated that due to moral concerns or personal beliefs they could never consider imposing the death penalty even if so instructed by the law as defined by the judge. Three jurors expressed strong support for the application of the death penalty. Mr. Leib stated that he personally felt that if someone kills someone else, "they've got it coming." Mr. Jurecki and Ms. Frankel also stated personal support for the use of the death penalty. Each of these three jurors, however, stated that he or she would apply the law as given by the trial court judge, which might necessitate finding the appellant innocent, or sentencing him to life in prison. Ms. Frankel was removed by a peremptory challenge by the defense. The defense never moved to remove Mr. Jurecki for cause. The defense did move to have Mr. Leib removed for cause, but this motion was denied by the court.

*Id.*

Mack presented a claim of juror bias to the Ohio Supreme Court on direct appeal related to these prospective jurors. *See Mack*, 73 Ohio St. 3d at 509-10.  As Respondent notes, however, the state court found the claim waived as to one of the jurors, Thomas Jurecki, because defense counsel failed to move to have him removed for cause at trial. *Id.* at 510.  Respondent argues that this claim is therefore procedurally defaulted as to Mr. Jurecki.  (Doc. 158 at 52-53.)  Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have been avoided or corrected. *E.g., State v. Mason*, 82 Ohio St. 3d 144, 162 (Ohio 1998); *State v. Glaros*, 170 Ohio St. 471 (Ohio 1960), paragraph one of the syllabus.

Failure to adhere to this "firmly-established" rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted. *See, e.g., Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).

Mack acknowledges that the state court invoked the waiver as to Mr. Jurecki but notes that the court "otherwise addressed and rejected the claim." (Doc. 162 at 110.) The court did not address the merits of the claim as it related to Mr. Jurecki, however, *see Mack*, 73 Ohio St. 3d at 510, and that portion of this claim is procedurally defaulted. Moreover, Mack does not make any showing regarding either the cause for, or prejudice resulting from, this procedural default.

The Ohio high court adjudicated Mack's juror-bias claim relating to the other jurors on the merits, however, and that portion of the claim is ripe for federal habeas review.

### B. Merits Analysis

Even if this claim were entirely preserved for habeas review, it would fail. The Ohio Supreme Court, the last state court to address Mack's claim that the jury was not impartial due to certain of the jurors' stance on the death penalty, reasoned:

> Appellant's fourth and fifth propositions of law claim that the trial court abused its discretion when it dismissed for cause potential jurors who expressed reservations on recommending the death penalty and when it denied motions to remove potential jurors for cause who favored the death penalty. Neither of these propositions is supported by the record.
>
> Appellant argues that the trial court failed to allow an impartial jury to hear the case by overruling appellant's motions for dismissal for cause of prospective jurors Leib, Jurecki, and Frankel, who were allegedly predisposed towards the death penalty, and by sustaining the state's motions for dismissal of prospective jurors Spelic and Davis, who stated they could not vote for the death penalty.
>
> In order for a defendant to be properly convicted of a crime, a guilty verdict must be returned by a fair and impartial jury composed of a fair and

49

representative cross-section of the community as mandated by the Sixth Amendment of the United States Constitution and Section 10, Article I, Ohio Constitution. This court in *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576, stated that a prospective juror must be willing to follow the applicable law as given by the trial judge in the jury instructions. "'[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath.'" *Id.* at 30, 553 N.E.2d at 586, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 585. Improperly conducted voir dire may constitute reversible error only upon a showing of abuse of discretion by the trial court. *State v. Rogers* (1985), 17 Ohio St.3d 174, 179, 17 OBR 414, 418, 478 N.E.2d 984, 990.

Applying the above standards to the record shows that the trial court did not abuse its discretion by dismissing the anti death-penalty jurors because they indicated that they could not recommend the imposition of the death penalty under any circumstances. When asked whether he could fairly consider the death penalty, potential juror Spelic stated, "I don't think I could ever recommend it, no." Furthermore, in response to the trial court's questioning about his ability to sign a verdict recommending the death penalty, Spelic stated, "I don't think so. No matter what the circumstances were I wouldn't be able to sign anything recommending the death penalty, no." Similarly, potential juror Davis answered "no" to the trial court's questions of whether she could sign a verdict form recommending the death penalty under any set of circumstances and whether she could follow the law if it mandated the death penalty. When the evidence in the record shows that a potential juror will not follow the law concerning the death penalty, the trial court does not abuse its discretion in dismissing that juror for cause. The responses of these two prospective jurors gave the trial court ample reason to believe that they would be unable to follow their oath and would be substantially impaired in performing their duties as jurors. A juror must be able to follow the law as provided in the jury instructions, and if during voir dire the trial court feels that a juror cannot follow the law and the record supports this decision, then it is not an abuse of discretion to excuse the juror for cause.

With regard to potential jurors Leib, Jurecki, and Frankel, appellant argues in his fifth proposition of law that the trial court erred in overruling his challenges for cause to dismiss these jurors. Leib and Jurecki were members of the final jury. Frankel was excluded by defense counsel's third peremptory challenge. Appellant subsequently exhausted his six peremptory challenges.

The record reflects that defense counsel failed to move to have Jurecki removed for cause. According to *State v. Greer* (1988), 39 Ohio St.3d 236, 244, 530

N.E.2d 382, 394, the doctrine of waiver applies in capital cases and therefore appellant waived this error, if any existed, as it pertains to potential juror Jurecki.

To determine whether potential jurors Leib and Frankel should have been dismissed for cause, we apply the previously mentioned *Witt* standard of whether the prospective juror's views would prevent or substantially impair the performance of their duties according to their instructions and oath. *State v. Rogers,* 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. The transcript reveals that Leib and Frankel initially revealed a predisposition toward imposing the death penalty; however, both later stated to the trial judge that they would follow the law set forth in his instructions. Because the trial court's denials of appellant's challenges for cause are supported by the record, we find that the trial court did not abuse its discretion and hereby overrule appellant's fifth assignment of error.

*Mack*, 73 Ohio St. 3d at 509-10.

In a capital case, "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown,* 551 U.S. 1, 9 (2007). At the same time, the State has a "legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme." *Wainwright v. Witt*, 469 U.S. 412, 416 (1985).

It is permissible, therefore, to ask prospective jurors about their views concerning the death penalty during *voir dire* in capital cases. These "death-qualifying" questions ensure the impartiality of jurors by allowing the State to properly exercise challenges for cause against potential jurors unwilling to return a capital sentence. *Witherspoon v. Illinois,* 391 U.S. 510, 520-23 (1968). The standard for determining whether a potential juror may be excluded for cause because of the juror's views on capital punishment is "whether the

51

juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt,* 469 U.S. at 424.  This standard "does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id*.

The Supreme Court repeatedly has emphasized that habeas courts are to accord "special deference" to trial courts in applying these standards, because trial judges are in the best position to assess the demeanor and credibility of the jurors.  *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 176-78 (1986); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).

Mack does not specify how the state court's decision rejecting this claim contravenes or misapplies *Witherspoon* or *Witt* or rests on an unreasonable determination of fact under § 2254(d).  Nevertheless, he contends the trial court erred in excluding prospective jurors Richard Spelic and Mary Davis because "[t]here was no evidence that either . . . would not have been able to carry out their duties as jurors in this case."  (Doc. 155 at 58.)  The Ohio Supreme Court, however, cited to persuasive evidence of just that, quoting evidence in the record indicating that the potential jurors would not follow the law concerning the death penalty.  Mack notes that Mr. Spelic agreed that he would follow the law as instructed by the judge, and Ms. Davis stated that she would "try" to consider the options during deliberations.  (*Id*. (citing Doc. 150-1 (Trial Tr.) at 62, 163-72).)  But that is not sufficient to override the judge's conclusion, based on the jurors' testimony and his observations of their demeanor, that their views would "'prevent or substantially impair the performance of [their] duties as [jurors] in accordance with his instructions and [their] oath.'" *Witt,* 469 U.S. at 424.

Similarly, Mack points to statements of prospective jurors Leib, Jurecki, and

Frankel that they made during *voir dire* demonstrating they were predisposed to the death penalty.  (Doc. 155 at 59.)  Ms. Frankel, however, was excused from the jury.  And, as noted, defense counsel did not object to Mr. Jurecki's presence on the jury.  As to Mr. Leib, he was extensively questioned by the prosecutor.  (*See* Doc. 150-1 (Trial Tr.) at 97-105.) He initially expressed doubt that he could disregard evidence as he had seen jurors instructed to do on television, and professed that "if somebody takes another person's life they've got it coming to them."  (*Id*. at 99-103.)  But he also swore, after the prosecutor explained to him the juror's obligation to follow the judge's instructions, that he could do that, earnestly citing his four years of military service.  (*Id*. at 101-05.)  The Ohio Supreme court, therefore, was reasonable in upholding the trial court's denial of Mack's challenge for cause regarding Mr. Leib.

Accordingly, Mack has not demonstrated that the Ohio Supreme Court's decision was contrary to, or an unreasonable application of, *Witherspoon* or *Witt*, or was based on an unreasonable determination of fact.

**III.       Fifth Ground for Relief:  *Prosecutorial Misconduct / Suppressed Evidence***

Mack claims for his fifth ground for relief that the prosecution failed to disclose to the defense material exculpatory and impeachment evidence and knowingly presented perjured testimony, violating his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959).  (*See* Doc. 155 at 65-105.) Specifically, he alleges that prosecutors suppressed the following seven categories of information, primarily relating to the State's key witness, Timothy Willis:

1.       Handwritten notes authored by Mr. Sanelli's son-in-law regarding the family's first meeting with Willis on January 23, 1991.

53

2.      Cleveland Police Department ("CPD") reports regarding Willis' first communications with police about the Sanelli murder.

3.      CPD reports regarding Mr. Sanelli's stolen car and its crash on Holton Avenue.

4.      Evidence of an agreement between the prosecution and Willis in which the State provided favorable consideration to Willis in an unrelated, pending felony case in exchange for his testimony and cooperation in the prosecutions of Mack and Sowell for the Sanelli murder.

5.      CPD reports and related evidence regarding the police's consideration of Willis as a suspect in the Sanelli murder investigation and trial and police searches of Willis' house at that time.

6.      CPD reports concerning Willis' involvement in the so-called ski-mask robberies and murders.

7.      Willis' oral statement to prosecutors in June 1991 alleging that Mack admitted to shooting Mr. Sanelli after Sowell fired the first shots and the prosecutor's notes regarding that statement.

(*See* Doc. 162 at 121-23.)[6]  Mack further argues that the prosecution permitted Willis to present perjured testimony.  (*See id.* at 122.)

Respondent concedes that Mack presented these claims to state courts, which adjudicated them on the merits, and they are properly preserved for habeas review.  (Doc. 158 at 56.)  But she contends they lack merit.  (*Id*. at 56-62.)

---

[6]  Mack asserts an eighth category of alleged *Brady* material:  "other police reports and statements."  (Doc. 155 at 94.)  He specifies a statement William Lekas, who owned a bar next to Mr. Sanelli's business, gave to the police and the full report of Detective Norman Sherwood pertaining to his January 25, 1991, interview of Ms. Demill Blue.  (*Id*.)  But Mack does not explain the basis for this claim or provide any legal or factual argumentation whatsoever in either his petition or traverse, and the court will not address it.  *See, e.g., United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

54

**A.** *Brady v. Maryland* **and** *Napue v. Illinois*

In *Brady v. Maryland,* the Supreme Court held that a criminal defendant's due process rights are violated if the prosecution suppresses favorable evidence that is material to the defendant's guilt or punishment. *See Brady*, 373 U.S. at 87. This duty to disclose applies even though there has been no request by the accused and encompasses impeachment as well as exculpatory evidence. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Nevertheless, to win relief under *Brady*, the petitioner must show that the improperly withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

A related claim falling within the *Brady* disclosure doctrine arises when a state "knowingly use[s] false evidence, including false testimony, to obtain a tainted conviction . . . ." *Napue*, 360 U.S. at 269. To establish a due process violation based on the knowing use of perjured testimony, the petitioner must demonstrate that "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Id*. at 271; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972).

**B.** **Procedural History**

**1.** **Trial-Court proceedings**

Months before Mack's trial began, defense counsel, led by Paul Mancino, filed numerous discovery requests for information about State witnesses and for State evidence that was potentially exculpatory or mitigatory. (*See* Doc. 154-9 at 232-39 (Federal Evidentiary Hearing ("FEH") Ex. 44).) In a general response, the State represented that

55

"[n]o exculpatory material [was] available to or in the possession of the Prosecuting Attorney."  (*Id*. at 255 (FEH Ex. 45).)  This response was never updated or corrected.  (Doc. 154-8 (FEH Tr.) at 668-70 (Mancino Test.).)

At a pretrial conference, however, the parties informed the trial court that discovery was being provided.  (Doc. 150-1 (Trial Tr.) at 8.)  Ohio Criminal Procedural Rule 16(B) at the time did not provide for pretrial production of hard copies of witness statements or police reports,[7] and the policy of the Cuyahoga County Prosecutor's Office was to discourage prosecutors from disclosing them.  (*See* Doc. 101 (FEH Tr.) at 11 (Bombik Test.); Doc. 99 (FEH Tr.) at 153-54 (Ghazoul Test.).)  But prosecutors had discretion concerning what information they could divulge to defense counsel, and both the lead prosecutor in Mack's case, Richard Bombik, and his first chair, John Ghazoul, testified at the federal evidentiary hearing that they generally disclosed all relevant information contained in police reports and witness statements to defense attorneys.  Bombik testified that it was his "consistent policy" over the years to "[go] over every police report in the file" with defense counsel at pretrials.  (Doc. 101 (FEH Tr.) at 27-28.)  Ghazoul similarly recalled that his "practice was to always open the file and let the defense attorney read anything, what anyone has said."  (Doc. 99 (FEH Tr.) at 151.)

---

[7] Ohio Criminal Procedure Rule 16(B)(2) provided that, aside from certain evidence specified in section (B)(1) that prosecutors were required to disclose to defendants, the rule

> [did] not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents.

Ohio R. Crim. P. 16(B)(2).  This rule has since been amended.  *See* Ohio R. Crim. P. 16(B).

In particular, Bombik and Ghazoul testified that they believed they read or summarized the initial police reports about Willis and Willis' written statement to defense counsel at pretrials.  Bombik stated that "over a series of pre-trials, every page of every report was gone over with Mr. Mancino, you know.  There is no reason not to, really . . . ." (Doc. 101 (FEH Tr.) at 27.)  Ghazoul recalled that "the evidence was all ascertained by the Macinos that was involved in that file."  (Doc. 99 (FEH Tr.) at 151.)  And Paul Mancino testified that, although he did not specifically remember the pretrials in this case, "[n]ormally, they read over some police reports," and he agreed his notes from the pretrials reflect that the prosecution disclosed information from the police investigation.  (Doc. 100 (FEH Tr.) at 142-43.)

In fact, the State represented in a response to a discovery request, filed several months before trial, that Willis' statement had been produced.  (*See* Doc. 154-9 at 262 (FEH Ex. 46).)  In addition, in accordance with then-existing Ohio Criminal Procedure Rule 16(B), after Willis testified at trial, prosecutors disclosed Willis' written statement to defense counsel for *in camera* inspection to determine if any inconsistencies existed between Willis' testimony and a prior statement.[8]  (*See* Doc. 101 (FEH Tr.) at 112-13

---

[8] At the time of Mack's trial, Ohio Criminal Procedure Rule 16(B)(1)  required that prosecutors disclose to defendants certain information, including:

> In camera inspection of witness' statement.  Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement. If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies. If the court determines that inconsistencies do not exist the statement shall not be given

(Mancino Test.); Doc. 102 (FEH Tr.) at 6-7 (Bombik Test.).)  *See also Mack*, 1993 WL 497052, at *7 (noting that Willis was the only witness to supply a written statement before Mack's trial, and during his cross-examination, defense counsel requested and was provided an opportunity to review that statement pursuant to Criminal Procedure Rule 16).

Shortly after Mack's trial ended, defense counsel filed a motion for a new trial on the ground that the State had suppressed exculpatory and impeachment evidence regarding Willis' attempt to earn a reward from the Sanelli family.  (Doc. 154-9 at 308-14 (FEH Ex. 51 (Motion for New Trial)).)  The trial court denied the motion.  (*Id*. at 307 (Judgment).)

## 2. Federal habeas proceedings

After exhausting his state-court appeals and post-conviction review, Mack initiated habeas proceedings in this court on May 4, 2004.  (Doc. 1.)  Mack filed his original petition on December 15, 2004.  (Doc. 24.)  In it, he asserted a *Brady* claim based on the following allegedly suppressed information:  (1) Willis' prior statements to the police, Crime Stoppers, and the Sanelli family; (2) notes of interviews, conferences and/or meetings with Willis concerning his testimony; (3) notes taken by a Sanelli family member about the family's meeting with Willis; (4) any evidence of a deal between the prosecutors and Willis in which the State provided Willis with assistance in his criminal matters in exchange for

---

to the defense attorney and he shall not be permitted to cross-examine or comment thereon.

Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal.

Ohio R. Crim. P. 16(B)(1)(g).  This rule has since been amended.  *See* Ohio R. Crim. P. 16(B).

his testimony against Mack; (5) William Lekas' statement to police; (6) the police report regarding their interview of Demill Blue; and (7) the fact that Gerry Kirkland was going to testify for the State about the Holton crash.  (Doc. 24-1 at 33-37.)

On May 16, 2005, Mack filed a motion for leave to conduct discovery and for the appointment of experts, which Respondent opposed.  (Docs. 36, 42.)  This court granted Mack's motion in part on March 31, 2008, permitting certain discovery relating to his ineffective-assistance and *Brady* claims, including depositions, document production, and funds to retain a criminal investigator.  (Doc. 52.)

On June 17, 2009, Mack filed a motion for an evidentiary hearing, which Respondent also opposed.  (Docs. 65, 69.)  The court granted Mack's motion in part on May 31, 2010, and conducted an evidentiary hearing on certain of Mack's ineffective-assistance and *Brady* claims on June 28 through June 30, 2010, and July 9, 2010.  (*See* Docs. 99-102 (FEH Trs.).)

On November 23, 2011, the court denied a motion to dismiss filed by Respondent (Doc. 76).  (Doc. 115.)  It agreed with Respondent that certain of Mack's ineffective-assistance and *Brady* claims were unexhausted, but found that there was good cause for Mack's failure to exhaust his claims first in state court, the unexhausted claims were not "plainly meritless," and state-court remedies existed for Mack to exhaust the claims in state court.  (*See, e.g., id.* at 41-43, 45, 47-50, 52.)  It therefore stayed Mack's federal habeas case and held it in abeyance pending Mack's exhaustion of the claims in state court.  (*Id.* at 52.)

### 3.        Second state post-conviction proceedings

On December 21, 2011, Mack filed a successor post-conviction petition and motion for leave to file a motion for new trial in the state trial court.  (Doc. 151-1 at 37-65 (Mtn. for New Trial), 66-123 (Post-Conviction Pet.).)  In them, he asserted *Brady* claims based on the State's suppression of:  (1) the Sanelli family notes; (2) the initial Willis police reports and Willis' written statement; (3) the Holton Avenue crash reports; (4) the Willis deal evidence; (5) the police searches of Willis' property; (6) police reports regarding the Ski Mask Task Force; (7) Willis' oral statement; and (8) other police reports and statements.  (*See id*.)  Mack also claimed the State improperly presented Willis' perjured testimony under *Napue*.  (*See id*.)

On April 20, 2012, the State moved to dismiss the post-conviction petition and motion for new trial (*id*. at 138-69), which Mack opposed (*id*. at 181-212).  The court conducted an evidentiary hearing on August 27 and September 10, 2013.  (*See* Doc. 151-9 at 23-256 (Hrg. Tr.).)  It denied the petition and motion on March 20, 2014.  (Doc. 151-2 at 260-69.)

Mack appealed the trial court's judgment to the Eighth District Court of Appeals and Ohio Supreme Court, but the appeals were unsuccessful.  *See State v. Mack*, 2018 WL 565704 (Ohio Ct. App. Jan. 25, 2018) (affirming trial court on remand and on reconsideration); *State v. Mack*, 152 Ohio St. 3d 1489 (Ohio 2018) (declining jurisdiction).

### 4.    Reinstated federal habeas proceedings

Mack's amended habeas petition asserts the identical *Brady* and *Napue* claims that he raised in his second state post-conviction pleadings.  (Doc. 155 at 65-105.)  Mack and Respondent agree that the merits of the claims were fully litigated in state courts and the

60

claims are therefore ripe for federal habeas review. (*See* Doc. 158 at 56; Doc. 162 at 124.)

**C.      Standard of Review**

As noted above, habeas courts look to the "last *explained* state-court judgment" on the federal claim at issue to determine whether AEDPA's deferential review applies. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original). The last state court to address Mack's *Brady* and *Napue* claims was the state appellate court on successor post-conviction review. *See Mack*, 2018 WL 565704. Mack argues that the state court's decision is not entitled to AEPDA deference in two respects: (1) the entire decision was not an "adjudication on the merits" under AEDPA's § 2254(d) because Ohio's procedural requirements for successive post-conviction petitions is less protective of federal constitutional rights than federal law; and (2) even if the decision was an adjudication on the merits for purposes of § 2254(d), the state appellate court failed to consider the impact of alleged *Brady* evidence on Mack's sentencing and that issue must be reviewed *de novo*. (Doc. 162 at 126-34.) Respondent does not address either argument.

**1.      Ohio's procedural requirements for successive post-conviction petitions**

Mack first argues that AEDPA deferential review does not apply to his *Brady* / *Napue* claims because the state appellate court's decision resolving them was not an "adjudication on the merits" under AEDPA's § 2254(d). (Doc. 162 at 126-31.) "The denial of a federal constitutional claim by a state court," he posits, "using state law standards which are less protective of the federal right does not constitute an 'adjudication on the merits' of the federal claim." (*Id*. at 130 (citing *Morgan v. Dickaut*, 677 F.3d 39, 49 (1st Cir. 2012)).) And here, he contends, the state appellate court "ultimately applied" the

61

jurisdictional standards of Ohio's successor post-conviction relief statute, Ohio Rev. Code

§ 2953.23, to his claims by affirming the trial court's denial of his petition based on Mack's

failure to meet those standards, which were "much less protective" of the federal due

process rights recognized in *Brady* and of other federal constitutional rights that impose

lower standards of proof.  (*Id*. at 127 (citing *Mack*, 2018 WL 565704, at *7-8 (¶¶ 10-12)).)[9]

In particular, Mack asserts, the Ohio statute required that the petitioner show by clear and

convincing evidence that but for constitutional trial error, "no reasonable factfinder" would

have found the petitioner guilty or eligible for a death sentence.  (*Id*. (quoting Ohio Rev.

Code § 2953.23(A)(1)).)  Mack cites no controlling authority to support his position.

Mack also does not address the fact that he raised this argument with the state post-

conviction appellate court, although in support of a different claim – one challenging the

adequacy of Ohio's post-conviction procedures.  *Mack*, 2018 WL 565704, at *7-8.  The

---

[9] Section 2953.23(A)(1) provided that a court may not entertain an untimely or successive petition unless the petitioner is able to demonstrate each of the following:

> (a) Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

> (b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

Ohio Rev. Code § 2953.23(A)(1).  This provision was amended in 2017 but remains substantively the same.  *See Mack*, 2018 WL 565704, at *8 n.5.

state court rejected Mack's contention, explaining that it and other Ohio appellate courts have concluded that, because post-conviction relief is not a constitutional right but a state statutory right, § 2953.23(A)(1)'s clear-and-convincing standard is a "reasonable procedural hurdle" for successive petitions for post-conviction relief and the statutory scheme "is not unconstitutional on its face or as applied . . . ." *Id.* (internal quotation marks and citations omitted).

The state appellate court further relied on the Supreme Court's decision in *Weaver v. Massachusetts*, 582 U.S. – , 137 S. Ct. 1899 (2017).  *Id.* at *8.  In that case, the Court held that prejudice is not presumed when a defendant raises a violation of the right to a public trial in the context of a post-conviction claim of ineffective assistance of counsel, applying the higher standard of the petitioner's ineffective-assistance claim, which requires a showing of prejudice, than the structural-error standard of the underlying public-trial claim.  *Weaver*, 137 S. Ct. at 1911.  The state appellate court, in considering Mack's argument that Ohio's successive post-conviction statute requires a greater showing than federal constitutional claims of ineffective assistance of counsel or suppressed evidence, construed *Weaver* as establishing that "the standard of review does depend on the procedural posture of the case, and requiring a defendant to satisfy a higher burden does not violate a defendant's due process rights."  *Mack*, 2018 WL 565704, at *8.

This court need not reach this issue, however, as it rejects the very premise of Mack's argument:  that the Ohio appellate court "ultimately" rejected his *Brady* claims based on the jurisdictional requirements of § 2953.23.  (Doc. 162 at 127.)  It is true that in overruling Mack's first assignment of error, the appellate court appeared to uphold the trial

court's conclusion that Mack failed to satisfy § 2953.23's jurisdictional requirements for successive or untimely post-conviction petitions. *Mack*, 2018 WL 565704, at *5-6 (¶12). But the court went on to observe that the trial court "did not deny the petition outright, but held a hearing, and analyzed the petition properly under R.C. 2953.23." *Id*. at *6. And the court then limited the trial court's procedural judgment to Mack's ineffective-assistance claims: "Therefore," it concluded, "the remainder of the discussion of this assigned error will include [Mack's claims of ineffective assistance of counsel] where he argues the merits of his petition." *Id*. It proceeded to find Mack's ineffective-assistance claims procedurally barred, either by *res judicata* or because they were not "newly discovered" under § 2953.23(A)(1)(a). *Id*.

By contrast, the state appellate court analyzed Mack's *Brady* claims independently of the trial court's procedural ruling and entirely on the merits; it referred to § 2953.23 in its *Brady* discussion only once as a side note[10] and never applied the provision's procedural requirements to Mack's *Brady* claims. *See id.* at *8-14. In habeas, "if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). Here, as both parties apparently agree, since neither argues the claims are defaulted, the state appellate

---

[10] The state appellate court found, in its *Brady* analysis of Willis' written statement, that Mack's trial counsel's notes and the trial record itself demonstrated that the evidence was not suppressed. *Mack*, 2018 WL 565704, at *10. But it also remarked that this "indicat[ed] that a lack of disclosure was not newly discovered and . . . this claimed *Brady* violation [could have been] brought in the prior postconviction relief petitions." *Id*.

court did not clearly and expressly invoke the procedural bar of Ohio's successor post-conviction statute to foreclose Mack's *Brady* claims.[11]  Rather, the state court conducted a merits review of the claims, applying *Brady* and other controlling federal constitutional law.  AEDPA deference, therefore, applies to Mack's *Brady* claims.

> ## 2. State appellate court's failure to consider the impact of alleged *Brady* evidence on sentencing

Mack further argues that even if the state appellate court's decision regarding his *Brady* claims were generally governed by § 2254(d), AEDPA deference still would not apply to this court's analysis of whether the allegedly suppressed evidence impacted his death sentence, because no state court addressed that particular issue.  (Doc. 162 at 131-34.)

As Mack asserts, where a state court explicitly relies on one element of a multi-prong test to resolve a claim to the exclusion of others, AEDPA deference does not apply and federal habeas courts review the unanalyzed issue *de novo*.  *See, e.g., Brumfield v. Cain*, 576 U.S. 305, 323 (2015) (applying *de novo* review to unanalyzed portion of *Atkins* claim); *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) ("Because the state court did not decide whether [petitioner's] counsel was deficient, we review this element of [petitioner's] *Strickland* claim *de novo*."); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*." (citation omitted)); *Rayner v. Mills*, 685 F.3d 631, 637 (6th Cir. 2012) ("[W]here the state court

---

[11] It is unclear how Mack reconciles his analysis of the state appellate court's decision as "ultimately" a rejection of his *Brady* claims on state procedural grounds with his conflicting position that the claims are not procedurally defaulted but are preserved for federal habeas review.

adjudicated only one prong [of an ineffective-assistance claim], we have . . . reviewed the

remaining prong de novo.").[12]

Mack argues that, contrary to *Brady*, the state appellate court considered the impact

of the allegedly suppressed evidence only on his conviction, not on his sentencing.  (Doc.

162 at 132-34.)  Indeed, the *Brady* Court was clear that the prosecution must disclose

favorable evidence to the defense that is "material either to guilt *or to punishment*."  *Brady*,

373 U.S. at 87 (emphasis added).  The Court later emphasized this point in *Cone v. Bell*,

556 U.S. 449 (2009), holding that while it agreed with the lower courts that the withheld

evidence would not likely have affected the jury's verdict on the petitioner's insanity

defense at the guilt phase of trial, they erred in failing to "fully consider[] whether the

suppressed evidence might have persuaded one or more jurors that [the petitioner's] drug

addiction—especially if attributable to honorable service of his country in Vietnam—was

sufficiently serious to justify a decision to imprison him for life rather than sentence him to

death."  *Id*. at 475.  When reviewing *Brady* claims, it explained, courts must "distinguish

between the materiality of the evidence with respect to guilt and the materiality of the

evidence with respect to punishment . . . ."  *Id.* at 472.  The Court remanded the case to the

district court for a *de novo* review of the cumulative effect of the improperly suppressed

---

[12] The Sixth Circuit has found no conflict between this rule, which applies when a state court *partially* adjudicates a multi-prong claim, and the rule established in *Harrington v. Richter*, 562 U.S. 86, 99 (2011), which holds that when state court *summarily* denies a federal constitutional claim with no analysis at all, it is presumed that the state court adjudicated the claim "on the merits" for purposes of § 2254(d) and AEDPA deference applies.  *Rayner*, 685 F.3d at 638-39 (explaining that in *Richter*, "the Supreme Court expressly limited application of its holding to cases in which the state court's decision is unaccompanied by an explanation[,]" and the Court has continued to rely on the rule regarding *de novo* review of partially adjudicated claims since that decision) (quotation marks and citation omitted).

evidence regarding the seriousness of petitioner's drug problem on his sentence.  *Id*. at 476.

Similarly, here, the state appellate court did not adjudicate the issue of whether any alleged suppression of material evidence impacted Mack's sentencing.  In setting forth the standards governing *Brady* claims, the state court explained that in order to prevail on a *Brady* claim, "evidence must be material *to the conviction* in order to warrant a new trial," but did not mention sentencing.  *Mack*, 2018 WL 565704, at *9 (emphasis added).  And in its analysis of the materiality of the evidence at issue, the court again stated that the evidence "must be material to *the convictions*," with no mention of sentencing.  *Id*. at *14 (emphasis added).  Moreover, in its analysis of the claim, the court never discussed any potential impact of the alleged *Brady* evidence on Mack's capital sentence.  *See id.* at *9-13.  And it concluded, "the evidence adduced does not undermine the confidence in *the verdicts of guilt*, and therefore, the trial court did not abuse its discretion in denying" Mack's post-conviction petition.  *Id*. at *15 (emphasis added).  This court agrees with Mack, therefore, that it must consider *de novo* whether any improperly withheld evidence would have been material to the jury's determination of Mack's punishment.

### D.    *Brady* Claims

Mack argues that the decision of the Ohio post-conviction appellate court denying his *Brady* claims was contrary to, or an unreasonable application of, *Brady* and its progeny under § 2254(d)(1), and was based on unreasonable determinations of fact in light of the evidence presented under § 2254(d)(2).  (*See* Doc. 162 at 134-67.)  As noted above, in order to establish a *Brady* violation, a petitioner must demonstrate that:  (1) the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) the

evidence was suppressed by the state, either willfully or inadvertently; and (3) prejudice ensued.  *Strickler,* 527 U.S. at 281-82.

Evidence is considered favorable under *Brady* if it would have had "some value . . . [or] weight and its tendency would have been favorable" to the defendant.  *Kyles*, 514 U.S. at 450–51 (rejecting the state's argument that the evidence was "neither impeachment nor exculpatory evidence" because the jury might not have substantially credited it, as "[s]uch argument . . . confuses the weight of the evidence with its favorable tendency"); *see also United States v. Blackwell,* 459 F.3d 739, 758 (6th Cir. 2006) ("Evidence is favorable to the accused if it exculpates the accused or enables the accused to impeach witnesses.").

To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control.  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).  There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  *Id.* (internal quotation marks and citations omitted).

Prejudice, or materiality, in the *Brady* context is a far more difficult test to meet than the threshold questions of suppression and favorability.  *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002).  Evidence is "material" when there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Cone*, 556 U.S. at 469-70.  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in

the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75-76 (2012) (quoting *Kyles,* 514

U.S. at 434 (internal quotation marks omitted)).

Courts examine each item of alleged *Brady* evidence individually for suppression

and favorability, then consider the cumulative impact of any *Brady* evidence for materiality.

*Kyles,* 514 U.S. at 436-37 & n.10 ("We evaluate the tendency and force of the undisclosed

evidence item by item; there is no other way.  We evaluate its cumulative effect for

purposes of materiality separately . . . .").

The court will first review each alleged item of *Brady* material individually for

suppression and favorability.

### 1.     Sanelli family notes

Mack first contends that the prosecution improperly suppressed handwritten notes

that Mr. Sanelli's son-in-law, Michael Barone, took during the family's first meeting with

Willis on January 23, 1991 (Doc. 154-9 at 50 (FEH Ex. 8)).  (Doc. 155 at 69-72.)  In

addressing this claim on post-conviction review, the Ohio court of appeals reasoned:

> {¶ 32} Willis met with the family of the victim a day or two after the murder
> at their glass store that was run by Peter. Peter's son-in-law, Mike Barone, took
> notes of this conversation. At trial, Anthony Sanelli, Peter's son, testified that
> the notes were not given to police. During the previous appeals, it was the
> state's argument that these notes were not turned over to police. However,
> during the federal proceedings, appellant was able to show that police were
> given the notes shortly after the meeting. Appellant argues that his name does
> not appear in the notes memorializing the conversation, although the name of
> the codefendant, Thomas Sowell, does.
>
> {¶ 33} The trial prosecutor from appellant's criminal trial (the "trial
> prosecutor") testified in the federal proceedings that these notes were not
> disclosed to him and were not in his file at trial. He appeared to assert that he
> had no duty to turn over items not in his possession. However, the *Kyles* court
> specifically rejected this argument. *Kyles*, 514 U.S. at 438, 115 S.Ct. 1555, 131
> L.Ed.2d 490. But these notes were cumulative of evidence gathered by

69

appellant in preparation for trial. One of appellant's trial attorneys interviewed members of the Sanelli family and both attorneys were aware that Willis met with the family soon after the murder. Anthony Sanelli testified at trial about this meeting, and the notes also mirror Willis's first statement to the police.

{¶ 34} It is true that the notes do not include appellant's name, but they indicate that two people were involved and specifically mention one of the codefendants. The notes indicate that Willis identified the codefendant, Thomas Sowell, as the shooter, but that is not inconsistent with Willis's testimony. Both Sowell and appellant fired shots at Sanelli, as the forensic evidence established. Therefore, the notes are not contradictory in nature. They identify one perpetrator by name, and Willis identified the second perpetrator, appellant, to police shortly thereafter. These notes, while helpful in the cross-examination of Willis, were cumulative of other evidence and do not cast serious doubt on the verdicts in this case. The notes indicate two people were involved in the shooting of Peter even though only Sowell was named in this initial conversation.

*Mack*, 2018 WL 565704, at *9-10.

Respondent does not contest the state appellate court's finding that the prosecution withheld the Sanelli notes from the defense.[13] Indeed, Barone testified at the federal evidentiary hearing that he gave the notes to the police soon after the meeting with Willis. (Doc. 102 (FEH Tr.) at 74-75 (Barone Test.))  *See also Mack,* 2018 WL 565704, at *9 (citing *Kyles*, 514 U.S. at 437-38 (holding that individual prosecutors have a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including police)).

Mack asserts that this evidence also was favorable, as it has significant exculpatory and impeachment value.  He first argues that the notes support Mack's defense at trial that

---

[13] In fact, Respondent offers little argument or analysis in countering the merits of any of Mack's *Brady* and *Napue* claims.  She devotes just six pages of her return of writ to address these claims (compared to Mack's combined 87 pages in his amended petition and traverse), and provides little more on the merits than a summary of the state appellate court's opinion and brief, conclusory remarks regarding the state court's conclusion.  (*See* Doc. 158 at 56-62.)

he did not participate in the murder and the only reason he became a suspect was because Willis was actually the perpetrator and set Mack up.  (Doc. 162 at 138-40.)  The notes also show, according to Mack, that Willis never mentioned Mack at all while meeting with the Sanelli family; instead, he repeatedly referred to a "man" rather than "men," and identified only Sowell.  They could have established, therefore, that even if Mack were present at the murder, Sowell was the lone shooter and Mack was not the principal offender, rendering him ineligible for the death penalty as charged by the State.  (*Id*. at 140.)  *See also* Ohio Rev. Code § 2929.04(A)(7) (providing the death penalty may be imposed for aggravated murder if it was committed during certain felony offenses, including aggravated robbery, and the defendant was either the principal offender in the murder or committed the aggravated robbery with prior calculation and design); *State v. Taylor,* 66 Ohio St. 3d 295, 306-07 (Ohio 1993) (defining "principal offender" under § 2929.04(A)(7) as the "actual shooter"); Doc. 150-2 (Trial Tr.) at 39-40 (State dismissing premeditated murder count before trial).

Mack argues that the Sanelli notes also would have had great impeachment value at trial.  They would have been most helpful, according to Mack, in impeaching the credibility of Willis, whom Mack describes as "the singularly most important witness in the State's weak death-penalty case."  (Doc. 162 at 141.)  Mack contends that, over time, Willis changed his story of the events surrounding the crime, altering and embellishing facts along the way, and he benefitted financially through rewards and in a pending criminal case against him from his cooperation with the police and prosecution.  (*Id*. at 141-48.)  The notes also could have been used, Mack asserts, to impeach the detectives who testified, by

71

challenging the State's investigation and "rush to judgment" in relying on Willis.  (*Id.* at

141, 149.)  Finally, Mack argues that the defense could have impeached Tony Sanelli with

the notes, as he testified at trial that his family did not turn over the notes to police and he

did not know where they were.  (*Id.* at 148-49 (citing Doc. 150-2 (Trial Tr.) at 181).)

The state appellate court apparently considered the Sanelli notes favorable, stating

that they would have been "helpful in the cross-examination of Willis . . . ."  *Mack*, 2018

WL 565704, at *10.[14]  This court agrees.

The Sanelli family notes, therefore, constitute *Brady* material:  the State had these

notes in its possession and they were favorable to Mack's defense.  The prosecution should

have produced them to Mack's counsel before trial.

### 2.    Initial Willis written statement and related police reports

Mack further argues that the prosecution wrongfully suppressed Willis' written

---

[14] The court notes that in its analysis of Mack's *Brady* claims, the state appellate court did not strictly adhere to the Supreme Court's instruction that courts examine each item of alleged *Brady* evidence individually for suppression and favorability and then consider the cumulative impact of any *Brady* evidence for materiality.  *Kyles,* 514 U.S. at 436-37 & n.10.  At times, it appeared to conflate the favorability and materiality factors, making individual determinations of materiality of the alleged *Brady* material.  Regarding this claim, for example, the state court concluded that the Sanelli notes, "while helpful in the cross-examination of Willis, were cumulative of other evidence and do not cast serious doubt on the verdicts in this case." *Mack*, 2018 WL 565704, at *10.  Nonetheless, the state court separately evaluated the cumulative impact of all of the alleged *Brady* evidence on the jury's verdict.  *See id.* at *14 (¶¶ 61, 62).  And, as this court will explain below, its ultimate conclusion was objectively reasonable:  that the prosecution's wrongful suppression of evidence, examined as a whole, did not prejudice Mack such that it violated his due process rights.  *See Cone,* 556 U.S. at 473–74 ("Although we take exception to the Court of Appeals' failure to assess the effect of the suppressed evidence 'collectively' rather than 'item by item,' *see Kyles*, 514 U.S., at 436, . . . we nevertheless agree that even when viewed in the light most favorable to Cone, the evidence falls short of being sufficient to sustain his insanity defense.").

statement to the police (Doc. 154-9 at 60-61 (FEH Ex. 11)) and two police reports of

Willis' first communications with them about the Sanelli murder, one that essentially

summarized Willis' written statement (*id*. at 52-58 (FEH Ex. 9)) and one that reported

Willis' second visit with the Sanelli family (*id*. at 85 (FEH Ex. 16)).  (*See* Doc. 155 at 73-

76.)  As to this claim, the state appellate court opined:

> {¶ 35} In the first police report documenting Willis's contact with police, he
> relayed that Sowell was the person that shot Peter and that appellant and
> Reginald Germany were also involved. A second supplemental police report
> documented Willis's initial phone contact with police and contained materially
> the same statement. Willis's written statement also indicates that police asked
> Willis to identify Peter's vehicle prior to giving a written statement. Appellant
> claims this is all information that could have been used to impeach Willis's
> testimony. Appellant further claims that the fact that Willis identified Sowell
> as the shooter and appellant and Germany were involved constitutes a *Brady*
> violation.

> {¶ 36} The transcript from the federal proceedings indicates trial counsel's
> notes included the disclosure or summary of Willis's written statements. This
> court has also previously found the trial record indicates disclosure of the
> written statement during trial. *Mack I*, 8th Dist. Cuyahoga No. 62366, 1993 WL
> 497052, at *7, 1993 Ohio App. LEXIS 5758, at *18. Appellant raised this in an
> assignment of error taking issue with the court's denial of a motion for
> discovery and inspection. This court found a lack of prejudice. *Id*. This also
> indicates that a lack of disclosure was not newly discovered and appellant does
> not explain why this claimed *Brady* violation was not brought in the prior
> postconviction relief petitions. The supplemental police reports documenting
> Willis's contact with police were duplicative of his written statement that
> resulted from that contact.

*Mack*, 2018 WL 565704, at *10.

Mack argues that the initial police reports about Willis and Willis' written statement

contained valuable impeachment evidence that was never disclosed to his trial counsel,

such as:  (1) Willis first identified Sowell as the shooter, not Mack, and initially did not

attribute any statements to Mack about shooting Mr. Sanelli; (2) the police showed Willis

Mr. Sanelli's car before they took Willis' statement, while the prosecutor told the jury that Willis provided important details about the car to police before he saw the car; (3) Willis later embellished his story about the crime, adding that Germany offered Sowell his gun before the murder and Mack said he wanted to "kill" an "Arab" after the crime; and (4) Willis visited the Sanelli store a second time, though he and Tony Sanelli testified that he had been there only once.  (Doc. 155 at 73-76.)

The court agrees with the state appellate court, however, that Willis' written statement and the related police report  were not suppressed.  Foremost, as noted above, the record shows that the prosecution provided Willis' written statement to defense counsel after its direct examination of Willis for an *in camera* inspection pursuant to Ohio Criminal Procedure Rule 16.  (*See* Doc. 150-3 (Trial Tr.) at 110); Doc. 102 (FEH Tr.) at 6-7 (Bombik Test.); Doc. 101 (FEH Tr.) at 111-13 (Mancino Test.).)

The record further demonstrates that the prosecution disclosed the information contained in Willis' written statement and the related police report at a pretrial conference well before trial.  The State's response to a discovery request, filed several months before trial, represented that Willis' statement had been produced.  (*See* Doc. 154-9 at 262 (FEH Ex. 46).)  And Paul Mancino acknowledged at the federal evidentiary hearing that it appeared from notes he took of pretrial proceedings that the prosecutor read him Willis' written statement.  (Doc. 101 (FEH Tr. ) at 109-10; *see also* Doc. 154-9 at 188-98 (FEH Ex. 38) (Mancino notes).  Mancino's pretrial notes closely follow both Willis' statement and the report summarizing it.  In his statement, Willis recounted that Mack, Sowell, and Germany stopped by his house and Sowell asked him if he had a gun because, Sowell said,

"we need a car tonight, we fixin to ride downtown, and get a hotty."  (Doc. 154-9 at 60

(FEH Ex. 11).)  The report, for example, states:  "Sowell, Mack and Germany came over

his house and asked for a gun. . . .  [T]hen told Willis they were going down town [*sic*] to

get a car."  (Doc. 154-9 at 54 (FEH Ex. 9) (capitalization altered).)  Mancino wrote in his

notes:  "Tim Willis – before incident went down – Reggie, Tom, Clarence there – needed

car – going downtown[.]  Tom needed a gun . . . ."  (*Id*. at 188 (FEH Ex. 38).)  Willis'

written statement and the information in the police report summarizing it, therefore, were

disclosed to defense counsel, before trial and then again during it.

As to the fact contained in a second police report that Willis appeared at Mr.

Sanelli's store a second time, even if prosecutors did not disclose that evidence to the

defense, it does not meet *Brady*'s favorability requirement. The police report stated:  "Also

while at the [Sanelli store] Timothy Willis came to the store and informed the victim's [*sic*]

that he had contacted the police and provided the information that he knew, and he states he

would stay in contact with the police."  (Doc. 154-9 at 85 (FEH Ex. 16) (capitalization

altered).)  Mack claims this was valuable impeachment evidence because it contradicted

Willis' and Tony Sanelli's testimony that they met only once, and buttressed Mack's theory

that Willis was "lurking around" the investigation to further his goal of obtaining the

reward money and a deal regarding his own felony case.  (Doc. 155 at 75-76.)  The court

disagrees.  If the jury had been informed of the second meeting, they may have found that

Willis and Tony Sanelli simply forgot about the brief and uneventful meeting rather than

lied about it.  And Willis' reported statement to the family is consistent with Willis'

testimony that he was trying to assist the family and police in the investigation, even if he

denied that he was motivated by the reward.  (*See* Doc. 150-3 (Trial Tr.) at 134 (Willis Test.).)

Accordingly, the information contained in Willis' statement and the related police reports was either disclosed to defense counsel or was not favorable to Mack's defense and does not qualify as *Brady* material.

### 3. Holton Avenue crash reports

Mack next asserts that the prosecution should have disclosed two police reports regarding the crash and recovery of Mr. Sanelli's stolen car on Holton Avenue.  (Doc. 155 at 76-78; Doc. 154-9 at 36-38 (FEH Ex. 4), 45-46 (FEH Ex. 6).)  In considering this claim, the state appellate court opined:

> {¶ 43} A witness reported to Cleveland Police that he saw a man fitting Sowell's description crash Peter's car on Holton Avenue. A police report also indicated that someone was seen entering the stolen vehicle after it had been crashed into a utility pole and abandoned. The individual moved the car some distance and took the keys.

> {¶ 44} Appellant argues that the witness to the crash gave a description of the driver that matched Sowell, rather than appellant. Appellant argues this indicates that it was Sowell, rather than appellant, who shot Peter. Appellant also argues that the individual seen moving the car could have returned to the vehicle to retrieve evidence rather than being an individual who happened upon an abandoned vehicle.

> {¶ 45} This evidence is not exculpatory or readily used for impeachment. Willis testified that appellant told him that Sowell crashed the car into a pole. So that information was adduced at trial. Further, simply because Sowell was driving the car does not conflict with the evidence adduced or the state's theory of the case. Appellant claims that it only makes sense that if Sowell was seen driving the car, he must have been the person on the driver's side of the vehicle when the car was stolen. Therefore, he must have been the one who actually killed Peter. The fact that Sowell was driving the car does not lead to the conclusion that Sowell was the person that killed Peter. This post hoc argument does not cast doubt on appellant's conviction. It is also possible that Sowell wanted to drive the car and appellant let him, or that as appellant was pulling

76

Peter from the vehicle after shooting and searching him, Sowell came around to the driver's side of the car and got in so the two could make a quick escape.

{¶ 46} All this evidence tends to establish is that Sowell was the person who was driving the car after the murder. This does not mean that Sowell, rather than appellant, was the person that caused Peter's death. This evidence is not exculpatory nor does it contradict Willis's statements at trial. Willis testified that Sowell was the driver of the vehicle when he encountered him and appellant soon after the murder. The accident reports that were not turned over do not amount to a *Brady* violation.

*Mack*, 2018 WL 565704, at *11-12.

Mack argues that the two police reports regarding the recovery of Mr. Sanelli's car on Holton Avenue contained two pieces of suppressed evidence that would have had exculpatory and impeachment value to the defense.  (*See* Doc. 155 at 76-78; Doc. 162 at 154-56.)  One is the statement of Jerry Kirkland, who told police that he and his two daughters witnessed a man crash what turned out to be Mr. Sanelli's car into a utility pole on Holton Avenue and then saw the man, who was wearing a gray Chicago Bulls coat, emerge from the damaged car holding his nose.  (Doc. 154-9 at 45-46 (FEH Ex. 6).)  Prosecutors, however, included Kirkland and his daughter, Lashanda, along with their Holton Avenue home address, on their witness list, which was served on defense counsel on February 26, 1991, nearly five months before the trial.  (*Id*. at 268-69 (FEH Ex. 46).)  No *Brady* violation occurs "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  *Coe*, 161 F.3d at 344 (internal quotation marks and citations omitted).  This evidence, therefore, was not suppressed and is not *Brady* material.

The other piece of evidence from these police reports that Mack contends the

77

prosecution improperly withheld is the report that a man and his mother told the police that, as they were walking near Mr. Sanelli's abandoned car on Holton Avenue, they saw a man with a mustache, wearing a reddish sweater, drive up to the car, get in, and then move it a couple feet back from the utility pole.  (Doc. 154-9 at 37-38 (FEH Ex. 4).)  The man then got out of the car, and with his female companion yelling at him "hysterically" to "get away from that car [because] it might be stolen," returned to his car and drove away.  (*Id*.)  Mack argues that this evidence, in conjunction with the suppressed fact from the Sanelli notes that, according to Willis, Sowell left a 9 mm clip in the car, "lead[s] to the inference that the man who moved the car was involved in the crime and was seeking to recapture the left-behind clip[,]" which was not in the car when it was recovered.  (Doc. at 162 at 155.)  He suggests this "unknown man" was Sowell or Willis himself.  (*Id*.)  But he was unable to use this evidence at trial or "to timely pursue any leads that this information revealed," including that Sowell was the actual shooter or that Sowell had an accomplice other than Mack, possibly Willis.  (*Id*.)

There is nothing in the record to suggest that the prosecution disclosed this evidence to the defense, and the court agrees that this evidence had some exculpatory or impeachment value.  The police report regarding the Holton Avenue car crash, therefore, qualifies as *Brady* material.

### 4.    Willis deal evidence

In May 1991, nearly two months before Mack's trial, Willis was charged with felonious assault with a violence specification, aggravated burglary, aggravated robbery, and possession of criminal tools for severely beating and stealing a revolver from 83-year-

78

old Robert Burgess.  (Doc. 154-9 at 398-401 (FEH Ex. 63).)  According to police records,

Mack was wearing a ski mask at the time of the offense, but Burgess pulled it off and

recognized him as "Tim," whom he had once hired to repair his washing machine.  (*Id*. at

394, 396.)  Burgess was hospitalized for three days due to injuries sustained in the assault.

(*Id*. at 397.)  He then identified Willis as the assailant from a lineup and provided a written

statement about the crime.  (*Id*.)  However, Burgess died in October 1991 for reasons

"unrelated to the beating," and the assault case against Willis was dismissed a short time

later.  (*Id*. at 366.)  Mack claims that the prosecution wrongfully withheld evidence of an

unwritten agreement between it and Willis that the State would drop the charges against

Willis in the Burgess case in exchange for Willis' testimony and cooperation in the

prosecutions of Mack and Sowell for Mr. Sanelli's murder.  (Doc. 155 at 78-83.)

> The state appellate court, in reviewing this claim, reasoned:

> {¶ 51} In the weeks leading up to appellant's trial, it was disclosed to
> appellant's counsel that Willis was charged with aggravated robbery involving
> Robert Burgess. The charges in this case were ultimately dismissed. Appellant
> points to a note in the state's file of this prosecution that the trial prosecutor
> called the prosecutor assigned to Willis's case and asked him to hold the case
> to investigate it further. This conversation, documented by the prosecutor in
> Willis's case, occurred on July 30, 1991, a few weeks after the conclusion of
> appellant's trial, and a few days after Willis finished testifying against Sowell.

> {¶ 52} The evidence adduced at the federal evidentiary hearing and below
> indicates Willis received no deal from the state for his testimony. The trial
> prosecutor testified that no consideration with other criminal matters was ever
> exchanged with Willis for his testimony against appellant. Willis's attorney
> testified that he was unaware of any deal. There is no evidence of the terms of
> any deal between the state and Willis in the record before this court.

> {¶ 53} However, appellant makes an inference, based on the sequence of events
> that took place in Willis's criminal matter, that a deal was reached. O'Malley
> also indicated during his testimony during a bail hearing involving federal
> charges against Willis, that he thought Willis received some type of deal. He

testified, at the hearing below, that this impression was his personal opinion based on, his best recollection, some notes he read at the time.

{¶ 54} The trial prosecutor explained the conversation, stating he asked the other prosecutor to reinvestigate the case because, according to Willis, people were trying to set him up to discredit him.

{¶ 55} The notes of the prosecutor in Willis's case indicate that the case was dismissed because the victim, Burgess, died of unrelated causes, and without a witness, they could not prosecute. The trial court found that appellant had not demonstrated that a deal was reached to secure Willis's testimony. This court agrees.

*Mack*, 2018 WL 565704, at *12-13.

Mack claims the state appellate court's determination that no deal existed between Willis and the prosecution relating to Willis' testimony in the Sanelli cases and his prosecution in the Burgess case was an unreasonable determination of fact in light of the evidence presented under § 2254(d)(2).  (*See, e.g.,* Doc. 162 at 156.)  To prove this, Mack must establish that the state court's factual finding that there was no undisclosed deal was clearly erroneous.  *See Williams v. Coyle*, 260 F.3d 684, 707 (6th Cir. 2001) (to prevail on his *Brady* claim, petitioner "must show that the court's factual finding that no deal existed was clearly erroneous").  Mack has not made that showing.

As Mack points out, even a "less formal, unwritten or tacit agreement" between a prosecutor and cooperating witness are "subject to *Brady*'s disclosure mandate."  *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (*en banc*); *see also Giglio*, 405 U.S. at 154-55.  And Mack alleges that "powerful" and "objective" undisclosed evidence demonstrates that Willis and prosecutors had such an unwritten agreement in this case.  (Doc. 162 at 158.) He points to a supervisor's instruction to Bombik in February 1991 that he "[b]etter make sure that T. Willis doesn't get scared off."  (Doc. 154-9 at 171 (FEH Ex. 34).)  Mack also

80

cites a police report and Bombik's notes showing that Bombik knew about the Burgess case as early as June 1991 and had discussed with Willis at a trial-preparation meeting at least who was representing him, who the judge was, and the trial date in the case. (*Id*. at 137-38 (FEH Ex. 30) (Police Report); 173 (FEH Ex. 35) (Bombik Notes).)

But even more telling, according to Mack, is a case log entry in the prosecution's Burgess case file for July 30, 1991, which states,

> Talk[ed] to R. Bombik who used [Willis] on murder case. Bombik believes [Willis] did not do this crime and wants case cont'd for further invest. [Willis'] counsel notified [and] agrees. Case to be continued at least a month.

(*Id*. at 366 (FEH Ex. 63).) Mack points out that July 30 was the same day that testimony in the Sowell trial concluded and the case was sent to the jury for deliberations (Doc. 154-10 at 855 (FEH Ex. 79-2 (Sowell Trial Tr.))); thirteen days after Mack's conviction (*see* Doc. 149-1 at 108); and just six days before the Burgess case's trial date (*see* Doc. 101 (FEH Tr.) at 88 (Bombik Test.)). Nothing in the Burgess case log indicates that any further investigation was conducted after July 31. (*Id*.)

Finally, Mack offers the testimony of Michael O'Malley, a detective in the CPD's homicide unit who was assigned to a task force investigating the so-called ski-mask homicides and robberies taking place in Cleveland at the time of the Sanelli murder investigation. (Doc. 102 (FEH Tr.) at 94-95, 98-99.) O'Malley testified at a federal court detention hearing in 1996 regarding Willis' then-pending federal firearms charges that, in his "personal opinion," and based on case notes he read, there "appeared" to have been a "deal" between prosecutors and Willis that the charges against him relating to the Burgess case would be dropped if he testified against the defendants in the Sanelli cases. (Doc. 154-

81

11 at 66 (FEH Ex. 81).)  O'Malley later testified at the federal evidentiary hearing in this case that this was just his "opinion" about Willis and the Burgess case, but he "still st[ood] by it . . . ."  (Doc. 102 (FEH Tr.) at 135.)

As the state appellate court found, however, there is also substantial countervailing evidence that there was no deal rewarding Willis for testifying against Mack.  The prosecution's case log states that Burgess' doctor confirmed that Burgess' death was not related to the beating, and "there [was] no case without the victim."  (Doc. 154-9 at 366 (FEH Ex. 63).)  And the cover of the prosecution's case file stated that the case was dismissed because the victim had died.  (*Id*. at 365.)  There was a reasonable explanation, therefore, for the Burgess case's dismissal other than a deal with Willis.

Moreover, the prosecutors in both the Sanelli and Burgess cases *and* Willis' defense attorney in the Burgess case all testified in the federal proceedings that no tacit agreement existed between Willis and the State relating to his testimony against Mack and the Burgess case.  Bombik was emphatic that he never made any deal with Willis for him to testify against Mack, nor did he ask the prosecutor in the Burgess case to give Willis special consideration of any kind in that case.  (Doc. 101 (FEH Tr.) at 99-100.)  Bombik testified that he reviewed a police report about the Burgess case once he learned of the charges against Willis.  (Doc. 101 (FEH Tr.) at 89.)  He learned from the report that Burgess alleged Willis was wearing a face mask at the time of the offense but Burgess had pulled it off; had identified Willis from a lineup; and was hospitalized after the assault.  (*Id*. at 89-90.)  But he knew nothing else about the case.  (*Id*. at 89-92.)  The only reason he intervened in the Burgess case at all, Bombik testified, was because Willis told him at a meeting on July 1,

the day Mack's trial began, that the weekend before, he and his children were threatened twice by several men and Mack himself had called Willis to threaten him, mentioning the Burgess case.  (*Id*. at 63-64.)  Bombik said he believed "Willis had been placed in serious danger" (*id*. at 93) and he "was beginning to wonder whether or not Mr. Willis had not been set up on that case" (*id*. at 64).  Indeed, "'[t]he government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to that testimony.'" *Bell*, 512 F.3d at 234 (quoting *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003)) (emphasis in original).

Prosecutor David Zimmerman, who supervised the Burgess case, recalled that Burgess was "seriously injured" by an "extensive beating."  (Doc. 99 (FEH Tr.) at 40.)  He testified that there was "some evidence" that Burgess' death was "due at least in part to this beating[,]" but he wrote in the case log that he spoke to Burgess' doctor, who said his death was "not related to [the] beating."  (*Id*. at 63-64.)  Zimmerman testified that after Burgess died, he evaluated the case against Willis and, based on a thorough investigation of the case and his professional judgment, he determined that because Burgess had died, "we did not have sufficient information to continue forward on the case."  (*Id*. at 29, 47, 88.)  He denied ever speaking to Bombik about the Burgess case.  (*Id*. at 49, 57, 78, 88.)  He further noted that if any deal had been given to Willis, it would have been noted on the case log in the file.  (*Id*. at 88.)  Prosecutor Anthony Manning, the prosecutor assigned to the Burgess case, also testified that he could not recall any agreement with Willis related to the case.  (Doc. 105 (Manning Depo.) at 26.)  Manning specifically remembered that he tried to get Willis

83

to plead guilty even after Burgess had died.  (*Id*. at 27-28.)  Finally, Willis' defense attorney, Jim McDonnell, testified that he could not recall anyone offering a deal to Willis in order to secure his testimony against Mack.  (Doc. 100 (FEH Tr.) at 70.)

Willis himself also denied that any deal existed.  At trial, Mack's attorney questioned Willis about whether he hoped to receive consideration in his pending criminal case in exchange for testifying against Mack.  (Doc. 150-3 (Trial Tr.) at 151-52.)  Willis testified that the cases had nothing to do with one another.  (*Id*. at 152.)  At the federal evidentiary hearing, Willis again testified that he did not receive a deal to testify against Mack, and professed that he did not expect any help from the State in the Burgess case because he "didn't do it" and had no need for a deal.  (Doc. 99 (FEH Tr.) at 216, 223, 241, 249.)  He had wanted the Burgess case to go to trial, Willis explained, but the case was dismissed because the victim had died.  (*Id*. at 216, 223, 249.)

Given this evidence, the state court's determination that Willis received no deal from prosecutors for his testimony against Mack was not clearly erroneous.  True, the timing and stated purpose of Bombik's intervention in the Burgess case are curious.  It is difficult to square the serious and credible allegations against Willis in the Burgess case with Bombik's explanation for why he told the prosecutor in that case to continue its investigation while the Sanelli trials were unfolding: that he was concerned Willis was being "set up" for the Burgess assault because he testified against Mack.  Nevertheless, the fact that Bombik intervened in this relatively minor way – requesting a continuance for further investigation – and the Burgess case ultimately was dismissed, without more, is insufficient to establish that some kind of tacit agreement existed.  This is especially true

when the prosecutors in both the Sanelli and Burgess cases and Willis' attorney at the time all uniformly and unequivocally denied it happened and Burgess died of other causes before the trial could take place, leaving no witness to the crime. *See Williams*, 260 F.3d at 707 ("The mere fact that [some witnesses'] sentences were later altered is not evidence that a deal existed prior to their testimony at trial."); *Matthews v. Ishee*, 486 F.3d 883, 896 (6th Cir. 2007) ("The fact [a witness] entered into a favorable plea bargain within two weeks after [petitioner's] conviction and sentence is not evidence, or is at most weak circumstantial evidence, that a deal existed at the time of trial[,]" especially when, "like in *Williams*, the assistant prosecutor testified categorically that there was no preexisting deal with [the witness]."); *Abdur-Rasheed v. Jones*, 100 Fed. Appx. 357, 359 (6th Cir. 2004) (finding that being subsequently charged with a lesser offense is not evidence a witness had a preexisting agreement with the prosecution).

Thus, "[w]ithout an agreement, no evidence was suppressed, and the state's conduct not disclosing something it did not have, cannot be considered a *Brady* violation." *Bell*, 512 F.3d at 234. And even if the court were to assume that such a deal existed, as will be discussed below, the prosecution's failure to disclose it did not prejudice Mack.

### 5.     Willis' status as Sanelli murder suspect

Mack next contends that prosecutors should have disclosed evidence that the police considered Willis a suspect in the Sanelli murder investigation and searched Willis' property four times. (Doc. 155 at 84-86.) The state court of appeals reviewed this claim, deciding:

> {¶ 47} Appellant argues that he should have been informed that Willis's house had been searched four times by police.

85

{¶ 48} The trial prosecutor testified during the federal proceedings that the searches were consensual searches conducted at Willis's request. He also testified he did disclose the police reports indicating police searched Willis's home and property, although the notes taken by appellant's attorney do not include disclosure of that fact. Further, notes taken by one of appellant's attorneys indicate she was aware that property was recovered from Willis's home that tied appellant to other robberies. Appellant was identified by the victims of those robberies as the person who stole the items. This further casts doubts on appellant's arguments that Willis was setting appellant up to escape his own responsibility in the murder. This is not beneficial to appellant such that it deprived appellant of an opportunity to properly cross-examine Willis and does not constitute a *Brady* violation.

*Mack*, 2018 WL 565704, at *12.

The record supports the state court's findings regarding the State's disclosure of the police searches of Willis' property, and, indeed, Mack does not explicitly contest them (*see* Doc. 155 at 84-86).  As the state court noted, Mack's trial attorneys' notes reference Willis "turn[ing] over" to police various items on January 22 or 23, 1991, that Willis claimed Mack "and his companions" left on his property and were connected to one of the ski-mask robberies.  (Doc. 154-9 at 193 (FEH Ex. 38).)  And Bombik testified at the federal evidentiary hearing that Mack's trial counsel "probably did know" about the searches, since, as explained above, his long-standing practice was to go over police reports in his files with defense counsel at pretrials.  (Doc. 101 (FEH Tr.) at 33.)  The state court reasonably determined, therefore, that the prosecution disclosed to defense counsel that the police had searched Willis' property.

The record also does not support Mack's contention that Willis was a suspect in the Sanelli murder case.  Mack infers from materials produced by the State and testimony given in the federal habeas proceedings relating to those searches that Willis was a suspect in the ski-mask crimes and the Sanelli murder, which the prosecution never disclosed.  (*See* Doc.

86

155 at 84-86.)  He cites an extensive array of documents:  police reports regarding the Sanelli murder investigation (Doc. 154-9 at 73-81 (FEH Ex. 14), 83 (FEH Ex. 15), 120 (FEH Ex. 24), 124 (FEH Ex. 26), 135 (FEH Ex. 29)); police records regarding the ski-mask crimes and police task force (*id*. at 673 (FEH Ex. 78), 675 (FEH Ex. 79)); the transcript of the 1996 federal detention hearing at which former detective Michael O'Malley testified about Willis (Doc. 154-11 at 26-95 (FEH Ex. 81)); and testimony of former detectives Gray and O'Malley at the federal evidentiary hearing (Doc. 99 (FEH Tr.) at 104, 114-25 (Gray Test.); Doc. 102 (FEH Tr.) at 103-49 (O'Malley Test.)).

But nowhere in the police records is Willis identified as a suspect in the Sanelli murder.  And Bombik emphatically denied that Willis was a suspect in the case at the federal evidentiary hearing; the evidence against Mack and Sowell was "clear," he recalled, and "had nothing to do with Tim Willis."  (Doc. 101 (FEH Tr.) at 31-33.)  The fact that the police searched Willis' property, Bombik explained, did not mean Willis was a "suspect [in the Sanelli case,] trying to exonerate himself by blaming other people."  (*Id*. at 30.)  After all, he continued, Willis consented to the searches and was a cooperating witness in the Sanelli case.  (*Id*. at 29-30; *see also* Doc. 154-9 at 83 (FEH Ex. 15), 120 (FEH Ex. 24) (police reports showing searches were consensual).)

Mack focuses on a police report describing the purpose of one of the searches of Willis' property as "locat[ing] any clothing or items that may have been used in the [Sanelli] Homicide or the robberies . . . ."  (Doc. 154-9 at 120 (FEH Ex. 24).)  But that is because, the report explains, Willis told the police that "the males arrested in this crime changed clothing regularly [on Willis' property] and fired weapons [there] on many

occasions."  (*Id*.)  O'Malley also testified that a report about the search of Willis' property

in which the police found a spent pellet, two Halloween masks, and an overnight bag

indicated that Willis was a "cooperative witness," not a suspect.  (Doc. 102 (FEH Tr.) at

112; Doc. 154-9 at 120 (FEH Ex. 24).)

The only direct evidence Mack offers that Willis was classified as a suspect in the

Sanelli murder investigation is O'Malley's testimony at the 1996 detention hearing in

federal court in which Willis was facing federal firearms charges.  He testified there that, in

his opinion based on reading police reports, Willis "supplied the weapons to the

defendants" in the Sanelli cases, but Willis was not charged for any crime related to Mr.

Sanelli's murder because "[h]e turned state witness."  (Doc. 154-11 at 42-43 (FEH Ex.

81).)  When questioned about Willis' status as a suspect in the Sanelli murder investigation

at the federal evidentiary hearing in this case, however, O'Malley revised and clarified his

earlier testimony.  He stressed that he was only "[o]n the peripheral" of the Sanelli murder

investigation.  (Doc. 102 (FEH Tr.) at 97.)  And he testified that he could not recall if

Willis was a suspect in the Sanelli case.  (*Id*.)  He held to this position when pressed on the

issue in this exchange:

> Q:    And you knew at that time [of the Sanelli investigation], did you not,
> that Timothy Willis was going to be the key witness for the state in that
> case; isn't that correct?
>
> A:    I learned as the investigation was going on, yes.
>
> Q:    And you learned, did you not, during the time as the investigation went
> on the decision was made by Timothy Willis to turn state's witness and
> testify against the defendants; isn't that correct?
>
> A:    As the investigation was going on, I learned that.

88

Q:     And you knew then, and concluded as a result of the fact that he was turning state's witness, that he was in fact a suspect in that case, correct?

A:     Again, I was on the peripheral.  I wasn't the lead detective in the case. I can't honestly answer that.

(*Id.* at 97-98.)  On further questioning, O'Malley testified that he had "some personal belief" or "a gut feeling" that Willis "may have been involved" in the Sanelli murder, but he "didn't have anything to back it up if [he] did believe that."  (*Id.* at 127-28.)

Accordingly, because the fact that the police had searched Willis' property during the Sanelli murder investigation was disclosed to defense counsel before trial, and there is little, if any, evidence that Willis was a suspect in the Sanelli murder investigation, this evidence does not qualify as *Brady* material.

### 6.    Willis' possible involvement in the ski-mask crimes

In a related claim, Mack contends that the prosecution improperly withheld information contained in police reports and other records concerning Willis' possible involvement in the ski-mask robberies and murders that occurred in Cleveland around the same time as the Sanelli murder.  (Doc. 155 at 86-89.)  The state appellate court wrote about this claim:

{¶ 49} Appellant argues that Willis was a person of interest in several aggravated robberies and homicides being investigated by a Cleveland Police task force, dubbed the "Ski Mask Task Force."

{¶ 50} The testimony of the trial prosecutor indicated that these task force records were not a part of his file and no charges were pending or about to be filed before or during trial relating to this investigation. Willis did have a pending criminal indictment at the time of trial, but appellant's attorney testified he knew that. The evidence in the task force investigation goes only so far to name Willis as a person of interest. This fact was established at the hearing below by the testimony of Michael O'Malley. The fact that Willis was a person

of interest in certain crimes, and his picture was included in a book, along with roughly 30 others used by police investigating a series of robberies, does not amount to material that was required to be disclosed. The testimony adduced at the federal and state hearings indicates that appellant was not identified by any witness as a perpetrator of these crimes. The Robert Burgess prosecution was disclosed and trial testimony indicated that this case was pending against Willis at the time of trial. Therefore, this information does not constitute *Brady* material that was required to be turned over.

*Mack*, 2018 WL 565704, at *12.

Mack does not address the state court's findings on this claim. (*See* Doc 155 at 86-89.) Instead, he reasserts his contention that "[t]he State suppressed [police] reports indicating that Timothy Willis was, during the relevant time, believed by police to himself be a suspect in other ski-mask robberies and murders that were believed by police to be related to the Sanelli murder." (*Id*. at 86.) He points to hundreds of pages of police records regarding the crimes. (*Id*. (citing Doc. 154-9 at 364-401 (FEH Ex. 63), 632-35 (FEH Ex. 71), 673 (FEH Ex. 78); Doc. 154-12 at 311-596 (FEH Ex. 90/96)).) Mack cites, for example, references in police reports to a "blue spiral binder" compiled by the homicide unit that contained photographs of "potential suspects," including Willis (Doc. 154-12 at 425, 426 (listing names of potential suspects), 432, 434 (FEH Ex. 90/96)); and the fact that the police were interested in Willis' black van because witnesses had seen suspects of one of the ski-mask homicides in a similar black van (*id*. at 484, 496-98, 518-22 (FEH Ex. 90/96)).

This court agrees with the state court that this information does not constitute *Brady* material. First, it is not clear that the prosecution had a duty to disclose information about Willis' possible involvement in the ski-mask crimes. Former detective O'Malley, who was assigned to the police ski-mask task force at that time, testified at the federal evidentiary

hearing that he would classify Willis as a "person of interest" in the ski-mask crimes investigation, but Willis was not "considered a suspect [or] charged as a suspect" for those offenses.  (Doc. 102 (FEH Tr.) at 126.)  In his "opinion," he explained, Willis was "involved" in the crimes, "[p]ossibly not [as] an active participant, but maybe on the peripheral . . . as a receiver."  (*Id*.)  And while there was some overlap between the police investigations of the Sanelli murder and ski-mask crimes, as O'Malley explained at the federal evidentiary hearing (*see* Doc. 102 (FEH Tr.) at 96-98), Bombik was adamant in his testimony that when he prosecuted Mack for Mr. Sanelli's murder, he did not view that case as related at all to the ski-mask crimes (Doc. 101 (FEH Tr.) at 14-16, 56-58).  Bombik noted that if Willis had been "under indictment, or charges [were] going to be pressed against him, or if there [was] . . . a meaningful investigation against him" as a named suspect in the ski-mask crimes, that information may have been relevant to the Sanelli investigation.  (*Id*. at 19.)  But as it was, Bombik continued, any information about Willis' possible role in those crimes would have been inadmissible and speculative, and not subject to *Brady*'s disclosure rules.  (*Id*. at 19-20.)  Bombik contrasted his disclosure to defense counsel that Willis was charged in the Burgess case.  (*Id*. at 21-22.)  Further, as the state court noted, Bombik did not even believe the police reports relating to the ski-mask crimes were originally in his file.  (*Id*. at 57.)

Moreover, the record shows that Mack's defense team was aware of many of the basic facts regarding Willis' possible connection to the ski-mask crimes before Mack's trial took place.  Just two weeks after Mack was arrested for the Sanelli murder, on February 7, 1991, Mack was charged with aggravated robbery in two of the ski-mask cases.  (*See* Doc.

91

154-12 at 293-98 (FEH Ex. 94).) Notes of Mack's trial counsel indicate they also represented Mack in these matters and Bombik was at least initially the prosecutor on those cases. (*See* Doc. 154-9 at 192-93 (FEH Ex. 38).) Mack's attorneys were informed at a pretrial in the ski-mask cases shortly after the Sanelli indictment was issued that the victims had identified Mack at a lineup and their stolen possessions, which Willis turned over to police, telling them that Mack and Germany and others had "dumped" them on his property. (*Id.*; *see also id.* at 54 (FEH Ex. 9), 93-94 (FEH Ex. 18), 120 (FEH Ex. 24).) Mack's counsel knew before Mack's trial, therefore, that Willis was involved in the ski-mask crimes at least to the extent that he admitted to police he had received stolen property connected to those robberies from Mack and others. The defense also knew, as explained above, that the police searched Willis' property at least once and Willis was arrested and charged with robbery and assault in the Burgess case, in which he allegedly wore a ski mask.

Police and prosecutors, therefore, disclosed sufficient information about Willis' involvement in the ski-mask crimes to indicate that Mack "knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence [was] available . . . from another source . . . ." *Coe*, 161 F.3d at 344 (internal quotation marks and citations omitted). The Ohio appellate court reasonably concluded that this information was not suppressed and does not qualify as *Brady* material.

### 7. Willis' oral statement and Bombik-Willis meeting notes

Mack's final *Brady* claim involves an allegation Willis made about Mack at a meeting he had with Bombik to prepare for his testimony about a month before trial and

92

Bombik's notes from that meeting.  (Doc. 155 at 89-91 (citing Doc. 101 (FEH Tr.) at 45-47 (Bombik Test.); Doc. 154-9 at 173 (FEH Ex. 35) (Bombik Notes)).)  Willis claimed – and later testified at trial – that after Sowell explained to Mack why he fired at Mr. Sanelli the night of the murder, Mack said to Sowell, "I shot because you shot."  The notes do not include the "I shot because you shot" statement, but Bombik testified at the federal evidentiary hearing that he "imagine[d]" Willis told him about the statement then.  (Doc. 101 (FEH Tr.) at 47.)  The notes also reference the trial date, judge, and defense counsel in the Burgess case, a criminal assault case then pending against Willis. (*Id*. at 48-49.)[15]  Mack asserts that this alleged admission of Mack's, which Mancino testified at the federal evidentiary hearing that he heard for the first time when Willis testified at trial, together with Bombik's meeting notes, demonstrate how Willis changed his story over time to further implicate Mack, conceal his own involvement in the crime, and curry favor with the prosecutors.  (*Id*. (citing Doc. 150-3 (Trial Tr.) at 75; Doc. 100 (FEH Tr.) at 100).)

The state appellate court reviewed this claim and concluded:

{¶ 37} According to the trial prosecutor's testimony in the federal proceedings, he met with Willis within one month of trial to discuss his trial testimony. Appellant argues the notes from this meeting indicate that, for the first time, Willis remembered that appellant stated, "I shot because you [meaning Sowell] shot." No prior statement contains this line Willis claimed was uttered by appellant when appellant, Sowell, and Willis were discussing the murder shortly after it happened. Appellant argues the changing nature of Willis's story as trial approached means this is relevant impeachment evidence that should have been disclosed prior to trial. Appellant also argues that the trial prosecutor made note of Willis's pending burglary case. Appellant asserts these notes

---

[15] The court examined these notes above in connection with Mack's *Brady* claim that the prosecution suppressed materials demonstrating the existence of an implicit agreement between Bombik and Willis in which he would testify against Mack in exchange for favorable treatment in the Burgess case.  *See supra* Section III.D.4.

should also have been disclosed because they could be used to infer that an undisclosed deal had been struck between Willis and the state.

{¶ 38} The notes do not contain an "I shot because you shot" reference. A statement contained in the notes indicates that Willis told the trial prosecutor that Sowell said he shot because Peter was uncooperative: " 'I told the fool to get out, instead he got in & locked the door. I shot him.' " This is consistent with Willis's prior written statement. The trial prosecutor's testimony in the federal proceedings indicates that he did not remember taking notes of the meeting. However, when asked about the "I shot because you shot" statement appellant allegedly made to Willis, the trial prosecutor said he likely learned about the statement at that meeting. His answer was "I imagine I did. Yes. I would imagine I did, sure." The notes of the conversation that we now know exist do not indicate such a statement was made by Willis at the meeting.

{¶ 39} Other statements Willis made to police did not contain this statement, and therefore, these statements serve the same impeachment purposes that appellant alleges this undisclosed statement would have served. Further, the notes do not indicate that a deal was reached to secure Willis's testimony.

*Mack*, 2018 WL 565704, at *10-11.

Mack contends the state court's opinion is based on unreasonable determinations of fact and the court unreasonably applied clearly established federal law, but Mack does not identify any erroneous factual determinations or misapplied federal law.  (Doc. 162 at 162-64.)  Rather, he argues that instead of focusing on the fact that Bombik's notes do not contain the statement at issue, the state court should have recognized the "further impeachment value" of the evidence in showing that Willis was still "shap[ing]" and "embellish[ing]" his story "to harm Mack" and protect himself.  (*Id*. at 163.)  The court disagrees.

The state court correctly determined that the prosecution had no duty to disclose to the defense before trial the "I shot because you shot" statement or the meeting notes as they relate to that statement, despite their impeachment value.  *Brady* generally does not apply to

the delayed disclosure of exculpatory or impeachment information, but only to a complete failure to disclose.  *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994).  "If previously undisclosed evidence is disclosed during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure."  *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir. 1984); *see also United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir.1992), *vacated and remanded on other grounds*, 507 U.S. 956 (1993) ("Delay only violates *Brady* when the delay itself causes prejudice.").

There was no prejudice to Mack here.  Willis' testimony about Mack's statement was made "'in time for full and adequate correction.'"  *Holloway*, 740 F.2d at 1381 (quoting *United States v. Enright*, 579 F.2d 980, 989 (6th Cir. 1978)).  Mack's counsel had the opportunity to cross-examine Willis and impeach him by exploring the differences between his new account of Mack and Sowell's conversation after the murder and his prior statements to police about Mack's involvement in the shooting.  Moreover, defense counsel did not request a recess or continuance after Willis testified about the statement in order to further prepare or adjust his cross-examination of Willis, indicating that he was "satisfied he had sufficient opportunity to use the evidence advantageously."  *United States v Osorio*, 929 F.2d 753, 758 (1st Cir. 1991).  The Sixth Circuit has noted that where defense counsel makes no request for a continuance after the State has introduced surprise testimony like Willis', it "conclude[s] that the timing of the disclosure did not prejudice [the defendant]."  *Holloway*, 740 F.2d at 1381; *see also United States v. Diaz–Villafane*, 874 F.2d 43, 47 (1st Cir. 1989) ("[i]f, indeed, this was a sneak attack, then a continuance would have been a complete cure").

It was not unreasonable, therefore, for the state court of appeals to have concluded that prosecutors had no obligation under *Brady* to disclose before trial Willis' allegation that Mack stated "I shot because you shot" or the prosecutor's notes from his meeting with Willis as they may relate to that statement.

### E.   *Napue* **Claim**

Finally, Mack argues that his due process rights under *Napue* were violated when the prosecution permitted Willis to present perjured testimony and failed to disclose information that would have enabled Mack to challenge Willis' false testimony.  (*See* Doc. 155 at 91-93.)  Specifically, he alleges the prosecution knew but did not disclose that Willis falsely testified that:  (1) he encountered Sowell and Mack while walking home from the Fairfax Recreation Center with his daughter the night of the murder, even though the center was closed for Martin Luther King Jr. Day (*see* Doc. 100 (FEH Tr.) at 2-8 (Henderson Test.); Doc. 154-9 at 466 (FEH Ex. 68) (Aff. of Fairfax Rec. Ctr. Mgr.); Doc. 154-11 at 101 (FEH Ex. 83) (City Records); (2) he never owned a gun, even though he was under indictment for the Burgess case, the police had found a spent bullet on his property, and he was a person of interest in the ski-mask crimes investigation (*see supra* Sections III.D.5, 6); (3) he did not see the Sanelli family again until February 1991 after his initial meeting with them on January 23, 1991, even though he saw them the next day (*see supra* Section III.D.2); and (4) he was not interested in any reward for his assistance in the Sanelli murder investigation and trials, even though he was "motivated to testify falsely by his expectation of[] a favorable deal from the State" in the Burgess and Sanelli cases (*see supra* Section III.D.4).  (*Id.*)

In reviewing this claim, the state court of appeals opined:

{¶ 56} Appellant claims the state withheld evidence that indicated Willis was lying or that his story changed over time.

{¶ 57} The trial transcript indicates Willis testified that he was waiting outside of a recreation center while his child was inside on January 21, 1991. At approximately 5:30, he saw Sowell, Reginald Germany, and appellant in a car, and they stopped to talk. Sowell exited the car and asked Willis if he had a gun. Sowell indicated the three were going downtown to get a "hottie," i.e., a stolen car.

{¶ 58} Willis testified that at about 7:15 he was walking his daughter back from The Fairfax Recreation Center. He saw Sowell and appellant in a different vehicle than they were driving previously. Sowell was driving a car that matched a description of the car stolen from Peter during the murder. Willis testified that he asked them where they got the car, and Sowell said they got it on Prospect Avenue. Appellant then asked Sowell why Sowell shot the man. After Sowell explained that he shot because the man didn't do what he said, Willis testified appellant stated, " 'I shot because you shot.' " The gun that fired the bullets that killed Peter was also found in appellant's possession.

{¶ 59} Appellant claims the state should have known Willis's testimony was fabricated because the recreation center was closed that day. During the federal proceedings, appellant introduced testimony from a city of Cleveland employee that on the day Willis testified he saw appellant and Sowell in the car, the recreation center was actually closed because it was Martin Luther King, Jr., Day. However, Willis testified there was a big festival or a talent show or something. This does not indicate that the state knew Willis's testimony constituted perjury.

{¶ 60} Also, the fact that Willis's testimony differed somewhat from his previous statements to police does not indicate the state knew or should have known that Willis's testimony was untrue. Willis's testimony was substantially similar to his prior statements. This does not amount to a *Brady* violation.

*Mack*, 2018 WL 565704, at *13.

Mack does not address the state court's findings regarding his *Napue* claim based on Willis' testimony. Furthermore, he presents no evidence here to refute the state court's factual findings or conclusions. He has not shown that at the time of the trial, the

97

prosecutors knew or should have known that Willis was lying about his daughter being at the recreation center the night of the murder, on Martin Luther King Jr. Day.  Nor has Mack proven that Willis lied about never owning guns, or that prosecutors knew or should have known that he was lying about that.  Even if they may have *suspected* that was not true, police had searched Willis' property several times before Mack's trial and apparently had not found any guns.  Mack also has not demonstrated that Willis was lying, as opposed to forgetting, when he testified that he did not meet the Sanelli family again after their first encounter until the following month.  Finally, as demonstrated above, Mack has not shown that Willis did in fact have a deal with prosecutors to receive consideration for testifying against Mack and Sowell.  It follows, therefore, that he has no proof that prosecutors knew that such a deal drove Willis' decision to testify in Mack's trial.  This claim is without merit.

### F.      Prejudice

As noted above, the "touchstone of materiality" for purposes of a *Brady* claim is "a 'reasonable probability' of a different result, . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).  To obtain relief, the petitioner must show that the State's failure to turn over the suppressed evidence can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id.* at 435.

Based on the analysis above, only three categories of the alleged *Brady* material meet *Brady*'s favorability and suppression requirements and will be included in the court's consideration of whether their nondisclosure collectively impacted the result of Mack's trial

such that it undermines confidence in its outcome.  They are:  (1) the notes of Willis' initial meeting with the Sanelli family; (2) police reports showing that someone moved Mr. Sanelli's damaged and abandoned car on Holton Avenue; and (3) evidence of an unspoken agreement between Willis and the prosecution, assuming one existed, that Willis would receive favorable treatment in the Burgess case in consideration for his testimony against Mack and Sowell in the Sanelli cases.

The state appellate court, which considered all of the alleged *Brady* evidence collectively for materiality, concluded:

> {¶ 61} Assuming the evidence appellant claims to have been wrongly withheld should have been disclosed prior to trial, the evidence must be material to the convictions in order to warrant a new trial. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555, 131 L.Ed.2d 490. The Court went on to set forth that a reasonable probability of a different result is shown "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.*, quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375, 87 L.Ed.2d 481.

> {¶ 62} Considering this evidence as a whole does not lead this court to the conclusion that there is a reasonable probability of a different result. The evidence does not undermine the confidence in the outcome of the trial given the nature of the evidence that is alleged to constitute *Brady* violations and the other evidence adduced at trial.

*Mack*, 2018 WL 565704, at *14.

Mack contends that the state court's decision both contravened and misapplied *Brady* and the Supreme Court cases that followed it.  (*See, e.g.*, Doc. 162 at 164-67.)  One of his chief complaints is that the court did not adhere to the Supreme Court's directive in *Kyles,* 514 U.S. at 434, that *Brady* materiality "is not a sufficiency-of-the-evidence test." (*See* Doc. 162 at 149-50, 155-56, 165-66.)  The *Kyles* Court explained that "[a] defendant

need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434–35. Mack cites three instances where he believes the Ohio court improperly applied a sufficiency-of-the-evidence standard in finding Mack suffered no prejudice from the suppressed evidence, when the court concluded: (1) the Sanelli notes "were cumulative of other evidence and [did] not cast serious doubt on the verdicts in this case[,]" (Doc. 162 at 149-50 (quoting *Mack*, 2018 WL 565704, at *10 (¶ 34))); (2) "the fact that Sowell was driving the car [when it crashed into the pole] does not lead to the conclusion that Sowell was the person that killed Peter . . . [and] does not cast doubt on appellant's conviction" (*id*. at 155-56 (quoting *Mack*, 2018 WL 565704, at *11 (¶ 45))); and (3) considering the alleged *Brady* evidence as a whole, "[t]he evidence does not undermine confidence in the outcome of the trial given the nature of the evidence that [was] alleged to constitute *Brady* violations and the other evidence adduced at trial" (*id*. at 149-50 (quoting *Mack*, 2018 WL 565704, at *14 (¶ 62))). According to Mack, these statements show the court "essentially concluded that, despite the withheld evidence, the jury could still have convicted Mack of being the shooter and principal offender on the basis of the forensic and other evidence." (*Id*. at 165.)

It is true that the first two statements Mack identifies, when parsed from the court's detailed analysis of his *Brady* claim, suggest the court found no *Brady* violation in one group of evidence (the Holton Avenue crash reports) because it was insufficiently exculpatory, and in another (the Sanelli notes) because it was insufficiently damaging to Willis's credibility such that it would create reasonable doubt about Mack's guilt. The state court seems to have moved beyond *Brady*'s suppression and favorability requirements in its

100

individualized analysis of the alleged *Brady* material into a consideration of materiality, which should be examined collectively. *See Kyles,* 514 U.S. at 436-37 & n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item . . . [and] its cumulative effect for purposes of materiality separately . . . ."). This may have resulted in the court placing too much emphasis on the weaknesses, or insufficient weight, of particular items of alleged *Brady* evidence. Nevertheless, when the state court conducted its cumulative review of all of the alleged *Brady* evidence, albeit in a summary fashion, the court did not impose the higher burden of a sufficiency-of-the-evidence test, or "whether the [*Brady* evidence] necessarily exculpates [Mack], or discounts so much of the incriminating evidence that [Mack's] conviction beyond a reasonable doubt cannot stand." *Montgomery v. Bobby*, 654 F.3d 668, 696 (6th Cir. 2011) (Clay, J., dissenting). Rather, it addressed the "relevant question" for a *Brady* materiality analysis: "whether, after considering the relative strength and relevance of the inculpatory and exculpatory evidence, including the [*Brady* material], [Mack's] conviction [was] 'worthy of confidence.'" *Id.* (quoting *Jells v. Mitchell*, 538 F.3d 478, 502 (6th Cir. 2008)). Or, as the state court properly put it, whether "[t]he evidence . . . undermine[d] confidence in the outcome of the trial given the nature of the evidence that [was] alleged to constitute *Brady* violations and the other evidence adduced at trial." *Mack*, 2018 WL 565704, at *14 (¶ 62). And the state court reasonably concluded that it did not.[16]

---

[16] Mack also argues that the state court unreasonably applied clearly established federal law by requiring that Mack show by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted in his acquittal, also proscribed by the Supreme Court in *Kyles*. (*See* Doc. 162 at 165 (citing *Kyles*, 514 U.S. at 434).) Mack does not elaborate on this argument, however, and, as explained above, this court finds the state court's ultimate conclusion regarding

### 1.      Impeachment value of *Brady* material

Mack's principal materiality argument is that the state court improperly discounted the "enormous" impeachment value of the suppressed *Brady* evidence in attacking the credibility of the State's key witness, Willis.  (Doc. 162 at 142.)[17]  He argues that "the entirety of the State's weak case against Mack, for conviction and death, hung by the thread of whether Willis was credible or not," and "*every single key piece of evidence . . .* swirled from and around Willis, and only *Willis*."  (Doc. 162 at 141 (emphasis in original).)  Mack asserts that the undisclosed notes of Willis' meeting with the Sanelli family and evidence of some tacit agreement between Willis and the prosecutors relating to his testimony would have demonstrated how Willis "shaped" his story over time, increasingly implicating Mack and Sowell, in an effort to earn financial rewards, gain assistance from the prosecution in his own criminal case, and conceal his involvement in the Sanelli murder.  (*See, e.g., id.* at 141-45, 154-56, 156-58.)  Without credible testimony from Willis, he contends, it is reasonably probable that the jury would have had reasonable doubt about both his guilt and

---

the materiality of the alleged *Brady* evidence did not unreasonably apply *Kyles* or other clearly established Supreme Court precedent.

[17] Mack contends that the undisclosed evidence also would have been useful in challenging the State's investigation and "rush to judgment with its imprudent over-reliance on the pliable, unreliable, and benefit-seeking Willis."  (Doc. 162 at 141.)  But Mack does not develop this argument, and given that Mack was arrested with a gun in his possession that was used in the murder, it is difficult to see how the police "rushed to judgment."  The court, therefore, will not address this issue.  In addition, Mack argues that the Sanelli notes could have been used to impeach Tony Sanelli's testimony that the family never gave police the notes and did not have them.  (*Id.* at 148-49 (citing Doc. 150-2 (Trial Tr.) at 181).)  It is reasonable to assume, however, that if the notes had been disclosed prior to trial, Sanelli would not have testified this way.  And, Michael Barone, who took the notes, testified at the federal evidentiary hearing that he gave them to the police (Doc. 102 (FEH Tr.) at 74), so it is possible that Sanelli just did not know what happened to them at the time of Mack's trial.

102

eligibility for a death sentence as the actual shooter and principal offender.  (*Id*. at 151.)  As

Mack notes, "'withheld evidence is more likely material when the State presents a weaker

case for guilt.'"  (*Id*. at 164-65 (quoting *Floyd v. Vannoy*, 894 F.3d 143, 166 (5th Cir.

2018)).)

Willis certainly was a key witness for the State.  As Ohio Supreme Court Justice

Wright wrote in a dissenting opinion in Mack's direct appeal:

> Any sort of rational review of the record in this case reveals that Willis's
> testimony was critical to the state's case. Willis is the only witness who places
> appellant at the scene of the crime. Willis is the only witness who testified that
> appellant was in a position to fire a shot at Sanelli. Willis is the only witness
> who in any way related that appellant had a motive to commit the crime. Willis
> is the only witness who described in any sort of detail the automobile that
> appellant and co-defendant Thomas Sowell were allegedly driving on the day
> of the crime. In a word, Willis was a key witness for the state whose testimony
> was critical to the conviction of appellant. If his credibility would have been
> impugned, the issue of the appellant's guilt would have been a close call at best.

*Mack*, 73 Ohio St. 3d at 517 (Wright, J., dissenting).  Nonetheless, the suppressed evidence

at issue here – which Mack presented in state post-conviction proceedings years after

Justice Wright penned his dissent – would not have so impugned Willis' credibility that it

would have "put the whole case in such a different light as to undermine confidence in the

verdict." *Kyles*, 514 U.S. at 435.

*Sanelli notes.*  Mack identifies few significant inconsistencies between Willis' trial

testimony and the information contained in the Sanelli notes (Doc. 154-9 at 50 (FEH Ex.

8)) that could have been used to impeach Willis.  He points out that the notes record Willis'

description of Sowell's jacket as a black Lakers or Raiders coat, when Willis testified at

trial that Sowell was wearing a Chicago Bulls jacket the night of the murder (Doc. 150-3

(Trial Tr.) at 73).  (Doc. 162 at 143.)  He also cites the notes' notation "INFORMER use

name 'Mickey,'" while Willis denied being a police informant at trial (Doc. 150-3 (Trial

Tr.) at 130).  (Doc. 162 at 141.)  These inconsistencies, however, did not relate to "an

important issue of guilt," but merely "tangential issues," and are not strong impeachment

evidence.  *Beuke v. Houk*, 537 F.3d 618, 635 (6th Cir. 2008) (finding withheld

impeachment evidence against state witness not material).  The notes also show that Willis

was able to accurately describe the color (black) and type of jacket (a sports starter jacket)

that Sowell was wearing when arrested.  (*See* Doc. 150-2 (Trial Tr.) at 296 (Bornfeld

Test.).)  And the notes do not indicate whether Willis called himself an informer and told

them to use the name Mickey, or the note taker, Michael Barone, labeled Willis an informer

and suggested that name.  Barone testified at the federal evidentiary hearing that he could

not recall.  (Doc. 102 (FEH Tr.) at 76-77.)

Most significant, according to Mack, is that the notes indicate that Willis told the

Sanelli family that Sowell was the shooter and do not mention Mack at all, yet Willis

testified at trial that he heard both Sowell and Mack admit to firing shots at Mr. Sanelli

(Doc. 150-3 (Trial Tr.) at 75-76).  (*See* Doc. 162 at 139-41.)  This information is not wholly

contradictory, however, when placed into the broader context of how Willis divulged his

story to the Sanelli family and the police and other evidence adduced at trial.

First, the notes do not say that Sowell was the sole shooter or anything to that effect;

they state, "man called TOM SOLWELL [*sic*]," along with personal information about him.

Mack infers Willis said Sowell was the sole shooter because he was the only assailant

named in the notes, but Barone testified at the state evidentiary hearing that Willis never

told him there was only one person involved in the murder.  (Doc. 151-9 (State Evidentiary

Hearing ("SEH") Tr.) at 100.)  Further, although, as Mack argues, the notes describe a

"*man* talking" and a "*man* called [Sowell]," and state that "*he* left clip in the car," the notes

also state, "were 2 guys."  (Doc. 154-9 at 50 (FEH Ex. 8) (emphasis added).)  Barone

testified at the federal evidentiary hearing that his reference to "2 guys" in the notes referred

to there being two men Willis overheard discussing the crime, Sowell and another man.

(Doc. 102 (FEH Tr.) at 87.)  Still, the notes do not unambiguously identify Sowell as the

sole shooter or rule out anyone else's participation, such as the other man Willis alleged he

overheard Sowell talking to.

     Nevertheless, Mack asserts that the notes are valuable impeachment evidence

because, as the contemporaneously-recorded notes of Willis' first recorded remarks about

the shooting, they demonstrate how Willis "shaped" or "embellished" his story over time:

from Sowell being the only shooter, to Mack being involved in the murder and Germany

offering Sowell his gun (which was used in the crime and found by the police on Germany

when he was arrested), to Mack stating he wanted "to kill me an Arab any old way," to

Mack admitting to Sowell, "I shot because you shot."  (Doc. 162 at 142-44.)  But the time

frame is key here:  The same day Willis met with the Sanelli family, he also provided a

detailed account of the events surrounding Mr. Sanelli's murder to the police in a written

statement, identifying Mack, Germany, and Sowell as being involved.

     Willis met with the Sanellis on January 23, 1991, just two days after the murder.

According to a police report, later *that same day*, Willis called the police and informed

them that "the person who shot the guy who has the glass store[] was Tom Sowell," and

"the other guys in the killing" were Mack and Germany.  (Doc. 154-9 at 53 (FEH Ex. 9)

(capitalization altered).)[18]  Willis then met with the police later that day, and after being

interviewed and viewing Mr. Sanelli's car, he gave police his written statement.  (Doc. 154-

9 at 60-61 (FEH Ex. 11)).  From that point on, Willis never wavered from his identification

of Sowell, Mack, and Germany as the perpetrators of this crime.  And, although he added

details to his story in his trial testimony (most notably, Mack's admission "I shot because

you shot"), his testimony was consistent with his initial account of the key events, such as

the three men planning to go downtown to steal a car; Germany offering Sowell his "nine"

after Willis refused to provide a gun; later seeing Sowell and Mack in Mr. Sanelli's

damaged car; Sowell admitting to shooting Mr. Sanelli and Mack being disappointed that

Mr. Sanelli was not Arab because, he said, he "want[ed] to kill . . .an Arab any old way";

and Sowell crashing Mr. Sanelli's car into a pole and hurting his nose.  (*Compare id. with*

Doc. 150-2 (Trial Tr.) at 65-97 (Willis Test.).)  The fact that the Sanelli notes mention only

Sowell, therefore, is not the compelling and decisive impeachment evidence that Mack

contends, given that they do not expressly identify Sowell as the sole shooter and when

viewed in the context of Willis' consistent statements to police both that same day and

afterward.

Furthermore,  much of the information in them was corroborated by, and cumulative

of, evidence presented at trial.  *See Brooks v. Tennessee*, 626 F.3d 878, 893 (6th Cir. 2010)

("Evidence that is merely cumulative to evidence presented at trial is not material for

purposes of *Brady* analysis.") (internal quotation marks omitted).  Willis told the Sanelli

---

[18] Willis also testified at trial that he called Crime Stoppers before meeting the Sanellis and told them that both Sowell and Mack committed the murder.  (Doc. 150-3 (Trial Tr.) at 83-84.)

family, for instance, *before* he had viewed Mr. Sanelli's car at the impound lot, that the "2

guys . . . had [a ] gray car with back window broken out." (Doc. 154-9 at 50 (FEH Ex. 8).)

Detective Allen testified that Mr. Sanelli's abandoned, damaged car was light blue with the

driver's and rear passenger's windows broken out.  (Doc. 150-2 (Trial Tr.) at 210-11.)  The

notes state, "had 9MM gun."  (Doc. 154-9 at 50 (FEH Ex. 8).)  Mack and Germany had

nine millimeter guns in their possession when they were arrested, which fired the bullets

found in Mr. Sanelli's clothing and at the crime scene.  (Doc. 150-2 (Trial Tr.) at 264-65

(Horval Test.).)  And the notes record that Willis said the "man had black case [with]

binoculars."  (Doc. 154-9 at 50 (FEH Ex. 8).)  Tony Sanelli testified that his father always

kept a pair of binoculars in his car.  (Doc. 150-2 (Trial Tr.) at 167.)

      Thus, given that Willis informed police of Mack and Germany's involvement in the

murder within hours of meeting with the Sanelli family and the notes were otherwise

consistent with Willis' testimony and other evidence introduced at trial, the Sanelli notes

are not the strong impeachment evidence that Mack contends, showing that Willis "shaped"

his story in a deceitful and self-interested way.

      *Agreement regarding testimony.*  Mack further asserts that the undisclosed evidence

of a tacit agreement between Willis and prosecutors, in which Willis received favorable

treatment in the Burgess case in exchange for his testimony against Mack and Sowell in the

Sanelli cases, would have greatly damaged Willis' credibility with the jury.  (Doc. 162 at

156-62.)  Even assuming such an agreement existed, however, "'where the undisclosed

evidence merely furnishes an additional basis on which to challenge a witness whose

credibility has already been shown to be questionable or who is subject to extensive attack

by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.'" *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)). And here, Mack's lead trial counsel, Paul Mancino, sufficiently impeached Willis at trial to alert the jury that such a deal may have transpired.

Mancino began his cross-examination of Willis by asking him why Prosecutor Bombik called him Timmy, and whether he and Bombik were "good friends" or had known each other before this case. (Doc. 150-3 (Trial Tr.) at 98.) Willis denied any relationship. (*Id*.) Mancino also asked Willis if he was police informant, which he denied. (*Id*. at 130.) He established that Willis was in prison on May 2, 1991, just months before the trial, though the judge sustained Bombik's objection when Mancino asked why. (*Id*. at 145.) Finally, Mancino was able to elicit from Willis that Willis had a pending criminal case in this exchange:

> Q:    Did you tell her you were in jail because you were charged with felonious assault and aggravated robbery?
>
>       MR. BOMBIK:        Objection, your Honor.
>
> A:    I didn't tell her, she –
>
>       THE COURT:        Objection sustained.
>
> Q:    Is that right?
>
>       MR. BOMBIK:        Objection, your Honor.
>
>       THE COURT:        Objection sustained.
>
> Q:    You do have a pending criminal case, do you not?
>
> A:    Do I got a pending criminal case?

Q:     That's not that difficult a question, is it?

A:     I got a case that they say I did, you know.

Q:     I mean, is the case over with?

A:     Nah.

Q:     It's still pending, still active, right?

A:     Pending, active, yeah.  Yes, I do have a pending criminal case.

Q:     And you hope to get some help on that case by your testimony in this case, right?

A:     Nothing to do with this case.

Q:     The same prosecutor's offices [*sic*] is going to be after you in that case, isn't it?

A:     I don't know.  How many prosecutor's office is there?  I don't know. If they're a prosecutor for the State, I guess so.

Q:     Same police department?

A:     I don't know.

Q:     Now, how many police departments are there?

A:     I don't know.  I don't know who is going to be investigating.

Q:     One of the items they charged you with having is a ski mask; isn't that correct.

|  |  |
|---|---|
| MR. GHAZOUL: | Objection. |
| MR. BOMBIK; | Objection. |
| THE COURT: | Objection sustained.  I instructed you not to address that, Mr. Mancino. |
|  | The jury is instructed to disregard all of that. |

(*Id*. at 151-52.)

Mack is correct that the trial court limited defense counsel's cross-examination of Willis on the subject of the Burgess case and any agreement with prosecutors regarding his testimony against Mack. But the court did not preclude any "meaningful" or "effective" impeachment of Willis' trial testimony, as Mack asserts. (Doc. 162 at 146-48.) The jury understood, through the defense's cross-examination of Willis, that Willis had been imprisoned and charged in a criminal matter and had a motive to testify against Mack, standing to benefit significantly by cooperating with the prosecution. Thus, it "would arguably have been *more* effective if evidence of the [alleged] mutual understanding [with the prosecutor] had been disclosed prior to trial, but only incrementally so." *Akrawi v. Booker*, 572 F.3d 252, 264 (6th Cir. 2009) (emphasis in original) (holding that where the jury heard evidence of the potential for a charge-reduction deal, the failure of the prosecution to disclose an informal agreement with a witness did not meet the prejudice prong of the *Brady* analysis); *see also Jefferson v. United States*, 730 F.3d 537, 553 (6th Cir. 2013) (finding any undisclosed agreement with prosecutors would have been cumulative where witness admitted to having pending criminal charges against him and the jury understood he may benefit from cooperating); *Bell v. Bell,* 512 F.3d 223, 237 (6th Cir. 2008) (holding that, although prosecutor's notes from meeting with government witness would have provided support for defense theory that witness, who had been jailed with defendant and thus was not credible witness, defense counsel was able to challenge the witness' credibility without those notes during closing arguments, and therefore meeting notes were not material under *Brady*); *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. 2001) (noting "the jury knew of this reason to question the veracity of [the witnesses'] testimony"

110

and that "knowledge of the existence of an actual deal prior to deliberation would [not] have given the jury a greater reason to question the veracity of [the witnesses'] testimony" – "[a]t least, not to the level that not knowing undermines confidence in the outcome").

Evidence of a tacit deal between Willis and prosecutors, therefore, in which Willis obtained leniency in the Burgess case for his cooperation in the Sanelli cases – if such a deal took place – would not have significantly bolstered defense counsel's efforts to undermine Willis' credibility with the jury such that the inclusion of the withheld evidence would have put case the whole case in a different light so as to undermine confidence in the verdict.

*Strength of State's case.*  Finally, even if one accepts Mack's argument that the Sanelli notes and deal evidence would have severely impugned Willis' credibility, that evidence "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith*, 565 U.S. at 76 (citing *Agurs*, 427 U.S. at 112-13, & n. 21).  The Sixth Circuit's decision in *Beuke v. Houk, supra,* is instructive.  Like Mack, the petitioner in *Beuke* argued that undisclosed impeachment evidence was material because the prosecution's proof of the murder at issue depended on the credibility of that witness' testimony, who recounted for the jury the story the petitioner told him about how he committed the murder at issue.  *Beuke*, 537 F.3d at 635.  The circuit court first found that the impeachment evidence related to "inconsistencies on tangential issues" and would not have "do[ne] much to undermine [the witnesses'] testimony relating to [the petitioner's] confession."  *Id.*  But even if it had, the court reasoned, the prosecution had presented other "concrete" and "objective" evidence in addition to the witness' testimony, linking the

111

petitioner to the crime, including, as here, forensic evidence indicating that the bullets removed from the victim's body were fired from the petitioner's gun. *Id*. at 635-36. The court found, therefore, that, "contrary to [the petitioner's] assertions, [the witness'] testimony was not the central piece of evidence holding together an otherwise feeble case, but was merely one piece of a cumulative evidentiary puzzle." *Id*. at 636. And it held that "because the objective evidence sufficiently linked [the petitioner] to [the] murder, the suppressed evidence undermining [the witness'] credibility [did] not tend to undermine our confidence in the jury's verdict." *Id*.

Similarly, here, the State's case against Mack was neither weak nor entirely reliant on Willis' testimony, as Mack contends. The State's strongest evidence: the gun found in Mack's possession when he was arrested fired the bullets recovered in Mr. Sanelli's clothing. The state appellate court on direct review provided this summary of the State's physical evidence:

> The evidence presented at trial established that Peter Sanelli was shot while seated in the driver's seat of his car. The evidence also demonstrated that the front driver's side window and the back passenger window were shattered and missing following the robbery. Additionally, ballistic tests revealed that the gun confiscated from Clarence Mack fired three of the four spent nine millimeter shell casings recovered from the murder scene. The ballistic tests also revealed that the gun confiscated from Clarence Mack two days after the murder fired the copper jacketed pellet which was removed from the right shoulder area of the murder victim's inner clothing. The autopsy of Peter Sanelli revealed that he sustained three gunshot wounds to the upper left side of his body. The coroner testified that the bullet which exited the victim's right shoulder area caused the most significant internal damage by perforating the victim's lung and the sack which surrounds the heart. It is thus apparent that the bullet recovered from the murder victim's inner clothing caused the most significant internal damage and was fired by the gun confiscated from Mack.

> Moreover, the coroner's testimony also established that the other gunshot wound to the victim's left shoulder was simply a flesh wound and the gunshot

> wound to the left side of the victim's face only struck the victim's left and right jaw and larynx. Significantly, there is no indication that the bullet which caused the facial wound impacted or damaged the victim's brain or any other vital body parts.

*Mack*, 1993 WL 497052, at *19.  (*See also* Doc. 150-2 (Trial Tr.) at 264-65 (Horval Test.);

Doc. 150-3 (Trial Tr.) at 21-26, 34 (Lucey Test.).)

Mack's statement also strengthened the State's case.  Detective Qualey, who interviewed Mack after he was arrested, testified that when Mack was initially questioned, he said that he purchased the gun found in his possession on January 22, 1991, the day after Mr. Sanelli's murder, from someone whose name he did not know, and he was home taking a bath the night of the murder.  (Doc. 150-3 (Trial Tr.) at 193-94.)  However, when Qualey confronted Mack with the fact that the ballistic tests revealed that the gun found in his possession  was involved in the shooting, Mack stated he loaned his gun to someone named Dee, whose address and real name he did not know, "a couple days" before the murder and noticed it had been fired but did not ask the person why.  (*Id*. at 195-97.)  And Mack's own witnesses contradicted his story.  Defense witness John Scott testified that Mack bought the gun from Willis the day after the murder.  (Doc. 150-4 (Trial Tr.) at 8 (Scott Test.).)  And Demill Blue testified that Mack was at her house the night of the murder.  (Doc. 150-3 (Trial Tr.) at 228-32 (Blue Test.).)

Finally, Willis' testimony was corroborated by other evidence adduced at trial on key points.  Willis testified that, after the time of the murder, he saw Sowell and Mack driving a small, silver, "little mini station wagon," with the driver's side and rear passenger's windows broken out and red license plates.  (*Id*. at 71-72.)  Detective Allen testified that Mr. Sanelli's abandoned, damaged car was a light blue small car (a Horizon)

113

with the driver's side and rear passenger's windows broken out and red licence plates. (Doc. 150-2 (Trial Tr.) at 210-11.) Willis testified that when he saw Sowell and Mack after the murder, Sowell was wearing a black Bulls starter jacket the night of the murder. (Doc. 150-3 (Trial Tr.) at 73.) Sowell was arrested at work, wearing a black Bulls starter jacket with a nail in the pocket that matched nails found in Mr. Sanelli's car when it was recovered. (Doc. 150-2 (Trial Tr.) at 295-97 (Bornfeld Test.).) Willis also said Sowell was handling a pair of binoculars in a pouch when he saw him that night. (Doc. 150-3 (Trial Tr.) at 76.) Tony Sanelli testified that his father always kept a pair of binoculars in his car. (Doc. 150-2 (Trial Tr.) at 167.) Lastly, Willis testified that Mack told him Sowell crashed Mr. Sanelli's car into a pole. (Doc. 150-3 (Trial Tr.) at 79.) Detective Allen testified that Mr. Sanelli's car was discovered abandoned and damaged from apparently crashing into a nearby pole. (Doc. 150-2 (Trial Tr.) at 210-11.)

The record, therefore, belies Mack's contention that the State had a weak case, hinging entirely on Willis' credibility. And the prosecution's failure to disclose the Sanelli notes and evidence of an agreement between Mack and the prosecutors relating to his testimony, if such an agreement existed, did not prejudice Mack in his ability to impeach Willis to the extent that it undermines confidence in Mack's conviction or sentence. *See Strickler v. Greene*, 527 U.S. 263, 293-94 (1999) (refusing to find prejudice where the record contained "considerable forensic and other physical evidence linking petitioner to the crime," because this objective evidence indicated that the "petitioner would have been convicted . . ., even if [the witness] had been severely impeached" by the undisclosed evidence); *cf. Kyles*, 514 U.S. at 441, 453 (finding *Brady* materiality satisfied where, unlike

114

here, the physical evidence was "inconclusive," so "'the essence of the State's case' was the testimony of eyewitnesses"); *Wearry v. Cain*, 577 U.S. 385, 392-93 (2016) (finding prejudice "[b]eyond doubt" where "[t]he State's trial evidence resembles a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi"); *Smith,* 565 U.S. at 76 (undisclosed statements of eyewitness that he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them" were "plainly material" where his testimony was the "*only* evidence" linking defendant to the crime and the statement "directly contradict[ed] his testimony"); *Banks v. Dretke*, 540 U.S. 668, 701 (2004) (witness' undisclosed informant status was "material" where witness gave "critical" and "uncorroborated" testimony); *Giglio v. United States*, 405 U.S. 150,154-55 (1972) (where prosecution "depended almost entirely" on witness' testimony, government's undisclosed promise of immunity to witness was "material"); *Bies v. Sheldon,* 775 F.3d 386, 401 (6th Cir. 2014) (noting materiality of the undisclosed evidence "becomes even more apparent when viewed in light of the paltry evidence that the State did present[,]" especially with no physical evidence linking the petitioner to the crime); *Jamison v. Collins*, 291 F.3d 380, 391 (6th Cir. 2002) (finding prejudice where, unlike here, the undisclosed evidence would have impeached vital prosecution testimony, leaving only one piece of highly suspect physical evidence upon which to base the conviction).

2.      <strong>Exculpatory value of *Brady* material</strong>

Mack argues that the Sanelli notes also would have provided potent exculpatory evidence to support, or lead to other evidence that would have supported, either:  (1) his theory of defense at trial, that he had an alibi that he was elsewhere and had nothing to do

115

with the crime, and Willis set him up either because Willis committed the murder alone or with someone else, such as Sowell; (2) an alternative defense that Sowell was the lone assailant; or (3) a defense to capital punishment that even if Mack were involved in the crime, he was an "unwitting accomplice" and not the actual shooter or principal offender. (*See, e.g.*, Doc. 162 at 139, 142, 145, 149, 155.)

Mack asserts the Sanelli notes would have been critical exculpatory evidence because they show Willis mentioned only Sowell as participating in the crime, made several references to a lone "man," and state that "he left clip in the car."  (*Id*. at 139.)  As discussed above, however, the notes actually were ambiguous regarding the number of participants in the crime; Willis named Mack and Germany as perpetrators in the Sanelli murder soon after meeting with the Sanelli family and afterward remained consistent on that fact; and much of the information in the notes was also contained in Willis' statement to the police, which was available to the defense and cumulative to evidence adduced at trial.

The police report that someone moved Mr. Sanelli's car after it crashed on Holton Avenue is similarly weak.  As the state court noted, the fact that someone moved the car – whether it was Sowell, Willis, or someone else – does little to prove that person's involvement in the Sanelli murder at all, much less that person's specific role in the murder.  *Cf. Bies,* 775 F.3d at 400 ("On its face, the nondisclosure of the identities of the other suspects—two of whom were reported to have confessed to the murder—was an egregious breach of the State's *Brady* obligations.").

Moreover, the Supreme Court has rejected Mack's argument that the *Brady*

materiality standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence.  *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976).  Such an approach, it explained, "would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentiary support for the charge."  *Id*.

At the same time, Mack's defense was weak.  He presented several witnesses: Sowell's girlfriend, Demill Blue, who testified that Mack was at her house the time of the murder (Doc. 150-3 (Trial Tr.) at 228-32); Johnny Scott, Mack's sister's boyfriend, who testified that he knew Willis well and Willis owned many guns, which they frequently shot together on Willis' property (Doc. 150-4 (Trial Tr.) at 2-3); Barbara Lackey, Mack's girlfriend, who testified that Willis was looking for Mack the day after the murder  (*id*. at 43-44); and Curtis Mack, Mack's cousin and Germany's brother, who testified that Willis kept many guns in his house and regularly sold them (*id*. at 84-86).  None of these witnesses offered strong evidence supporting Mack's alibi or Willis' involvement in the murder, and the Sanelli notes and Holton Avenue crash information would not have helped in any significant way.

Similarly unpersuasive is Mack's argument that this evidence would have prompted defense counsel to pursue a theory at his sentencing hearing that even if Mack were present at the shooting, he was only an unwitting accomplice and not the actual killer or principal offender – even when reviewed *de novo*.  There was evidence introduced at trial to support

this argument.  Willis testified that Sowell admitted he shot Mr. Sanelli first through "the glass" because Mr. Sanelli would not get out of the car, and Sowell was driving Mr. Sanelli's car after the murder, suggesting Sowell fired the fatal shots through the driver's side window at Mr. Sanelli.  (Doc. 150-3 (Trial Tr.) at 71-76.)  And the defense could have argued that Sowell used Mack's gun, which fired the bullets found in Mr. Sanelli's body and clothes, and Mack used Germany's gun.  Mancino testified at the federal evidentiary hearing, however, that he never considered presenting this actual-shooter theory at trial, as it would have conflicted with and discredited Mack's defense that "he wasn't there." (Doc. 100 (FEH Tr.) at 149-50.)  And the Sanelli notes and Holton Avenue crash information would not have strengthened this principal-offender argument so much that defense counsel undoubtedly would have altered their trial strategy.

Accordingly, the suppressed evidence – the Sanelli notes, the evidence of a tacit agreement between Willis and the prosecution regarding his testimony against Mack, and the police reports about Mr. Sanelli's car after it was crashed into a pole on Holton Avenue – could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

### G.  Conclusion

The Ohio court of appeals' decision rejecting Mack's post-conviction claim that the State suppressed material exculpatory and impeachment evidence, therefore, was neither contrary to, nor an unreasonable application of, *Brady*, *Napue,* and their progeny.  Nor was the decision based on an unreasonable determination of fact in light of the evidence presented.  Mack's fifth ground for relief is denied.

118

**IV.     Sixth Ground for Relief:  *Unreasonable Search and Seizure***

Mack alleges for his sixth ground for relief that the police subjected him to an unreasonable search and seizure in violation of his constitutional rights during his warrantless arrest.  (Doc. 155 at 105-07.)  Mack presented this claim to state courts on direct appeal, which reviewed and rejected it on the merits.  *See Mack*, 1993 WL 497052, at *8-9.  Respondent counters that this claim is not cognizable on federal habeas review. (Doc. 158 at 62.)  The court agrees.

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced in his trial."  *Id.* at 494 (footnotes omitted).  *Powell*'s limitation on federal habeas relief is not jurisdictional in nature, but rests on "prudential concerns counseling against the application of the Fourth Amendment exclusionary rule on collateral review."  *Withrow v. Williams*, 507 U.S. 680, 686 (1993).  Two considerations underpin *Powell's* general rule against federal habeas review of Fourth Amendment claims:  first, "the key purpose of federal habeas corpus is to free innocent prisoners[, and] whether an investigation violated the Fourth Amendment has no bearing on whether the defendant is guilty"; and, second, "exclusion is a prudential deterrent prescribed by the courts, not a personal right guaranteed by the Constitution[, so] [a]ny deterrence produced by an additional layer of habeas review is small, but the cost of undoing final convictions is great."  *Good v. Berghuis*, 729 F.3d 636, 637 (6th Cir. 2013) (citing *Powell*, 428 U.S. at 490, 493).

119

The Sixth Circuit interpreted and applied *Powell* in *Good v. Berghuis, supra.*  The court clarified that "opportunity for 'full and fair consideration'" under the *Powell* standard "means an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Good,* 729 F.3d at 639.  Thus, "[i]n the absence of a sham proceeding, there is no need to ask whether the state court conducted an evidentiary hearing or to inquire otherwise into the rigor of the state judiciary's procedures for resolving the claim." *Id.*  Instead, federal habeas courts "must . . . presume that, once a federal claim comes before a state court, the state judge will use a fair procedure to achieve a just resolution of the claim . . . ." *Id.* Applying these principles, the court held that *Powell* precluded federal habeas review of the petitioner's Fourth Amendment claim because, even though he was not granted an evidentiary hearing on his motion to suppress, he was able to present his motion to the state trial and appellate courts, which considered and rejected it.  *Id.* at 640.

Similarly, here, the state courts clearly afforded Mack "a full and fair consideration" of his Fourth Amendment claim under *Powell*.  The trial court conducted a hearing on Mack's motion to suppress on the record.  (Doc. 150-3 (Trial Tr.) at 1-38.)  After hearing testimony from several witnesses and argument from the prosecution and defense, the judge denied the motion.  (*Id.* at 37-38.)  Mack then raised this claim on direct appeal in state courts.  The state court of appeals addressed the merits of the claim and denied relief.  *See Mack*, 1993 WL 497052, at *8-9.  And the Ohio Supreme Court summarily affirmed the appellate court's judgment.  *See Mack*, 73 Ohio St. 3d at 507, 518.

Mack offers no evidence, and does not even contend, that the trial court's review of

120

his suppression motion was a "sham proceeding." *Good,* 739 F.3d at 639. Because Mack

received a full and fair consideration of his Fourth Amendment claim by the state courts,

this claim is not cognizable on federal habeas review. *Powell*, 428 U.S. at 494. Mack's

sixth ground for relief, therefore, is denied.

**V.      Seventh Ground for Relief:  *Right to Remain Silent***

For his seventh ground for relief, Mack contends that he was denied his

constitutional right against self-incrimination. (Doc. 155 at 107-11.) Mack raised this

claim in state courts on direct appeal and it is preserved for federal habeas review. *See*

*Mack*, 73 Ohio St. 3d at 512-14. Respondent argues the claim lacks merit. (Doc. 158 at

63-65.)

The last state court to review this claim, the Ohio Supreme Court, opined:

In his ninth proposition of law, appellant claims he was denied his
constitutional right against self-incrimination as guaranteed by the Fifth and
Fourteenth Amendments to the United States Constitution and Section 10,
Article I of the Ohio Constitution. His contention rests on the failure of
investigators fully to re-administer the *Miranda* warnings to him at the outset
of a second interview, where the first interview preceded the second by a
relatively short period of time and the investigators fully informed appellant of
his *Miranda* rights at the beginning of the first interview. For the following
reasons we find appellant's claim to be without merit.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694,
the United States Supreme Court enunciated the standards by which custodial
police interrogations are to be conducted in order to safeguard defendants'
rights under the Constitution. The purpose of the *Miranda* warnings is "to
dissipate the compulsion [by police] inherent in custodial interrogation and, in
so doing, guard against abridgment of suspect's Fifth Amendment rights."
*Moran v. Burbine* (1986), 475 U.S. 412, 425, 106 S.Ct. 1135, 1143, 89 L.Ed.2d
410, 421. The threshold requirement of *Miranda* is that the suspect must be
informed in clear and unequivocal terms that he has the right to remain silent.
384 U.S. at 467–468, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. Only after such
warning may a suspect be deemed capable of "knowingly and intelligently"
waiving his rights and agreeing to answer questions or make a statement. *Id*. at

121

479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

Appellant here takes issue with investigators' failure fully to readminister the *Miranda* warnings before beginning interrogation for a second time. On January 23, 1991, appellant was transported after his arrest by Detective Qualey and Lt. James to an interview room in the Homicide Unit in the Justice Center. Detective Qualey informed appellant of his *Miranda* rights and asked him if he understood those rights, to which he responded in the affirmative. Thereafter Lt. James began to question appellant and Detective Qualey took notes. Appellant answered voluntarily, stating that he did not know anything about the death of Peter Sanelli. The interview lasted approximately forty-five minutes to one hour.

After returning appellant to his cell, Detective Qualey received the ballistics report from the forensic laboratory matching the morgue bullet recovered from the victim and the shell casings found at the crime scene with the gun confiscated from appellant. With this new information in hand, Detective Qualey and Lt. James brought appellant back to the Homicide Unit to resume questioning approximately one-half hour to one hour after the first interview had ended. Without explicitly reciting the *Miranda* warnings again, Detective Qualey asked appellant if he understood his rights and he said yes. When confronted with the new evidence, appellant provided a brief explanation and denied any involvement in the killing of Peter Sanelli. Questioning ceased soon thereafter when appellant made a request for counsel, and he was returned to his cell. The second interview lasted approximately thirty minutes.

Appellant's contention that he was denied his right against self-incrimination is not borne out by the facts. After being read his *Miranda* rights, appellant voluntarily submitted to questioning by Detective Qualey and Lt. James. When the interview ended, appellant had yet to invoke his right to silence or to counsel. When Detective Qualey and Lt. James sought to resume questioning they asked appellant, again, if he understood his rights, and again appellant answered in the affirmative and voluntarily answered questions.

Moreover, the cases give no indication of a requirement upon police to re-administer the *Miranda* warnings, when questioning a suspect again after a relatively short period of time. In fact, the time between the first and second interviews in question is significantly shorter than that sustained in other cases. See, e.g., *Stumes v. Solem* (C.A.8, 1985), 752 F.2d 317 (five hours); *Evans v. McCotter* (C.A.5, 1986), 790 F.2d 1232 (one to one and one-half hours).

Accordingly, we reject appellant's ninth proposition of law.

*Mack*, 73 Ohio St. 3d at 512-14.

122

The Fifth Amendment privilege against self-incrimination is implicated whenever an individual is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . ."  *Miranda v. Arizona,* 384 U.S. 436, 478 (1966).  Because custodial interrogations are said to be inherently coercive, *Miranda* established that a suspect must be apprised of certain rights to protect the privilege against self-incrimination, including the right to remain silent.  *Id.* at 444.

A suspect may waive his *Miranda* rights, however, "provided the waiver is made voluntarily, knowingly and intelligently."  *Id.*  "Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement."  *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  The prosecution must establish waiver by a preponderance of the evidence.  *Id.* at 384 (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

"The waiver inquiry 'has two distinct dimensions':  waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Id*. at 382-83 (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)).  Coercive police activity "is a necessary predicate to the finding that a confession is not 'voluntary' . . . ."  *Connelly*, 479 U.S. at 167.  Whether a defendant has waived his *Miranda* rights and "voluntarily" confessed cannot rest on his state of mind alone.  *Id*. at 165.  The second prong of the

123

*Miranda* inquiry focuses not on whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege[,]" but on whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

"Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Burbine*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Courts must examine "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

The prosecution, therefore, does not need to show that a waiver of *Miranda* rights was express. *Thompkins,* 560 U.S. at 384. "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Id.* (citing *Butler*, 441 U.S. at 376). A waiver of *Miranda* rights may be implied through the defendant's silence, as long as the defendant understands his rights and his conduct indicates waiver. *Id.*

Mack first contends the Ohio Supreme Court's decision was based on unreasonable factual determinations that: (1) the police officers read him his *Miranda* rights, which Mack denies ever happened; and (2) Mack made a statement to them during the second interview, which Mack claims was untrue and "manufactured by the police." (Doc. 162 at 169-70.) But Mack offers no clear and convincing evidence of this, only conclusory assertions.

124

Detective Qualey testified under oath that before his initial questioning of Mack he read Mack his *Miranda* rights and Mack stated that he understood and agreed to talk to him and another office; and before the second interview he asked Mack if he still understood his rights, and Mack said he did.  (Doc. 150-3 (Trial Tr.) at 173-75.)  Furthermore, Mack's testimony at the trial court's hearing on his motion to suppress his statements supports the state court's finding that Mack's waiver was knowing and voluntary.  Mack admitted on cross-examination that he had heard *Miranda* rights before on at least three occasions.  (Doc. 150-3 (Trial Tr.) at 186.)  And he conceded that, although he knew and understood his rights, he continued to talk to the officers and was never coerced.  Mack testified:

> Q:    So you knew that you had the right to remain silent when Lt. James and Detective Qualey interviewed you?   You knew that from past experience, you've known that, correct?
>
>           Mrs. Mancino:   Objection.
>
>           The Court:      Overruled.
>
> A:    Yes.
>
> Q:    And nonetheless, you did as Detective Qualey testified a few minutes ago, he and Lt. James sat down with you in the Homicide Unit and asked you questions and you gave them answers to various questions that they asked, correct?
>
> A:    Lieutenant James asked me questions.
>
> Q:    Oh, okay.  And Detective Qualey is jotting down perhaps your answers to those questions.  Is that a fair statement?
>
> A:    To the questions I knew the answers to, yes.
>
> Q:    Well he was jotting something down right on his little note pad?
>
> A:    Yeah.

125

> Q: You weren't coerced to make a statement, were you?  Did he hit you or threaten to hit you or anything along those lines, did they?
>
> A: No.
>
> Q: You weren't under the influence of any alcohol or drugs at the time, were you?
>
> A: No.
>
> Q: Clear-headed, clear-minded, so to speak?
>
> A: Well I was kind of confused because I didn't really understand what was going on and everything that had took place and what they was accusing me of.
>
> Q: But you did talk to them?
>
> A: Yes, I talked to them.
>
> Q: The only item of dispute here is you contend they did not advise you of your constitutional rights?
>
> A: Yes.

(*Id.* at 186-87.)  Mack further demonstrated that he understood those rights when he

invoked his right to silence and counsel in this exchange:

> Q: And how long did the second interview last?
>
> A: It didn't last long because I told them that I had wanted my attorney here.  So they cancelled the interview then.
>
> Q: And then you were brought back to the cell?
>
> A: Yes.

(*Id.* at 185.)

Based on this record, the state court reasonably affirmed the trial court's findings

that the police officers administered *Miranda* rights to Mack; Mack knowingly, voluntarily,

126

and intelligently waived those rights before providing statements to the officers; and the detectives recorded Mack's statements and later included them in a police report.

Mack also argues that the Ohio Supreme Court unreasonably concluded that Mack's rights were not violated when the officers did not fully administer the *Miranda* warnings before resuming their interview with Mack.  As the state court explained, however, there is no legal authority, much less Supreme Court precedent, requiring police "to re-administer the *Miranda* warnings, when questioning a suspect again after a relatively short period of time." *Mack*, 73 Ohio St. 3d at 514.  Indeed, as the state court noted, many circuit courts have found such warnings uncalled for even when the time between the first and second interviews was longer than in this case. *Id*. (citing *Stumes v. Solem*, 752 F.2d 317 (8th Cir. 1985) (five hours); *Evans v. McCotter*, 790 F.2d 1232 (5th Cir. 1986) (one to one and one-half hours)).[19]

As Mack argues, however, the Supreme Court's decision in *Wyrick v. Fields*, 459 U.S. 42 (1982) (per curiam), controls.  (Doc. 162 at 169-70.)  In that case, the petitioner, who had been criminally charged but released from custody and was represented by counsel, requested a polygraph examination at which, after receiving *Miranda* warnings, he had expressly waived his right to have counsel present.  *Fields*, 459 U.S. at 44.  At the conclusion of the test, which took less than two hours, the agent who administered the test

---

[19] Respondent further cites as support for this proposition:  *United States ex rel. Patton v. Thieret*, 791 F.2d 543, 547-48 (7th Cir. 1986) (forty minutes); *Jarrell v. Balkcom*, 735 F.2d 1242, 1254 (11th Cir. 1984) (three hours); *United States ex rel. Henne v. Fike*, 563 F.2d 809, 814 (7th Cir. 1977) (nine hours); *United States v. Anthony*, 474 F.2d 770, 773 (5th Cir. 1973) ("There is no requirement that an accused be continually reminded of his rights once he has intelligently waived them[.]").  (Doc. 158 at 65.)

127

told the petitioner that the test indicated some deceit and asked him if he would like to explain why.  *Id*.  In response, the petitioner made an incriminating statement.  *Id*. at 44-45.  The agent asked him if he would like to discuss it further with other authorities and the petitioner again agreed.  *Id*. at 45.  These officers then read him the *Miranda* warnings again, and the petitioner repeated his incriminating statement.  *Id*.  The trial court denied the petitioner's motion to suppress the statements on the ground that he had waived his right to counsel.  *Id*.  The state courts affirmed that ruling, as did the district court on habeas review.  *Id*.  The Eighth Circuit, however, reversed, holding that, while the petitioner had waived his right to have counsel present at the polygraph examination, he did not knowingly and intelligently waive that right at the "post-test" interrogation because the authorities did not re-administer "*meaningfully timed Miranda* warnings."  *Id*. at 46-47 (quoting *Fields v. Wyrick*, 682 F.2d 154, 160 (8th Cir. 1982) (emphasis in original)).

The Supreme Court reversed.  It found that by requesting the polygraph examination, the petitioner not only waived his right to have counsel present at that test, but he "initiated interrogation" by requesting the test and thereby validly waived his right to have counsel present at 'post-test' questioning under *Edwards v. Arizona*, 451 U.S. 477, 484-87 (1981).  *Fields,* 459 U.S. at 45-47.  *Edwards* holds that "once a suspect invokes his right to counsel, he may not be subjected to further interrogation until counsel is provided unless the suspect himself initiates dialogue with the authorities."  *Id*. at 45-46.  The Court noted, however, that the case presented a further issue of more relevance here:  whether, in examining the "totality of the circumstances" as required under *Edwards*, the court found that "the circumstances changed so seriously that [the petitioner's] answers no longer were

128

voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." *Id*. at 47 (quoting *Edwards*, 451 U.S. at 482). The Court rejected the circuit court's belief that "the use of polygraph 'results' in questioning, although it does not necessarily render a response involuntary, is inherently coercive." *Id.* at 48. Instead, the Court recognized the petitioner's "voluntary, knowing, and intelligent waiver of the right to have counsel present at a polygraph examination, and . . . clear evidence that the suspect understood that right and was aware of his power to stop questioning at any time or to speak to an attorney at any time" during questioning after the test. *Id.* "Merely disconnecting the polygraph equipment," it remarked, "could not remove this knowledge from [the petitioner's] mind." *Id.*

Mack distinguishes *Fields* on the ground that in his case, the detectives' second interview of him occurred under "drastically changed circumstance[s]": the ballistics test results recast him as the "principal suspect" in the Sanelli murder. (Doc. 162 at 170.) "Confronting Mack in such an unguarded fashion," he contends, "was precisely the type of confrontation that would cause a reasonable person to forget the rights of which he had (supposedly) only recently been advised." (*Id*.) The police, therefore, according to Mack, had a duty to repeat the *Miranda* warnings before questioning him. (*Id*.)

This court disagrees. In examining the circumstances of Mack's two-part interrogation, it is apparent that when the examination resumed, the circumstances had not "changed so seriously that [Mack's] answers no longer were voluntary, or . . . he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." *Fields*, 459 U.S. at 47. As in *Fields*, Mack was administered full *Miranda* warnings at the

onset of his interview and it was clear he understood them, especially given his criminal

history and prior experience with *Miranda* warnings.  When the interview resumed less

than an hour later, he was asked if he understood his rights and he said yes.  After being

informed of the results of the ballistics tests, Mack again voluntarily talked to the

detectives.  He testified that he was not coerced, and he understood his rights well enough

to terminate the questioning and request counsel.  The thirty to sixty minutes that lapsed

before the detectives' second examination of Mack, therefore, "would not have caused him

to forget the rights of which he had been advised and which he had understood [less than an

hour] before."  *Id*. at 49.  Mack's waiver of his right to remain silent at the start of the first

part of his examination remained valid throughout the second part.

Accordingly, the Ohio Supreme Court's decision rejecting Mack's *Miranda* claim

was neither contrary to, nor an unreasonable application of *Miranda*, *Fields*, or any other

Supreme Court precedent, and was not based on unreasonable determinations of fact in

light of the evidence presented.

**VI.     Eighth Ground for Relief:  *Grand Jury Transcript***

For his eighth ground for relief, Mack claims that the trial court violated his right to

due process when it denied his motion for disclosure of the grand jury transcript of State

witness Timothy Willis' testimony.  (Doc. 155 at 111.)  Respondent contends this claim

does not warrant relief in federal habeas.  (Doc. 158 at 66-67.)

Mack presented this claim on direct appeal to the Ohio Supreme Court, which

reviewed the merits of the claim and denied relief.  *See Mack*, 73 Ohio St. 3d at 507-09.

The state high court, citing only Ohio law, found that Mack had not established a

particularized need for the grand jury testimony. *Id.* "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Moreover, Mack has identified no clearly established Supreme Court precedent that the Ohio Supreme Court either contravened or misapplied under § 2254(d)(1) in rejecting this claim. *See Coley v. Bagley*, 706 F.3d 701, 752-53 (6th Cir. 2013) ("[Petitioner] does not meet his burden of proving that state court rejection of his claim [based on trial court's rejection of his motion to disclose grand jury transcripts] was contrary to or an unreasonable application of clearly established Supreme Court precedent.") (citing *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011)).

Accordingly, Mack's eighth ground for relief is denied.

## VII.   Ninth through Twelfth Grounds for Relief:  *Trial-Court Evidentiary Rulings*

Mack argues in his ninth through twelfth grounds for relief that the trial court violated his constitutional rights through several evidentiary rulings.  Specifically, he claims the trial court erred when it:  (1) excluded the testimony of Carole Mancino and Curtis Mack, who were prepared to testify about the State's key witness, Timothy Willis', bias and prior inconsistent statements (ground nine); (2) did not permit a meaningful cross-examination of Willis (ground ten); (3) admitted hearsay testimony of Dr. Robert Challener (ground eleven); (4) admitted Tony Sanelli's out-of-court statements to Willis (ground eleven); (5) permitted Detective Edward Lucey to testify as an expert (ground eleven); (6) admitted Willis' testimony about hearsay statements made to him (ground eleven); and (7) admitted gruesome photographs (ground twelve).  (Doc. 155 at 112-25.)  Respondent

contends two of these claims are procedurally defaulted and they are all meritless.  (Doc. 158 at 68-73.)

> **A.    Procedural Posture**

Respondent argues that sub-claims (2) and (6), as listed above, are procedurally defaulted.  (*Id*. at 69, 71.)  The court agrees.  Mack did not raise these claims on direct appeal, and because they are record-based, Mack is barred by Ohio's *res judicata* rule from raising the issues in any state post-conviction proceeding, and the claims are procedurally defaulted.

Mack counters that he fairly presented these claims to state courts in an application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B) as the underlying grounds of claims of ineffective assistance of appellate counsel, or the claims are exempt from AEDPA's exhaustion requirement under § 2254(b)(1)(B) because Rule 26(B) does not provide an adequate corrective process for redressing constitutional violations.  (Doc. 162 at 34-67, 104-07, 180, 182.)  *See also Mack*, 2003 WL 21185786, at *9.  As explained in this court's discussion of grounds one and two, the court has rejected both of these arguments in a previous ruling (*see* Doc. 115 at 16-22).  Sub-claims (2) and (6) are procedurally defaulted.  Moreover, as will be explained below in relation to Mack's separate and independent claims of ineffective assistance of trial and appellate counsel and actual innocence, Mack has not demonstrated cause and prejudice for the defaulted claims.

Mack raised the remaining evidentiary claims on direct appeal in state courts, which adjudicated and denied them.  *See Mack*, 73 Ohio St. 3d at 507, 510-12, 514-15.  These claims are preserved for federal habeas review.

132

### B. Merits Analysis

Regardless of any procedural default, each of these claims also would fail on their merits.  As a general rule, to the extent Mack's claims allege violations of Ohio evidentiary law, they are not cognizable on federal habeas review.  *See, e.g., Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) (generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review.").  Federal habeas courts presume that state courts correctly interpret state law in their evidentiary rulings.  *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005).  Their review of state-court evidentiary rulings, therefore, "is limited to whether [a petitioner] can demonstrate a violation of his federal constitutional rights."  *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007) (citing *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976)).

State-court evidentiary rulings may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be  "so egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'"  *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

### 1. Exclusion of defense witnesses' proffered testimony

Mack first argues that the trial court erred by not permitting one of his trial attorneys, Carole Mancino, and cousin, Curtis Mack, to testify about prior inconsistent

statements made by State witness Timothy Willis.  Carole Mancino would have testified that when she interviewed Willis while he was in jail, he told her:  "'he can't believe Clarence [Mack] would do anything like this'"; he did not see Mack on the day of the murder; he did not call the police the day they arrested Mack near his house – they came to his house that day because his phone line may have been tapped, as the police suspected his van was involved in one of the ski-mask homicides; and he "'can make [his] statements fit into any story anyone wants to hear.'"  (Doc. 155 at 114 (quoting Doc. 150-4 (Trial Tr.) at 122-26 (Proffered Mancino Test.)).)  Curtis Mack would have testified that Willis admitted to him that Mack did not murder Mr. Sanelli; he (Willis) did.  (*Id.* at 115.)

The last state court to address this claim, the Ohio Supreme Court on direct appeal, opined:

> In his tenth proposition of law, appellant argues that the trial court abused its discretion by refusing to allow the defense to introduce extrinsic evidence of a prior inconsistent statement by a key state witness. Appellant contends the trial court's refusal inhibited his ability to impeach the testimony of the witness and, therefore, effectively denied his right to a fair trial. We disagree.

> In an effort to impeach the testimony of the state's witness, Timothy Willis, appellant sought to introduce extrinsic evidence of prior inconsistent statements made by Willis at different times to Carole Mancino, co-counsel for appellant, and Curtis Mack, cousin of appellant. Appellant proffered the testimony of both Mancino and Curtis Mack, after the trial court refused to allow them to testify.

> Evid.R. 613(B) states: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded a prior opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. * * *"

> In her proffer to the record, Carole Mancino testified that Willis had told her that "he [Willis] can't believe Clarence would do anything like this." This statement is actually consistent with those made by Willis while on the stand during the trial. Willis stated that he had told Carole Mancino that he "can't believe that Clarence would do something like this." Because there is no

134

contradiction between the statement made by Willis to Carole Mancino and his statement made on the stand, the statement is not a prior inconsistent statement and was properly excluded.

Carole Mancino's proffered testimony also states that during their conversation, Willis said he didn't think he had seen Clarence Mack on the murder date. We hold that this portion of Mancino's proffered testimony was properly excluded because appellant failed to lay a proper foundation for its admission under Evid.R. 613(B). "When extrinsic evidence of a prior inconsistent statement * * * is offered into evidence pursuant to Evid.R. 613(B), a foundation must be established through direct or cross-examination in which: (1) the witness is presented with the former statement; (2) the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement." *State v. Theuring* (1988), 46 Ohio App.3d 152, 155, 546 N.E.2d 436, 439. By examining the record, we find that Willis was never specifically asked if he had told Carole Mancino that he had not seen appellant on the day of Sanelli's murder. Willis was asked on the stand if he told Mancino that Clarence Mack had visited him at his home on the murder day. Because Willis was never specifically asked about this statement on the stand, no foundation was laid for its introduction into evidence.

Carole Mancino also proffered that during their conversation, Willis had denied calling the police. During his trial testimony, Willis stated that he did not remember if he had made this statement to Mancino. While we find that Mancino's testimony to impeach Willis's ambiguous answer should have been admitted by the trial court, we also find that the trial court's exclusion of this testimony did little to prejudice Clarence Mack. There was an abundance of other credible inculpatory evidence even if the jury were to conclude that Willis did not call the police.

The statements made by Willis to Curtis Mack were also inadmissible extrinsic evidence because appellant failed to lay a proper foundation for their admission. Curtis Mack claimed that Willis had admitted murdering Peter Sanelli. Appellant, however, never asked Willis during the trial whether he had ever made this statement to Curtis Mack. Thus, a proper foundation was not laid for admission of the extrinsic evidence. We, therefore, reject appellant's tenth proposition of law.

*Mack*, 73 Ohio St. 3d at 514-15.

Two justices dissented to this ruling.  *See id*. at 516-18.  As to Curtis Mack's

proffered testimony, they disagreed with the majority's application of Ohio evidentiary

135

rules regarding the admission of extrinsic evidence for impeachment purposes. *Id*. at 517. And they concluded that this was not harmless error because "Willis was the linchpin of the state's case, and to a large extent the prosecution's case would stand or fall on Willis's credibility." *Id*. at 518. The dissent did not find Carole Mancino's proffered testimony "as strong" as Curtis Mack's, but, aside from the ethical problem of Mancino testifying in a case in which she was counsel, found "it obvious that she had a perfect right to testify." *Id*.

Mack concedes that this court is bound by the Ohio Supreme Court's interpretation of Ohio evidentiary rules. (Doc. 155 at 116.) But he argues that the state court's decision was so fundamentally unfair that it infringed on his due process rights. He cites his Sixth Amendment right to present a defense and "'to call witnesses in one's own behalf . . .[, which has] long been recognized as essential to due process.'" (Doc. 155 at 112 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)).) In *Chambers*, the Supreme Court noted that "the hearsay rule may not be applied mechanistically to defeat the ends of justice[,]" and held that given the "facts and circumstances" of that case, and "coupled with the State's refusal to permit Chambers to cross-examine [the third party]" due process required that the petitioner should have been permitted to present testimony of three witnesses to whom a third party had confessed to the crime in question. *Chambers*, 410 U.S. at 302-03. Mack contends that, as in *Chambers*, Carole Mancino and Curtis Mack's testimony was "direct" and "credible" evidence that "challenged Willis on key aspects of his testimony and exposed at least one source of his very substantial bias" – his confession to Mr. Sanelli's murder. (Doc. 162 at 176.)

In the context of this case, however, the court does not find the proffered testimony

136

of either Carole Mancino or Curtis Mack so probative or reliable that its exclusion rises to the level of fundamental unfairness and a violation of Mack's due process rights.  Defense counsel cross-examined Willis about his meeting with Ms. Mancino while he was in prison on charges for the Burgess assault.  (*See* Doc. 150-3 (Trial Tr.) at 145-50 (Willis Test.).)  When asked whether he said to her, "I can't believe that Clarence would do something like that[,]" Willis admitted that he "probably" did.  (*Id.* at 149.)  He explained he "ain't lying, I didn't believe that Clarence would kill a man."  (*Id*.)  As the state court observed, this statement was not inconsistent with Willis' testimony, and excluding Ms. Mancino's testimony about it was not fundamentally unfair.

When cross-examined about whether he told Ms. Mancino that Mack did not visit his house the day of the murder and he did not call the police the day of Mack's arrest, Willis testified that he did not recall saying those things and explained that he was not about to tell Mancino anything incriminating about Mack, Sowell, or Germany while he was incarcerated in the same jail as them, for fear of his own safety.  (*Id*. at 148-50.)  Given the circumstances of Ms. Mancino's interview of Mack, and the fact that – unlike in *Chambers* – Willis was subject to cross-examination by the defense on these issues, Mancino's testimony about these statements would not have significantly added to the defense's impeachment of Willis' credibility through cross-examination.  The exclusion of her testimony about these statements, therefore, was not fundamentally unfair.

The defense did not cross-examine Willis about his alleged statement to Ms. Mancino that he "can make [his] statements fit into any story anyone wants to hear."  This statement, then, also was not inconsistent with Willis' trial testimony.  Moreover, it was

137

given in the context of a jailhouse interview, and, as explained above in great detail in connection with Mack's *Brady* claim, the defense was able to thoroughly cross-examine Willis about his statements to the police.  It was not fundamentally unfair, therefore, to exclude Ms. Mancino's testimony about this statement.

Finally, the state trial court's exclusion of Curtis Mack's proffered testimony that Willis admitted to him that he murdered Mr. Sanelli also was not fundamentally unfair.  As Mack's cousin and Germany's brother, Curtis Mack had every reason to be biased himself, and his testimony that Willis admitted to the Sanelli murder was not so credible that its exclusion violated Mack's due process rights.  This claim lacks merit.

### 2. Defense's cross-examination of Willis

In a related claim, Mack asserts that the trial court prevented the defense from conducting a "meaningful" cross-examination of Willis such that it violated his due process rights.  He complains that in addition to preventing Carole Mancino and Curtis Mack from testifying about Willis' prior inconsistent statements, the judge limited the defense's cross-examination of Willis concerning Willis' ongoing welfare fraud, responsibility for the Sanelli murder, and pending criminal case.  (Doc. 155 at 117-18.)  Mack never raised this claim in state court and provides little argumentation here.  Nevertheless, the court has reviewed defense counsel's entire cross-examination of Willis and finds that not one of the trial court's evidentiary rulings at issue so constricted the questioning that it rendered his trial so fundamentally unfair.  This claim is procedurally defaulted and meritless.

### 3. Dr. Robert Challener's expert testimony

Mack further objects to the trial court's admission of the testimony and

accompanying exhibits of the county deputy coroner, Dr. Robert Challener, on the basis

that his testimony was hearsay because he did not personally conduct Mr. Sanelli's autopsy,

and it therefore violated his Sixth Amendment right to confront witnesses against him.

(Doc.155 at 119-20.)

> The state appellate court, the last state court to address this claim, reasoned:

> Appellant argues that he was impermissibly denied an opportunity to confront and cross-examine witnesses when Dr. Challener was permitted to testify concerning Peter Sanelli's autopsy protocol which was prepared by Dr. Kalil Jiraki. At the time of trial, Dr. Jiraki, the deputy coroner who performed the autopsy on Peter Sanelli, was employed out of state and was no longer a member of the staff of the Cuyahoga County Coroner's Office.

> R.C. 313.10 provides that certified records of a coroner are public records and shall be received as evidence in any criminal or civil court. Furthermore, pursuant to Evid.R. 902(4), certified copies of public records are self-authenticating. In an analogous situation, the Ohio Supreme Court has held that R.C. 2317.422, which provides for the admission into evidence of certified hospital records, absent the testimony of their custodian, their author, or the person under whose supervision they were made, preserves the confrontation rights of a criminal defendant. *State v. Spikes* (1981), 67 Ohio St.2d 405. Similarly, we find that R.C. 313.10, which establishes a procedure for admitting certified records of a coroner into evidence, preserves the confrontation rights of a criminal defendant since the coroner's records possess a strong indicia of reliability and a particularized guarantee of trustworthiness.

> Furthermore, we note that this court has previously held that an autopsy protocol is admissible as a business exception under Evid.R. 803(6) and a defendant is not denied his right to confrontation where a coroner who did not personally perform an autopsy is permitted to testify concerning the autopsy and its results. *State v. Boyd* (May 28, 1992), Cuyahoga App. No. 60639, unreported.

> In the present case, Dr. Challener identified State's Exhibit 1 as an autopsy protocol prepared by Dr. Jiraki. Dr. Challener further revealed that the autopsy protocol was a regularly prepared document and contained the seal of the Cuyahoga County Coroner's Office. Dr. Challener also revealed on cross-examination, that consistent with his supervisory responsibilities at the Cuyahoga County Coroner's Office, he reviewed the findings with Dr. Jiraki before the case was closed. Additionally, Dr. Challener related that he reviewed

139

the autopsy report, the microscopic slides prepared in connection with the case, the photographs and the trace evidence findings, prior to testifying at appellant's trial.

We find that Dr. Challener testified to facts obtained through his personal observations and review. Moreover, it is uncontroverted that he was qualified as an expert to testify regarding the autopsy protocol. We further find that appellant has failed to demonstrate that he was prejudiced by Dr. Challener's testimony concerning the autopsy protocol. We note that defense counsel, during cross-examination of Dr. Challener, made it perfectly clear to the jury that Dr. Challener had not personally performed the Sanelli autopsy. We also note that appellant could have made use of his right to compulsory process to compel the presence of Dr. Jiraki if he disputed the reliability of the autopsy protocol.

Additionally, appellant's claim that he was denied his confrontation rights when Dr. Challener testified concerning the discovery of a bullet in the victim's inner clothing is misplaced. The record clearly reflects that Sharon Rosenberg, an employee of the trace evidence department of the Cuyahoga County Coroner's Office, testified that she discovered the bullet and photographically documented its discovery. She further testified that she submitted the bullet to the pathologist who was conducting the autopsy. The record further reflects that Ms. Rosenberg was cross-examined by defense counsel concerning the discovery of the bullet.

Accordingly, we conclude that appellant was not impermissibly denied an opportunity to confront and cross-examine witnesses when Dr. Challener was permitted to testify concerning Peter Sanelli's autopsy. Appellant's sixth assignment of error is therefore overruled.

*Mack*, 1993 WL 497052, at *11-12.

The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.  The provision's "central concern . . . is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

Mack argues that the admission of Dr. Challener's testimony violated his confrontation rights.  As Respondent argues, however, Mack does not identify any clearly established Supreme Court precedent at the time of the state court's opinion that specifically addressed the issue here:  whether an expert's consideration of hearsay violates a defendant's rights under the Confrontation Clause.[20]  *See Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (reversing grant of habeas relief because no Supreme Court decision had "squarely address[ed]" the issue or "clearly establish[ed]" that law developed in a different context applied to the facts of that case).  Mack has not demonstrated that admitting Dr. Challener's autopsy testimony rendered his trial so fundamentally unfair as to violate his due process rights.

### 4.      Tony Sanelli's testimony regarding Willis statements

---

[20] Mack cites *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), and *Melendez–Diaz v. Massachusetts,* 557 U.S. 305 (2009), to support this claim.  (Doc. 155 at 119-20.)  Those cases, however, were not decided at the time of the state courts' adjudication of Mack's claim.  *See, e.g., Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) ("[C]learly established Federal law" for purposes of  § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.").  And they are not directly on point.  *See, e.g., Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (clearly established law under § 2254(d)(1) "squarely addresses" the issue presented).  The cases held that scientific reports could not be used as substantive evidence against a defendant unless the analyst who prepared and certified the report was subject to confrontation.  *Bullcoming*, 564 U.S. at 652; *Melendez-Diaz*, 557 U.S. at 311.  However, as Respondent notes, after deciding *Bullcoming* and *Melendez-Diaz*, the Supreme Court clearly established law that more directly applies here (but, obviously, also was decided too late to apply to this case).  It held in *Williams v. Illinois*, 567 U.S. 50 (2012), that an expert witness does not violate the Confrontation Clause when he or she voices an opinion based on facts concerning the events at issue even if the expert lacks first-hand knowledge of those facts.  *Id.* at 58 ("When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth.  Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.").

141

Mack further argues, with scant argumentation, that Tony Sanelli's testimony also violated his confrontation right.  (Doc. 155 at 122.)

The state appellate court was the last state court to address the claim, deciding:

Appellant argues that he was impermissibly denied the right to confront witnesses against him when state's witness Anthony Sanelli testified on redirect examination. Specifically, appellant objects to Anthony Sanelli's testimony, wherein, he recounted a conversation he had with Timothy Willis two days after the murder concerning the death of his father.

The Sixth Amendment's Confrontation Clause, made applicable through the states through the Fourteenth Amendment, see *Pointer v. Texas* (1965), 380 U.S. 400, 403-405, provides as follows:

> "In all criminal prosecutions, the accused shall enjoy the right
> * * * to be confronted with the witnesses against him."

Moreover, it has been held that a defendant's right to confront witnesses is not violated so long as the accused has an opportunity to effectively cross-examine the witnesses against him. See, *Ohio v. Roberts* (1980) 448 U.S. 56 and *Delaware v. Fensterer* (1985), 474 U.S. 15.

In the present case, the appellant was not denied his right to confrontation by the admission of Anthony Sanelli's testimony. The record reflects that Timothy Willis testified at trial which afforded the appellant the opportunity to cross-examine Willis concerning the statements he made to Anthony Sanelli. The record further reflects that defense counsel fully and effectively cross-examined Willis on all relevant areas of inquiry including the fact that a reward was offered. We thus conclude that appellant was not denied his right to confrontation. Accordingly, appellant's seventh assignment of error is overruled.

*Mack*, 1993 WL 497052, at *12.

Mack argues that "this testimony is clear hearsay and its admission deprived Mack of his rights to due process and a fair trial."  (Doc. 155 at 122.)  But he concedes, as the state court found, that the State "put Timothy Willis on the stand to testify as to the substance of what he had told Anthony Sanelli," and defense counsel had the opportunity to

142

cross-examine both Sanelli and Willis on Sanelli's testimony.  (*Id*. at 121.)  As explained above, a defendant's confrontation right is not violated when he or she was able to effectively cross-examine the declarant, as Mack was here.  *See, e.g., Crawford,* 541 U.S. at 59 n.9.  This claim, too, fails.

### 5.      Detective Lucey's expert testimony

Mack also complains that the trial court improperly permitted Detective Thomas Lucey to testify as an expert on ballistics evidence.  (Doc. 155 at 122-23.)  He claims Lucey should have been precluded from offering his opinions because the State failed to lay a proper foundation as to his expert qualifications and because he relied on hearsay opinions of others who did not testify.  (*Id* at 122.)

The last state court to address this claim, the Ohio Supreme Court, stated:

In his eighth proposition of law, appellant contends that he was denied due process of law when the trial court admitted the expert testimony of Detective Thomas L. Lucey. Appellant argues that Detective Lucey was improperly qualified as an expert witness, that Lucey's opinions were improperly based on hearsay opinions of others, and, thus, the admission of his testimony violated appellant's right to due process of law. We disagree.

The question here turns on whether Detective Lucey's testimony as a ballistics expert satisfied the requirements of both Evid.R. 702 and 703. For the following reasons we believe that it did.

Former Evid.R. 702 provided: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." As appellant notes in his brief, the testimony of Detective Lucey was critical in establishing the relationship between the bullets and casings found at the crime scene and the weapon found on the appellant at the time of his arrest. Clearly, Detective Lucey's testimony assisted the jury in its understanding of the technical ballistics report submitted into evidence and "aid[ed] [the jury] in the search for the truth." *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566.

However, appellant questions Detective Lucey's qualifications as an expert witness.

The record shows that Detective Lucey's qualifications satisfied the requirements of Evid.R. 702. Detective Lucey has performed firearm and tool mark examinations for the Scientific Investigation Unit of the Cleveland Police Department for the past five years. During his tenure with the forensic laboratory, he has examined in excess of one thousand guns. He was trained in firearm identification by Victor Kovacic, a twenty-five-year veteran in the field. Detective Lucey is a member of the Firearm and Tool Mark Examiners and Ohio Criminalists Associations. Moreover, he has testified over sixty times as an expert witness in various courts throughout Ohio.

"The qualification of an expert is a matter for determination by the court on the facts, and rulings with respect to such matters will ordinarily not be reversed unless there is a clear showing that the court abused its discretion." *State v. Maupin* (1975), 42 Ohio St.2d 473, 479, 71 O.O.2d 485, 488, 330 N.E.2d 708, 713; see, also, *State v. Tomlin* (1992), 63 Ohio St.3d 724, 728, 590 N.E.2d 1253, 1256. Qualifications which may satisfy the requirements of Evid.R. 702 are multitudinous. This court has held that there is no "degree" requirement, per se. Professional experience and training in a particular field may be sufficient to qualify one as an expert. *State v. Beuke* (1988), 38 Ohio St.3d 29, 43, 526 N.E.2d 274, 289. Detective Lucey's extensive background was, indeed, sufficient to qualify him as an expert in the field of ballistics. The trial court did not abuse its discretion by allowing his expert testimony.

Appellant further argues that Detective Lucey's testimony was improperly based upon inadmissible hearsay opinions of others within the forensic laboratory. Evid.R. 703 requires that an expert base an opinion or inference on facts or data either perceived by him or admitted into evidence. Here, Detective Lucey test-fired the gun confiscated from appellant upon his arrest. Detective Lucey compared the test shot with the morgue bullet recovered from the victim, Peter Sanelli, and the spent shell casings recovered from the crime scene, concluding that all had been discharged from appellant's gun. Doubtlessly based on his own observations, the findings of the ballistics examination were well within Detective Lucey's personal knowledge.

Notwithstanding Detective Lucey's personal analysis of the evidence, appellant is troubled by the corroborative procedure of the forensic laboratory, where "two or three or even more individuals view the findings" of any one examination. Appellant cites *Zelenka v. Indus. Comm.* (1956), 165 Ohio St. 587, 594, 60 O.O. 524, 528, 138 N.E.2d 667, 671, for the proposition that "the opinion of an expert witness cannot be predicated either in whole or in part upon the opinions, inferences and conclusions of others, whether expert or lay

144

witnesses."

> Appellant's reliance on *Zelenka* is, however, misplaced. In a case decided since Zelenka, this court found admissible the opinions of doctors to be "based on facts or data perceived by [them]" within the meaning of Evid.R. 703, despite their being partially based on medical reports not in evidence, where the doctors had personally examined the defendant. *State v. Solomon* (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118. Speaking for the majority, Justice Douglas opined, "[w]here an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied." (Emphasis added.) *Id.* at syllabus.

> In this case, Detective Lucey conducted extensive analysis upon appellant's gun, the morgue bullet recovered from the victim, and the shell casings recovered from the crime scene. The fact that his colleagues in the laboratory may have confirmed, or even debated, his findings does not remove his opinion beyond the boundaries for admissible expert testimony prescribed by Evid.R. 703. Accordingly, we reject appellant's eighth proposition of law.

*Mack*, 73 Ohio St. 3d at 510-12.

Mack argues that the state court's decision contravenes or misapplies numerous Supreme Court decisions, but does not explain how.  (Doc. 162 at 180-81.)  He also asserts that the decision is based on unreasonable determination of facts, but does not identify any factual errors.  (*Id*. at 181.)  Indeed, Mack's argument is based primarily on Ohio evidentiary rules.  (*See* Doc. 155 at 122-24.)  The Ohio Supreme Court carefully considered this claim and found no error under Ohio law, and this court is bound by that determination. Further, Mack has provided no argument as to how the admission of this testimony, other than that it was important evidence in the case, was so egregious that it rendered his trial fundamentally unfair.  This claim also is meritless.

### 6.      Willis testimony

Mack also argues that the trial court erred by allowing Willis to testify about numerous hearsay statements made to him by Mack's co-defendants, Crime Stoppers, and

145

the Sanelli family.  (Doc. 155 at 121-22.)  Again, Mack offers only conclusory assertions

regarding hearsay with no argument as to how the admission of this testimony was so

egregious that it rendered his trial fundamentally unfair.  This claim, therefore, is

unfounded as well as procedurally defaulted.

### 7.    Gruesome photographs

Finally, Mack argues that the trial court's admission of gruesome photographs

violated his due process rights.  (Doc. 155 at 124-25.)  The state appellate court rejected

this claim, stating:

> Appellant argues that he was denied the right to a fair trial during both the guilt
> and penalty phases of his trial by the admission of State's Exhibits 2 through 8,
> autopsy photographs of Peter Sanelli.  Appellant initially contends that the
> photographs were inadmissible under Evid.R. 403, as their probative value was
> outweighed by the inflammatory and prejudicial effect on the jurors.

> In *State v. Maurer* (1984), 15 Ohio St.3d 239, the Supreme Court of Ohio set
> forth the standard for reviewing the admissibility of photographs in a capital
> case. The court stated:

> Properly authenticated photographs, even if gruesome, are admissible in a
> capital prosecution if relevant and of probative value in assisting the trier of
> fact to determine the issues or are illustrative of testimony and other evidence,
> as long as the danger of material prejudice to a defendant is outweighed by their
> probative value and the photographs are not repetitive or cumulative in number.
> *Id.* at paragraph seven of the syllabus.

> Under Evid.R. 403 and 611(A), the admission of photographs is left to the
> sound discretion of the trial court. *State v. Jackson* (1991), 57 Ohio St.3d 29,
> 37.

> Review of the photographs reveals they are illustrative of testimony from the
> state's witnesses concerning the manner of the victim's death. Each photograph
> shows the entrance points and exit points of the three gunshot wounds
> sustained by the victim. Furthermore, the photographs are not unnecessarily
> cumulative or repetitive. They were thus properly admitted.

> Appellant also contends it was error to introduce the autopsy photographs

146

during the penalty phase of his trial citing *State v. Thompson* (1987), 33 Ohio St.3d 1, 13 in support.

In *State v. DePew* (1988), 38 Ohio St.3d 275, 282, the Ohio Supreme Court clarified the Thompson decision by stating:

Our decision in *Thompson* is being misconstrued, we assume unintentionally, as holding that the introduction of gruesome photographs in the penalty state is reversible error. It is not. *Thompson* was meant principally to focus on the question of prosecutorial misconduct, especially the issue of commenting on a defendant's silence at any stage of the proceedings. In fact, we find that the introduction of photographs, even if gruesome, in the penalty stage is not error and is indeed authorized by R.C. 2929.03(D)(1), which provides in part that during the penalty stage, the court and the trial jury *shall* consider " * * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *." In addition, this section provides that the court and the trial jury " * * * shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing * * *." (Emphasis added).

Thus, the trial court did not abuse its discretion by admitting the autopsy photographs during the penalty phase of trial. Accordingly, appellant's thirteenth and nineteenth assignments of error are overruled.

*Mack*, 1993 WL 497052, at *19-20.

Mack again does not specify how this decision contravenes or unreasonably applies Supreme Court precedent, or is based on an erroneous determination of fact.  Indeed, the Sixth Circuit repeatedly has held that a trial court's admission of gruesome photographs of a murdered victim does not violate the Constitution when there is some legitimate evidentiary purpose for demonstrating the nature of the injuries.  *See, e.g., Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) ("The [state] court found, however, that the photographs were properly admitted as they demonstrated that Biros beat Engstrom rather severely and meticulously dissected her body with two different knives."); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) ("The Ohio Supreme Court directly addressed this evidentiary

147

issue, concluding that the multiple photographs 'were introduced during the coroner's testimony to illustrate the testimony,' that '[e]ach photograph presents a different perspective of the victim,' and that the photographs 'were used to illustrate' the nature of the encounter that immediately preceded Skiba's death.") (citation omitted).

Similarly, here, the Ohio Supreme Court reasonably concluded that the photographs were probative demonstrative evidence of the manner of Mr. Sanelli's death, showing the entrance points and exit points of the three gunshot wounds he sustained, and were not unnecessarily cumulative or repetitive.  These photographs were far less inflammatory than in *Biros*, for example, where the Sixth Circuit upheld the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso.  *See Biros*, 422 F.2d at 391.  Accordingly, this evidence also did not deprive Mack of a fundamentally fair trial, and this claim, therefore, is not cognizable on habeas.

Mack's ninth through twelfth grounds for relief, therefore, are denied.

## VIII.  **Thirteenth and Fourteenth Grounds for Relief:  *Jury Instructions***

Mack argues for his thirteenth ground for relief that the trial court issued several erroneous jury instructions, violating his right to due process.  These include jury instructions regarding:  (1) purpose and specific intent; (2) reasonable doubt; (3) death sentence as a recommendation; (4) death-first and unanimity instructions; and (5) aggravating circumstances.  (Doc. 155 at 125-36.)  For his fourteenth ground, he claims that the trial court also erred by:  (6) refusing to instruct the jury on the lesser-included offenses of murder and involuntary manslaughter and improperly instructing on purpose to kill.  (*Id.* at 136-37.)  Respondent contends these claims are partially procedurally defaulted and

148

meritless.  (Doc. 158 at 73-76.)

### A.    Procedural Posture

Respondent asserts that sub-claims (1) through (4), as listed above, were raised and adjudicated in state courts and are preserved for federal habeas review.  (*Id*. at 75.)  She contends sub-claims (5) and (6), however, are procedurally defaulted.  (*Id*. at 75, 77.)

Specifically, Respondent argues that sub-claim (5) is defaulted because Mack never presented it to state courts.  (*Id*. at 75.)  Mack contends the claim was presented to state courts as the underlying ground for an appellate-counsel ineffective-assistance claim in an application to reopen the direct appeal under Ohio Appellate Rule 26(B).  (Doc. 162 at 188-89.)  As the court discussed in relation to Mack's first and second grounds for relief, this argument is unavailing.  Mack never presented this claim as an independent claim in state court, and because he no longer can do so, it is procedurally defaulted.  Moreover, as shown below, Mack has not demonstrated cause and prejudice based on the ineffective assistance of counsel or his actual innocence to excuse the default.

As to sub-claim (6), Respondent asserts that Mack did not fairly present it to the Ohio Supreme Court because he referred in his state-court pleadings to "involuntary" rather than "voluntary" manslaughter.  (Doc. 158 at 77.)[21]  Mack counters that the use of the word "involuntary" in the state-court pleadings was an obvious mistake.  (Doc. 162 at 193-94.)  The court agrees.  The state appellate court, the last state court to address the merits of this

---

[21] Respondent also argues that Mack presents here a new and different legal argument supporting sub-claim (6) concerning the instruction on "purpose to kill."  (Doc. 158 at 77.)  It appears, however, that the argument is substantially similar to sub-claim (1), which was fairly presented to state courts.

claim, quoted Mack's assignment of error using the term "*involuntary* manslaughter," but it considered only the instruction on the lesser-included offenses of murder and *voluntary* manslaughter.  *See Mack*, 1993 WL 497052, at *23-24.  Mack fairly presented this sub-claim to state courts and it is preserved for habeas review.

Mack also argues that, contrary to Respondent's assertion that he presented sub-claim (4) to state courts on direct review, he only raised that sub-claim as the underlying basis for appellate-counsel ineffective assistance in his state reopening application.  (Doc. 162 at 189-90.)  He notes that he did not cite the controlling federal constitutional law in state-court briefs.  (*Id*.)  But Mack's state-court pleadings on direct review cite state case law that relied on the governing federal constitutional authority and framed the issue in a way that sufficiently alleged the denial of a constitutional right.  (*See* Doc. 149-2 at 390-91 (State Appellate Brief); Doc. 149-3 at 283-84 (Ohio Supreme Court Merits Brief).)  This claim, therefore, was fairly presented to state courts.  *See Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (habeas petitioner fairly presents the substance of a federal constitutional claim to state courts by, among other things, relying upon state cases using a federal constitutional analysis and phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right); *Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008) ("To present a claim fairly, it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support.").  Sub-claim (4), therefore, also was fairly presented to state courts and is

150

not procedurally defaulted.[22]

**B.    Merits Analysis**

Alternatively, these claims each lack merit.  Errors in jury instructions generally do not rise to the level of federal constitutional violations.  In criminal trials, the state must prove every element of the offense, and a jury instruction violates due process if it fails to meet that requirement.  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citing *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979)).  But the Supreme Court has emphasized that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  *Id.*  Indeed, the circumstances under which a federal court would overturn a state court's determination regarding a requested jury instruction "would need to be extraordinary."  *Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990).  To obtain relief, a habeas petitioner must demonstrate that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'"  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

**1.    "Purpose" and "specific intent"; "cause" and "result"**

---

[22] In addition, the court notes that the state appellate court, the last state court to address sub-claim (2), found that claim procedurally barred because Mack's counsel failed to object to the instruction at trial, violating Ohio's contemporaneous objection rule.  *Mack*, 1993 WL 497052, at *23; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (Ohio 1998).  Sub-claim (2), therefore, may be procedurally defaulted.  *See, e.g., Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).  But Respondent did not raise a procedural-default defense to this sub-claim, and it is therefore waived. *See, e.g., Trest v. Cain*, 522 U.S. 87, 89 (1997) ("procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter'") (citation omitted); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) ("The state may waive a defense," including procedural default, "by not asserting it.").

Mack first complains that the trial court's instructions to the jury on the issues of "purpose" and "specific intent" confused the jury as to whether general or specific intent to cause death was necessary to convict him for aggravated murder, and the instructions on "cause" and "result" transformed the state-of-mind requirement from specific intent to a negligence standard.  (Doc. 155 at 125-26.)

The last state court to address this sub-claim was the state appellate court, which decided:

> Next appellant contends the court gave the jury improper and conflicting instructions on the purpose to kill. Appellant maintains the court gave an improper general intent instruction by citing a portion of the court's instruction wherein the court was charging the jury on the purpose requirement of aggravated robbery rather than aggravated murder. Specifically, in describing the purpose to commit aggravated robbery the court stated, "A person acts purposely when the gist of the offense is prohibition against conduct of a certain nature regardless of what the offender intends to accomplish thereby, if it is his specific intention to engage in conduct of that nature." (Tr. 1169). In charging the jury on aggravated murder the court repeatedly emphasized the jury must find that the killing was done purposely and with specific intent. To that effect the following appears in the court's aggravated murder charge:
>
> "You must further find beyond a reasonable doubt that the killing of Peter Sanelli was done purposely and with specific intent.
>
> "Purposely, purpose to kill is an essential element of the crime of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result.
>
> "It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to kill Peter Sanelli.
>
> "Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.
>
> "The purpose with which a person brings about a result is determined from the

manner in which it is done, the weapon used, if any, and all the other facts and circumstances in evidence."

(Tr. 1163-1164).

"Specific intent. No person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another.

"Specific intent in Ohio is no more nor less than a particular intent prescribed by statute. This statute mandates that the jury must find that the killing must have been done purposely and with specific intent, and that the defendant specifically intended to produce the death of Peter Sanelli."

(Tr. 1165).

By reviewing the court's overall charge in its relevant context rather than reviewing it in artificial isolation, it is abundantly clear that the court's aggravated murder charge properly set forth the requirement of specific intent in compliance with R.C. 2903.01(D). See, also *State v. Thompson* (1987), 33 Ohio St.3d 1, 13. It was thus a proper recitation of the law.

Appellant next contends that the following portion of the court's cause and result charge erroneously allowed him to be convicted under the improper negligence standard of foreseeability. We disagree.

"Cause occurs when the death is the natural and foreseeable result of the act. A death is the result of an act when it is produced directly by the act or failure to act in a natural and continuous sequence and would not have occurred without the act.

"Result occurs when the death is naturally and foreseeably caused by the act. Causal responsibility of the defendant for an unlawful act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable results that follow in the ordinary course of events from an unlawful act."

(Tr. 1166).

Appellant incorrectly relies on this court's decision in *State v. Jacks* (1989), 63 Ohio App.3d 200, in support of his argument. Close review of that case reveals the trial court not only charged the jury on cause and result but also instructed the jury on the issue and definition of foreseeability. In the present case, the court did not provide the jury with an instruction and definition of foreseeability. Additionally, in Jacks, unlike the present case, the prosecutor

153

improperly referred to the foreseeability instruction during closing argument. No such reference was made by the prosecutor in the present case.

Moreover, a defendant's claim that similar jury instructions may have misled a jury into believing that he could be convicted of aggravated murder if he acted recklessly or negligently rather than purposely was rejected by the Ohio Supreme Court in *State v. Thompson*, 33 Ohio St.3d 12-13. The *Thompson* court concluded the jury could not have been misled regarding the element of purpose because the trial court's instruction specifically required the jury to find that the defendant purposely intended to kill the victim. *Id.* In the present case, the trial court's instructions made it abundantly clear that the jury must find that the appellant harbored a specific intent to kill the victim prior to convicting him of aggravated murder. We thus find that the jury could not have been misled on the element of purpose.

*Mack*, 1993 WL 497052, at *21-22.

The Sixth Circuit considered the constitutionality of similar Ohio jury instructions in *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001), and found that the petitioner had not demonstrated that the instructions were "erroneous, let alone that they rose to this higher constitutional standard necessary to prove a due process violation." *Id*. at 366.  Here, too, Mack makes only conclusory assertions about these instructions and does not even mention the state court's decision.  This claim fails.

## 2.    "Reasonable doubt"

Mack next challenges the trial court's instructions on "reasonable doubt" in both the guilt and sentencing phases of trial.  (Doc. 155 at 126-29.)  The state appellate court, after finding the claim waived because counsel did not object to it at trial, reviewed the claim for plain error, stating:

Upon review of the record, we are unable to conclude that the court's reasonable doubt jury instruction prejudiced appellant. The reasonable doubt instruction duplicated the definition set forth in R.C. 2901.05(D) and was therefore proper. See, *State v. Scott* (1986), 26 Ohio St.3d 92, 99-100. Moreover, the Ohio Supreme Court has upheld the constitutionality of this

154

statutory definition of "proof beyond a reasonable doubt." *State v. Jenkins* (1984), 15 Ohio St.3d 164.

*Mack*, 1993 WL 497052, at *23. The court further upheld the trial court's reasonable doubt instruction during the sentencing phase of trial, stating:

> As was previously stated during our disposition of appellant's fourteenth assignment of error, the Ohio Supreme Court has upheld the constitutionality of the statutory definition of "proof beyond a reasonable doubt." *State v. Jenkins*, 15 Ohio St.3d 164. Thus, appellant's argument lacks merit.

*Id*. at *28.

Mack again fails to address the state court's decisions. But he asserts that the trial court's reasonable-doubt instructions were unconstitutional under *Cage v. Louisiana,* 498 U.S. 39 (1990), which held that Louisiana's definition of reasonable doubt was unconstitutional, and other Supreme Court precedent. (Doc. 155 at 126-29.) The Sixth Circuit, however, repeatedly has held that these reasonable-doubt instructions, which were based on Ohio's statutory definition of reasonable doubt in Ohio Rev. Code § 2901.05(D), do not violate due process. *See, e.g., Buell*, 274 F.3d at 366; *Scott v. Mitchell*, 209 F.3d 854, 883-84 (6th Cir. 2000); *Byrd v. Collins,* 209 F.3d 486, 527-28 (6th Cir. 2000)*; Thomas v. Arn*, 704 F.2d 865, 867–69 (6th Cir. 1983). This claim, therefore, also fails.

### 3. Death sentence as a recommendation

Mack further alleges the trial court's instruction to the jury that its recommendation of a death sentence would not be binding on the court, but a life sentence would be, also was deficient. (Doc. 155 at 129-30.) As to this claim, the state appellate court reasoned:

> In this assignment of error appellant argues the trial court improperly instructed the jury during the penalty phase of his trial. . . .
>
> "If all twelve members of the jury find by proof beyond a reasonable doubt that

155

the aggravating circumstance which defendant was found guilty of committing outweighs the mitigating factors, then you must return such finding to the Court.

"I instruct you as a matter of law if you make such finding then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant.

"On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence and the arguments of counsel, you are unable to unanimously agree that the aggravating circumstance which the defendant was found guilty of committing, outweighs the mitigating factors, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court."

(Tr. 1312-1322).

R.C. 2929.03(D)(2) provides that if the jury unanimously finds that the aggravating circumstance(s) outweigh any mitigating factor(s) beyond a reasonable doubt, the jury shall recommend that the offender be sentenced to death. *State v. Springer* (1992), 63 Ohio St.3d 167, 171. R.C. 2929.03(D)(2) also requires that if the jury is unable to unanimously recommend the sentence of death, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment. *Id.* at 172.

Review of the trial court's instruction reveals that it accurately set forth the law contained in R.C. 2929.03(D)(2). We thus find it was proper.

. . .

Appellant also argues he was denied a fair trial by the trial court's instructions and comments that the jury's death verdict was only a non-binding recommendation. This argument has been repeatedly rejected by the Ohio Supreme Court. *State v. Buell* (1986), 22 Ohio St.3d 124, 142-144; *State v. Rogers* (1986), 28 Ohio St.3d 427, 428; *State v. Poindexter* (1988), 36 Ohio St.3d 1; *State v. Broom* (1988), 40 Ohio St.3d 277; *State v. Roe* (1989), 41 Ohio St.3d 18.

Accordingly, appellant's twentieth assignment of error is overruled.

*Mack*, 1993 WL 497052, at *27-28.

Without addressing the state court's opinion, Mack contends that these instructions

are unconstitutional under the Supreme Court's decision in *Caldwell v. Mississippi*, 472

U.S. 320 (1985).  (Doc. 155 at 129-30.)  There, the Court held that "it is constitutionally

impermissible to rest a death sentence on a determination made by a sentencer who has

been led to believe that the responsibility for determining the appropriateness of the

defendant's death rests elsewhere." *Id*. at 328-29.  Mack argues that Ohio's death-sentence

instructions are improper under *Caldwell* because, by making a death sentence a

recommendation, they lessened the jurors' sense of responsibility in the sentencing and

injected irrelevant and arbitrary factors into the decision that biased the jurors in favor of

the death penalty.  (Doc. 155 at 130.)

The Sixth Circuit, however, considered and rejected this very argument regarding

nearly identical Ohio jury instructions in *Buell v. Mitchell*, *supra*.  It reasoned:

> Unlike in *Caldwell,* where the jury was given the uncorrected impression that
> the appellate courts would make the final decision on the imposition of a death
> sentence, not merely review the appropriateness of the jury's decision to impose
> a death sentence, Buell has not demonstrated that the instructions at his trial
> improperly described the role assigned to the jury by local law. In instructing
> the jury that they are to make a recommendation as to a death sentence, and that
> the final decision regarding imposition of a death sentence rests with the trial
> court, the jury instruction complied with the letter of Ohio law and described
> with complete accuracy the jury's role in the sentencing process. By doing so,
> the jury's sense of responsibility was not diminished. Therefore, this claim must
> fail.

*Buell*, 274 F.3d at 352-53.

Here, too, the state court found that the instructions regarding the death penalty as a

whole complied with Ohio law and accurately described the jury's role in the sentencing

process.  The jury's sense of responsibility, therefore, was not reduced, and the state court's

157

decision did not contravene or misapply *Caldwell*.

### 4.    Death-first and unanimity instructions

Mack next challenges the constitutionality of the trial court's sentencing jury instructions on the grounds that they:  (1) required the jury to first reject a death sentence before considering the life sentencing options, misleading the jury about its role in the sentencing process; and (2) overemphasized unanimity, creating a "substantial possibility" that one or more of the jurors might have mistakenly believed that a life sentence also required a unanimous decision.  (Doc. 155 at 131-35.)

The state appellate court rejected this argument, stating:

Initially, appellant contends the following instruction improperly denied the jury an opportunity to consider either of the life sentence options:

"If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstance which defendant was found guilty of committing outweighs the mitigating factors, then you must return such finding to the Court.

"I instruct you as a matter of law if you make such finding then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant.

"On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence and the arguments of counsel, you are unable to unanimously agree that the aggravating circumstance which the defendant was found guilty of committing, outweighs the mitigating factors, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court."

(Tr. 1312-1322).

R.C. 2929.03(D)(2) provides that if the jury unanimously finds that the aggravating circumstance(s) outweigh any mitigating factor(s) beyond a reasonable doubt, the jury shall recommend that the offender be sentenced to death. *State v. Springer* (1992), 63 Ohio St.3d 167, 171. R.C. 2929.03(D)(2) also requires that if the jury is unable to unanimously recommend the sentence

158

> of death, the jury shall recommend that the offender be sentenced to life
> imprisonment with parole eligibility after serving twenty full years of
> imprisonment, or life imprisonment with parole eligibility after serving thirty
> full years of imprisonment. *Id.* at 172.

> Review of the trial court's instruction reveals that it accurately set forth the law
> contained in R.C. 2929.03(D)(2). We thus find it was proper.

*Mack*, 1993 WL 497052, at *27-28.

Mack does not address the state court's decision.  But he argues that these "death-first" and "unanimity" instructions violated clearly established Supreme Court precedent, citing a host of cases, such as *Mills v. Maryland*, 486 U.S. 367 (1988), for the principle that "[t]he Constitution requires that the jury instructions not be a hindrance to the jury's role"; *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994), for the proposition that "a capital sentencing 'jury cannot be 'affirmatively misled' regarding its role in the sentencing process'"; and *Dugger v. Adams*, 489 U.S. 401, 407-08 (1989), for the principle that "a capital sentencing jury must receive 'materially accurate' information about its role under local law." (Doc. 155 at 131, Doc. 162 at 186-87.)  None of the decisions Mack cites, however, "squarely address[]" the claim he presents here, *Wright v. Van Patten*, 552 U.S. 120, 125 (2008), and each applies "at too high a level of generality" to constitute clearly established federal law for purposes of § 2254(d)(1), *Woods v. Donald*, 575 U.S. 312, 318 (2015).

In fact, the Supreme Court itself has held that it has never found Ohio jury instructions like those at issue here unconstitutional because they "'require[d] the jury to unanimously reject a death sentence before considering other sentencing alternatives,'" and relief therefore was precluded under AEDPA for such a claim. *Bobby v. Mitts*, 563 U.S. 395, 399-400 (2011) (per curiam) (quoting *Smith v. Spisak*, 558 U.S. 139, 149 (2010)).  For

159

that same reason, Mack cannot establish that the state court of appeals' decision rejecting this claim is contrary to, or an unreasonable application of, clearly established federal law. This sub-claim is meritless.

### 5. "Aggravating circumstance"

Mack also claims the trial court improperly instructed the jury regarding the aggravating circumstances in the case.  (Doc. 155 at 136.)  The jury instruction provided:

> We further find and specify that the aggravated murder of Peter Sanelli was committed while the defendant was committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated robbery, and the defendant was the principal offender.

(Doc. 150-5 (Trial Tr.) at 175.)  Defense counsel did not object to the instruction at trial. (*See* Doc. 150-5 (Trial Tr.) at 182-86.)  As no state court has addressed the merits of this claim, the court reviews it *de novo*.

Mack argues that "[w]hether [he] was the 'principal offender' or not is not an aggravating circumstance, at least not as explained by the court[,]" and the jury's consideration of this non-statutory aggravating circumstance renders his sentence invalid. (Doc. 155 at 136.)  He cites as support the Ohio statute governing capital specifications, Ohio Rev Code § 2929.04(A), and Ohio Supreme Court decisions in *State v. Wogenstahl*, 75 Ohio St. 3d 344 (Ohio 1996), *State v. Gumm*, 73 Ohio St. 3d 413 (Ohio 1995), and *State v. Johnson*, 24 Ohio St. 3d 87 (Ohio 1986).  (Doc. 155 at 136.)  In *Johnson*, Ohio's high court held that "[p]resenting the jury with specifications not permitted by statute impermissibly tips the scales in favor of death, and essentially undermines the required reliability in the jury's determination." *Johnson*, 24 Ohio St. 3d at 94. In *Gumm*, it held that trial courts "should not instruct jurors that 'nature and circumstances' evidence is to be

'weighed against' mitigating factors[.]" *Gumm,* 73 Ohio St. 3d at 422.  And in *Wogenstahl,*

the court held that "it is completely improper for prosecutors in the penalty phase of a

capital murder trial to make any comment before a jury that the nature and circumstances of

the offense are 'aggravating circumstances.'" *Wogenstahl*, 75 Ohio St. 3d at 352.  Mack

cites only one federal case, with no discussion:  *Barclay v. Florida*, 463 U.S. 939 (1983).

(Doc. 155 at 136.)  In that case, the Supreme Court examined whether a trial judge's

consideration of a non-statutory, "improper" aggravating circumstance that the murder

included the element of racial hatred "so infect[ed] the balancing process created by the

Florida statute that it [was] constitutionally impermissible for the Florida Supreme Court

[to] let the sentence stand[,]" and found that it did not.  *Barclay*, 463 U.S. at 956.

Respondent counters, with no analysis or citation to the record, that this claim fails based

on "the Ohio Supreme Court's implicit decision to the contrary," which is binding on this

court.  (Doc. 158 at 76.)

 This claim fails.  First, Mack provides no authority to support his argument that the

fact that he was found a "principal offender" was not properly included in the trial court's

aggravating-circumstance instruction under Ohio law.  Indeed, in *Gumm*, the Ohio Supreme

Court directed courts to "continue to describe only the statutorily defined elements

specified in the indictment as being the 'aggravating circumstances' a jury is to place on

one side of the balance, with mitigating factors placed on the other side." *Gumm*, 73 Ohio

St. 3d at 422.  And the instruction at issue here did just that:  it accurately described the

statutorily defined elements specified in the indictment, including Mack's role in the

aggravated murder as a "principal offender."  Mack was indicted and convicted for

aggravated murder with the death-penalty specification contained in § 2929.04(A)(7), which provides:

> The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

Ohio Rev. Code § 2929.04(A)(7).  The jury found that Mack was the "principal offender in the commission of the aggravated murder."  (Doc. 150-5 (Trial Tr.) at 43 (Jury Verdict).) The fact that Mack was a "principal offender," therefore, was not a "nature or circumstance" of the crime, but a "statutorily defined element specified in the indictment" of the crime itself and properly included under Ohio law in the trial court's aggravating-circumstance instruction.  *Gumm*, 73 Ohio St. 3d at 422; *see also Stallings v. Bagley*, 561 F. Supp. 2d 821, 851 (N.D. Ohio  2008) ("While the 'nature and circumstances' of the offense are not enumerated aggravating factors, the fact that the murder occurred in the context of an aggravated burglary and aggravated robbery *are*.") (citing Ohio Rev. Code § 2929.04(A)(7)) (emphasis in original).

Moreover, even if the instruction were improper under Ohio law, Mack provides no authority to support his contention that the deficiency rises to the level of a constitutional violation.  In fact, in *Barclay*, the Court noted that in an earlier case, *Proffitt v. Florida*, 428 U.S. 242 (1976), a plurality of the Court similarly "saw no constitutional defect in a sentence based on both statutory and nonstatutory aggravating circumstances."  *Barclay*, 463 U.S. at 957.  The Court explained that it "[had] never suggested that the United States Constitution requires that the sentencing process should be transformed into a rigid and

162

mechanical parsing of statutory aggravating factors[,] . . . and as long as the decision is not

so wholly arbitrary as to offend the Constitution, the Eighth Amendment cannot and should

not demand more."  *Id*. at 950-51.  Here, there was nothing in the trial court's instruction to

the jury that its finding that Mack was a "principal offender" in the murder was an

aggravating circumstance that would have led to a decision "so wholly arbitrary" as to

violate Mack's constitutional rights.  This claim is meritless.

### 6. Refusal to instruct on lesser included offenses

Mack also challenges the trial court's refusal to instruct the jury on lesser-included

offenses of murder and/or involuntary manslaughter.  (Doc. 155 at 136-37.)  The state

appellate court, in considering this claim, reasoned:

> Appellant argues that the trial court should have instructed the jury on the lesser included offenses of murder and voluntary manslaughter. Appellant's argument lacks merit.

> It is well-settled that murder and voluntary manslaughter are lesser included offense of aggravated murder. *State v. Solomon* (1981), 66 Ohio St.2d 214, 219. However, a court need not give an instruction on the lesser included offense unless the offense is supported by the evidence. *State v. Kidder* (1987), 32 Ohio St.3d 279, 281; *State v. Thomas* (1988), 40 Ohio St.3d 213, paragraph two of the syllabus.

> An instruction on murder should be given only if the evidence would reasonably support an acquittal on the felony murder charge and a conviction on the lesser included offense. *State v. Clark* (1988), 38 Ohio St.3d 252, 255. An instruction on voluntary manslaughter should be given only if the jury could have reasonably found that the victim seriously provoked the appellant and that the serious provocation was reasonably sufficient to have incited the use of deadly force. *State v. Lawrence* (1989), 44 Ohio St.3d 24, 26.

> In this assignment of error appellant does not even attempt to show how the evidence supported jury instructions on murder and voluntary manslaughter. Our review of the record reveals that the evidence does not reasonably support the theory that appellant committed either of those crimes. The evidence adduced at trial established that Peter Sanelli was killed during the commission

163

of an aggravated robbery. His death was caused by three gunshot wounds to his upper body the most serious of which caused perforations of his left lung and the sack that surrounds the heart. Further, the record contains no evidence of serious provocation and does not support an acquittal on the felony murder charge. Thus, we conclude the trial court properly refused to instruct the jury on murder and voluntary manslaughter.

Accordingly, appellant's fifteenth assignment of error is overruled.

*Mack*, 1993 WL 497052, at *23-24.

Mack asserts, again without addressing the state court's decision, that the trial court's refusal to instruct on the lesser-included offenses of murder and involuntary manslaughter violated his due process rights under *Beck v. Alabama*, 447 U.S. 625 (1980), and *Hopper v. Evans*, 456 U.S. 605 (1982). In *Beck*, the Supreme Court held that a death sentence violated due process where the "jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict[.]" *Beck.* 447 U.S. at 627 (internal quotation marks and citation omitted). In *Hopper*, it held that the defendant was not constitutionally entitled to a lesser-included instruction because the evidence did not support a conviction on the lesser offense, and there was not sufficient evidence to support a rational jury's conclusion that he should have been acquitted of the greater offense. *Hopper*, 456 U.S. at 610.

According to Mack, evidence adduced at trial showed that he lacked the purpose to kill Mr. Sanelli and was not the actual shooter, if he was even there at all – supporting verdicts of either murder or involuntary manslaughter. (Doc. 162 at 192.) He points to testimony of Willis and others that Mack told Sowell that he shot Mr. Sanelli only because Sowell shot him first, and Sowell, who was standing on the driver's side of Mr. Sanelli's car, fired the fatal shot. (*Id*. at 192-93.)

164

The state appellate court was reasonable to conclude, however, that the evidence did not support the lesser crimes of murder and involuntary manslaughter or reasonably support an acquittal on the felony-murder charge. The evidence conclusively demonstrated that the fatal shooting occurred during the course of an aggravated robbery and that the bullets that killed Mr. Sanelli were fired from the gun found in Mack's possession when he was arrested. Moreover, as the state court observed, there was no evidence of a serious provocation that could have supported an acquittal on the felony-murder charge.

The state court of appeals' decision, therefore, was neither contrary to, nor an unreasonable application of, *Beck* or *Hopper*.

## IX. Fifteenth Ground for Relief: *Miscellaneous Trial-Court Errors*

Mack argues for his fifteenth ground for relief that the trial court committed numerous other errors that violated his constitutional rights. They are: (1) applying the wrong standard in conducting the death penalty *voir dire*; (2) using the term "recommendation" in describing the jury's sentencing verdict; (3) failing to prevent the use of victim-impact evidence during the sentencing phase; (4) determining the sentence prior to the sentencing hearing; (5) conducting improper *ex parte* communications with a juror between the trial and sentencing phases; (6) improperly substituting an alternate juror into the jury between the trial and sentencing phases; (7) considering statutory mitigating factors not raised by the defense; (8) considering non-statutory aggravating circumstances in determining that Mack should be sentenced to death; (9) improperly limiting the admission of mitigation evidence; (10) ignoring Mack's mitigation evidence; and (11) admitting all of the evidence from the trial phase of the case into evidence in the mitigation phase. (Doc.

165

155 at 138-47.)  Respondent counters that many of these claims are procedurally defaulted and each is meritless.  (Doc. 158 at 79-85.)

### A.    Procedural Posture

Respondent argues that sub-claims (1), (3), (5), (6), (7), (9), and (11), as listed above, are procedurally defaulted.  (Doc. 158 at 80-85.)  Mack contends that he raised sub-claims (5), (6), (7), (9), and (11) in state courts as the underlying ground for an appellate-counsel ineffective-assistance claim in an application to reopen the direct appeal under Ohio Appellate Rule 26(B).  (Doc. 162 at 197-98.)  As the court discussed in relation to Mack's first and second grounds for relief, this argument is meritless.  Mack never presented these independent claims in state court, and because he no longer can do so, they are procedurally defaulted.  *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998).  Moreover, as shown below, Mack has not demonstrated cause and prejudice based on the ineffective assistance of counsel or his actual innocence to excuse the defaults.  Sub-claims (1), (3), (5), (6), (7), (9), and (11), therefore, are procedurally defaulted.

### B.    Merits Analysis

Even if all of these claims were ripe for habeas review, they would fail.

#### 1.    *Voir dire* standard

Mack first asserts that the trial court applied the incorrect legal standard in deciding whether to excuse jurors for cause during *voir dire* based on their beliefs about the death penalty.  (Doc. 155 at 138-39.)  He contends the judge used the standard set forth in *Wainwright v. Witt*, 469 U.S. 412 (1985), rather than the standard required under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and Ohio Rev. Code § 2945.25(C).  (*Id.*)  To

166

support this claim, Mack cites:  (1) several instances in which he alleges the trial court articulated an improper standard governing the excusal of potential jurors for cause based on their views of the death penalty (*id*. at 138 (citing Doc. 150-1 (Trial Tr.) at 52, 72, 81, 275)); (2) the judge's allegedly improper dismissal of four potential jurors (Gomez, Spelic, Romans, and Davis) because of their opposition to the death penalty (*id*. (citing Doc. 150-1 (Trial Tr.) at 38-41, 58-63, 211, 263-72)); and (3) the trial court's refusal to excuse one potential juror (Frankel) on the ground that her support of the death penalty prevented her from considering a life sentence (*id*. (citing Doc. 150-1 (Trial Tr.) at 221-26)).

Respondent correctly argues that to extent that Mack is alleging a violation of state law, this claim is not cognizable on federal habeas review, although she does not address Mack's claim under federal law.  (Doc. 158 at 80.)  This court, however, has reviewed the trial-court *voir dire* proceedings in relation to Mack's third ground for relief, and found the Ohio Supreme Court did not contravene or misapply *Witt* or *Witherspoon* in upholding the trial court's dismissal for cause of potential jurors – including Spelic and Davis – who articulated misgivings about the death penalty, and in denying Mack's motions to remove prospective jurors – including Frankel – who favored the death penalty.  The court further has reviewed the other instances Mack cites here and finds no error in the trial court's application of federal constitutional standards during *voir dire*.  This claim lacks merit.

### 2. Use of term "recommendation"

Mack argues in this sub-claim that the trial court's use of the term "recommendation" to describe the jury's sentencing verdict was constitutionally impermissible under *Caldwell v. Mississippi*, 471 U.S. 320 (1985).  (Doc. 155 at 139-40.)

167

Mack presented this claim to state courts on direct review in conjunction with his claim challenging the trial court's jury instruction regarding the recommendation of a death sentence (sub-claim (3) of Mack's thirteenth ground for relief), and it was last considered on the merits by the state court of appeals.  *See Mack*, 1993 WL 497052, at *27-28.  For the same reasons the court set forth in relation to Mack's jury-instruction claim, the court finds the state appellate court's decision rejecting this claim was neither contrary to, nor an unreasonable application of, *Caldwell*.

### 3.  Use of victim-impact evidence

Mack also claims the trial court erred by allowing the use of victim-impact evidence in the State's closing argument during the sentencing phase of trial.  (Doc. 155 at 140-41.)  As discussed in the court's analysis of Mack's sixteenth ground for relief, it has found no prosecutorial misconduct based on the alleged use of victim-impact evidence.  It follows that the trial court did not err by failing to prevent its use of that evidence.

### 4.  Timing of sentencing opinion

Mack further asserts that the trial court improperly determined his sentence before the sentencing hearing, depriving him of his right to a fair and impartial tribunal and his right to allocution.  (Doc. 155 at 141-42.)  Mack raised this claim in state courts.  The last state court to address it, the state appellate court, opined:

> Appellant argues he was prejudiced because the trial court prepared its sentencing memorandum subsequent to the conclusion of the penalty phase of his trial but prior to hearing from counsel and the appellant at the subsequent sentencing hearing. Appellant claims the court's action violated Crim.R. 32(A)(1) and R.C. 2947.05.
>
> R.C.2929.03 governs the imposition of sentence for a capital offense. Specifically, R.C. 2929.03(D)(3) provides:

168

(3) Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section, if, after receiving pursuant to division (D)(2) of this section the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, or if the panel of three judges unanimously finds, that the aggravating circumstances the offender was found guilty of committing outweigh mitigating factors, it shall impose sentence of death on the offender. Absent such a finding by the court or panel, the court or the panel shall impose one of the following sentences on the offender:

(a) Life imprisonment with parole eligibility after serving twenty full years of imprisonment;

(b) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.

At the sentencing hearing the trial judge stated he had reviewed the evidence in the case, the exhibits, the arguments of counsel and all of the factors that were introduced in the case. Additionally, the record reflects that prior to imposing sentence, the trial court permitted both defense counsel and the appellant to personally address the court in compliance with Crim.R. 32(A)(1) and R.C. 2947.05. We also note that during the penalty phase of his trial appellant made an unsworn statement, presented mitigation evidence, and presented arguments by defense counsel. We thus find that the trial court's imposition of sentence complied with the sentencing provisions contained in R.C. 2929.03(D)(3), R.C. 2947.05 and Crim.R. 32.

Accordingly, appellant's twenty-second assignment of error is overruled.

*Mack*, 1993 WL 497052, at *29-30.

Mack does not address the state court's decision. Nor does he identify any Supreme Court precedent clearly establishing federal constitutional requirements for what Mack calls a "meaningful sentencing hearing," including the timing of a state trial court's sentencing opinion or a defendant's allocution, and this court has found none. This claim, too, fails.

### 5. *Ex parte* communication with juror

Mack contends the trial court also erred by engaging in an *ex parte* discussion with

a juror without disclosing the contact, permitting an inquiry into the nature of the meeting, or making a record of what was said.  (Doc. 155 at 142.)  As Mack never presented this claim to state courts as an independent claim, the court reviews it *de novo*.

The record shows that at about 3 a.m. on the morning the trial's sentencing phase was set to begin, juror Gordon received a phone call in which the caller said, "We know who you are, and we know what you've done."  (Doc. 150-5 (Trial Tr.) at 53.)  Gordon spoke to the judge about the call that morning.  (*Id*.)  The judge then convened the juror, defense counsel, and the prosecutors in his chambers for a recorded conference, so that he and counsel could question the juror about the call and her feelings about continuing to serve on the jury.  (*Id*. at 53-59.)  Ultimately, defense counsel requested that Gordon be removed, to which the court and prosecutors agreed.  (*Id*. at 59-61.)

"[A] defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . .  The presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'"  *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 108 (1934)).  As Justice Stevens has observed:

> [T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.  The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.

*Rushen v. Spain*, 464 U.S. 114, 125-26 (1983) (Stevens, J., concurring in judgment).  In *Gagnon*, the Supreme Court concluded that an *ex parte* discussion between a juror and

170

judge in that case did not prejudice the defendant, as it "was a short interlude in a complex trial; the conference was not the sort of event which every defendant had a right personally to attend under the Fifth Amendment." *Gagnon*, 470 U.S. at 527.  "Respondents could have done nothing had they been at the conference," it observed, "nor would they have gained anything by attending." *Id*.

Generally, when an *ex parte* communication relates to some aspect of the trial, the trial judge should disclose the communication to counsel for all parties. *Rushen*, 464 U.S. at 119.  The court also should conduct a hearing with all interested parties permitted to participate, to determine the circumstances of the *ex parte* communication, the impact of the contact on the juror, and whether or not it was prejudicial. *Remmer v. United States*, 347 U.S. 227, 230 (1954).  The defense has the burden of demonstrating that the *ex parte* communication caused actual prejudice. *Smith v. Phillips*, 455 U.S. 209, 215–17 (1982).

Mack has not demonstrated that he was prejudiced by the *ex parte* discussion at issue here.  Contrary to Mack's assertion, the judge's initial conversation with juror Gordon was disclosed to counsel.  Their discussion also did not concern any evidence presented at trial or any legal issue in the case.  This was not disputed; Mack's counsel did not even question the juror about it.  Mack and his counsel, therefore, "could have done nothing had they been [present during that conversation], nor would they have gained anything by [being there]." *Gagnon*, 470 U.S. at 527.  Furthermore, the judge took all necessary steps to protect Mack's due process rights.  He promptly notified counsel of his initial conversation with the juror, held a hearing on the matter soon after, and removed the juror at defense counsel's request to eliminate any risk of unfairness to Mack should the

171

threatening call have affected her impartiality. This claim is meritless.

### 6.    Substitution of juror before sentencing

Mack next complains that the trial court improperly substituted an alternate juror for excused juror Gordon between the guilt and sentencing phases of his trial. (Doc. 155 at 142-44.) The substitution violated Ohio sentencing procedures, he claims, which in turn deprived him of due process. (*Id*. at 143-44.) Mack did not raise this claim in state courts, so the court reviews the claim *de novo*.

As Respondent argues, to the extent that Mack challenges Ohio law, this court is bound by state courts' determinations of their own laws. *E.g., Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). And, as Mack concedes, in *State v. Hutton*, 53 Ohio St. 3d 36 (Ohio 1990), the Ohio Supreme Court held that the precise procedure the trial court used here – substituting an alternate juror for an original juror between the two phases of a capital case – complied with Ohio law, which mandates that only the "trial jury" can impose a death sentence. *Id*. at 44-48 (construing Ohio Rev. Code § 2929.03(C)(2)(b); Ohio R. Crim. P. 24(F)).

Mack contends his case is distinguishable from *Hutton* because the alternate juror at issue was not "properly substituted," as *Hutton* requires. (Doc. 155 at 143 (quoting *Hutton*, 53 Ohio St. 3d at 45).) He argues that, unlike in *Hutton*, the alternate did not participate in the jury's guilt-phase deliberations and was therefore "deprived of critical information, thoughts, and insights regarding one of Mack's primary mitigating factors, residual doubt." (*Id*.) It is not clear, however, that the alternate juror in *Hutton* joined the jury's deliberations over guilt. After explaining that the trial court seated the alternate juror after

172

the defendant was convicted, it noted that the alternate "sat through the penalty phase and participated in all *subsequent* deliberations." *Hutton*, 53 Ohio St. 3d at 44-45 (emphasis added). But, regardless, the Ohio Supreme Court's reasoning in *Hutton* for finding the alternate juror part of the "trial jury" for purposes of Ohio Rev. Code § 2929.03(C)(2)(b) still applies here:

> Alternate jurors are selected in the same way as regular jurors and hear the same evidence. Since they see and hear the trial, they are as capable as regular jurors of considering the evidence admitted in the guilt phase, and quite as likely to entertain "residual doubts" and weigh them in the defendant's favor.

*Id*. at 45.

Accordingly, this court is bound by the Ohio Supreme Court's holding in *Hutton* and finds no legal or factual basis upon which to find a due process violation based on the trial court's substitution of a juror with an alternate juror before the sentencing phase of Mack's trial. This claim also lacks merit.

### 7. Consideration of statutory mitigating factors not raised by the defense

For his next sub-claim, Mack asserts that the trial court improperly considered statutory mitigating factors not raised by the defense, which converted them into aggravating factors. (Doc. 155 at 144.) This claim, also reviewed *de novo*, fails for several reasons.

First, Mack alleges only a violation of state law; he cites to no federal constitutional provision or case law. Second, he does not specify which statutory mitigating factors were allegedly improperly raised and exactly how that prejudiced him. Finally, as Respondent points out, even if a trial court's alleged error rises to the level of a due process violation, a

state supreme court can cure that error through its independent reweighing of aggravated and mitigating circumstances in reviewing a death sentence. *Hoffner v. Bradshaw*, 622 F.3d 487, 497 (6th Cir. 2010) (holding that "even if the trial court's alleged error rose to the level of a due process violation, the state supreme court cured it through independent reweighing"). Here, the Ohio Supreme Court, in its independent review of Mack's death sentence, explicitly stated that it "[w]eigh[ed] the aggravated circumstances against the *evidence presented* in mitigation," and found the aggravating circumstances outweighed those mitigating factors beyond a reasonable doubt. *Mack*, 73 Ohio St. 3d at 516 (emphasis added).

### 8. Consideration of non-statutory aggravating circumstances

Mack also argues that the trial court improperly considered non-statutory aggravating circumstances in determining Mack's death sentence when it stated in its sentencing opinion that it considered "the circumstances surrounding the commission of the crime – the robbery, the violence, and all the other aspects . . . ." (Doc. 155 at 144-45 (quoting Doc. 149-1 at 124).) Mack raised this claim on direct review to state courts.

The last state court to address the merits of this claim was the state appellate court, which reasoned:

> Appellant also argues that the trial court improperly considered the nature and circumstances of the offense as an aggravating factor. Review of the trial court's opinion reveals that it refers to only one aggravating circumstance, the charged course of conduct. Moreover, the trial judge's reference to the nature and circumstances of the offense was permissible to explain why the evidence allowed the jury to find that the aggravating circumstance outweighed the mitigating factors. *State v. Stumpf* (1987), 32 Ohio St.3d 95, paragraph one of the syllabus. *State v. Combs* (1991), 62 Ohio St.3d 278, 288. We also note that our independent review of the sentence would cure any deficiency in the trial court's sentencing decision. *State v. Landrum* (1990), 53 Ohio St.3d 107.

174

*Mack*, 1993 WL 497052, at *32.

Mack does not discuss the state court's decision. However, as explained above in relation to Mack's challenge of a jury instruction that he alleged improperly advised the jury to consider non-statutory aggravating circumstances, a trial court's consideration of a non-statutory, "improper" aggravating circumstance does not rise to the level of a constitutional violation unless it "so infect[ed] the balancing process created by [state law] that it [was] constitutionally impermissible . . . ." *Barclay*, 463 U.S. at 956. The state appellate court reasonably determined that in this case, it did not. As the state court of appeals noted, the trial court specified in its analysis of Mack's death sentence that it was only considering the one charged statutory aggravating circumstance. (Doc. 149-1 at 122-23.) And the statement of which Mack complains was merely a general reference to the evidence in the case contained in the court's conclusion paragraph. Moreover, as explained above, even if the trial court's alleged error rose to the level of a due process violation, the Ohio Supreme Court cured it through independent reweighing. *Hoffner*, 622 F.3d at 497.

The state court's decision, therefore, did not contravene or misapply *Barclay* or other clearly established Supreme Court precedent.

### 9.     Limitation of mitigating evidence

Mack further asserts that the trial court improperly limited the admission of mitigation evidence, including: (1) Carole Mancino's testimony; (2) Curtis Mack's testimony; (3) defense counsel's closing argument about electrocution as a method of execution; and (4) defense counsel's closing argument about a racist comment he overheard in the court house. (Doc. 155 at 145-46.)

175

Even under *de novo* review, this claim lacks merit.  As explained above in relation to Mack's other claims contesting trial-court evidentiary rulings (grounds nine through twelve), to the extent Mack's claims allege violations of Ohio evidentiary law, they are not cognizable on federal habeas unless they are "so egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

As to Carole Mancino and Curtis Mack's testimony, this court already has determined that the trial court's refusal to allow them to testify about prior inconsistent statements made by State witness Timothy Willis did not render Mack's trial fundamentally unfair.  Mack does not specify what mitigation evidence Mancino and Mack would have presented had they been permitted to testify, and aside from their testimony concerning Willis' statements, there seems little they could have offered of such value that its absence resulted in a denial of fundamental fairness.  Nor were the trial court's rulings limiting defense counsel's closing argument concerning electrocution and an overheard racist comment egregious enough to cause fundamental unfairness.  As the judge instructed the jury, counsel's closing arguments "were designed to assist [the jury], but they were not evidence."  (Doc. 150-5 (Trial Tr.) at 7.)

### 10.    Failure to consider mitigating evidence

Mack further maintains that the trial court erred by failing to consider Mack's arguments at sentencing regarding residual doubt based on "the facts being developed" in Sowell's case.  (Doc. 155 at 146-47.)  He presented this argument to state courts on direct review.  The last state court to address the claim, the state appellate court, decided:

> Appellant initially argues that the trial court's sentencing opinion failed to consider residual doubt as a mitigating factor. Appellant's claim lacks merit.

> We acknowledge that residual doubt of a defendant's guilt may be properly considered in mitigation. *State v. Watson* (1991), 61 Ohio St.3d 1, 17. However, the court expressly stated in its opinion that it considered the unsworn statement of Clarence Mack wherein he apologized to the victim's family but denied any involvement in the victim's death. Further, the court in its opinion recognized its duty to consider the relevant evidence raised at trial, the testimony, other evidence, the defendant's statement, and arguments of counsel in order to determine beyond a reasonable doubt whether the aggravating circumstances outweighed the mitigating factors. Under these circumstances we find that the trial court properly considered residual doubt as a mitigating factor.

*Mack*, 1993 WL 497052, at *31.

Mack again does not provide any analysis as to how this decision violates AEDPA's § 2254(d). He argues only in a conclusory manner that the failure of the trial court to consider a mitigating factor rendered his death sentence unconstitutional. (Doc. 155 at 146.) The state appellate court reasonably concluded, however, that the trial court's sentencing opinion demonstrated that it did in fact properly consider residual doubt as a mitigating factor. This decision was not contrary to, or an unreasonable application of, clearly established federal law.

**11. Admission of guilt-phase evidence in sentencing phase of trial**

Finally, Mack argues that the trial court improperly permitted the prosecutor to reintroduce all of the evidence from the guilt phase of trial into the sentencing phase. (Doc. 155 at 147.) He contends the trial court, in so ruling, misapplied the Ohio Supreme Court decision *State v. DePew*, 38 Ohio St. 3d 275 (Ohio 1988), and allowed the jury to consider non-statutory aggravating circumstances in violation of *Barclay v. Florida*, *supra*. (*Id.*) Mack never raised this claim in state court, and this court reviews the claim *de novo*.

In *DePew*, the Ohio Supreme Court announced:

> We now hold that, pursuant to R.C. 2929.03(D)(1), the prosecutor, at the penalty stage of a capital proceeding, may introduce " * * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * *." While this appears to permit repetition of much or all that occurred during the guilt stage, nevertheless, a literal reading of the statute given to us by the General Assembly mandates such a result, especially in light of the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation. R.C. 2929.03(D)(1).

*DePew,* 38 Ohio St. 3d  at 282-83.  Mack contends that the trial court erred in applying this holding to evidence of the aggravated murder, much of which was irrelevant to the aggravating circumstance at issue in his sentencing and prejudicial, such as the autopsy photos and autopsy protocol.  (Doc. 155 at 147; Doc. 162 at 196.)  But he does not provide any authority for this proposition from before the time of the trial.  This court, therefore, is bound to the state trial court's interpretation of state law, as Mack did not present this claim on direct review in state court.

Moreover, as noted above, a trial court's consideration of a non-statutory, "improper" aggravating circumstance does not rise to the level of constitutional violation unless it "so infect[ed] the balancing process created by [state law] that it [was] constitutionally impermissible . . . ." *Barclay,* 463 U.S. at 956.  And it did not do so here. As Ohio's high court observed in *DePew*, admitting all the evidence from the guilt phase of Mack's trial in the sentencing phase, while "appear[ing] to permit repetition of much or all that occurred during the guilt stage," 38 Ohio St. 3d  at 282-83, directly related to the statutory aggravating circumstance for which Mack was convicted:  that "[t]he offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit . . . aggravated robbery . . . and . . .

178

the offender was the principal offender in the commission of the aggravated murder . . . ."

Ohio Rev. Code § 2929.04(A)(7).  This kind of repetition was not unduly prejudicial and

did not "so infect the balancing process created by [state law] that it [was] constitutionally

impermissible . . . ."  *Barclay*, 463 U.S. at 956.  This claim also fails.

## X.      Sixteenth Ground for Relief:  *Prosecutorial Misconduct*

Mack alleges for his sixteenth ground for relief that prosecutors rendered his trial

fundamentally unfair through the following improper conduct:  (1) vouching for State

witnesses; (2) shifting the burden of proof; (3) commenting on Mack's post-*Miranda*

silence; (4) commenting on Mack's unsworn statement; (5) misrepresenting aggravating

circumstances; (6) commenting on Mack's alleged lack of remorse; (7) commenting on

society's need for vengeance; (8) thwarting defense counsel's admission of mitigation

evidence and closing argument; (9) arguing that the sentencing verdict was only a

recommendation; (10) introducing victim-impact evidence in closing argument; and (11)

introducing all of the guilt-phase evidence into sentencing.  (Doc. 155 at 148-55.)

Respondent contends this ground is partially procedurally defaulted and meritless.  (Doc.

158 at 85-90.)

### A.      Procedural Posture

Respondent concedes that Mack raised sub-claims (3), (4), and (5), as listed above,

in state courts on direct appeal, where they were decided on the merits, and they are

preserved for habeas review.  She argues that sub-claims (1), (2), and (6) through (11),

however, are procedurally defaulted because they were never raised on direct appeal and

Mack is now precluded from doing so.  (Doc. 158 at 86-89.)

179

Mack correctly counters that he did in fact raise sub-claims (6) and (10) in state courts on direct appeal, where they were adjudicated on the merits, and they are therefore preserved for review.  (Doc. 162 at 202.)  Sub-claims (7) through (9) and (11), he asserts, were raised in state courts as the underlying grounds for appellate-counsel ineffective-assistance claims in an application to reopen the direct appeal under Ohio Appellate Rule 26(B).  (*Id*. at 203.)  As the court discussed in relation to Mack's first and second grounds for relief, this argument is meritless.  Mack never presented these independent claims in state court, and because he no longer can do so, they are procedurally defaulted.  Moreover, as shown below, Mack has not demonstrated cause and prejudice based on the ineffective assistance of counsel or his actual innocence to excuse the defaults.  Sub-claims (1), (2), and (7) through (9) and (11), therefore, are procedurally defaulted.

### B.      Merits Analysis

Alternatively, each of these claims also lacks merit.  The Supreme Court established the test for claims of prosecutorial misconduct in *Darden v. Wainwright*, 477 U.S. 168 (1986):  "The relevant question is whether the prosecutors' [conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  The Court emphasized that "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"  *Id.* (quoting *Donnelly*, 416 U.S. at 642); *see also Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) ("We do not possess supervisory powers over state court trials.");  *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979) ("[I]t is the responsibility of the [state courts] to

180

police their prosecutors; we have no such authority."). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct," therefore, "is the fairness of the trial, not the culpability of the prosecutor." *Phillips*, 455 U.S. at 219.

The *Darden* standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations' . . . ." *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (rejecting the Sixth Circuit's multi-step test for prosecutorial misconduct). As the Supreme Court advised decades ago,

> In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

*Johnson v. United States*, 318 U.S. 189, 202 (1943) (Frankfurter, J., concurring).

To determine whether a prosecutor's improper comment was sufficiently flagrant to warrant reversal, courts consider: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). "'The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments.'" *Wogenstahl v. Mitchell*, 668 F.3d 307, 329 (6th Cir. 2012) (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)). Whether the prosecution's closing argument is improper depends on the

circumstances of the case and "what the defense has said or done (or likely will say or do)."

*Id*.  The Supreme Court has cautioned,

> [A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

*United States v. Young*, 470 U.S. 1, 11 (1985).

*Darden* itself concerned comments the prosecution made in closing argument.  The Court found some of the comments at issue "undoubtedly were improper."  *Darden*, 477 U.S. at 180.  Some implied that the death penalty would be the only guarantee against a future similar act; others incorporated the defense's use of the word "animal"; and several were offensive, reflecting an emotional reaction to the case.  *Id*.  But the Court concluded that in the broader context of the trial, the prosecutorial statements complained of did not deprive the petitioner of a fair trial.  *Id*. at 181-83.  It noted that the prosecutor's closing argument "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent."  *Id*. at 182.  Also, "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense."  *Id*.  The trial court also instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and the arguments of counsel were not evidence.  *Id*.  And the weight of the evidence against the petitioner was "heavy," the Court observed, including "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," which "reduced the likelihood that the jury's decision was influenced by argument."  *Id*. (internal quotation marks and citations omitted).

182

Prosecutorial misconduct may not warrant reversal of a sentence or verdict if the reviewing court finds that the comment amounted to harmless error beyond a reasonable doubt.  *See Lundgren v. Mitchell*, 440 F.3d 754, 780 (6th Cir. 2006) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).  Courts assess the prejudicial impact of prosecutorial misconduct under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *Moore v. Mitchell*, 708 F.3d 760, 799 (6th Cir. 2013) (citing *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007)).

### 1.  Improper vouching for State witnesses

Mack's initial claim of prosecutorial misconduct is that the prosecutor improperly bolstered the testimony of two State witnesses.  (Doc. 148-49.)  The court reviews this claim *de novo* as Mack never raised it in state courts.

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor] behind that witness."  *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).  It generally involves either "blunt comments," such as remarks asserting a belief in a witness' credibility, or comments that "imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony," such as argument that a witness testifying under a plea agreement was in jeopardy if the court or government did not find the testimony truthful.  *Id*. (citing *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992); *United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir. 1994)).

Mack first argues that the prosecutor improperly bolstered the testimony of the

183

State's ballistics expert, Detective Thomas Lucey, who opined that, based on his tests and examinations, the gun found on Mack at the time of his arrest fired the bullet that was recovered from Mr. Sanelli's clothing and three spent shell casings recovered at the murder scene.  Mack contends the prosecutors vouched for Lucey's credibility "with argument that . . . the defense expert corroborated his testimony . . . [and] other 'experts' in his lab corroborated his work."  (Doc. 155 at 148 (citing Doc. 150-3 (Trial Tr.) at 29-30, 40).)  The defense ballistics expert and Lucey's colleagues did not testify at trial.  The record, however, does not bear this out.

On direct examination, the prosecutor twice properly elicited Lucey's testimony about standard procedures in Lucey's lab, one of which was "to have two or three or even more individuals view [each scientist's] findings."  (Doc. 150-3 (Trial Tr.) at 40 (Lucey Test.).)  The prosecutor made no improper "argument" about Lucy's colleagues reviewing his work; an expert's methodology is an appropriate and permissible area of inquiry.

Mack's allegations of three instances where prosecutors vouched for Lucey's testimony through questioning or argument regarding the defense's ballistics expert also fail.  While questioning Lucey on recross-examination, defense counsel asked Lucey if an opinion was his own or his supervisor's.  (*Id*. at 59.)  Lucey responded that it was "[b]oth of [their] opinions, and also the outside expert that examined the bullets."  (*Id*.)  Then, on redirect examination, the prosecutor asked Lucey if the "outside expert" he had just mentioned worked on the State's behalf.  (*Id*. at 61.)  Defense counsel promptly objected and the court sustained the objection; Lucey did not answer.  (*Id*.)  In closing argument, Prosecutor Ghazoul stated:

184

Mr. Ghazoul:  And, ladies and gentlemen, Mr. Mancino made or placed a lot of questions in front of Detective Lucey regarding his testing. But the test results are uncontroverted. You didn't see anybody else getting up there saying they weren't.

Mr. Mancino:  Objection.

The Court:     Overruled.

Mr. Ghazoul:  The outside expert wasn't hired by the State.

Mr. Mancino:  Objection.

The Court:     Objection sustained

(Doc. 150-4 (Trial Tr.) at 189.)   And on rebuttal closing, Prosecutor Bombik argued:

Mr. Bombik:   . . . And let me tell you one thing right now, ladies and gentlemen, in a case like this, in any criminal case where there is physical evidence, Mr. Mancino has an opportunity to have any expert in the world if he chooses to examine this gun.

Mr. Mancino:  Objection.

Mr. Bombik:   And these findings, he has got that right –

The Court:     Overruled.

(*Id*. at 272-73.)  The court also instructed the jury before its deliberations to disregard any question to which the court had sustained an objection.  (Doc. 150-5 (Trial Tr.) at 7-8.)

Even if these comments constituted improper vouching because they signaled that the defense either had a ballistics expert who agreed with Lucey or failed to obtain one who did not, they were not so flagrant as to rise to the level of a due process violation.  The comments were few and isolated, and they did not prejudice Mack, as two of the three drew immediate objections, which the court sustained and later instructed the jury to disregard. *See Greer v. Miller*, 483 U.S. 756, 766 (1987) ("The sequence of events in this case—a

185

single question, an immediate objection, and two curative instructions—clearly indicates that the prosecutor's improper question did not violate [the petitioner's] due process rights.") (footnote omitted); *Puertas v. Overton*, 168 Fed. Appx. 689, 701-02 (6th Cir. 2006) ("Any prejudice, moreover, was cured when the trial court sustained [an] objection to the comments and instructed the jury not to consider them in reaching its verdict."); *United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001) ("Ordinarily, a court should not overturn a criminal conviction on the basis of a prosecutor's comments alone, especially where the district court has given the jury an instruction that may cure the error. As a general matter, juries are presumed to understand and follow directions from the court.") (internal citations omitted).

Mack also contends the prosecutor improperly bolstered the testimony of Timothy Willis, the State's key witness, by stating in his closing argument that while in prison for a pending criminal matter, Willis was contacted by defense investigators and told them "he didn't want to say anything at that time." (Doc. 155 at 149 (quoting Doc. 150-4 (Trial Tr.) at 195).) Mack argues this was improper because prosecutors knew this was not true due to Carole Mancino's proffered, but excluded, testimony recounting new and conflicting information Willis provided to her regarding Mr. Sanelli's murder. (*Id.* (citing Doc. 150-4 (Trial Tr.) at 122-26).) The prosecutor's remark to the jury, however, accurately reflected Willis' trial testimony. Willis acknowledged on cross-examination that he spoke to the defense investigators and told them a few things, but "didn't say nothing pertaining to the situation that I told on these boys. See, I'm trying to protect myself. I'm in jail here. I didn't tell her nothing that would make her believe that I said something about these boys'

case.  I didn't want her to know nothing."  (Doc. 150-3 (Trial Tr.) at 145-50 (Willis Test.).)

And that testimony did not necessarily contradict what Carole Mancino told the judge

Willis said to her in the defense's proffer of her testimony.  (Doc. 150-4 (Trial Tr.) at 123-

26.)  As the prosecutor explained in opposing Carole Mancino's proffered testimony,

Willis' testimony that he would not "say anything" to the defense investigators was not

untrue; what Willis said was that he may have been willing to tell Carole Mancino some

things he knew about the events surrounding the murder, but he would not further implicate

Mack or his co-defendants while he was in the same prison with them, which he did not do.

(*Id*. at 126-27.)  The prosecutor included this portion of Willis' testimony in his closing

argument in the context of explaining how Willis' involvement in the case evolved from

being an anonymous source to a cooperating witness.  This was not improper vouching.

This claim, therefore, lacks merit.

### 2. Shifting the burden of proof

Mack next asserts that the prosecutor improperly shifted the burden of proof to him

by stating in his closing argument that "now the defense has to try and fill these holes, all

these holes in this, in their case."  (Doc. 155 at 149 (quoting Doc. 150-4 (Trial Tr.) at 197).)

Even if this claim were not procedurally defaulted, it would fail.  This isolated remark did

not suggest that it was Mack's burden to prove his innocence.  "[A] prosecutor is allowed –

indeed, expected – to argue reasonable inferences from the evidence and to point out

inconsistencies or holes in the defense."  *Jeffries v. Burton*, 715 Fed. Appx. 490, 492-93

(6th Cir. 2017) (citing *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005)).  This was

permissible comment.

187

### 3.    Commenting on Mack's post-*Miranda* silence

Mack also claims that the prosecutor made improper comments during his closing argument about his post-*Miranda* silence when he argued that Mack's initial account during the police's post-arrest interrogation of how he obtained the gun that was found in his possession when he was arrested and his alibi changed after the detectives informed him of the results of the ballistics tests and also conflicted with defense witnesses' trial testimony. (Doc. 155 at 149-50 (citing Doc. 150-4 (Trial Tr.) at 285-86).)

The state appellate court on direct review was the last state court to address this claim, reasoning:

> Appellant initially argues the prosecutor committed prejudicial misconduct by commenting on his post-Miranda silence.
>
> Comments by prosecutors on the post-arrest silence or refusal to testify by defendants have always been looked upon with extreme disfavor because they raise an inference of guilt from a defendant's decision to remain silent. *State v. Thompson* (1987), 33 Ohio St.3d 4. Such comments penalize a defendant for choosing to exercise a constitutional right and thus prosecutors must take care not to equate the defendant's silence to guilt. See *State v. Rogers* (1987), 32 Ohio St.3d 70; *Doyle v. Ohio* (1976), 426 U.S. 610.
>
> In the present case, the appellant voluntarily chose not to exercise his constitutional right to remain silent. Herein, the alleged improper comments of the prosecutor did not reflect upon the post-arrest silence of the appellant. The comments were directed at the conflicting nature of appellant's initial statements to police and his subsequent statement after being confronted with the ballistic test results which connected the appellant's gun with Peter Sanelli's murder. We thus find that the prosecutor's comments were proper and did not render appellant's trial fundamentally unfair.

*Mack*, 1993 WL 497052, at *25.  Mack does not address this decision.

As Mack argues, the state may not comment on a defendant's choice to exercise his Fifth Amendment right against self-incrimination to impeach him if the defendant's silence

188

occurred after his arrest and receipt of *Miranda* warnings.  *Doyle v. Ohio*, 426 U.S. 610,

618-19 (1976).  Here, however, as the state court noted, Mack waived his right to remain

silent during his post-arrest interrogations and voluntarily answered many of Detective

Qualey's questions until he eventually requested counsel and the interview ended.  (*See*

Doc. 150-3 (Trial Tr.) at 191-92 (Qualey Test.).)[23]

Moreover, as the state court reasonably determined, the prosecutor's remarks did

not concern Mack's assertion of his right to counsel and silence at all, but accurately

highlighted the inconsistencies between Mack's initial statement to the police about where

and when he obtained the gun and his alibi, his later statement to police about the gun after

learning of the results of the ballistics test, and the trial testimony of his witnesses on those

issues.  After his arrest, Mack initially told the police that he bought the gun the night

before from someone whose name he did not know and was home taking a bath the night of

the murder.  (*Id*. at 193-94.)  Then, after being confronted with the results of the ballistics

tests on his gun that same evening, Mack told them he lent his gun to a man named Dee,

whose address and real name he did not know, "a couple days" before and noticed it had

been fired.  (*Id*. at 196.)  At trial, however, defense witness John Scott testified that Mack

bought the gun from Willis the day after the murder.  (Doc. 150-4 (Trial Tr.) at 8 (Scott

Test.).)  And Demill Blue testified that Mack was at her house the night of the murder.

(Doc. 150-3 (Trial Tr.) at 228-32 (Blue Test.).)  The prosecutor's comments about Mack's

statements to police, therefore, were proper, and this claim lacks merit.

---

[23] For a full discussion of Mack's waiver of his right to remain silent, see the court's
analysis of Mack's seventh ground for relief, concluding that the detectives' post-arrest
interrogation of Mack did not violate his Fifth Amendment privilege against self-incrimination.

### 4.    Commenting on Mack's unsworn statement

Mack further complains that the prosecutor improperly commented on his unsworn statement during his sentencing-phase closing argument, violating Mack's Fifth Amendment right not to testify.  (Doc. 155 at 150.)  Mack chose to make an unsworn statement to the jury during the penalty phase of his trial, as he was entitled to do under Ohio law.  *See* Ohio Rev. Code § 2929.03(D)(1) (permitting a capital defendant to present an unsworn statement during the sentencing phase without being subjected to cross-examination).  Before Mack gave his statement, the trial court advised the jury of his right to do so.  (Doc. 150-5 (Trial Tr.) at 134.)  The prosecutor later commented on Mack's unsworn statement in the following portion of his closing argument:

> Mr. Bombik:  Clarence Mack took the witness stand. And he was the only witness in this whole case who did not have to take an oath.
>
> Mr. Mancino:  Objection.
>
> The Court:  Overruled.
>
> Mr. Bombik:  And he gave you a statement. And he said, "I don't know nothing about it. I don't know nothing about it."
>
> Does he offer you any explanation in his statement as to why two days later he is caught carrying the murder weapon that killed Peter Charles Sanelli?
>
> Does he offer you any explanation in his statement as to why he was in the company two days afterwards with Reginald Germany and that Reginald Germany so happened to have the other murder weapon on his person?
>
> Does he offer you any explanation in his statement as to why that little nail was found in his buddy, Tom Sowell's, pocket –
>
> Mr. Mancino:  Objection.

The Court:  Overruled.

Mr. Bombik:    – two days after the murder of Peter Charles Sanelli, Sr.? And why that nail was remarkably similar in size to the nails that were found in Mr. Sanelli's car?

Does he offer you any explanation as to why in his house in January, with a dated receipt January 3rd is a holster package which matches up as identical to the make, size and brand of the holster he was carrying two days after the murder?

Does he offer you any explanation whatsoever? And he's in a perfect position to give you that explanation.

"I know nothing about it."

(*Id.* at 165-66.)

Mack raised this claim on direct review in state courts, which adjudicated it on the merits.  The state appellate court, the last state court to address the claim, decided:

Appellant next argues that the prosecutor committed prejudicial misconduct by improperly commenting on the unsworn nature of his statement made during the penalty phase of his trial. Specifically, appellant objects to the prosecutor's comments that the appellant did not offer any explanation as to why he was found in the company of others who also possessed weapons involved in the fatal shooting.

In the penalty phase of a capital trial, a prosecutor may only make limited remarks concerning the defendant's unsworn statement. The prosecution may comment that the defendant's statement has not been made under oath or affirmation. However, in so commenting, the prosecution must carefully tailor its remarks so as only to remind the jury that the defendant's statements, in contrast to the testimony of all other witnesses, was not made under oath. *State v. Durr* (1991), 58 Ohio St.3d 86, 94-95, citing *State v. DePew* (1988), 38 Ohio St.3d 275.

The prosecutor's statement does violate the *DePew* standard as it improperly comments on the appellant's unsworn statement. However, in light of the overwhelming nature of the aggravating circumstance compared to the mitigating factors, we find the prosecutor's remark was harmless and did not rise to a level sufficient to warrant a reversal.

191

*Mack*, 1993 WL 497052, at *27.  Again, Mack does not address this decision and how it violates AEDPA's § 2254(d).

A prosecutor's comment about a criminal defendant's failure to testify violates the Fifth Amendment privilege against compelled self-incrimination.  *Griffin v. California*, 380 U.S. 609, 614 (1965); *see also Lundgren*, 440 F.3d at 780 ("A prosecutor's comment on a defendant's silence is improper and may rise to the level of prosecutorial misconduct requiring reversal on appellate review.").  In Ohio, if a defendant chooses to make an unsworn statement, the prosecution "may remind[] the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses."  *DePew v. Anderson,* 311 F.3d 742, 745 (6th Cir. 2002) (internal quotation marks and citation omitted).  But it "may go no further and may not disparage the defendant's decision not to testify under oath."  *Bedford*, 567 F.3d at 236.  It may not comment "extensively" on the issue.  *Moore*, 708 F.3d at 799.

This court agrees with state appellate court that the prosecutor's extended argument regarding Mack's unsworn statement constituted impermissible comment on Mack's assertion of his right to refrain from testifying.  Rather than limiting his remarks to Mack's choice to make an unsworn statement, the prosecutor's series of rhetorical questions "arguably invit[ed] the jury to draw an adverse inference from the fact that [Mack] never testified under oath at all."  *Bedford*, 567 F.3d at 236; *see also Moore*, 708 F.3d at 800 (finding prosecutor's rhetorical question about why the petitioner did not explain an aspect of his criminal conduct "drew attention to [his] choice not to testify under oath and may have encroached upon [his] Fifth Amendment right not to testify against himself").

Nonetheless, as the state court reasonably concluded, the prosecutor's remarks did not have a substantial and injurious effect upon the jury's sentence.  Given the judge's admonition to the jury regarding Mack's right to present an unsworn statement, the remarks did not tend to mislead the jury.  Nor did the comments address the aggravating circumstances or mitigating factors.  *See Moore*, 708 F.3d at 800.  Finally, the state court reasonably relied on its reweighing of the aggravating circumstances and mitigating factors to eliminate the potential for prejudice.  *See id.*; *Bedford*, 567 F.3d at 236; *Lundgren*, 440 F.3d at 781-83.

The state appellate court, therefore, did not contravene or misapply clearly established Supreme Court precedent in rejecting this claim.

### 5. Misrepresenting aggravating circumstances; and commenting on Mack's alleged lack of remorse

Mack further contends that, in its closing argument in the penalty phase of trial, the prosecution improperly misrepresented the aggravating circumstances by:  referring to the nature of the murder as aggravating circumstances, including the number of times Mr. Sanelli was shot; using the term "aggravating circumstances" in the plural when there was just one; and commenting on Mack's alleged lack of remorse.  (Doc. 155 at 150-52, 154 (citing Doc. 150-5 (Trial Tr.) at 72, 139, 143, 144-45, 147, 163, 167).)

Mack raised this claim in state court on direct appeal, and the state appellate court, the last court to address the claim, reasoned:

> Appellant next argues that the prosecutor committed prejudicial misconduct when he argued that the nature and circumstances of the offense were aggravating circumstances and also commented on appellant's lack of remorse. Specifically, appellant contends the following comments by the prosecutor denied him a fair trial:

Aggravating circumstances, I would hope they are clearer now, you can define what they are now. Look at some of the examples in this case.

Peter Charles Sanelli, shot, not once * * * not twice, but three times with the use of a firearm, a gun. He could have been ordered from that car. He could have been given a chance to abandon the 1987 Plymouth Horizon. * * *

Peter Charles Sanelli, left to die in the cold in the snow. And the laughing afterwards of Clarence Mack. Peter Charles Sanelli was not important to Clarence Mack.

This was senseless * * * It was brutal. It was revolting. * * *

In *State v. Jackson* (1991), 57 Ohio St.3d 29, 39, the Supreme Court of Ohio concluded that defendant was not denied a fair trial despite the prosecutor's improper remarks on the defendant's lack of remorse and the assertion that the nature and circumstances of the offense were aggravating circumstances. In so holding the court noted that the trial judge correctly instructed the jury on the aggravating circumstance and that only one existed. *Id*. at 40.

Similarly, in the present case, the trial judge correctly instructed the jury on the aggravating circumstance and that only one existed. We thus find that the prosecutor's argument when viewed in its entirety did not deny appellant a fair trial.

*Mack*, 1993 WL 497052, at *26.  Mack does not address this decision.

Even assuming the challenged remarks of the prosecutor about aggravating circumstances and Mack's apparent lack of remorse were improper, the state court reasonably found that the comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted).  The remarks did not tend to mislead the jury or unduly prejudice Mack. *See Wickline v. Mitchell*, 319 F.3d 813, 823-24 (6th Cir. 2003) (finding prosecutor's comments about nonstatutory aggravating circumstances and the petitioner's lack of remorse, even if improper, did not rise to the level of prosecutorial misconduct because they did not mislead the sentencer or prejudice the petitioner). They

194

also did not constitute overly heated rhetoric that might have "result[ed] in inflamed passions" against Mack. *Darden*, 477 U.S. at 182. Finally, the trial court instructed the jury on just one aggravating circumstance (Doc. 150-5 (Trial Tr.) at 174-75), and defense counsel addressed the inaccuracy of the prosecutor's comments in his closing argument (*id.* at 149). *See Jackson v. Anderson*, 141 F. Supp. 2d 811, 870 (N.D. Ohio 2001) (Economus, J.) (finding no due process violation where, as here, prosecutor referred to aggravating "circumstances" although only one aggravating circumstance existed, remarked on petitioner's lack of compassion and remorse, and asserted that the nature and circumstances of the offense were "what really warrants the death penalty," but trial judge correctly instructed the jury on the one aggravating circumstance).

The state court's decision, therefore, did not contravene or misapply Supreme Court precedent.

### 6. Introducing all of the guilt-phase evidence into sentencing and preventing defense counsel's admission of mitigation evidence and closing argument

Mack also claims that the prosecution violated his due process rights during the sentencing phase of his trial by introducing all of the guilt-phase evidence and preventing defense counsel's admission of mitigation evidence and closing argument. (Doc. 155 at 151-52.) This court already has found on *de novo* review, in considering Mack's fifteenth ground for relief, that the trial court did not err in allowing all of the State's guilt-phase evidence into sentencing and in not permitting defense counsel's admission of certain mitigation evidence and closing argument. Accordingly, it finds no constitutionally impermissible prosecutorial conduct based on the same State actions.

### 7.    Commenting on society's need for vengeance as an aggravating circumstance

Mack further contends that the prosecution improperly "argued that society's need for vengeance was an aggravating circumstance." (Doc. 155 at 151.)  He cites the prosecutor's remark, for example, that the death penalty "reflects a limit that the State, the people of Ohio, our society will tolerate to a certain degree, past that degree, the toleration ends." (Doc. 150-5 (Trial Tr.) at 144.)  In another instance, Mack complains, the prosecutor said of Ohio's death penalty, "And basically what they're saying is that there comes a point in time when society becomes fed up, completely fed up with certain behavior." (*Id*. at 163.)  And the prosecutor exhorted the jury to "express the conscience of the community" in rendering its sentence.  (*Id*. at 168.)  Mack never presented this claim to state courts, so the court reviews it *de novo.*

These comments did not rise to the level of prosecutorial misconduct. The prosecutor was not suggesting that society's need for vengeance was an aggravating circumstance, as Mack argues.  Rather, he was expounding on the purpose of the death penalty and urging the jury to find that the aggravating circumstance in the case called for that harshest of society's punishments.  As the Sixth Circuit has observed in rejecting a similar claim, "When considered in context, these statements are general background information on the death penalty and the need to punish guilty people, rather than an impassioned command that the jurors must recommend death based on some amorphous societal obligation." *Beuke v. Houk*, 537 F.3d 618, 647 (6th Cir. 2008); *see also Byrd*, 209 F.3d at 538-39 (noting that the prosecutor's comments about the death penalty were not necessarily improper because he did not "ask the jury to send a message to other potential

196

murderers or robbers," rather he discussed "the purpose of capital punishment as a way of arguing that the jury should find that these purposes would be served by imposing the death penalty on [p]etitioner"); *Hicks v. Collins*, 384 F.3d 204, 219 (6th Cir. 2004) (acknowledging that a prosecutor may properly make "general references to the societal need to punish guilty people"). Indeed, "[n]othing prevents the government from appealing to the jurors' sense of justice." *Bedford*, 567 F.3d at 234 (citing *Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998)). Also, the trial court instructed the jurors to "make [their] findings with intelligence and impartiality and without bias, sympathy or prejudice" (Doc. 150-5 (Trial Tr.) at 32), and that counsel's arguments were not evidence (*id*. at 7). "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and there is no reason to believe that the jury did not follow those admonitions. This claim lacks merit.

### 8. Arguing that the sentencing verdict was only a recommendation

Mack next argues that the prosecutor "improperly misled the jury and minimized the jury's sense of duty by arguing that the sentencing verdict was only a recommendation." (Doc. 155 at 153.) The court reviews this claim *de novo,* as Mack never presented it to state courts. However, Mack raised this same claim in relation to the trial court's sentencing jury instructions in his thirteenth ground for relief, and the claim fails for the reasons already discussed.

### 9. Introducing victim-impact evidence in closing argument

Finally, Mack contends that the prosecutor improperly presented victim-impact evidence in his closing argument. (Doc. 155 at 153-54.) Mack raised this claim on direct

appeal in state courts.  The last state court to address the claims' merits, the state appellate

court, decided:

> Appellant next argues that the prosecutor committed prejudicial misconduct by
> introducing victim impact evidence in closing argument during the penalty
> phase of trial. Specifically, appellant contends statements by the prosecutor that
> Peter Sanelli was shot "not once, not twice, but three times" and that he could
> have been ordered out of the car, but was not given the chance (Tr. 1288) and
> that there was much more to Peter Sanelli "other than a name" (Tr. 1290)
> constitutes improper victim impact statements by the prosecutor.
>
> In *Booth v. Maryland* (1987), 482 U.S. 496, the United States Supreme Court
> held unconstitutional the introduction of victim impact evidence during the
> sentencing phase of a capital trial. The court found that victim impact evidence
> included the emotional trauma suffered by the victim's family and personal
> characteristics of the victim. In *State v. Post* (1987), 32 Ohio St.3d 380, the
> Ohio Supreme Court noted that while the Ohio General Assembly did not
> specifically prohibit the use of victim impact statements, it would follow the
> Supreme Court's mandate in Booth. Moreover, in *State v. Williams* (1988), 38
> Ohio St.3d 346, it was held that such evidence is admissible if offered to
> establish facts relevant to the crime.
>
> In *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, the United States
> Supreme Court overruled *Booth* and permitted the use of victim impact
> evidence in some situations. In *State v. Evans* (1992), 63 Ohio St.3d 231, 238,
> the Ohio Supreme Court recently acknowledged Payne and held that victim
> impact statements were "no longer precluded per se."
>
> We find that the challenged remark of the prosecutor does not constitute a
> victim impact statement as it is only a recitation of the facts brought out during
> trial. We further find that the prosecutor's comments in this case fall within the
> prescribed limits of *Payne* and *Evans*.

*Mack*, 1993 WL 497052, at *26.  Mack does not address this decision.

As the state court explained, while the Supreme Court's decision in *Payne v.*

*Tennessee*, 501 U.S. 808 (1991), removed any *per se* constitutional bar to a prosecutor's

use of victim-impact evidence, it recognized that where "evidence is introduced that is so

unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause . . .

198

provides a mechanism for relief." *Id.* at 825 (citing *Darden*, 477 U.S. at 179-83).

"[E]xcessive or prejudicial references to victim-impact evidence might 'so infect[ ] the trial

with unfairness as to make the resulting conviction a denial of due process.'" *Beuke*, 537

F.3d at 648 n.9 (citations omitted).  The Sixth Circuit has rejected a habeas petitioner's

prosecutorial-misconduct claim based on the prosecutor's introduction of victim-impact

evidence during the guilt-phase closing argument, where, even if improper, the remarks

were "relatively isolated, were not extensive, and were only a small part of a closing

argument that focused heavily on summarizing the evidence presented at trial." *Byrd*, 209

F.3d at 532.  The court also noted in that case that the trial court instructed the jury that the

closing arguments were not evidence, and the prosecutor began his closing argument by

asking the jurors to bear that in mind.  *Id*. at 533.  And in another case, the circuit court

found testimony about a victim's children was not constitutionally improper, as it was

"minimal and largely insignificant" at less that one-half page of transcript testimony and

"not inflammatory." *Beuke*, 537 F.3d at 640.

 Here, too, the prosecutor's challenged remarks were isolated – accounting for less

than one page of the transcript – relatively insignificant, and not inflammatory.  The

comments, therefore, cannot be said to have "rendered the entire trial fundamentally

unfair." *Byrd*, 209 F.3d at 533 (internal quotation marks and citation omitted).  The Ohio

court of appeals reasonably found no due process violation with regard to these comments,

and its decision neither contravened nor misapplied Supreme Court precedent.

   **10.**  **Cumulative impact**

 Finally, Mack asserts that the cumulative effect of this alleged misconduct rendered

his trial unfair.  (Doc. 155 at 154-55.)  The "cumulative effect" of multiple acts of misconduct may be considered.  *See Berger v. United States,* 295 U.S. 78, 89 (1935).  However, courts must consider the impropriety or effect of a prosecutor's conduct at trial in the broader context in which the prosecutor's conduct took place.  *Darden,* 477 U.S. at 182.

Viewing all of Mack's allegations of prosecutorial misconduct cumulatively and in the context of the entire trial, his claims do not entitle him to habeas relief.  There are few instances of improper conduct among these claims, and even when those that verge on improper are viewed cumulatively, Mack has failed to demonstrate that the misconduct was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial . . . ."  *Beuke*, 537 F.3d at 656 (internal quotation marks and citation omitted).  As the Supreme Court has long held, "[a litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials."  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (internal quotation marks and citations omitted).  This claim, too, is denied.

**XI.  Fourth, Seventeenth, and Eighteenth Grounds for Relief:  *Ineffective Assistance of Trial Counsel***

Mack claims that he received constitutionally ineffective assistance of trial counsel in his fourth, seventeenth, and eighteenth grounds for relief.  (Doc. 155 at 60-65; 155-89.)  Specifically, he alleges that his trial counsel failed to:  (1) question potential jurors about race and capital punishment during *voir dire*; (2) investigate and pursue arguments and evidence that Mack was not the principal offender in the guilt phase of trial; (3) lodge timely and relevant objections to (a) Willis' testimony regarding his fear of Mack and his co-defendants, (b) the trial court's reasonable-doubt jury instruction, and (c) the court's verdict-as-recommendation jury instruction; (4) protect Mack's right to be present at the

jury view; (5) act as counsel (Carole Mancino); (6) lay a proper foundation to impeach
Willis and ensure that Carole Mancino testified; (7) obtain an independent ballistics test;
(8) conduct a reasonable investigation into the State's case in chief during the guilt phase of
trial by (a) investigating and calling five witnesses to testify, (b) obtaining the statements of
State witnesses Timothy Willis and William Lekas, and (c) discovering that the Fairfax
Recreational Center was closed on the day of the murder; (9) conduct a sufficient
investigation of mitigation evidence; and (10) argue that Mack was not the principal
offender in the sentencing phase of trial.[24]  Respondent argues these claims are either
procedurally defaulted or meritless.  (Doc. 158 at 54-56, 90-101.)

### A.    Procedural Posture

#### 1.    Sub-claims (3)(b), (5), and (6)

Respondent concedes that Mack raised sub-claims (3)(b), (5), and (6), as listed
above, in state courts, and those claims are properly preserved for federal habeas review.
(*Id*. at 92, 93 n.4, 94 n.5.)  She asserts that the remaining sub-claims, however, are
procedurally defaulted.

#### 2.    Sub-claims (1), (3)(a), (3)(c), (4), 8(b), and 8(c)

Respondent correctly asserts that Mack sub-claims (1), (3)(a), (3)(c), (4), 8(b), and
8(c), as listed above, are procedurally defaulted.  (*Id*. at 54-55, 74-75, 97.)  Although Mack
raised these claims as underlying grounds for appellate-counsel ineffective-assistance

---

[24] Mack's fourth ground for relief relates to trial counsel's performance during the *voir dire*
phase of trial (sub-claim 1); his seventeenth ground for relief, during the guilt phase of trial (sub-
claims 2 through 8); and his eighteenth ground for relief, during the sentencing phase of trial (sub-
claims 9 and 10).

claims in a reopening application under Ohio Appellate Rule 28(B), he never presented them to state courts as independent claims.

### 3.      Sub-claims (7) and (8)(a)

Respondent further contends that sub-claims (7) and (8)(a), as listed above, are procedurally defaulted, because the state appellate court on initial post-conviction review, the last state court to consider these ineffective-assistance claims, found them barred under the *res judicata* doctrine, even though it conducted an alternative merits review of the claims.  (*Id.* at 95-96.)  Indeed, federal habeas courts may not review claims to which a state court has explicitly invoked a state procedural bar, even if it did so as an alternative basis for its decision.  *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

Mack counters, however, that, as Respondent conceded in her original return of writ, these sub-claims are preserved for habeas review because the state court did not assert a *res judicata* bar to them but conducted a merits review of them.  (Doc. 162 at 226 (citing Doc. 26 at 189-90).)[25]  This court agrees.

Federal habeas courts presume there is no independent and adequate state procedural ground to bar AEDPA review of a state-court decision when the decision

---

[25]  The court notes that the state appellate court found that Mack did "not aver that trial counsel failed to find or interview most of the[] witnesses [at issue], but instead contend[ed] that they should have been called to testify at trial."  *Mack*, 2000 WL 1594117, at *4.  A review of the state-court pleadings, however, demonstrates that Mack fairly presented his claim that counsel failed both to investigate and present these witnesses.  (*See* Doc. 149-5 (First Post-Conviction App. Brf.) at 125 (alleging that the evidence the witnesses at issue would have presented was "available to counsel at the time of trial . . . [but] was not introduced"), and 126 ("Had counsel properly investigated the phone call from Mr. Payne and the information from Mr. Carrington, other evidence would have been introduced to offset that deficiency.").

202

"'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'"  *Coleman v. Thompson*, 501 U.S. 722, 735 (1991) (quoting *Michigan v. Long,* 463 U.S. 1032, 1040-41 (1983)); *see also Gulertekin v, Tinnelman-Cooper*, 340 F.3d 415, 422-23 (6th Cir. 2003) ("a state court invoking a state procedural bar must provide a 'clear and express' statement to that effect (the 'plain statement' rule)").  Here, the state appellate court in Mack's initial post-conviction proceedings found two of Mack's four ineffective-assistance claims barred by *res judicata* because they could have been raised on direct appeal.  *See Mack*, 2000 WL 1594117, at *3.  The court then proceeded to examine the evidence and merits of the two remaining claims, sub-claims (7) and (8)(a) .  *Id*. at *3-5.  In its analysis, the court cited an Ohio Supreme Court case as authority for the standard for claims of ineffective assistance of counsel, *State v. Bradley*, 42 Ohio St. 3d 136 (Ohio 1989), but that decision in turn adopted the governing federal law, *see id.*, paragraph two of the syllabus.  Therefore, because the state court did not clearly invoke the *res judicata* bar to Mack's ineffective-assistance sub-claims (7) and (8)(a) and applied federal law to those claims, the "plain statement" rule governs, and the court's examination of those claims was an adjudication on the merits for purposes of triggering AEDPA review.

### 4.     Sub-claims (2), (9), and (10)

Lastly, Respondent correctly argues that Mack has defaulted sub-claims (2), (9), and (10), as the state courts found them barred by *res judicata* and untimely under Ohio's post-conviction statute when he raised them in his second post-conviction petition.  (*Id*. at 91,

98-99.)  *See Mack*, 2018 WL 565704, at *6.[26]

### 5.    Cause and prejudice

Mack argues that any default of his ineffective-assistance claims should be excused

for cause due to the ineffective assistance of his post-conviction counsel.  (Doc. 162 at 116-

17, 220-22, 240-42.)  Respondent does not address this argument.

Defendants have no constitutional right to an attorney in state post-conviction

proceedings, and an attorney's negligence in those proceedings, therefore, generally cannot

establish cause to excuse a habeas petitioner's procedural default of claims in state court.

*Coleman*, 501 U.S. at 756-57; *see also* 28 U.S.C. § 2254(i).  In *Martinez v. Ryan*, 566 U.S.

1 (2012), however, the Supreme Court held that the "[i]nadequate  assistance of counsel at

initial-review collateral proceedings may establish cause for a prisoner's procedural default

of a claim of ineffective assistance at trial."  *Id*. at 9.  And in *Trevino v. Thaler*, 569 U.S.

413 (2013), the Court elaborated on and expanded the *Martinez* exception.  It held that

federal habeas courts may find cause to excuse a petitioner's procedural default where:  (1)

the claim of ineffective assistance of counsel claim was "substantial"; (2) the "cause"

---

[26] Mack counters that any procedural bar based on Ohio's post-conviction statute is neither an adequate nor independent rule upon which to foreclose federal habeas review.  (Doc. 162 at 212-20.)  The state appellate court also premised his procedural default of these claims, however, on Ohio's *res judicata* doctrine, which the Sixth Circuit long has recognized as a valid basis for barring federal review of habeas claims.  *See, e.g., Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006).  This court, therefore, need not reach the issue of whether Ohio's post-conviction statute is an "adequate and independent" rule for purposes of procedural default of federal habeas claims.  In addition, Mack adds to this claim that counsel were ineffective for failing to obtain the statements of Timothy Willis and William Lekas, and discovering that the Fairfax Recreational Center was closed on the day of the murder, contradicting Willis' testimony.  (Doc. 155 at 168-69.)  Respondent correctly notes that Mack never raised these claims in state court (Doc. 158 at 97), and they, too, are therefore procedurally defaulted.

consists of there being "no counsel" or "ineffective" counsel during the state collateral-review proceeding; (3) the state collateral-review proceeding was the "initial review of the petitioner's ineffective-assistance-of-trial-counsel claim; and (4) state law requires that the ineffective-assistance-of-trial-counsel claim be raised in the initial review post-conviction proceedings. *Trevino,* 569 U.S. at 423. But the Court modified the fourth requirement so that *Martinez* would apply in Texas, where state criminal procedure "on its face appears to permit (but does not require) the defendant to raise the claim [of ineffective assistance of trial counsel] on *direct appeal*." *Id.* (emphasis in original).

The Sixth Circuit has held that *Martinez* does not apply in Ohio because the state permits ineffective-assistance-of-trial-counsel claims on direct appeal, and, until recently, had questioned whether *Trevino* applies to Ohio prisoners. *Williams v. Mitchell*, 792 F.3d 606, 615 (6th Cir. 2015); *see also Hill v. Mitchell*, 842 F.3d 910, 937 (6th Cir. 2016) ("We have yet to decide whether *Trevino* applies in Ohio, but we have suggested it may not on multiple occasions.") (collecting cases); *McGuire v. Warden, Chillicothe Corr. Inst.,* 738 F.3d 741, 752 (6th Cir. 2013) (observing that *Trevino*'s application to Ohio cases was neither "obvious nor inevitable" as, "[a]rguably, . . . the review of trial counsel ineffectiveness claims in Ohio is more 'meaningful' than in Texas, because in Ohio there is 'ordinarily' the availability of direct review with constitutionally required counsel, with the back-up of collateral attack where evidence outside the record is required").

In *White v. Warden, Ross Corr. Inst*., 940 F.3d 270 (6th Cir. 2019), however, the circuit court applied the *Martinez/Trevino* exception to excuse the default of an Ohio prisoner's ineffective-assistance-of-trial-counsel claim. In that case, the petitioner's

appellate counsel had advised him that the claim at issue could be adequately addressed on direct appeal, but the appellate court determined that the claim needed factual development beyond the record and suggested it should be raised in post-conviction proceedings.  *Id*. at 273-74.  By the time the appellate court issued its opinion, however, the deadline to file a post-conviction petition had passed, and the prisoner had no post-conviction counsel.  *Id*.  The circuit court held that, under those circumstances, *Trevino* applied to the petitioner's claim, because "[t]he confluence of Ohio's general rule requiring the presentation of ineffective-assistance claims on direct review *unless* the record lacks sufficient evidence, the incorrect advice from [the prisoner's] appellate counsel that his record *did* contain sufficient evidence, and the tight procedural timeline imposed by Ohio's post-conviction-relief statute left [the *pro se* prisoner] without a 'meaningful opportunity' to obtain review of his substantial ineffective-assistance claim."  *Id.* at 278 (citing *Trevino*, 569 U.S. at 428) (emphasis in original).

It is unclear whether *White* applies in Mack's case.  Unlike in *White,* Mack had both appellate and post-conviction counsel in state court and he does not allege that either set of attorneys failed to adhere to the proper procedures for filing his trial counsel ineffective-assistance claims.  In essence, he makes no equitable argument that he was not provided a "meaningful opportunity" to obtain review of his ineffective-assistance claims under Ohio's procedural scheme – the premise of the *Martinez*, *Trevino*, and *White* decisions.  *See Martinez*, 566 U.S. at 14; *Trevino*, 569 U.S. at 428; *White*, 940 F.3d. at 278.  Instead, he claims his appellate and post-conviction counsel were ineffective for failing to raise his defaulted claims at all.  The *Martinez/Trevino* exception, therefore, may not apply here.

206

*See Hale v. Shoop,* No. 1:18-cv-504, 2021 WL 1215793, at *78 (N.D. Ohio Mar. 31, 2021)

(Lioi, J.) (distinguishing *White* and finding it did not apply to Ohio prisoner's claim);

*Statzer v. Marquis*, No. 1:18-cv-626, 2020 WL 1510241, at *15 (S.D. Ohio Mar. 30, 2020)

(Merz, M.J.) (same).  But even if the exception does apply, as the court will explain below,

Mack cannot meet its requirement that the defaulted ineffective-assistance claims were

"substantial."

  Mack also argues that the default should be excused because he is actually innocent

of his sentence, as he was not Mr. Sanelli's "actual killer" and therefore was ineligible for

the death penalty under Ohio law.  (Doc. 155 at 222-24.)  As discussed below in relation to

Mack's independent ground for relief asserting actual innocence, the court rejects that

claim.

  **B.**  **Merits Analysis**

  Although many of Mack's ineffective-assistance claims are procedurally defaulted,

each of the claims also lacks merit.  The Supreme Court has long recognized the Sixth

Amendment right to the effective assistance of counsel at trial as a "bedrock principle in

our justice system."  *Martinez,* 566 U.S. at 12; *see also Gideon v. Wainwright*, 372 U.S.

335, 342-44 (1963).  The Court announced a two-prong test for claims of ineffective

assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  First, the

petitioner must demonstrate that counsel's errors were so egregious that "counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id* at 687.

To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing

court must find that the representation fell "below an objective standard of reasonableness."

*Id.* at 688.  It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors. He or she must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.  If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail.  *Id.*

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'"  *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  It has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id*. (internal quotation marks and citations omitted).  Thus, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ."  *Strickland,* 466 U.S. at 689.  "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment[,]'" recognizing "'the constitutionally protected independence of counsel and . . . the wide

latitude counsel must have in making tactical decisions.'"  *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quoting *Strickland,* 466 U.S. at 689).

The Court further has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so."  *Richter,* 562 U.S. at 105 (internal quotation marks and citations omitted).  It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id*.

### 1.    Conducting *voir dire*

Mack first contends that his trial counsel performed deficiently in conducting *voir dire*, particularly in the superficiality and brevity of their inquiry into potential jurors' attitudes about race and capital punishment.  (Doc. 155 at 60-65.)  Mack acknowledges that his counsel questioned potential jurors about their views of racial matters and the death penalty, but claims they did not ask enough questions or pose questions that were sufficiently probing.  (*See id.* at 62-63.)  Mack never presented this claim to state courts, and the court reviews it *de novo*.

Trial counsel's questioning during *voir dire* is presumed to be a matter of sound trial strategy.  *See, e.g., Keith v. Mitchell*, 455 F.3d 662, 676 (6th Cir. 2006) (noting the "particular deference" owed to counsel's decisions when conducting *voir dire*) (citing *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)); *Stanford v. Parker*, 266 F.3d

209

442, 454 (6th Cir. 2001) ("Stanford presents no evidence to counteract our presumption that his counsel's failure to ask life-qualifying questions during general voir dire constituted trial strategy.").

Mack offers no evidence at all to rebut the presumption that his trial counsel were employing sound trial strategy in their performance during *voir dire*.  This leaves room only for speculation about why counsel did not inquire more into the potential jurors' views on race and the death penalty.  *Stanford*, 266 F.3d at 454.  It is possible, for example, that counsel was concerned such questions would be offensive to potential jurors or unlikely to actually uncover conscious or unconscious bias.  Accordingly, there is no basis for Mack's claim that his counsel were ineffective in failing to question potential jurors about their views on race or capital punishment, and this claim fails.  *See Stojetz v. Ishee*, 892 F.3d 175, 194-95 (6th Cir. 2018) (rejecting petitioner's *per se* ineffective-assistance claim based on trial counsel's failure to ask venire questions about racial attitudes).

### 2. Failure to present principal-offender defense in both guilt and sentencing phases of trial

Mack next argues that his trial counsel should have presented an alternative defense at both the guilt and sentencing phases of trial that he was not the "actual shooter" of Mr. Sanelli and therefore not a "principal offender" under Ohio law, rendering him ineligible for the death penalty.  (Doc. 155 at 155-64.)  This claim, too, is reviewed *de novo*, as it was never adjudicated on the merits in state court.

Mack recounts that evidence introduced at trial showed that one suspect stood next to the driver's side of Mr. Sanelli's car and fired three shots through the window that struck and killed Mr. Sanelli, while a second suspect stood on the passenger's side of the car and

slightly behind Mr. Sanelli and fired several bullets from a different gun, including one that shot through the back passenger-side window but none of which struck Mr. Sanelli.  (*Id.* at 156-57.)  And although Mack acknowledges that he was in possession of the murder weapon when he was arrested, he claims anyone, including the State's key witness, Timothy Willis, or his co-defendant Thomas Sowell, could have gained possession of that gun and used it to murder Mr. Sanelli.  (*Id*. at 158.)  Yet, Mack notes, defense counsel did not investigate, develop or present evidence to establish that he was not the actual shooter at trial, and instead argued only that he was not involved in the murder and was somewhere else when it was committed.  (*Id*.)

“[W]here there is more than one possible defense, and counsel conducts a substantial investigation into the possible defenses, the strategic choice made as a result of the investigation is 'virtually unchallengeable' . . . .”  *Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984) (quoting S*trickland*, 466 U.S. at 690).  Mack's lead counsel, Paul Mancino, testified at the state post-conviction evidentiary hearing that he chose to mount an alibi defense at Mack's trial, arguing that Mack was not at the scene of the crime, and presented witnesses who testified to that.  (Doc. 151-9 (SEH Tr.) at 224.)  He said he did not consider the principal-offender argument because “[w]e wanted to distance [Mack] from involvement in any manner.”  (*Id*. at 237.)  This is a sound strategy, since the evidence adduced at trial showing Mack was not the actual killer was not as compelling as Mack contends and Mack does not identify any new evidence supporting the theory that defense counsel could have, but failed to, discover.  Mack focuses on Willis' testimony that he saw Sowell get out of Mr. Sanelli's car from the driver's side, shaking off pieces of glass, and

heard Sowell tell Mack that he "shot the window" because Mr. Sanelli would not leave the car.  (Doc. 155 at 158-59 (quoting 150-3 (Trial Tr.) at 71-75).)  But this testimony does not prove that Sowell "admitted that he, Sowell, shot Sanelli through the driver-side window," as Mack asserts.  (Doc. 155 at 158-59.)  Both suspects shot through the car's windows, and even if one believes that Willis's testimon that he saw Sowell driving the victim's car after the murder, that does not prove that Sowell was the one who shot the fatal bullets through the driver's-side window.

The principal-offender defense had other weaknesses as well.  As Mancino acknowledged at the state post-conviction hearing, the fact that Mack was arrested with the murder weapon in his possession was "problematic" to a principal-offender line of defense.  (Doc. 151-9 (SEH Tr.) at 225.)  Mancino also agreed that advancing this alternative argument could have undermined his credibility with the jury.  (*Id*. at 224.)  Not to mention, it could have weakened the credibility of his alibi witnesses and of his client, who stated in an unsworn statement to the jury at the sentencing phase of trial that he "wasn't involved in [the murder] and [he] didn't know anything about it."  (Doc. 150-5 (Trial Tr.) at 135.)  Finally, Mancino actually touched on this theory when he argued in his closing argument at the guilt phase of trial that Willis either committed the murder or had someone else commit the murder on his behalf – an argument the jury did not accept.  (Doc. 150-4 (Trial Tr.) at 238-39.)

It was not unreasonable or poor trial strategy, therefore, for defense counsel to fail to consider presenting an alternative defense to a straightforward alibi defense, in which counsel would have had to have argued that:  even if Mack were present at the scene of the

212

murder, and even though he was apprehended with the murder weapon, and even though

both he and Sowell fired at Mr. Sanelli through the car windows, he was not the actual

killer because circumstantial evidence showed that Sowell was closer to the victim and

Mack's shots happened to miss their target.  As the *Strickland* Court noted, "There are

countless ways to provide effective assistance in any given case.  Even the best criminal

defense attorneys would not defend a particular client in the same way." *Strickland*, 466

U.S. at 689.  This claim is meritless.

### 3.  Failure to object

Mack further complains that his trial counsel were ineffective for failing to object

to:  (a) Willis' testimony regarding his fear of Mack and his co-defendants; (b) the trial

court's reasonable-doubt jury instruction; and (c) the court's verdict-as-recommendation

jury instruction.  (Doc. 155 at 164-65.)

The Constitution "does not insure that defense counsel will recognize and raise

every conceivable constitutional claim." *Engle v. Isacc*, 456 U.S. 107, 134 (1982).  In fact,

as the Sixth Circuit has observed,

> in a trial of any size, numerous potentially objectionable events occur. . . .
> [E]xperienced trial counsel learn that objections to each potentially
> objectionable event could actually act to their party's detriment.  Learned
> counsel therefore use objections in a tactical manner.  In light of this, any single
> failure to object usually cannot be said to have been error unless the evidence
> sought is so prejudicial to a client that failure to object essentially defaults the
> case to the state.  Otherwise, defense counsel must so consistently fail to use
> objections, despite numerous and clear reasons for doing so, that counsel's
> failure cannot reasonably have been said to have been part of a trial strategy or
> tactical choice.

*Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006).

*Willis' testimony regarding his fear of Mack and his co-defendants*.  Mack first asserts that his lawyers should have objected to Willis' testimony that, at various stages of the investigation and prosecution of this case, he was afraid of Mack and his co-defendants. (Doc. 155 at 164.)  Even applying *de novo* review, as Mack did not raise this claim in state court, the claim fails.  The fact that a witness who provides testimony in a capital murder trial was apprehensive about doing so did not so prejudice Mack that counsel's failure to object to that testimony "essentially default[ed] the case to the state."  *Lundgren*, 440 F.3d at 774.

*Reasonable-doubt jury instruction*.  Mack further argues, in just a partial sentence, that his attorneys should have objected to the trial court's jury instruction on the statutory definition of proof beyond a reasonable doubt.  (Doc. 155 at 165.)  The last court to address it was the state appellate court on direct review.  After setting forth the *Strickland* standard for ineffective assistance of counsel, it concluded:

> Appellant has failed to establish a substantial violation of any of defense counsel's essential duties to his client by failing to object to the court's reasonable doubt instruction. As we stated in our disposition of appellant's fourteenth assignment of error, the trial court's definition of "proof beyond a reasonable doubt" has been upheld in *State v. Jenkins*, 15 Ohio St.3d 164. Accordingly, appellant's sixteenth assignment of error is overruled.

*Mack*, 1993 WL 497052, at *24.

Mack advances no argument as to why the state court's decision was unreasonable. Regardless, as this court has previously found no merit in Mack's challenge of the trial court's reasonable-doubt instruction, Mack cannot establish that he was prejudiced by his counsel's failure to object to it, and the claim fails.  *See Henness v. Bagley*, 644 F.3d 308, 319 (6th Cir. 2011) (finding that because petitioner had not demonstrated that his Fourth

214

Amendment claim had merit, his underlying ineffective-assistance-of-trial-counsel claim

fails, along with the ineffective-assistance-of-appellate-counsel claim).

*Verdict-as-recommendation.*  Lastly, Mack claims his trial counsel were ineffective

in  failing to object to the trial court's jury instruction regarding the fact that the death

sentence verdict was a non-binding recommendation.  (Doc. 155 at 165.)  Again, because

this court has found no error in this jury instruction, no prejudice could result from trial

counsel's failure to object to it.  The claim is meritless.

### 4.        Waiver of presence at jury view

For this sub-claim, Mack contends that his trial counsel improperly waived his right

to be present at a jury view of the crime scene.  (Doc. 155 at 165-66.)  He asserts they failed

to obtain his consent or make a record of the visitation.  (*Id*.)  Mack did not raise this claim

in state court, so this court reviews it *de novo*.

The Constitution guarantees a criminal defendant the right to be present at trial.

*United States v. Gagnon*, 470 U.S. 522, 526 (1985).  But this right is not absolute.  It exists

only "at [a] stage of the criminal proceeding that is critical to its outcome" and "if [the

defendant's] presence would contribute to the fairness of the procedure."  *Kentucky v.*

*Stincer*, 482 U.S. 730, 745 (1987).  It is not protected "when presence would be useless, or

the benefit but a shadow."  *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934) (overruled

in part on other grounds).

In *Snyder v. Massachusetts, supra,* the Court held that the denial of a defendant's

presence at a jury view did not violate due process where the defendant's attorney was

present and participated, along with the prosecutor, in directing the jury's attention to

215

various aspects of the location.  *Id.* at 107-08.  The Court explained that "the presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."  *Id*.  And a defendant's presence at a jury view is not among those constitutional rights "conferred so explicitly as to leave no room for an inquiry whether prejudice to a defendant has been wrought through their denial."  *Id*. at 116.  In that case, the Court found no prejudice, noting that the presence of counsel at the jury view "supplie[d] an additional assurance that nothing helpful to either side [would] be overlooked upon the view."  *Id*. at 113.

Here, Mack argues that "[i]t is clear that [he] never waived his right to be present" at the jury view.  (Doc. 155 at 166.)  Mack produces no evidence, however, that counsel failed to advise him of his right to be present or that the waiver was not voluntary.  Mack further complains that counsel failed to make a record of the jury view, so it is unknown whether the view was conducted properly, his counsel attended, or his presence would have been useful to his defense.  (*Id*.)  The record shows only that the trial judge asked counsel for both parties to submit a list of anything they wanted the bailiff to point out to the jury, and that there were some "matters concerning the jury view" that defense counsel had raised and were resolved.  (Doc. 150-2 (Trial Tr.) at 39.)  The record, therefore, also does not indicate that anything improper occurred during the jury view or that Mack could have benefitted from being there such that his absence prejudiced him.  Mack offers only conjecture, and this claim, too, fails.

### 5. Carole Mancino failed to act as counsel

216

Mack also faults one of his trial attorneys, Carole Mancino, for failing "to act as counsel."  (Doc. 155 at 166-67.)  He complains that Carole Mancino acted "principally" as the investigator on the case, as the trial court denied Mack's request for an independent investigator, and was defense counsel "in name only" because she did not take an active role in argument or examining witnesses during the trial.  (*Id*.)  This claim is meritless.  As Respondent argues, there is no Sixth Amendment or any other constitutional right to more than one attorney, or requirement that counsel perform any particular function at trial, and it is commonplace for lead trial counsel to engage other attorneys during the course of a criminal case, who may assist in any number of ways.  (Doc. 158 at 93-94.)  And it is apparent from the record that Carole Mancino provided valuable legal and investigative services to Mack.

> ### 6.     Laying a proper foundation to impeach Willis and ensure Carole Mancino testified

Mack further argues that his trial counsel were ineffective in failing to lay a proper foundation to impeach Willis and to take all appropriate steps to remove impediments to Carole Mancino being permitted to testify about her conversation with Willis.  (Doc. 155 at 167.)  He claims she should have withdrawn as counsel or "otherwise advis[ed] the court long before trial of the issue posed by her dual role as defense counsel and investigator."  (*Id*.)  It is entirely speculative, however, that the actions Mack asserts Carole Mancino should have taken would have altered the course of the trial.  Mack cannot show prejudice, therefore, and this claim is meritless.

> ### 7.     Obtaining an independent ballistics test

Mack also faults his counsel for not obtaining an independent ballistics test on the murder weapon and bullets. (Doc. 155 at 168.) The state appellate court on initial post-conviction review was the last state court to review the claim and decided:

> Defendant's assertion that he was denied the effective assistance of counsel when his trial attorneys did not obtain an independent ballistics test on the bullets and gun at issue is not supported by the record. The gun, a nine millimeter handgun that was confiscated from defendant, and a pellet and three nine millimeter shell casings involved in the victim's murder, were tested by Thomas Lucey, a firearms expert and examiner in the Cleveland Police Department Forensic Lab. *State v. Mack* (Dec. 2, 1993), Cuyahoga App. No. 62366, unreported at 7, 8. (*Mack I*). The defense did not employ an independent examiner.
>
> In *Mack I*, this Court stated:
>
>> [Det.] Lucy [sic] testified that ballistics tests performed on the semi-jacketed bullet recovered from the victim's inner clothing revealed that the handgun recovered from [defendant] at the time of his arrest fired the bullet. He further testified that the gun found on [defendant] fired the three spent shell casings that were recovered on the street at the murder scene. Lucey indicated that he was unable to analyze the other morgue pellet which was submitted because it lacked an adequate copper jacket. Lucey also testified that the gun confiscated from Reginald Germany fired the spent shell casing that was recovered on the sidewalk at the murder scene and the fragment of the copper jacket recovered from the driver's side floor of the victim's vehicle.
>
> *Id*. at 8-9.
>
> Based on the above, the ballistic tests revealed that the gun confiscated from defendant fired the pellet jacket recovered from inside the victim's shirt. The same gun fired three of the four casings found at the murder scene. Defendant offers nothing more than pure conjecture of what an independent ballistics report might show. Since an independent test was never conducted, we have no evidence that defendant was prejudiced by counsel's failure to obtain the test. Furthermore, the decision to obtain, or not to obtain, an independent ballistics test is a matter of trial strategy. See *State v. Miller* (July 19, 1975), Lucas App. No. L-84-235, unreported at 5. As the Miller court correctly noted, the decision of trial counsel not to pursue ballistics tests * * * did not constitute a violation

218

of defendant's Sixth Amendment rights. *Id*. The decision is aptly within the broad brush strokes of overall trial strategy * * *. *Id*.

*Mack*, 2000 WL 1594117, at *3–4.

Mack does not address the state court's decision.  He argues that Detective Lucey's testimony about some of the bullets being semi-jacketed hollow points was not clear as to whether the pellets found at the scene and/or on the victim's body were hollow point or not, since hollow point bullets are known to "mushroom" on impact and that was not evident in the morgue bullets.  (Doc. 155 at 168.)  An independent expert, he contends, could have "explored this and other issues and discrepancies in the State's ballistics evidence.  (*Id*.) The state court reasonably concluded, however, that the decision to obtain, or not to obtain, testing of evidence, such as an independent ballistics test, is a matter of trial strategy. *Strickland*, 466 U.S. 689.  Moreover, Mack offers only speculation as to what such testing might have shown, so he cannot demonstrate that he was prejudiced by counsel's failure to obtain the testing.  This claim, therefore, is unavailing.

### 8.     Reasonable investigation into State's case

Mack argues that counsel were ineffective in failing to conduct a reasonable investigation into the State's case.  (Doc. 155 at 168-70.)  Specifically, he asserts his attorneys should have: (a) obtained statements from State witnesses Willis and Lekas; (b) discovered that the Fairfax Recreation Center was closed the day of the murder; and (c) presented five witnesses at trial:  Mike Carrington, Gerald Kates, William Payne, Bernice Alford (Mack's mother), and John Mack (Mack's uncle).  (*Id*.)  Mack raised only sub-claim (c) in state court, in his first state post-conviction petition.

219

The state appellate court, in rejecting Mack's claim sub-claim (c), as listed above, reasoned:

> Defendant also asserts the ineffective assistance of counsel when his trial counsel did not call as witnesses five individuals, i.e., Mike Carrington, Gerald Kates, William Payne and defendant's mother and uncle. Defendant does not aver that trial counsel failed to find or interview most of these witnesses, but instead contends that they should have been called to testify at trial. This claim is also without merit.
>
> Decisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics. *State v. Coulter* (1992), 75 Ohio App.3d 219,230. The mere failure to subpoena witnesses for trial is not a substantial violation of defense counsel's essential duty absent a showing of prejudice. *Id* at 230; *State v. Hunt* (1984), 20 Ohio App.3d 310,312; *State v. Mitts* (September 28, 2000), Cuyahoga App. No. 76963, unreported.
>
> In this case, defendant has not demonstrated prejudice. A review of the affidavits does not reveal that counsel was deficient in choosing not to call them and, had they been called, the outcome of the trial would have been different. In fact, the affidavits indicate that if the witnesses had been called, they would have only added confusion and implausibility to the defense strategy.
>
> First, Mike Carrington could very well have seen defendant at 6:30 p.m. the day of the murder driving a Lincoln Continental. Testimony at trial revealed the murder occurred sometime between 5:45 p.m. and 6:10 p.m. Carrington also stated that defendant purchased the gun the day after the murder from Willis. This actually contradicted defendant's own version where he stated he bought the gun a few days prior to the murder, first from an unknown person and then from a man named Dee. Carrington's testimony would have discredited defendant's version. His affidavit states that he met with trial counsel and told them of this information. It is entirely fair to state that it was a matter of trial strategy not to put Carrington on the stand.
>
> Second, Gerald Kates' affidavit reveals that the center from which Willis allegedly walked his daughter home the day of the murder was actually closed. The information that the center was closed was available at trial and could have been raised without resort to evidence outside the original record. Hence, this affidavit is barred by the doctrine of res judicata. See *Cole, supra*.
>
> Third, trial counsel interviewed defendant's mother, Bernice Alford, and chose not to call her as well. Her affidavit details that she carved defendant's initials

on the gun but the gun introduced at trial did not have the initials on it. She also averred that the police, during a search of defendant's room, planted evidence. Again, the implausibility of this explanation counseled against calling defendant's mother as a matter of trial strategy. Trial counsel was in the best position to determine the veracity of the witnesses who would actually help, not hurt, the defense.

Fourth, William Payne's affidavit states that he phoned defendant at about 5:00 p.m. on the day of the murder and then again a short time later. While this may have been true, the murder occurred after 5:00 p.m., but before 6:10 p.m. Again, this would not have helped the defense.

Finally, John Mack, defendant's uncle, essentially corroborated Bernice Alford's statement that during jail visits with co-defendant Germany, Germany stated defendant was not involved. This is hearsay, going to the truth of the matter asserted, and would not have been admissible at trial.

Assignment of Error I is overruled.

*Mack*, 2000 WL 1594117, at *4–5.

Again, Mack does not discuss the state court's decision.  He instead presents the same arguments here that he raised in state courts.  (Doc. 155 at 168-69.)  As the court reasonably concluded, the affidavits Mack submitted with his petition demonstrated that if the witnesses had testified, "they would have only added confusion and implausibility to the defense strategy." *Mack*, 2000 WL 1594117, at *4.  Defense counsel interviewed Carrington and Mack's mother, both of whom had a close relationship with Mack, and reasonably decided their testimony would not have assisted the defense; Payne's testimony would not have supported Mack's alibi as Mack alleged; Kates would have offered information that was available at trial, rendering his affidavit barred by *res judicata*; and the testimony of Curtis Mack, who also was close to Mack, would have been inadmissible hearsay.  The state court's decision on this claim, therefore, did not contravene or misapply *Strickland* or other Supreme Court precedent.

221

Sub-claims (a) and (b), as listed above, are similarly unavailing. As this court noted in relation to Mack's *Brady* claims, Willis' written statement was disclosed to defense counsel, most likely before trial and then again during it, and the information from the initial police reports concerning Willis either was disclosed to defense counsel or was not favorable to Mack's defense. Moreover, Carole Mancino's attempt to interview an uncooperative Willis and then to testify about what he said to her were documented in the trial transcript. (*See* Doc. 150-4 (Trial Tr.) at 121-29 (proffer of Carole Mancino's testimony regarding Willis interview).)

As to Mack's claim that counsel should have obtained Lekas' statement, Mack provides no argument at all as to why his counsel were deficient for failing to obtain this statement or how he was prejudiced by the failure. This court determined in connection with Mack's *Brady* claim that it is likely the prosecutor disclosed information contained in the police reports to defense counsel, which included Lekas' initial statement to police. (*See* Doc. 154-9 at 41-42 (Police Report).)

Finally, although the fact that the recreation center was closed on the day of the murder, contradicting Willis' story about events that night, and it would have been relevant impeachment evidence, Mack has not demonstrated that if counsel had discovered that fact, it would have undermined Willis' testimony such that the result of his trial would have been different. This claim, therefore, lacks merit.

### 9. Performance at mitigation phase of trial

Finally, Mack complains that his trial counsel failed to investigate mitigation evidence, to develop and present a coherent mitigation strategy, and to present "significant"

222

available mitigation evidence at the sentencing phase of trial, including evidence concerning Mack's background, social history, and mental health.  (Doc. 155 at 170-83.) As Mack did not present this claim to state courts, this court reviews the claim *de novo*.

The Supreme Court repeatedly has held that counsel in a capital case have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Williams v. Taylor*, 529 U.S. 362, 396 (2000).  In *Strickland*, the Supreme Court noted that a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" that counsel's role in the two proceedings is comparable:  "to ensure that the adversarial testing process works to produce a just result under the standards governing decision."  *Strickland*, 466 U.S. at 686.

Accordingly, the Supreme Court and Sixth Circuit have found ineffective assistance of counsel in capital cases where trial counsel failed to investigate or present mitigating evidence at sentencing.  *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (Defense counsel presented only "one significant mitigating factor-that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); *Rompilla v. Beard*, 545 U.S. 374, 389-93 (2005) (counsel ineffective where he failed to examine court file of defendant's prior conviction which contained a range of vital mitigation leads regarding defendant's childhood and mental health problems); *Frazier v. Huffman*, 343 F.3d 780, 795-99 (6th Cir. 2003) (counsel ineffective where he failed to introduce any mitigating evidence in either guilt or penalty phases of trial and he was aware of petitioner's brain injury).

223

Nevertheless, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383; *see also Wiggins*, 539 U.S. at 525 (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"); *Burger v. Kemp*, 483 U.S. 776, 793-94 (1987) (finding limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information).  "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  And counsel is not ineffective for deciding to offer little or no mitigating evidence where that decision is based on sound professional judgment.  *See*, *e.g., Bell v. Cone*, 535 U.S. 685, 699-702 (2002)*; Strickland*, 466 U.S. at 699-700; *Burger*, 483 U.S. at 793-95; *Darden v. Wainwright*, 477 U.S. 168, 184-87 (1986).  As the Supreme Court has explained,

> [T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. . . .  This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained.  It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

*Bobby v. Van Hook*, 558 U.S. 4, 11-12 (2009) (internal citations omitted).

224

The Ohio court of appeals, in reviewing Mack's reopening application, provided this summary of the defense's presentation during the sentencing phase of trial:

> During the mitigation phase, Mr. Mack gave an unsworn statement in which he pleaded his innocence and for his life and stated his belief that the State's chief witness framed him to cover up the witness's murdering Mr. Sanelli. Mr. Mack's uncle, mother and grandmother testified that he had a hard childhood, but was a good person. Their testimony reflected their belief that Mr. Mack was innocent, and counsel's closing argument included an attack that the chief witness was a liar.

*Mack*, 2003 WL 21185786, at *8.

Mack contends that his trial counsel should have known from even a "superficial exploration" of his background that they needed additional mitigation evidence and expert assistance. (Doc. 155 at 175.) He stresses the family's history of alcoholism, domestic violence, and poverty, including Mack's mother shooting his stepfather in Mack's presence, the stepfather being accused of, and prosecuted for, raping Mack's 13-year-old cousin, and the mother's youth and inability to raise her son. (*Id*. at 175-76.) And Mack emphasizes the importance of expert testimony regarding hiss medical, family, and social history, submitting an affidavit and report from clinical psychologist Robert Smith as support. (*Id.* at 174-76 (citing Doc. 154-9 at 447-62 (Smith Aff.).)

Mancino testified at the federal evidentiary hearing, however, that Mack displayed no sign of any mental illness while he represented him, and the use of experts for mitigation purposes in capital cases was just developing at that time; he could not recall if mitigation specialists were even available then. (Doc. 100 (FEH Tr.) at 177-78, 182-83.) Mancino explained that they were "trying to present a human person to the jury, and the best people who knew about him were people who – in this case, his family was very cooperative." (*Id.*

225

at 179.)  "[M]ost of the mitigation that I knew in those days," he added, "all they do is I was

told this and that by the family.  If you got it from the family, it would be more

compelling."  (*Id*. at 181.)  The Supreme Court has endorsed this very mitigation strategy,

noting in one case that testimony of lay witnesses such as family members describing a

defendant's "terrible" childhood was

> neither complex nor technical. It required only that the jury make logical
> connections of the kind a layperson is well equipped to make. The jury simply
> did not need expert testimony to understand the "humanizing" evidence; it
> could use its common sense or own sense of mercy.

*Wong v. Belmontes*, 558 U.S. 15, 24 (2009).

Moreover, "expert testimony discussing [Mack's] mental state, seeking to explain

his behavior, or putting it in some favorable context [may] have exposed [Mack] to

[damaging] evidence."  *Id.* at 25 (rejecting petitioner's "'more-evidence-is-better' approach

to mitigation" where it would have opened door to evidence of past murders); *see also*

*Strickland*, 466 U.S. at 699 ("Restricting testimony on respondent's character to what had

come in at the plea colloquy ensured that contrary character and psychological evidence and

respondent's criminal history, which counsel had successfully moved to exclude, would not

come in.").  Mancino testified that he considered this risk in choosing his mitigation

strategy:  "[T]he one risk in this case that I saw, he just got out on shock probation from

another offense, and I didn't really want to open that up."  (Doc. 154-1 at 97 (Mancino

Depo.).)

Finally, many of Smith's findings report what Mack's mother and uncle testified to

at trial:  Mack's mother's alcoholism, his stepfather's abuse, and their poverty.  (Doc. 154-9

at 457-62.)  And other than the "negative effects of significant early childhood trauma,"

Smith diagnosed Mack only with the chronic depressive disorder, dysthymia.  (*Id*. at 457.)

"'[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.'"  *Eley v. Bagley*, 604 F.3d 958, 968 (6th Cir. 2010) (quoting *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007))

Mack, therefore, has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689.  His trial counsel did not perform deficiently by failing to uncover more mitigating evidence or retaining experts.  Nor has Mack shown "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.

Accordingly, Mack's fourth, seventeenth, and eighteenth grounds for relief are meritless.

## XII.     Nineteenth Ground for Relief:  *Ineffective Assistance of Appellate Counsel*

Mack claims for his nineteenth ground for relief that his appellate counsel provided constitutionally ineffective assistance.  (Doc. 155 at 189-93.)  He lists forty separate claims that appellate counsel should have raised on direct appeal but did not.  (*Id*. at 190-92.)  Mack does not, however, provide any argument regarding the claims' procedural status or merits.

"'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'"  *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).  This

court, therefore, declines to review these claims.  *See, e.g., United States v. Crosgrove,* 637

F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these

claims, the panel declines to address [the defendant's] general assertions of misconduct in

witness questioning and closing statements.").[27]

### XIII.    Twentieth and Twenty-Eighth Grounds for Relief:  *Insufficiency of the Evidence*

Mack asserts for his twentieth ground for relief that his conviction under Ohio's

felony-murder specification violated his due process rights because there was insufficient

evidence that he was the principal offender.  (Doc. 155 at 193-94.)  He further claims in his

twenty-eighth ground for relief, which he states "incorporates" his twentieth ground, that

his convictions and sentence violated his due process rights because they were based

"almost entirely, if not entirely, on the uncorroborated testimony of [State witness Timothy]

Willis."  (*Id*. at 231-32.)

### A.    Procedural Posture

Mack presented his twentieth ground on direct appeal to the Ohio Supreme Court,

which summarily denied it on the merits.  *Mack*, 73 Ohio St. 3d at 507, 519.  That claim is

therefore preserved for federal habeas review.

Respondent argues, however, that Mack did not present his twenty-eighth ground to

state courts, and that claim is therefore procedurally defaulted.  (Doc. 158 at 111.)  Mack

responds that this claim is substantially similar to his sufficiency-of-the-evidence claim

---

[27] Because the court finds Mack waived his appellate-counsel ineffective-assistance claims, he cannot establish cause for the procedural default of other claims based on the ineffective assistance of appellate counsel.

228

asserted in his twentieth ground, and is therefore also ripe for habeas review.  (Doc. 162 at

281.)  The court agrees.  The substance of the claim he presents here in his twenty-eighth

ground was presented to the state courts.  *See Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir.

2008) ( "To present a claim fairly, it is sufficient if the substance of the claim was presented

to the state courts, such that the ultimate question would have been the same despite

variations in the legal theory or factual allegations urged in its support.").

> **B.    Merits Analysis**

The last state court to address Mack's insufficiency-of-the-evidence claim, the state

court of appeals on direct appeal, opined:

> Appellant argues that the state presented insufficient evidence to sustain his
> conviction for the felony murder specification. Specifically, appellant contends
> there was insufficient evidence to establish that he was a principal offender in
> the Peter Sanelli murder. We disagree.
>
> In reviewing a challenge to the legal sufficiency of the evidence "the relevant
> question is whether, after viewing the evidence in a light most favorable to the
> prosecution, any rational trier of fact could have found the essential elements
> of the crime beyond a reasonable doubt." *Jackson v. Virginia* (1979), 443 U.S.
> 307, 319; *State v. Davis* (1988), 38 Ohio St.3d 361, 365. Appellant was
> convicted of the following capital specification contained in R.C. 2929.04
> which provides in relevant part:
>
> "(A) Imposition of the death penalty for aggravated murder is precluded, unless
> one or more of the following is specified in the indictment or count in the
> indictment pursuant to section 2941.14 of the Revised Code and proved beyond
> a reasonable doubt:
>
> "(7) The offense was committed while the offender was committing, attempting
> to commit, or fleeing immediately after committing or attempting to commit
> kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary,
> and either the offender was the principal offender in the commission of the
> aggravated murder or, if not the principal offender, committed the aggravated
> murder with prior calculation and design."

The evidence presented at trial established that Peter Sanelli was shot while seated in the driver's seat of his car. The evidence also demonstrated that the front driver's side window and the back passenger window were shattered and missing following the robbery. Additionally, ballistic tests revealed that the gun confiscated from Clarence Mack fired three of the four spent nine millimeter shell casings recovered from the murder scene. The ballistic tests also revealed that the gun confiscated from Clarence Mack two days after the murder fired the copper jacketed pellet which was removed from the right shoulder area of the murder victim's inner clothing. The autopsy of Peter Sanelli revealed that he sustained three gunshot wounds to the upper left side of his body. The coroner testified that the bullet which exited the victim's right shoulder area caused the most significant internal damage by perforating the victim's lung and the sack which surrounds the heart. It is thus apparent that the bullet recovered from the murder victim's inner clothing caused the most significant internal damage and was fired by the gun confiscated from Mack.

Moreover, the coroner's testimony also established that the other gunshot wound to the victim's left shoulder was simply a flesh wound and the gunshot wound to the left side of the victim's face only struck the victim's left and right jaw and larynx. Significantly, there is no indication that the bullet which caused the facial wound impacted or damaged the victim's brain or any other vital body parts.

In reviewing the evidence and testimony presented and the inferences drawn therefrom in a light most favorable to the prosecution, we find that there was sufficient evidence for a rational trier of fact to conclude that the appellant was the principal offender in the aggravated murder of Peter Sanelli. The evidence established that the nine millimeter gun confiscated from Mack fired the bullet which caused the most significant internal damage. Accordingly, appellant's twelfth assignment of error is overruled.

*Mack*, 1993 WL 497052, at *18-19.

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). When reviewing a claim of insufficient evidence, habeas courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). "[T]he *Jackson* inquiry does

230

not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).

Because both *Jackson* and AEDPA apply to Mack's insufficiency claims, federal habeas review requires deference at two levels. "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).  The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010).  The circuit court further has observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'"  *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Mack has not met this burden.  He argues that the state court's decision was contrary to, or an unreasonable application of, *Jackson*, "and/or" was based on an unreasonable determination of the facts in light of the evidence presented.  (Doc. 162 at 264.)  But Mack does not contest any of the court's specific factual findings.  And he has not demonstrated that the state court's decision was unreasonable.

Mack asserts that his convictions and sentence were impermissibly based "exclusively on Willis' uncorroborated testimony."  (*Id*. at 260-63.)  As this court found with regard to Mack's *Brady* claim, however, not only was the State's case founded on more than Willis' testimony – most notably, the conclusive forensic evidence that, as the state court aptly summarized, linked Mack to the crime.  But Willis' testimony was in fact corroborated by other evidence adduced at trial on numerous key points.

Willis' key testimony was in identifying Sowell and Mack as the shooters.  (Doc. 150-3 (Trial Tr.) at 75-76.)  He testified that Germany offered Sowell his gun to go downtown to get a "hotty," and he saw Sowell carrying a nine millimeter gun after the murder.  (*Id*. at 66-68, 76.)  The forensic evidence adduced at trial showed that the guns Mack and Germany had in their possession when they were arrested, both nine millimeter guns, fired the bullets recovered from Mr. Sanelli's clothing and the crime scene.  (*See, e.g.*, Doc. 150-2 (Trial Tr.) at 264-65 (Horval Test.); Doc. 150-3 (Trial Tr.) at 21-26 (Lucey Test.).)  Willis testified that, after the time of the murder, he saw Sowell and Mack driving a small, silver, "little mini station wagon" with the driver's and rear passenger's windows broken out and red license plates.  (Doc. 150-3 (Trial Tr.) at 71-72.)  Detective Allen testified that Mr. Sanelli's abandoned, damaged car was a light blue small car (a Horizon) with the driver's and rear passenger's windows broken out and red licence plates.  (Doc. 150-2 (Trial Tr.) at 210-11.)  Willis testified that when he saw Sowell and Mack shortly after the murder occurred, Sowell was wearing a black Bulls starter jacket.  (Doc. 150-3 (Trial Tr.) at 73.)  The State presented evidence that when Sowell was arrested, he was wearing a black Bulls starter jacket with a nail in the pocket that matched nails found in

Mr. Sanelli's car when it was recovered.  (Doc. 150-2 (Trial Tr.) at 295-97 (Bornfeld

Test.).)  In addition, Willis said Sowell was handling a pair of binoculars in a pouch.  (Doc.

150-3 (Trial Tr.) at 76.)  Tony Sanelli testified that his father always kept a pair of

binoculars in his car.  (Doc. 150-2 (Trial Tr.) at 167.)  Finally, Willis testified that Mack

told him Sowell crashed Mr. Sanelli's car into a pole.  (Doc. 150-3 (Trial Tr.) at 79.)

Detective Allen testified that Mr. Sanelli's car was discovered abandoned and damaged

from apparently crashing into a nearby pole.  (Doc. 150-2 (Trial Tr.) at 210-11.)

Mack further argues that there was insufficient evidence to support the jury's

finding that he was the "principal offender" and therefore eligible for the death penalty

under Ohio law.  (Doc. 155 at 194.)  As this court explained above in relation to Mack's

ineffective-assistance claim based on counsel's failure to mount a defense that Mack was

not the principal offender, the evidence established at trial that there were two perpetrators

who both shot through Mr. Sanelli's car windows, but it was Mack who was found with the

gun that actually fired the fatal bullets.  A rational jury, therefore, could have found that

Mack was the actual shooter and "principal offender."

Based on the State's forensic evidence and Willis' corroborated testimony,

therefore, the state appellate court reasonably concluded that "*any* rational trier of fact

could have found the essential elements of [felony murder] beyond a reasonable doubt."

*Jackson,* 443 U.S. at 319 (emphasis in original).  The state court's decision neither

contravened nor misapplied *Jackson*.

### XIV.    Twenty-First Ground for Relief:  *Ohio Death Penalty Specification*

233

For his twenty-first ground for relief, Mack asserts that the statutory death penalty specification under which he was sentenced, Ohio Rev. Code § 2929.04(7), violated his rights to due process and equal protection.  (Doc. 155 at 195.)  That provision applies to the commission of a felony murder where "either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."  Ohio Rev. Code § 2929.04(7).  Mack contends the statute imposes a higher degree of proof for aiders and abettors (prior calculation and design) than principal offenders, and because he was sentenced as a principal offender, he was "subject to the death penalty with a less culpable mental state than an aider and abettor, who must have acted with prior calculation and design." ( Doc. 155 at 195.)  Mack presented this claim to the Ohio Supreme Court, which summarily denied relief.  *Mack*, 73 Ohio St. 3d at 507, 519.

As Respondent argues, however, Mack does not cite any Supreme Court precedent supporting his argument, and indeed there is none.  (Doc. 158 at 105.)  The state court's decision rejecting this claim, therefore, neither contravened nor misapplied clearly established federal law under § 2254(d)(1).  28 U.S.C. § 2254(d)(1); *see also Wright v. Van Patten*, 552 U.S. 120, 125 (2008).  This claim fails.

### XV.        Twenty-Second and Twenty-Fifth Grounds for Relief:  *Proportionality*

For Mack's twenty-second and twenty-fifth grounds for relief, he challenges the Ohio courts' review of his case to determine if his sentence was excessive or disproportionate to the penalty imposed in other cases.  (Doc. 155 at 196-97; 211-12.)  He contends that the Ohio court did not "meaningfully review" the proportionality of his death

sentence, and his sentence was "unfairly disproportionate" when compared to similar cases, including those of his co-defendants.  (*Id*. at 197, 212.)  He presented these claims to the Ohio Supreme Court on direct appeal, which denied them summarily.  *Mack*, 73 Ohio St. 3d at 507, 519.

The Supreme Court has held that comparative review by an appellate court is not constitutionally required.  *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984) ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); *see also Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003) ("The Supreme Court has held that the Constitution does require proportionality review, but that it only requires proportionality between the punishment and the crime, not between the punishment in this case and that exacted in other cases.") (citing *Harris*, 465 U.S. at 50).  And the Sixth Circuit repeatedly has upheld Ohio's proportionality review system as constitutional.  *See, e.g.*, *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854 (6th Cir. 2017) (collecting cases); *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001) ("By limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed.").

In the absence of controlling Supreme Court precedent, Mack cannot demonstrate that the Ohio Supreme Court's decision rejecting these claims contravened or misapplied clearly established federal law, and this claim fails.

**XVI.     Twenty-Third Ground for Relief:  *Ohio's Post-Conviction Relief Statute***

235

Mack contends in his twenty-third ground for relief that Ohio's post-conviction relief scheme is unconstitutional. (Doc. 155 at 197-211.) This claim, however, is not cognizable on federal habeas review. *See, e.g., Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) ("[E]rrors in post-conviction proceedings are outside the scope of federal habeas corpus review."); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854-55 (6th Cir. 2017) (declining to revisit issue). As the Sixth Circuit has explained, "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)). Challenges to state post-conviction proceedings "address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." *Id.* at 247. A due process claim related to collateral post-conviction proceedings, therefore, even if resolved in a petitioner's favor, would not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention[,]" and cannot be brought in federal habeas proceedings. *Id*. at 247. Mack's twenty-third ground for relief is denied.

## XVII.   Twenty-Fourth Ground for Relief: *Weighing of Mitigating and Aggravating Factors*

Mack asserts in his twenty-fourth ground for relief that his death sentence is "unreliable, inappropriate, and unconstitutional," because there is residual doubt as to whether he is guilty of aggravated murder with an aggravating circumstance when "the only evidence against him was the dubious testimony of Timothy Willis." (Doc. 155 at 211.) Therefore, he contends, the mitigating factors outweigh the "sole questionable aggravating

236

circumstance." (*Id.*)  As Respondent argues, however, Mack cites to no law supporting a habeas court's authority to conduct an independent evaluation of the appropriateness of a state-court death sentence.  (Doc. 158 at 108.)  This claim does not present a cognizable ground for habeas corpus relief and is denied.

## XVIII.  Twenty-Sixth Ground for Relief:  *Constitutionality of Ohio's Statutory Death Penalty Scheme*

For his twenty-sixth ground for relief, Mack attacks Ohio's statutory death penalty scheme as unconstitutional on numerous grounds.  (Doc. 155 at 213-29.)  He asserted  this claim on direct appeal to the Ohio Supreme Court, which denied it summarily.  *Mack*, 73 Ohio St. 3d at 507, 522.  As Mack concedes, the Sixth Circuit repeatedly has upheld the constitutionality of Ohio's death penalty scheme, rejecting the very claims Mack asserts here.  *See, e.g., Beuke v. Houk*, 537 F.3d 618, 652-53 (6th Cir. 2008) ("Beuke next challenges the constitutionality of Ohio's death penalty scheme.  His arguments are entirely meritless and have been rejected by this court on numerous occasions. We therefore will afford them minimal attention."); *Cooey v. Coyle,* 289 F.3d 882, 922-28 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 367-76 (6th Cir. 2001).  This claim, therefore, fails.

## XIX.     Twenty-Seventh Ground for Relief:  *Cumulative Error*

Mack claims that the Ohio courts' cumulative errors violated his constitutional rights.  (Doc. 155 at 229-31.)  He presented this claim to the Ohio Supreme Court on direct appeal, which denied it summarily.  *Mack*, 73 Ohio St. 3d at 507, 520.  The Sixth Circuit repeatedly has held that a claim of cumulative trial error is not cognizable on federal habeas review.  *See, e.g., Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of

237

this Circuit is that cumulative error claims are not cognizable on habeas because the

Supreme Court has not spoken on this issue.").  This ground for relief, therefore, is denied.

**XX.**     **Twenty-Ninth Ground for Relief:**  *Actual Innocence*

Mack claims for his twenty-ninth ground for relief that he is actually innocent of the

crimes for which he was convicted and of the death penalty.  (Doc. 155 at 232.)  He asserts

this claim both as a substantive, freestanding claim and as a blanket procedural ground to

excuse any procedural default of his other claims.  (Doc. 162 at 282.)

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court held that "a claim of

'actual innocence' is not itself a constitutional claim, but instead a gateway through which a

habeas petitioner must pass to have his otherwise barred constitutional claim considered on

the merits."  *Id.* at 404.  The Court stated in *dicta*, however, that "in a capital case a truly

persuasive demonstration of 'actual innocence' made after trial would render the execution

of a defendant unconstitutional" regardless of whether any constitutional violation occurred

during trial.  *Id*. at 417.  But the Court emphasized that "the threshold showing for such an

assumed right would necessarily be extraordinarily high."  *Id.*; *see also House v. Bell*, 547

U.S. 518, 520 (2006).

Since *Herrera*, however, the Supreme Court has never applied a freestanding actual

innocence claim.  *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (declining to resolve

whether a freestanding actual innocence claim is cognizable on federal habeas review).

And the Sixth Circuit has held that such a claim is not a valid ground for habeas relief.  *See,*

*e.g., Smith v. Nagy*, 962 F.3d 162, 207 (6th Cir. 2020); *Cress v. Palmer*, 484 F.3d 844,

238

854-55 (6th Cir. 2007).  To the extent Mack asserts a freestanding claim of actual

innocence, therefore, that claim fails.

The "narrow exception" of actual innocence to the cause-and-prejudice requirement

for excusing the procedural default of a habeas claim applies only where a constitutional

violation has "probably resulted" in the conviction of one who is "actually innocent" of the

substantive offense.  *Dretke v. Haley*, 541 U.S. 386, 392 (2004).  To demonstrate "actual

innocence," a petitioner must show "'by clear and convincing evidence that, but for

constitutional error, no reasonable juror would have found the petitioner eligible under the

death penalty under the applicable state law.'"  *Id*. (quoting *Sawyer v. Whitley*, 505 U.S.

333, 336 (1992)).  The claim requires a showing of "new reliable evidence" and factual

innocence, not mere legal insufficiency.  *See Schulp v. Delo*, 513 U.S. 298, 324 (1995);

*Bousley v. United States*, 523 U.S. 614, 623 (1998).

Mack cannot meet this standard for reasons set forth in the court's discussion of

grounds five and twenty.  Most significantly, the State presented conclusive forensic

evidence linking the gun found in Mack's possession when he was arrested to a "morgue

bullet" recovered from Mr. Sanelli's clothing.

Accordingly, Mack is not entitled to relief on his twenty-ninth ground for relief.

### CERTIFICATE OF APPEALABILITY ANALYSIS

The court must now determine whether to grant a Certificate of Appealability

("COA") for any of Mack's claims for relief.  The Sixth Circuit has held that neither a

blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a

capital habeas case as it "undermine[s] the gate keeping function of certificates of

appealability, which ideally should separate the constitutional claims that merit the close

attention of counsel and this court from those claims that have little or no viability."

*Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d

466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's

analysis of claims).

      Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C.

§ 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-

AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.

The sole difference between the pre- and post-AEDPA statutes is that the petitioner must

now demonstrate he was denied a *constitutional*, rather than federal, right.  *Slack v.*

*McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision

between the pre- and post-AEDPA versions of that statute).

      Furthermore, if a habeas claim is not procedurally defaulted, then the court need

only determine whether reasonable jurists would find the district court's decision

"debatable or wrong."  *Id*. at 484.  A more complicated analysis is required, however, when

assessing whether to grant a COA for a claim the district court has determined is

procedurally defaulted.  In those instances, a COA should only issue if "jurists of reason

would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the court finds as follows:

The court will not issue a COA for grounds for relief:  3 (juror bias); 7 (right to remain silent); 15 (trial-court error), sub-claims 2, 4, 8, and 10; 16 (prosecutorial misconduct), sub-claims 3, 4, 5, 6, and 10; 17 (trial-counsel ineffective assistance / guilt phase), sub-claims 3(b), 5, 6, 7, and 8(a); 19 (appellate-counsel ineffective assistance); 20 and 28 (insufficiency of evidence); 21 (Ohio death penalty specification); 22 and 25 (proportionality); and 26 (Ohio death penalty scheme).  No jurist of reason would debate the court's conclusions on these claims.

No COA will issue for grounds for relief:  1 and 2 (juror selection); 4 (trial-counsel ineffective assistance / *voir dire*); 15 (miscellaneous trial-court errors), sub-claims 1, 3, 5, 6, 7, 9, and 11; 16 (prosecutorial misconduct), sub-claims 1, 2, 7, 8 , 9, and 11; 17 (trial-counsel ineffective assistance / guilt phase), sub-claims 2, 3(a), 3(c), 4, 8(b), and 8(c); and 18 (trial-counsel ineffective assistance / sentencing phase), because they are unequivocally procedurally defaulted.

In addition, no COA will issue for grounds for relief:  6 (search and seizure); 8 (grand jury transcripts); 10 though 12 (trial-court evidentiary rulings); 13 and 14 (jury instructions); 23 (Ohio post-conviction statute); 24 (weighing of aggravating and mitigating factors); 27 (cumulative error); and 29 (actual innocence), because they are not cognizable on federal habeas review.

The court will issue a COA for Mack's fifth ground for relief, asserting prosecutorial misconduct through the suppression of evidence, and his ninth ground for relief, regarding the trial court's exclusion of the proffered testimony of Carole Mancino and Curtis Mack. A reasonable jurist could debate the court's conclusions regarding these claims.

### CONCLUSION

For the foregoing reasons, this court denies Mack's Amended Petition for Writ of Habeas Corpus (Doc. 155).  The court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to the fifth and ninth grounds for relief, and the court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only. As to all remaining claims, the court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.


Date:  September 30, 2021          /s/ *SOLOMON OLIVER, JR.*
                                  Solomon Oliver, Jr.
                                  United States District Judge

242